**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:

BARCLAYS LIQUIDITY CROSS AND HIGH
FREQUENCY TRADING LITIGATION

*This Document Relates To City of Providence, Rhode
Island, et al.* v. *BATS Global Markets, Inc., et al.*,
1:14-cv-02811-JMF (S.D.N.Y.) (consolidated)

14-MD-2589 (JMF)

**MEMORANDUM OF LAW IN SUPPORT OF THE EXCHANGES'**
**MOTION TO DISMISS THE SECOND CONSOLIDATED AMENDED COMPLAINT**
**PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................1

BACKGROUND ...............................................................................................5

    A.    Exchanges And The Exchange Act...........................................................5

    B.    Regulation NMS ..................................................................................7

    C.    The NMS Plans ...................................................................................8

    D.    Proprietary Data Feeds And Co-Location...............................................9

        1.    Proprietary Feeds Have Been Approved By The SEC ...................9

        2.    Co-Location Services Have Been Approved By The SEC .......................10

    E.    Application Of The Exchange Act And Regulation NMS To The
        Timeliness Of Consolidated Market Data.................................................11

    F.    Order Types And Processing Of Trades .................................................13

    G.    Payment For Order Flow .....................................................................15

    H.    The Second Consolidated Amended Complaint .....................................16

ARGUMENT ...................................................................................................17

I.    The Court Lacks Subject Matter Jurisdiction Because The Exchange Act Provides
    The Exclusive Procedure For Reviewing Plaintiffs' Claims. .............................17

    A.    Plaintiffs' Claims Are Subject To Review By The SEC Under The
        Exchange Act's Comprehensive Review Process....................................18

    B.    Plaintiffs Cannot Bypass The Exchange Act's Review Process By Suing
        In Federal District Court. ....................................................................21

II.    Plaintiffs' Claims Are Barred By Absolute Immunity. ....................................24

    A.    The Exchanges Are Immune From Private Damages Suits Challenging
        Their Regulatory Activities..................................................................24

    B.    Plaintiffs' Damages Claims Attack The Exchanges' Exercise Of Their
        Regulatory Authority And Thus Are Barred By Absolute Immunity...................25

|   |   | 1. | The Exchanges' Implementation Of The National Market System Is A Core Regulatory Function Under The Exchange Act. | 26 |

|   |   | 2. | Plaintiffs' Claims Based On Complex Order Types And PFOF Programs Are Also Barred By The Exchanges' Absolute Immunity. | 29 |

|   |   | 3. | Plaintiffs Cannot Plead Around Absolute Immunity By Invoking Supposed "Profit" Motivations. | 32 |

III. | The Second Consolidated Amended Complaint Fails To State A Claim. | | | 36 |

|   | A. | Plaintiffs Fail To State A Claim Because The Conduct Attacked Has Been Approved By The SEC. | | 36 |

|   | B. | Plaintiffs Fail To State A Claim Under Section 6(b) Of The Exchange Act. | | 37 |

|   | C. | Plaintiffs Fail To State A Claim Under Section 10(b) Of The Exchange Act And The SEC's Rule 10b-5. | | 38 |

|   |   | 1. | Plaintiffs Do Not Have Standing To Assert A Claim Under Section 10(b) And Rule 10b-5. | 38 |

|   |   | 2. | Plaintiffs Fail To Plead A Claim For Market Manipulation And, At Most, Allege Inactionable Aiding And Abetting. | 39 |

|   |   | 3. | Plaintiffs Fail To Plead Any Deceptive Misrepresentations Or Acts By The Exchanges. | 43 |

|   |   | 4. | Plaintiffs Do Not Plead Reliance. | 45 |

|   |   | 5. | Plaintiffs Fail To Allege Loss Causation | 47 |

|   |   | 6. | Plaintiffs Fail To Plead Scienter | 48 |

CONCLUSION | | | | 50 |

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Achtman v. Kirby, McInerney & Squire, LLP,*
    464 F.3d 328 (2d Cir. 2006) ........................................................................... 17

*Acticon AG v. China N.E. Petro. Holdings., Ltd.,*
    692 F.3d 34 (2d Cir. 2012) ............................................................................. 48

*Affiliated Ute Citizens v. United States,*
    406 U.S. 128 (1972) ........................................................................................ 45

*Altman v. SEC,*
    687 F.3d 44 (2d Cir. 2012) ................................................................. 18, 21, 23

*Anschutz v. Merrill Lynch & Co.,*
    690 F.3d 98 (2d Cir. 2012) ............................................................................. 42

*Arneil v. Ramsey,*
    414 F. Supp. 334 (S.D.N.Y. 1976) ................................................................. 47

*Arneil v. Ramsey,*
    550 F.2d 774 (2d Cir. 1977) ........................................................................... 47

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) ................................................................. 40, 41, 48

*Baird v. Franklin,*
    141 F.2d 238 (2d Cir. 1944) ........................................................................... 37

*Baiul v. Williams Morris Agency, LLC,*
    No. 13-cv-8683, 2014 WL 1804526 (S.D.N.Y. May 6, 2014) ........................ 50

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) ................................................................................. 45, 46

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................................ 17

*Bernard v. Cnty. of Suffolk,*
    356 F.3d 495 (2d Cir. 2004) ..................................................................... 34, 35

*Blue Chip Stamps v. Manor Drug Stores,*
    421 U.S. 723 (1975) ................................................................................. 38, 39

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Cases** (continued)

*Brawer v. Options Clearing Corp.*,
    633 F. Supp. 1254 (S.D.N.Y. 1986) ..................................................... 37

*Brawer v. Options Clearing Corp.*,
    807 F.2d 297 (2d Cir. 1986) .............................................................. 37

*Castillo v. Dean Witter Discover & Co.*,
    No. 97 Civ. 1272, 1998 WL 342050 (S.D.N.Y. June 25, 1998)................................ 44

*Cent. Bank of Denver N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994).......................................................................... 42

*Citadel Sec., LLC v. Chi. Bd. Options Exch., Inc.*,
    No. 13-cv-5833 (N.D. Ill. Aug. 4, 2014) ..................................... 15, 19, 31

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014) ........................................................ 44, 46

*City of Tacoma v. Taxpayers of Tacoma*,
    357 U.S. 320 (1958).......................................................................... 21

*Cleantech Innovations, Inc. v. NASDAQ Stock Mkt., LLC*,
    No. 11-cv-9358, 2011 WL 7138696 (S.D.N.Y. Dec. 30, 2011)................................ 21

*Cleantech Innovations, Inc. v. NASDAQ Stock Mkt., LLC*,
    No. 11-cv-9358, 2012 WL 345902 (S.D.N.Y. Jan. 31, 2012)........................... 18, 22

*Cook v. NASD Regulation, Inc.*,
    31 F. Supp. 2d 1245 (D. Colo. 1998)....................................................... 19

*D'Alessio v. NYSE, Inc.*,
    125 F. Supp. 2d 656 (S.D.N.Y. 2000) ...................................................... 25

*D'Alessio v. NYSE, Inc.*,
    258 F.3d 93 (2d Cir. 2001) ....................................................... 24, 25, 33

*Desai v. Deutsche Bank Sec. Ltd.*,
    573 F.3d 931 (9th Cir. 2009) ...................................................... 46, 47

*Desiderio v. NASD*,
    191 F.3d 198 (2d Cir. 1999) ....................................................... 33, 37

*Dexter v. Depository Trust & Clearing Corp.*,
    219 F. App'x 91 (2d Cir. 2007) .................................................... 33, 35

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Cases** (continued)

*Dexter v. Depository Trust & Clearing Corp.*,
  406 F. Supp. 2d 260 (S.D.N.Y. 2005) ....................................................... 33, 34, 35

*DL Capital Grp., LLC v. NASDAQ Stock Mkt., Inc.*,
  409 F.3d 93 (2d Cir. 2005) ............................................................................. passim

*Dura Pharms. Inc. v. Broudo*,
  544 U.S. 336 (2005) ........................................................................................... 47

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ................................................................................ 44

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976) ..................................................................................... 40, 48

*Feins v. Am. Stock Exch., Inc.*,
  81 F.3d 1215 (2d Cir. 1996) ............................................................................... 37

*Fezzani v. Bear, Stearns & Co.*,
  384 F. Supp. 2d 618 (S.D.N.Y. 2004) ........................................................... 40, 48

*Fezzani v. Bear, Stearns & Co.*,
  716 F.3d 18 (2d Cir. 2013) ....................................................................... 40, 42, 46

*Fezzani v. Bear, Stearns & Co.*,
  No. 99-cv-0793 (S.D.N.Y. Apr. 7, 2005) .......................................................... 46

*Fraser v. Fiduciary Trust Co.*,
  No. 04-cv-6958, 2005 WL 6328596 (S.D.N.Y. June 23, 2005) ............................. 39

*Garber v. Legg Mason, Inc.*,
  347 F. App'x 665 (2d Cir. 2009) ......................................................................... 5

*Hayden v. NYSE, Inc.*,
  4 F. Supp. 2d 335 (S.D.N.Y. 1998) .................................................................... 21

*Hensley v. IEC Elecs. Corp.*,
  No. 13-cv-4507, 2014 WL 4473373 (S.D.N.Y.  Sept. 11, 2014) ........................... 49

*Hundahl v. United Benefit Life Ins. Co.*,
  465 F. Supp. 1349 (N.D. Tex. 1979) ................................................................... 40

*In re Charter Commc'ns Inc. Sec. Litig.*,
  443 F.3d 987 (8th Cir. 2006) ............................................................................. 40

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Cases** (continued)

*In re Charter Commc'ns Inc. Sec. Litig.,*
    552 U.S. 148 (2008) ............................................................................... 40

*In re China Organic Sec. Litig.,*
    No. 11-cv-8623, 2013 WL 5434637 (S.D.N.Y. Sept. 30, 2013) ....................................... 47, 48

*In re Citigroup Auction Rate Sec. Litig.,*
    700 F. Supp. 2d 294 (S.D.N.Y. 2009) ....................................................... 43, 47, 48

*In re Facebook, Inc. IPO Sec. & Derivative Litig.,*
    986 F. Supp. 2d 428 (S.D.N.Y. 2013) ........................................................ 35, 36

*In re JP Morgan Auction Rate Securities (ARS) Marketing Litig.,*
    No. 10-md-2157, 2014 WL 4953554 (S.D.N.Y. Sept. 30, 2014) ....................................... 43, 45

*In re NYSE Specialists Sec. Litig.,*
    503 F.3d 89 (2d Cir. 2007) ............................................................... passim

*In re Optionable Secs. Litig.,*
    577 F. Supp. 2d 681 (S.D.N.Y. 2008) ........................................................... 37

*In re Series 7 Broker Qualification Exam Scoring Litig.,*
    548 F.3d 110 (D.C. Cir. 2008) ........................................................... passim

*Kleinman v. Elan Corp.,*
    706 F.3d 145 (2d Cir. 2013) ................................................................. 49

*Levitt v. J.P. Morgan Sec. Inc.,*
    710 F.3d 454 (2d Cir. 2013) ................................................................. 46

*Makarova v. United States,*
    201 F.3d 110 (2d Cir. 2000) ................................................................. 17

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. NASD,*
    616 F.2d 1363 (5th Cir. 1980) ............................................................... 18

*Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.,*
    369 F.3d 27 (2d Cir. 2004) ............................................................... 38, 39

*Orman v. Charles Schwab & Co.,*
    688 N.E.2d 620 (Ill. 1997) ................................................................. 15

*Piemonte v. Chi. Bd. Options Exch., Inc.,*
    405 F. Supp. 711 (S.D.N.Y. 1975) ........................................................... 47

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Cases** (continued)

*Pivot Point Capital Master LP v. Deutsche Bank AG*,
No. 08-cv-2788, 2010 WL 9452230 (S.D.N.Y. 2010) ...................................................... 45, 46

*Rajamin v. Deutsche Bank Nat'l Trust Co.*,
757 F.3d 79 (2d Cir. 2014) ......................................................................................... 38

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ....................................................................................... 43

*Roth ex rel. Beacon Power Corp. v. Perseus, LLC*,
522 F.3d 242 (2d Cir. 2008) ....................................................................................... 36

*Santa Fe Indus., Inc. v. Green*,
430 U.S. 462 (1977) ............................................................................................. 38, 40

*Schreiber v. Burlington N., Inc.*,
472 U.S. 1 (1985) ...................................................................................................... 42

*Shields v. Citytrust Bancorp., Inc.*,
25 F.3d 1124 (2d Cir. 1994) ....................................................................................... 43

*Shmueli v. City of New York*,
424 F.3d 231 (2d Cir. 2005) ....................................................................................... 33

*Smith v. Seinfield*,
No. 13-cv-4211, 2014 WL 700202 (S.D.N.Y. Feb. 24, 2014) ................................................. 50

*Sparta Surgical Corp. v. NASD*,
159 F.3d 1209 (9th Cir. 1998) ............................................................................ 24, 25, 33

*Spears v. Metro. Life Ins. Co.*,
No. 2:07-cv-88, 2009 WL 2408928 (N.D. Ind. Aug. 4, 2009) ................................................. 39

*Standard Inv. Chartered v. NASD*,
No. 07-cv-2014, 2007 WL 1296712 (S.D.N.Y. May 7, 2007) .......................................... 19, 23

*Standard Inv. Chartered, Inc. v. NASD*,
637 F.3d 112 (2d Cir. 2011) ................................................................................. 24, 25

*Steinberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
No. 74-cv-63, 1974 WL 411 (S.D.N.Y. Jun. 14, 1974) ......................................................... 47

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
552 U.S. 148 (2008) .................................................................................................... 45

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Cases** (continued)

*Tannenbaum v. Walco Nat'l Corp.*,
  No. 83-cv-6815, 1984 WL 2374 (S.D.N.Y. Jan. 27, 1984) ..................................... 39

*Telecomms. Research & Action Ctr. v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984) ............................................................................ 22

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
  551 U.S. 308 (2007) ......................................................................................... 49

*The NASDAQ OMX Group, Inc. v. UBS Sec., LLC*, 770 F.3d 1010 (2d Cir. 2014) ..................... 29

*Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.*,
  379 U.S. 411 (1965) ......................................................................................... 22

*Wilson v. Merrill Lynch & Co.*,
  671 F.3d 120 (2d Cir. 2011) ............................................................................. 43

*Winer Family Trust v. Queen*,
  503 F.3d 319 (3d Cir. 2007) ............................................................................. 38

*Wright v. Ernst & Young LLP*,
  152 F.3d 169 (2d Cir. 1998) ............................................................................. 42

**Statutes**

15 U.S.C. § 78c(a)(26) ........................................................................................ 6

15 U.S.C. § 78f(a) ............................................................................................... 5

15 U.S.C. § 78f(b)(4) .......................................................................................... 31

15 U.S.C. § 78f(b)(5) ................................................................................. 6, 30, 32

15 U.S.C. § 78k-1(a)(1) ....................................................................................... 26

15 U.S.C. § 78k-1(a)(1)(C) .................................................................................... 6

15 U.S.C. § 78k-1(a)(1)(D) ................................................................................ 6, 26

15 U.S.C. § 78k-1(a)(3)(B) ....................................................................... 6, 7, 13, 27

15 U.S.C. § 78k-1(c)(1) ........................................................................................ 7

15 U.S.C. § 78k-1(c)(1)(D) .................................................................................... 7

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Statutes** (continued)

15 U.S.C. § 78s ...................................................................................... 18, 36

15 U.S.C. § 78s(c) ...................................................................................... 37

15 U.S.C. § 78s(h)(1) ............................................................................ 19, 37

15 U.S.C. § 78s(h)(4) .................................................................................. 37

15 U.S.C. § 78t(e) ....................................................................................... 42

15 U.S.C. § 78u(d) ...................................................................................... 19

15 U.S.C. § 78u(d)(3)(A) ............................................................................ 37

15 U.S.C. § 78u-3 ....................................................................................... 19

15 U.S.C. § 78u-4(a)(2)(iv) ........................................................................ 39

15 U.S.C. § 78u-4(b)(1)(B) ........................................................................ 43

15 U.S.C. § 78u-4(b)(2) .............................................................................. 48

15 U.S.C. § 78u-4(b)(2)(A) ......................................................................... 49

15 U.S.C. § 78u-4(b)(4) .................................................................. 44, 47, 48

15 U.S.C. § 78y(a)(1) .................................................................................. 18

**Rules and Regulations**

17 C.F.R. § 242.603(a) ............................................................................ 8, 11

17 C.F.R. § 242.603(b) ................................................................................ 27

17 C.F.R. § 242.608(a) ................................................................................ 27

17 C.F.R. § 242.608(c) .................................................................................. 9

17 C.F.R. § 242.608(d) .......................................................................... 18, 20

17 C.F.R. § 242.608(d)(1) ........................................................................... 20

17 C.F.R. § 242.610 .................................................................................... 14

**TABLE OF AUTHORITIES**
(continued)

<u>Page(s)</u>

**<u>Rules and Regulations</u>** (continued)

17 C.F.R. § 242.610(c) ................................................................................................ 16

17 C.F.R. § 242.611 .................................................................................................... 14

17 C.F.R. §§ 242.600–.613 .......................................................................................... 7

BATS Exchange Rule 11.9 ........................................................................................ 14

CHX Rules Art. 1, Rule 2 ......................................................................................... 14

EDGA Rule 11.8 ....................................................................................................... 14

EDGX Rule 11.8 ....................................................................................................... 14

NASDAQ Stock Market Rule 4751(f) ...................................................................... 14

NYSE Arca Equities Rule 7.31 ................................................................................. 14

NYSE Rule 13 ........................................................................................................... 14


**Other Authorities**

3 Thomas Lee Hazen, *The Law of Securities Regulation*
    (6th ed. 2009) ................................................................................................. 40, 41

Concept Release, Competitive Developments in the Options Markets,
    69 Fed. Reg. 6124 (Feb. 9, 2004) ..................................................................... 31

CTA Plan § IV ........................................................................................................... 27

CTA Plan § V ............................................................................................................ 27

Exchange Act Release No. 34-10787, 39 Fed. Reg. 17,799 (May 20, 1974) ............... 8

Exchange Act Release No. 34-15009, 43 Fed. Reg. 34,851 (Aug. 7, 1978) ................. 8

Exchange Act Release No. 34-16589, 45 Fed. Reg. 12,377 (Feb. 26, 1980) .............. 12

Exchange Act Release No. 34-28146, 55 Fed. Reg. 27,917 (July 6, 1990) ................... 8

Exchange Act Release No. 34-42208, 64 Fed. Reg. 70,613 (Dec. 17, 1999) ........... 7, 8

Exchange Act Release No. 34-43290, 65 Fed. Reg. 57,213 (Sept. 21, 2000) ............ 15

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Other Authorities** (continued)

Exchange Act Release No. 34-43313, 65 Fed. Reg. 58,135 (Sept. 27, 2000) ...............................8

Exchange Act Release No. 34-43462, 65 Fed. Reg. 64,466 (Oct. 27, 2000) ...............................15

Exchange Act Release No. 34-47090, 68 Fed. Reg. 141 (Jan. 2, 2003)........................................15

Exchange Act Release No. 34-47948, 68 Fed. Reg. 33,749 (June 5, 2003)..................................15

Exchange Act Release No. 34-48053, 68 Fed. Reg. 37,880 (June 25, 2003)................................15

Exchange Act Release No. 34-49325, 69 Fed. Reg. 11,126 (Mar. 9, 2004)...................................8

Exchange Act Release No. 34-51149, 70 Fed. Reg. 7531 (Feb. 14, 2005) ..................................33

Exchange Act Release No. 34-51808, 70 Fed. Reg. 37,496 (June 29, 2005)................. 8, 9, 12, 23

Exchange Act Release No. 34-53128, 71 Fed. Reg. 3550 (Jan. 23, 2006)...................................33

Exchange Act Release No. 34-53382, 71 Fed. Reg. 11,251 (Mar. 6, 2006)................................33

Exchange Act Release No. 34-56611, 72 Fed. Reg. 57,980 (Oct. 11, 2007) ...............................10

Exchange Act Release No. 34-59039, 73 Fed. Reg. 74,770 (Dec. 9, 2008)...........................9, 44

Exchange Act Release No. 34-59606, 74 Fed. Reg. 13,293 (Mar. 26, 2009).................. 10, 44, 49

Exchange Act Release No. 34-59714, 74 Fed. Reg. 17,264 (Apr. 14, 2009) ...............................49

Exchange Act Release No. 34-60684, 74 Fed. Reg. 48,632 (Sept. 23, 2009) ..............................14

Exchange Act Release No. 34-61097, 74 Fed. Reg. 64,788 (Dec. 8, 2009)................................15

Exchange Act Release No. 34-61358, 75 Fed. Reg. 3594 (Jan. 21, 2010)...........................passim

Exchange Act Release No. 34-61680, 75 Fed. Reg. 12,590 (Mar. 16, 2010)..............................11

Exchange Act Release No. 34-61698, 75 Fed. Reg. 13,151 (Mar. 18, 2010)..............................33

Exchange Act Release No. 34-61885, 75 Fed. Reg. 20,018 (April 16, 2010)..............................10

Exchange Act Release No. 34-62181, 75 Fed. Reg. 31,488 (June 3, 2010).................................10

Exchange Act Release No. 34-62397, 75 Fed. Reg. 38,860 (July 6, 2010)..................................11

Exchange Act Release No. 34-62534, 75 Fed. Reg. 43,590 (July 26, 2010)................................15

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Other Authorities** (continued)

Exchange Act Release No. 34-62716, 75 Fed. Reg. 51,295 (Aug. 19, 2010) .............................. 32

Exchange Act Release No. 34-62960, 75 Fed. Reg. 59,299 (Sept. 27, 2010) ........................ 11, 49

Exchange Act Release No. 34-63777, 76 Fed. Reg. 5630 (Feb. 1, 2011) .................................... 30

Exchange Act Release No. 34-65761, 76 Fed. Reg. 72,230 (Nov. 22, 2011) .............................. 15

Exchange Act Release No. 34-67093, 77 Fed. Reg. 33,798 (June 7, 2012) ................................. 15

Exchange Act Release No. 34-67412, 77 Fed. Reg. 42,022 (July 17, 2012) ................................ 15

Exchange Act Release No. 34-69419, 78 Fed. Reg. 24,449 (Apr. 25, 2013) ............................... 30

Exchange Act Release No. 34-69538, 78 Fed. Reg. 28,671 (May 15, 2013) ............................... 15

Exchange Act Release No. 34-70637, 78 Fed. Reg. 62,745 (Oct. 22, 2013) ............................... 15

Exchange Act Release No. 34-72676, 79 Fed. Reg. 44,520 (July 31, 2014) ................................ 15

Exchange Act Release No. 34-72812, 79 Fed. Reg. 48,824 (Aug. 18, 2014) .............................. 15

Exchange Act Release No. 34-73333, 79 Fed. Reg. 62,223 (Oct. 16, 2014) .................. 15, 31, 49

Exchange Act Release Nos. 34-58375, 73 Fed. Reg. 49,498 (Aug. 21, 2008) ............................ 32

H.R. Rep. No. 94-229, 94th Cong., 1st Sess. 93 (1975) ......................................................... 7, 27

*In re BearWagner Specialists LLC et al.*,
   Exchange Act Release No. 34-64553 (May 26, 2011) ............................................................. 19

*In re Boston Stock Exch., Inc.*,
   Exchange Act Release No. 34-58191, 2008 WL 2783572 (July 18, 2008) .............................. 22

*In re Chi. Bd. Options Exch., Inc.*, Exchange Act Release No. 34-69726 (June 11, 2013) .......... 13

*In re EDGA Exchange, Inc.*, Exchange Act Release No. 34-74032 (Jan. 12, 2015) .............. 13, 20

*In re NASDAQ Stock Mkt., LLC*, Exchange Act Release No. 34-69655 (May 29, 2013) ........... 13

*In re NYSE LLC et al.*, Exchange Act Release No. 34-72065 (May 1, 2014) .............................. 19

*In re NYSE LLC*, Exchange Act Release No. 34-67857 (Sept. 14, 2012) ...................... 12, 13, 19

Mary Jo White, *Enhancing Our Equity Market Structure* (June 5, 2014).................................... 13

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Other Authorities** (continued)

NASDAQ UTP Plan § IV.B ........................................................................................ 27

Report of the Advisory Committee on Market Information:
   A Blueprint for Responsible Change (Sept. 14, 2001) ............................................. 8

S. Rep. No. 1455, 73rd Cong., 2d Sess. 30–31 (1934) ................................................. 41

S. Rep. No. 94-75, 94th Cong., 1st Sess. 8 (1975) .................................................. 6, 7

Defendants BATS Global Markets, Inc. ("BATS"), Chicago Stock Exchange, Inc. ("CHX"), Direct Edge ECN, LLC ("Direct Edge"), The NASDAQ Stock Exchange LLC ("NASDAQ"), NASDAQ OMX BX, Inc., New York Stock Exchange, LLC ("NYSE"), and NYSE Arca, Inc. (collectively, "Exchanges") respectfully submit this memorandum of law in support of their motion under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss the Second Consolidated Amended Complaint ("SCAC").[1]  The Court lacks subject matter jurisdiction over this suit because Plaintiffs' claims are subject to exclusive review by the Securities and Exchange Commission ("SEC") and, on appeal, a federal court of appeals. Plaintiffs' claims also fail because they are barred by the absolute immunity afforded to self-regulatory organizations such as the Exchanges.  Further, Plaintiffs have no private right of action to sue under Section 6 of the Securities Exchange Act of 1934 ("Exchange Act"), and they have failed to adequately plead violations of Section 10(b) of the Exchange Act or the SEC's Rule 10b-5.

## PRELIMINARY STATEMENT

In their SCAC, which was filed in response to the Exchanges' initial motion to dismiss [Dkt. # 245], Plaintiffs reassert the same fundamentally flawed theory upon which the Exchanges moved to dismiss the first Consolidated Amended Complaint ("CAC"):  Plaintiffs allege that the market structure approved by the SEC—more specifically, the combination of co-location, proprietary data feeds, complex order types, and payment for order flow ("PFOF") programs— constitutes a massive fraud perpetrated on almost every member of the investing public in

---

[1]  On October 22, 2014, BATS and Direct Edge were granted leave by the Court to file separate moving and reply memoranda in support of their motion to dismiss.  *See* Dkt. # 232.  Based on the contents of this joint memorandum on behalf of all Exchanges, BATS and Direct Edge determined that a separate moving brief would be duplicative and an unnecessary burden on the Court.  BATS and Direct Edge reserve their rights to file a separate reply memorandum.

violation of the Exchange Act.  But all of these practices have been the subject of specific SEC rulemakings, and the SEC has found each to be consistent with the Exchange Act.  Plaintiffs have had multiple chances to plead a plausible claim, but they persist in attacking the Exchanges in the wrong forum, for conduct that the SEC has determined is lawful.

In April of last year, City of Providence filed the first of these four consolidated actions against broad classes of defendants that included virtually every brokerage and high-frequency trading firm ("HFT") in the country, as well as 16 national securities exchanges.  *See* D.E. 2 ("Complaint") ¶¶ 19–59, 68.  The Complaint alleged HFT firms engaged in a number of predatory trading practices.  *Id.* ¶ 6.

In the CAC and now the SCAC, Plaintiffs have retreated from their attempt to sue nearly every entity in the financial markets and narrowed their claims to eight defendants.  The remaining defendants, however, are not the high-frequency traders alleged to have engaged in the supposed predatory trading, or the broker-dealers who allegedly disregarded their obligations to their clients, but rather seven national securities exchanges and one financial institution that runs an alternative trading venue.  Despite having the benefit of the Exchanges' first brief moving to dismiss the CAC, the revisions in the SCAC are cosmetic at best; Plaintiffs removed some text that made the SCAC's flaws especially obvious, but have not cured its fundamental shortcomings.  At its core, the SCAC alleges that the Exchanges aided and abetted the high-frequency traders by providing co-location services and offering proprietary feeds, which the SCAC contends gave high-frequency traders early access to material, non-public information, and then allowed the high-frequency traders to profit from this information by executing complex orders on the Exchanges and by taking advantage of the Exchanges' PFOF fee structures.  *See* SCAC ¶ 9.

The SCAC fails for the multitude of reasons that were detailed in the Exchanges' first motion to dismiss brief and which are set forth below.  Most fundamentally, the SCAC fails because the SEC has approved, and actively oversees, the exact services about which Plaintiffs complain: co-location services, proprietary feeds, complex order types, and fee schedules.  The SEC has ruled that these services are consistent with the requirements of the Exchange Act and the rules and regulations thereunder, including particularly Regulation NMS, which regulates the Exchanges' dissemination of market data.  Under Regulation NMS, the Exchanges transmit information about securities transactions and quotes to a processor, which then disseminates to investors a consolidated feed of the information obtained from all relevant exchanges.  The Exchanges also offer separate proprietary data feeds of unconsolidated exchange-specific data to anyone that wishes to subscribe to them, and some Exchanges offer co-location services, which allow customers to "situat[e] [their] servers in close proximity to the Exchanges' own order matching servers."  SCAC ¶ 9.  Both proprietary data feeds and co-location can result in reduced latencies (*i.e.*, faster receipt of the exchange-specific data).

Plaintiffs claim that HFT firms are able to profit at other investors' expense because of this reduced latency.  Yet, contrary to Plaintiffs' theory, the SEC has specifically determined that this reduced latency does not offend Regulation NMS or the Exchange Act, and that the law does not require recipients of the respective channels of market information to *receive* information at the same time.  The SEC has expressly authorized the Exchanges to offer unconsolidated proprietary feeds as well as co-location services, even though it acknowledges that these services result in faster transmission speeds for investors that use them.  In addition, the SEC has regularly approved the various order types that the Exchanges have made available to investors to execute their trades, as well as the PFOF fees charged by the Exchanges, finding that the order

types and PFOF fees are consistent with the Exchange Act's requirements.  Plaintiffs'

fundamental theory of fraud has thus been rejected by the expert federal agency charged with

administering the statute under which Plaintiffs sue.

The claims should be dismissed on the following threshold grounds:

*First*, this Court lacks subject matter jurisdiction because Plaintiffs' claims are subject to

exclusive review by the SEC and, on appeal, a federal court of appeals.  Plaintiffs challenge the

decisions of the SEC in structuring the national market system, and the Exchange Act and

Regulation NMS provide multiple avenues by which Plaintiffs could have obtained SEC review

of their claims.  The Exchange Act also provides for direct appellate review of SEC decisions by

a federal court of appeals.  As the Second Circuit and this Court have recognized in analogous

cases, because this review process provides no role for district courts, this Court lacks subject

matter jurisdiction over Plaintiffs' claims.  *See infra* Part I.

*Second*, Plaintiffs' damages claims are barred by absolute immunity, which protects the

Exchanges from damages claims for conduct within their responsibilities under the Exchange

Act and the SEC's implementing regulations.  Plaintiffs' case critically depends on their

assertion that the Exchanges wrongfully provided HFT firms with earlier access to market data.

The dissemination of market data under Regulation NMS is a core regulatory function of the

Exchanges, and accordingly Plaintiffs cannot pursue damages based on claims that the

Exchanges improperly executed that regulatory function.  The Exchanges' provision of complex

order types and PFOF programs is similarly barred, as these practices are also regulatory in

nature:  The Exchanges' offerings of particular order types are part of their delegated function to

regulate trading in their markets, and PFOF programs are designed to increase market liquidity

and performance for the benefit of all investors.  *See infra* Part II.

In addition, the SCAC fails to state a claim upon which relief could be granted.  All of Plaintiffs' claims fail as a matter of law because they challenge practices that the SEC, pursuant to its power to regulate self-regulatory organizations, has authoritatively reviewed and approved as consistent with the Exchange Act.  Thus, the Exchanges cannot be liable under the Exchange Act for the alleged conduct.  *See infra* Part III.A.  Furthermore, Plaintiffs' claim under Section 6(b) of the Exchange Act (Count II of the SCAC) fails because Plaintiffs lack any private right of action to enforce that provision.  *See infra* Part III.B.  Their claim under Section 10(b) of the Exchange Act, and the SEC's corresponding Rule 10b-5 (Count I of the SCAC), also fails because, among other things, it does not identify the particular securities and transactions from which their losses supposedly arise, as required by the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Nor do Plaintiffs plead any actionable manipulative or deceptive acts by the Exchanges, or any of the other required elements of a claim for securities fraud, including scienter, reliance, or loss causation, let alone plead those elements with particularity as required by the PSLRA.  *See infra* Part III.C.

## BACKGROUND[2]

### A.    Exchanges And The Exchange Act

The Exchanges are national securities exchanges registered with the SEC under Section 6(a) of the Exchange Act.  15 U.S.C. § 78f(a); *see also* SCAC ¶¶ 26–33.  Registered national securities exchanges are "self-regulatory organizations" ("SROs") under the Exchange Act.  15

---

[2]   The facts in this Background section are drawn from (1) the SCAC, whose well-pleaded factual allegations are assumed to be true solely for purposes of this motion; (2) the relevant legal and regulatory background; (3) the Exchanges' plans under Regulation NMS, which are referred to in the SCAC, relied upon by Plaintiffs, and thus properly before the Court; and (4) SEC filings, the fact and content of which the Court is entitled to consider under long-standing precedent, *see, e.g.*, *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (summary order).

U.S.C. § 78c(a)(26); *see also*, *e.g.*, SCAC ¶¶ 28, 79.  In the Exchange Act and its amendments, Congress established a comprehensive system to regulate the functioning of the securities markets and those who participate in them.  Under the Act, Congress has delegated to SROs, including securities exchanges, the responsibility to operate and maintain fair and orderly markets, subject to supervision by the SEC.  15 U.S.C. §§ 78f(b)(5), 78k-1(a)(1)(C).  The regulatory powers and responsibilities delegated to the Exchanges under the Act include "planning, developing, operating, [and] regulating" their markets.  *Id.* § 78k-1(a)(3)(B); *see also DL Capital Grp., LLC v. NASDAQ Stock Mkt., Inc.*, 409 F.3d 93, 95 (2d Cir. 2005).

Dissemination of information about trading is and always has been a core regulatory function of exchanges.  Indeed, the Second Circuit has recognized that "safeguarding the integrity of market information was one of the purposes behind the regulation of the securities markets in the first place."  *DL Capital*, 409 F.3d at 98.  Before 1975, the various exchanges reported trades and quotes solely on their own markets.  SCAC ¶ 43.  But Congress and the SEC perceived a need for investors to receive consolidated market information.  In 1975, Congress mandated the creation of a "national market system" to promote the "linking of all markets for qualified securities through communication and data processing facilities."  15 U.S.C. § 78k-1(a)(1)(D); *see also* SCAC ¶ 44.  In particular, Congress specifically authorized the SEC to require SROs to "act jointly . . . in planning, developing, operating, or regulating a national market system," 15 U.S.C. § 78k-1(a)(3)(B), and gave the SEC "broad authority to oversee" that system, S. Rep. No. 94-75, at 8–9 (1975).

In Section 11A of the Exchange Act, Congress directed the SEC to "impose" rules "as necessary or appropriate for the protection of investors or maintenance of fair and orderly markets" to ensure that investors "may obtain on terms which are not unreasonably

discriminatory . . . information with respect to quotations for and transactions in such securities as is published or distributed by any self-regulatory organization or securities information processor." 15 U.S.C. § 78k-1(c)(1)(D); *see also* SCAC ¶ 44.  Section 11A gives the SEC "pervasive rulemaking power to regulate securities communications systems," H.R. Rep. No. 94-229, at 93 (1975) (Conf. Rep.), *reprinted in* 1975 U.S.C.C.A.N. 321, 324, and it explicitly requires the Exchanges to comply with rules and regulations promulgated by the SEC governing "distribution" of information "with respect to quotations for and transactions in [securities]," 15 U.S.C. § 78k-1(c)(1)(A).  Thus, "market information, at least since 1975, has been subject to comprehensive regulation under the Exchange Act."  Exchange Act Release No. 34-42208, 64 Fed. Reg. 70,613, 70,615 (Dec. 17, 1999) ("Market Data Concept Release").

However, Congress did not envision that SEC rulemaking alone would create the national market system, but that regulation would facilitate its establishment.  *See* S. Rep. No. 94-75, 94th Cong., at 8 (1975) ("Section 11A(a)(2) . . . directs the [SEC] to facilitate the establishment of a national market system in accordance with the foregoing findings and objectives.").  In performing the role mandated by Congress, the SEC relies *on the SROs* to develop, operate, and regulate the system.  *See* 15 U.S.C. § 78k-1(a)(3)(B).  Indeed, the SEC has emphasized that "it [is] the SROs who should be primarily responsible for disseminating consolidated information . . . [b]ecause of their unique role in the statutory scheme, including their obligation to enforce the federal securities laws subject to the [SEC's] review."  Market Data Concept Release, 64 Fed. Reg. 70,620 (internal quotation marks omitted).

### B.    Regulation NMS

The SEC has promulgated several regulations to comply with the congressional directive in Section 11A of the Exchange Act.  The most recent such regulation is Regulation NMS, 17 C.F.R. §§ 242.600–.613 *et seq*., which was adopted in 2005.  *See* Exchange Act Release No. 34-

51808, 70 Fed. Reg. 37,496 (June 29, 2005) ("NMS Adopting Release"); *see also* SCAC ¶ 46. Under the regulation, exchanges are required to distribute quotation and transaction information on "terms that are fair and reasonable," and that "are not unreasonably discriminatory." *Id.* § 242.603(a); *see also* SCAC ¶ 81. Regulation NMS's approach to market data was the product of years of continuous and comprehensive regulatory consideration.[3]

### C.    The NMS Plans

To implement Regulation NMS, the Exchanges were required to develop plans ("NMS Plans"). There are three plans for disseminating consolidated stock information: The CTA Plan, for transactions for securities listed on stock exchanges other than NASDAQ; the CQ Plan, for quotes for securities listed on exchanges other than NASDAQ; and the NASDAQ UTP Plan, for securities listed on NASDAQ. "These plans govern all aspects of the arrangements for disseminating market information" regarding NMS stocks. Market Data Concept Release, 64 Fed. Reg. 70,615. The SEC has approved each of these plans.[4]

Under each NMS Plan, the Exchanges transmit information on transactions and quotes on their individual exchanges to a securities information processor ("Processor"), which consolidates the information and transmits the consolidated information to parties who purchase it, either directly or through vendors. *See* SCAC ¶¶ 48, 121. Each of the NMS Plans provides

---

[3]   *See*, *e.g.*, Exchange Act Release No. 34-43313, 65 Fed. Reg. 58,135 (Sept. 27, 2000) (providing notice of the establishment of the SEC's Advisory Committee on Market Information); Report of the Advisory Committee on Market Information: A Blueprint for Responsible Change (Sept. 14, 2001) (providing recommendations to the SEC regarding the regulation of market information), *available at* http://www.sec.gov/divisions/marketreg/ marketinfo/finalreport.htm; Exchange Act Release No. 34-49325, 69 Fed. Reg. 11,126, 11,184– 85 (Mar. 9, 2004) (publishing proposed Regulation NMS for comment); NMS Adopting Release, 70 Fed. Reg. at 37,569 (adopting Regulation NMS and amendments to the NMS Plans).

[4]   *See* Exchange Act Release No. 34-10787, 39 Fed. Reg. 17,799 (May 20, 1974); Exchange Act Release No. 34-15009, 43 Fed. Reg. 34,851, 34,856 (Aug. 7, 1978); Exchange Act Release No. 34-28146, 55 Fed. Reg. 27,917, 27,925 (July 6, 1990).

for self-regulation of the process of producing consolidated market information.  Each plan, for example, establishes a governing body made up of representatives of the Exchanges that participate in the plan.  Each NMS Plan also has an administrator which manages its day-to-day operations.  And under Rule 608(c) of Regulation NMS, each Exchange not only must comply with any effective NMS plan, but also "shall, absent reasonable justification or excuse, enforce compliance with any such plan."  17 C.F.R. § 242.608(c).

### D.   Proprietary Data Feeds And Co-Location

#### 1.   Proprietary Feeds Have Been Approved By The SEC

In addition to sending market data to the Processors for consolidation, the Exchanges are permitted to disseminate market data through what the SCAC calls "direct" or "alternative" feeds (also known as "proprietary" feeds).[5]  ¶ 9, 123.  When it promulgated Regulation NMS, the SEC approved the use of proprietary feeds because doing so "would allow investors and vendors greater freedom to make their own decisions regarding the data they need."  NMS Adopting Release, 70 Fed. Reg. at 37,566; *see also*, *e.g.*, Exchange Act Release No. 34-59039, 73 Fed. Reg. 74,770, 74,780 (Dec. 9, 2008) (allowing the independent dissemination of unconsolidated data by exchanges because it "allows greater flexibility for market forces to determine data products and fees").  Exchanges submit to the SEC for review specific proposals to offer products such as depth-of-book quotes in their proprietary feeds.  Exchanges also file for SEC review of the fees they charge (if any) for their proprietary feeds.  The distribution standards of Rule 603(a) under Regulation NMS apply fully to proprietary feeds related to NMS stocks, and

---

[5]   In addition to disseminating the same information they send to the Processors, the Exchanges are permitted to offer proprietary feeds of additional information not sent to the Processors, such as "depth of order book" information relating to the balance of orders on an exchange's order book.  *See*, *e.g.*, SCAC ¶ 117.  The provision of this additional data to other customers has also been approved by the SEC.  *See* Exchange Act Release No. 34-59039, 73 Fed. Reg. 74,780–81.

they require exchanges that offer proprietary feeds to do so on terms that are fair and reasonable and not unreasonably discriminatory.

In approving exchange proposals to offer proprietary feeds, the SEC has expressly recognized that the proprietary feeds cater to "traders who are very latency [*i.e.*, transmission speed] sensitive and . . . who desire to use [the data] to power certain trading algorithms or smart order routers."  Exchange Act Release No. 34-59606, 74 Fed. Reg. 13,293, 13,294 (Mar. 26, 2009) (order approving proprietary feed of last-sale data by NYSE).  In other words, these proprietary feeds offer speed advantages over the consolidated data feeds that "can be measured in tens of milliseconds," advantages that are significant to traders who use sophisticated computer programs.  *Id.* at 13,294 n.7; *see also* SCAC ¶ 53.  With full knowledge of these differences, the SEC expressly found that proprietary feeds are "consistent with the requirements of the [Exchange] Act and the rules and regulations thereunder," including Section 6(b)(5)'s "require[ment] . . . to protect investors and the public interest."  74 Fed. Reg. at 13,294.[6] Moreover, proprietary feeds are available to anyone willing to pay the fees that the SEC has permitted for them (and for some exchanges, the feed is provided for free).

### 2.  Co-Location Services Have Been Approved By The SEC

Some of the Exchanges offer co-location services that allow customers to place computer servers in close physical proximity to the Exchanges' computer systems in order to (among other things) receive market information more quickly.  SCAC ¶ 108.  The SEC regulates co-location

---

[6]  *See also*, *e.g.*, Exchange Act Release No. 34-62181, 75 Fed. Reg. 31,488, 31,489 (June 3, 2010) (approving proprietary feed of NYSE best bid and best offer quotes, recognizing it as "likely to be a premium service, used by investors most concerned with receiving NYSE BBO Information on a low latency basis"); Exchange Act Release No. 34-61885, 75 Fed. Reg. 20,018 (April 16, 2010) (approving proprietary feeds offered by BATS); Exchange Act Release No. 34-56611, 72 Fed. Reg. 57,980 (Oct. 11, 2007) (approving proprietary feed CHX and confirming that it will not charge a fee for distribution of the feed).

services because it "views co-location services as being a material aspect of the operation of the facilities of an exchange," and thus concludes that "co-location services offered by registered exchanges are subject to the Exchange Act."  Exchange Act Release No. 34-61358, 75 Fed. Reg. 3594, 3610 & n.76 (Jan. 21, 2010) ("EMS Concept Release").  Accordingly, "[e]xchanges that intend to offer co-location services must file proposed rule changes" with the SEC and "receive approval of such rule changes" from the SEC.  *Id.* at 3610.

The SEC expressly acknowledges that "[m]any proprietary firm strategies are highly dependent upon speed" and that "[c]o-location is one means to save micro-seconds of latency," allowing these traders to be "faster than competitors."  *Id.*; *see also* Exchange Act Release No. 34-62960, 75 Fed. Reg. 59,299 (Sept. 27, 2010) ("Users that receive co-location services normally would expect reduced latencies in sending orders to the Exchange and receiving market data from the Exchange.").  The SEC has approved co-location, finding it to be "consistent with the requirements of the [Exchange] Act and the rules and regulations thereunder," including Section 6(b)(5)'s "require[ment] . . . to protect investors and the public interest."  *E.g.*, Exchange Act Release No. 34-62960, 75 Fed. Reg. 59,299, 59,299–300 (approving NYSE co-location services); Exchange Act Release No. 34-62397, 75 Fed. Reg. 38,860, 38,861 (July 6, 2010) (approving NASDAQ co-location services); Exchange Act Release No. 34-61680, 75 Fed. Reg. 12,590, 12,590 (Mar. 16, 2010) (approving CHX co-location services).

### E.   Application Of The Exchange Act And Regulation NMS To The Timeliness Of Consolidated Market Data

The Exchanges are required to transmit market information to their respective Processors on terms that are "fair and reasonable" and "not unreasonably discriminatory."  17 C.F.R. § 242.603(a).  The SEC has interpreted Rule 603 to require exchanges to *send* data to the Processors no later than they transmit data through proprietary feeds, but—importantly—not to

require that all subscribers *receive* the consolidated feed at the same time or earlier than other customers who receive data through the proprietary feeds.  *See, e.g. In re NYSE LLC*, Exchange Act Release No. 34-67857, at 9 (Sept. 14, 2012) ("exchanges have an obligation under Rule 603(a) to take reasonable steps to ensure . . . that they release data relating to current best-priced quotations and trades through proprietary feeds no sooner than they release data to the Network Processor").  Thus, Plaintiffs are legally incorrect when they assert that Regulation NMS "require[s] . . . that the [Processors] transmit [market] data so as *to be received* by all market participants at the same time."  SCAC ¶ 123 (emphasis added).

During the notice and comment period for Regulation NMS, the SEC stated that "Rule 603(a) will not require a market center to synchronize the delivery of its data to end-users with delivery of data by a Network processor to end-users."  NMS Adopting Release, 70 Fed. Reg. at 37,567.  The SEC has recognized that, even if an exchange sends data to a Processor and to a proprietary feed at the same time, the consolidated data will reach subscribers slightly later than the proprietary data.  *See In re NYSE*, Exchange Act Release No. 34-67857, at 9; EMS Concept Release, 75 Fed. Reg. at 3601, 3611.  For a variety of reasons, including the laws of physics, it is impossible to ensure that every subscriber receives consolidated information at the same time or earlier than other customers receive proprietary feeds.[7]

The SEC actively exercises its oversight authority, and has brought proceedings against

---

[7]   The SEC confronted this issue in 1980, when it first required exchanges to permit purchasers of consolidated feeds to retransmit those feeds to others.  In response to concerns that some vendors' high-speed transmissions of consolidated data might reach their subscribers earlier than the same information would reach others, the SEC found that any requirement of simultaneous delivery would be "technically and economically difficult to satisfy" and that there was no way to "ensure that all vendor subscribers receive transaction information at the same time." Exchange Act Release No. 34-16589, 45 Fed. Reg. 12,377, 12,384 (Feb. 26, 1980).

exchanges in recent years for a variety of reasons.[8]  In particular, the SEC has exercised its

authority to enforce Rule 603.  *See* SCAC ¶¶ 281–84.  In 2012, the SEC brought a cease-and-

desist proceeding against NYSE and NYSE Euronext for alleged violations of Regulation NMS.

*In re NYSE*, Exchange Act Release No. 34-67857, at 2, 9–10; *see also* SCAC ¶ 282.  In recent

months, the Chair of the SEC has reiterated the agency's focus on consolidated data latency.[9]

### F.     Order Types And Processing Of Trades

The Exchanges' responsibility to regulate pursuant to the Exchange Act includes

determining not only who may trade and what may be traded on the exchanges, but also how

trading will be conducted.  *See*, *e.g.*, 15 U.S.C. § 78k-1(a)(3)(B) (exchanges must "operat[e]" the

"national market system").  A critical part of this latter responsibility includes the adoption of

electronic order types, which are "preprogrammed commands traders use to tell the Exchanges

how to handle their bids and offers."  SCAC ¶ 4.

Exchanges "typically offer a wide range of order types for trading on their automated

systems."  EMS Concept Release, 75 Fed. Reg. at 3598.  "Some of their order types are

displayable in full if they are not executed immediately," while "[o]thers are undisplayed, in full

or in part."  *Id.*  Exchanges are "required to file a public order type description with the SEC

describing the functioning of the [particular] order type."  SCAC ¶ 160 (emphasis omitted); *see*

*also* EMS Concept Release, 75 Fed. Reg. at 3598 (exchanges' "proposed rule changes publicly

---

[8]   *See*, *e.g., In re EDGA Exchange, Inc.*, Exchange Act Release No. 34-74032 (Jan. 12, 2015); *In re Chi. Bd. Options Exch., Inc.*, Exchange Act Release No. 34-69726 (June 11, 2013); *In re NASDAQ Stock Mkt., LLC*, Exchange Act Release No. 34-69655 (May 29, 2013).

[9]   *See* Mary Jo White, *Enhancing Our Equity Market Structure* (June 5, 2014) (noting that algorithmic traders "use a variety of low-latency tools, including co-located servers in trading data facilities and direct data feeds from trading venues rather than the slower consolidated data feeds of the [Processors]," and stating that the SEC "will continue to focus the efforts of the exchanges and FINRA in minimizing consolidated data latency"), *available at* http://www.sec.gov/News/Speech/Detail/Speech/1370542004312.

disclose, among other things, the trading services [*i.e.*, order types] and fees of the exchanges").

In adapting to electronic exchanges that no longer rely on brokers to manually transact trades on physical trading floors, the Exchanges have adopted complex order types by rule. These allow investors to replicate the flexibility and complexity that could occur in human interactions, but with the speed and efficiency of automated execution of market orders. Many of these rule changes and approvals have been spurred by the requirements of Regulation NMS, including particularly Rules 610 (the "Locked and Crossed Markets Rule") and 611 (the "Order Protection Rule"). *See* 17 C.F.R. §§ 242.610, .611. For example, Rule 611 prohibits exchanges from executing trades when a better price is available on a different exchange, but the SEC created an exception for "Intermarket Sweep Orders" that exchanges use in various forms to avoid violations of Rule 611. *See* SCAC ¶¶ 182–83; *see also id.* ¶¶ 163–64 (discussing "Price to Comply" order type developed to avoid violations of Rule 610). And the SEC's role does not stop at approval of an order type—it considers whether order types should continue to be used pursuant to its oversight authority. *See, e.g.* Exchange Act Release No. 34-60684, 74 Fed. Reg. 48,632 (Sept. 23, 2009) (review by the SEC whether to eliminate "flash order" functionality).

Although Plaintiffs allege that certain exchanges have not filed all of their order types with the SEC, *see* SCAC ¶¶ 210, 214, 216–19, 229, the Exchanges' rules, which are publicly available and approved by the SEC, describe the available order types on each exchange. *See* NASDAQ Stock Market Rule 4751(f) (defining order types available); NYSE Rule 13 ("Orders and Modifiers"); NYSE Arca Equities Rule 7.31 ("Orders and Modifiers"); BATS Exchange Rule 11.9 ("Orders and Modifiers"); EDGA and EDGX Rules 11.8 ("Orders Types"); CHX Rules Art. 1, Rule 2 ("Order Types, Modifiers, and Related Terms"). Thus, the order types have

14

either been expressly or implicitly permitted by the SEC, and all are subject to SEC review.[10]

### G.    Payment For Order Flow

Many exchanges also have adopted SEC-approved rules governing PFOF fees imposed

on market-makers in connection with certain transactions.[11]  PFOF programs seek to attract order

flow to the exchanges' markets, and thereby enhance liquidity for investors.  *See EMS Concept*

*Release*, 75 Fed. Reg. at 3598; *see also*, *e.g.*, *Citadel Sec., LLC v. Chi. Bd. Options Exch., Inc.*,

No. 13-cv-5833, slip op. at 2 (N.D. Ill. Aug. 4, 2014) ("[PFOF] fees were imposed to attract

'order flow' to a market, thereby increasing market liquidity and benefitting investors.")

(attached as Exhibit 1); *Orman v. Charles Schwab & Co.*, 688 N.E.2d 620, 623 (Ill. 1997)

(noting the SEC's acknowledgment that order flow payments produce economic benefits to

customers, including increased competition).  PFOF programs are not novel; they have been

implemented in various forms (with approval by the SEC) since the early 1980s.  *See Orman*,

688 N.E.2d at 623–25.  Plaintiffs challenge a particular type of PFOF program known as a

"maker/taker" model, in which "non-marketable, resting orders that offer (make) liquidity at a

particular price receive a liquidity rebate if they are executed, while incoming orders that execute

---

[10]    *See* Exchange Act Release No. 34-67412, 77 Fed. Reg. 42,022 (July 17, 2012); Exchange Act Release No. 34-65761, 76 Fed. Reg. 72,230 (Nov. 22, 2011); Exchange Act Release No. 34-62534, 75 Fed. Reg. 43,590 (July 26, 2010); *see also* Exchange Act Release No. 34-72812, 79 Fed. Reg. 48,824 (Aug. 18, 2014); Exchange Act Release No. 34-72676, 79 Fed. Reg. 44,520 (July 31, 2014); Exchange Act Release No. 34-73333, 79 Fed. Reg. 62,223 (Oct. 16, 2014); Exchange Act Release No. 34-70637, 78 Fed. Reg. 62,745 (Oct. 22, 2013); Exchange Act Release No. 34-69538, 78 Fed. Reg. 28,671 (May 15, 2013); Exchange Act Release No. 34-67093, 77 Fed. Reg. 33,798 (June 7, 2012); Exchange Act Release No. 34-61097, 74 Fed. Reg. 64,788 (Dec. 8, 2009).

[11]    *See*, *e.g.*, Exchange Act Release No. 34-48053, 68 Fed. Reg. 37,880 (June 25, 2003); Exchange Act Release No. 34-47948, 68 Fed. Reg. 33,749 (June 5, 2003); Exchange Act Release No. 34-47090, 68 Fed. Reg. 141 (Jan. 2, 2003); Exchange Act Release No. 34-43462, 65 Fed. Reg. 64,466 (Oct. 27, 2000); Exchange Act Release No. 34-43290, 65 Fed. Reg. 57,213 (Sept. 21, 2000).

against (take) the liquidity of resting orders are charged an access fee."  EMS Concept Release, 75 Fed. Reg. at 3598–99; *see also* 17 C.F.R. § 242.610(c).  PFOF is also expressly approved by the SEC.  *See* 17 C.F.R. § 242.610(c).[12]

### H.    The Second Consolidated Amended Complaint

Plaintiffs allege that the Exchanges' use of proprietary feeds and co-location services provided HFT firms with earlier access to market information than other investors, and that the Exchanges facilitated the HFT firms' use of this informational advantage through complex order types and PFOF fees.  *See, e.g.*, SCAC ¶ 9.  Plaintiffs make very clear that the core of the fraud they allege is the combination of co-location, proprietary feeds, and complex order types: "[w]hen combined with either (or both) of the enriched data feeds or complex order types . . . , co-location results in a manipulative device under the Exchange Act"; "[w]hen combined with either co-location services referenced above or the complex order types discussed herein, direct and enhanced data feed products constitute manipulative devices under the Exchange Act[.]"  SCAC ¶¶ 108, 119.  According to Plaintiffs, the Exchanges caused non-HFT members of the investing public to "purchase and sell shares at distorted and manipulated prices."  *Id.* ¶ 296.  Plaintiffs assert that this conduct constitutes securities fraud in violation of Section 10(b) of the Exchange Act and the SEC's Rule 10b-5.  *See id.* ¶¶ 295–302.  In addition, they allege that the Exchanges have violated their responsibilities as registered national securities exchanges, in contravention of Section 6(b) of the Exchange Act.  *See id.* ¶¶ 303–08.

Plaintiffs seek to force sweeping changes on the current structure of the securities markets, by prohibiting practices that the SEC has approved.  For example, although the SEC has

---

[12]   Plaintiffs previously acknowledged that Regulation NMS allowed such fees, though they have struck that acknowledgement from their SCAC.  *Compare* CAC ¶ 46 ("Reg[ulation] NMS cemented this pricing practice by allowing exchanges to continue charging [PFOF] fees to so-called 'takers' of liquidity while not charging so-called 'makers'"), *with* SCAC ¶ 49.

expressly declined to require all recipients to receive market data from the consolidated feeds and any proprietary feeds at the same time, Plaintiffs ask this Court to enter an order "directing [the Exchanges] to ensure that customer bid and offer prices are provided to all investors and trading entities at the same time."  SCAC Prayer for Relief ¶ E.  Similarly, the SEC has approved co-location services, but Plaintiffs ask this Court to prohibit them.  *See id.* (seeking an order "prohibiting Defendants from providing an informational advantage to any HFT firm via paid-for reduced latency services").

## ARGUMENT

The SCAC should be dismissed because the Court lacks subject matter jurisdiction and because the SCAC fails to state a claim upon which relief can be granted.  "A case is properly dismissed . . . under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. . . .  A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  For a complaint to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face" and "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  Although the Court must accept all well-pleaded factual allegations in the SCAC, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."  *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (alterations and internal quotation marks omitted).

## I.    The Court Lacks Subject Matter Jurisdiction Because The Exchange Act Provides The Exclusive Procedure For Reviewing Plaintiffs' Claims.

When Congress chose to rely upon SROs for the regulation of the securities markets, it created a "complex self-regulatory scheme" enforced by the SEC using a "broad . . . range of

administrative remedies . . . for those aggrieved by [SRO] action." *Merrill Lynch, Pierce,*

*Fenner & Smith*, *Inc. v. NASD*, 616 F.2d 1363, 1368 (5th Cir. 1980).  Under the Exchange Act's

two-tiered review procedure, any allegation that the Exchanges violated the Exchange Act or

Regulation NMS must first be presented to the SEC.  *See*, *e.g.*, 15 U.S.C. § 78s; *see also* 17

C.F.R. § 242.608(d) (authorizing SEC review of challenges to market-data dissemination).  Any

party aggrieved by a final order of the SEC can then seek further review, but only in a federal

court of appeals.  *See*, *e.g.*, 15 U.S.C. § 78y(a)(1).  The Exchange Act does not permit Plaintiffs

to circumvent this review procedure by bringing claims like these to district court.  This Court

accordingly lacks jurisdiction over Plaintiffs' claims.  *See*, *e.g.*, *Altman v. SEC*, 687 F.3d 44, 46

(2d Cir. 2012) (per curiam) (affirming dismissal for lack of subject matter jurisdiction where

plaintiff failed to exhaust administrative remedies); *In re Series 7 Broker Qualification Exam*

*Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008) (discussing jurisdictional requirement to

channel claims through the SEC); *Cleantech Innovations, Inc. v. NASDAQ Stock Mkt., LLC*, No.

11-cv-9358, 2012 WL 345902, at *1 (S.D.N.Y. Jan. 31, 2012) ("*Cleantech II*") (dismissing for

lack of subject matter jurisdiction for failure to exhaust administrative remedies).

**A.**      **Plaintiffs' Claims Are Subject To Review By The SEC Under The Exchange Act's Comprehensive Review Process.**

Plaintiffs directly challenge the Exchanges' alleged failure to fulfill their responsibilities

as national securities exchanges under the Exchange Act and Regulation NMS.  Plaintiffs assert

that the Exchanges "failed to discharge the[ir] obligations" to "operate their securities exchanges

in the public interest and for the protection of investors."  SCAC ¶ 305.  They similarly assert

that the Exchanges' use of proprietary data feeds "contraven[ed]" Regulation NMS.  *Id.* ¶ 123.

And yet, Plaintiffs also claim that Regulation NMS "failed to go far enough," criticizing the SEC

for not doing more to curb what it calls "discriminatory" fee structures.  *Id.* ¶ 132–35.  For two

independent reasons, Plaintiffs' claims that the Exchanges violated the Exchange Act and
Regulation NMS must be adjudicated by the SEC.

      **1.**   <u>Exchange Act</u>.  The Exchange Act provides for review of Plaintiffs' allegations.
The SEC retains "plenary" authority under the Exchange Act to "remedy the acts and omissions
of self-regulatory organizations."  *Cook v. NASD Regulation, Inc.*, 31 F. Supp. 2d 1245, 1248 (D.
Colo. 1998); *see also*, *e.g.*, *Citadel*, No. 13-cv-5833, slip op. at 3.  Congress has given
"formidable oversight power" to the SEC to "supervise, investigate, and discipline" SROs for
"*any* possible wrongdoing."  *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 101 (2d Cir. 2007)
(emphasis added); *see also Standard Inv. Chartered v. NASD*, No. 07-cv-2014, 2007 WL
1296712, at *7 (S.D.N.Y. May 7, 2007) (noting the SEC's "numerous powers" to remedy
complaints by those claiming to be aggrieved by SRO action).  Among other things, the SEC has
power to censure SROs, suspend their registrations, and to pursue administrative or civil
proceedings against them.  *See* 15 U.S.C. §§ 78s(h)(1), 78u(d), and 78u-3; *Standard Inv.
Chartered*, 2007 WL 1296712, at *6–*7; *In re BearWagner Specialists LLC et al.*, Exchange Act
Release No. 34-64553 (May 26, 2011), *available at* 2011 WL 2098098.

      Plaintiffs complain that the Exchanges provided preferential access to market data to
HFT firms, and then encouraged them to take advantage of that preferential access at the expense
of other market participants—all in violation of the Exchange Act.  The SEC is vested with
authority to resolve these claims under the Exchange Act, and to provide appropriate remedies in
the event that it finds there has been a violation.  Indeed, the SEC has proven itself ready,
willing, and able to pursue enforcement proceedings under Sections 19 and 21D against an
exchange for market-data violations.  *See In re NYSE*, Exchange Act Release No. 34-67857
(proprietary feeds); *In re NYSE LLC et al.*, Exchange Act Release No. 34-72065 (May 1, 2014)

(co-location and order types); *In re EDGA Exch., Inc.*, Exchange Act Release No. 34-74032
(order types).

      **2.**    <u>Regulation NMS</u>.  Regulation NMS also creates a review procedure for the SEC
to "entertain appeals in connection with the implementation or operation of any effective
national market system plan."  17 C.F.R. § 242.608(d).  In particular, "*[a]ny action* taken or
failure to act by any person in connection with an effective national market system plan . . . *shall
be subject to review by the [SEC]*, on its own motion or upon application by any person
aggrieved thereby."  *Id.* § 242.608(d)(1) (emphases added).  Plaintiffs' challenges to proprietary
data feeds and co-location services address "action[s] taken" by the Exchanges "in connection
with an effective national market system plan," *id.*, and thus Plaintiffs had the opportunity to
complain to the SEC about those actions.

      Significantly, Plaintiffs' case rests on their assertion that proprietary data feeds and co-
location services violate Regulation NMS.  According to the allegations of the SCAC, complex
order types and maker/taker PFOF programs are *vehicles* through which the Exchanges
supposedly facilitated and encouraged the use of HFT firms' alleged informational advantage.
The complex order types are objectionable, Plaintiffs allege, because they provide "the ability to
gain access to the top of [the Exchanges'] 'order book,' or the queue of buy and sell orders that
are typically ranked by price and when they were received," SCAC ¶ 138, which in turn allows
HFT firms to take advantage of their speed advantage, *id.* ¶ 107.  Similarly, Plaintiffs allege that
maker/taker PFOF programs "incentivize[ ]" "HFT firms, which were way out ahead of the rest
of the market by micro- if not milliseconds," to "create more interest in the stock by pinging
more exchanges . . . in order to close the trade on an exchange that would pay them the largest
rebate rather than charging them a fee to transact."  *Id.* ¶ 247.  If the SEC were to change course

and require the Exchanges to eliminate proprietary data feeds and co-location services, then Plaintiffs would have no basis for claiming that HFT firms have an informational advantage, or that any harm resulted from that supposed advantage.  Thus, the SEC has authority under Regulation NMS to address the central element on which Plaintiffs' entire theory of liability depends: early access to market information through proprietary data feeds and co-location.

> **B.     Plaintiffs Cannot Bypass The Exchange Act's Review Process By Suing In Federal District Court.**

Congress has created a two-tiered, "self-contained process" to "review and remedy . . . complaints" about SRO actions such as those challenged here that does not include *any* role for the district courts.  *Series 7*, 548 F.3d at 114.  As a result, district courts lack subject matter jurisdiction over claims against SROs raising issues that "Congress intended to subject to the comprehensive enforcement structure created by the Exchange Act."  *Hayden v. NYSE, Inc.*, 4 F. Supp. 2d 335, 340 (S.D.N.Y. 1998).  This remains true "[w]hether or not Plaintiff[s] choos[e] to avail [themselves] of this process."  *Cleantech Innovations, Inc. v. NASDAQ Stock Mkt., LLC*, No. 11-cv-9358, 2011 WL 7138696, at *4 (S.D.N.Y. Dec. 30, 2011) ("*Cleantech I*") (dismissing challenge to SRO action for lack of jurisdiction).

The Second Circuit has recognized that the Exchange Act's provision allowing review of SEC decisions by the federal courts of appeals under 15 U.S.C. § 78y "generally preclude[s] *de novo* review in the district courts, requiring litigants to bring challenges 'in the Court of Appeals or not at all.'"  *Altman*, 687 F.3d at 45–46 (quoting *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958)).  Another judge of this Court has similarly recognized, in *Cleantech II*, that litigants cannot pursue claims in district court that could be raised through the Exchange Act's review process, because that statute "sets forth a specific and comprehensive scheme" for reviewing challenged SRO actions, "including review by the SEC and the United States Courts

of Appeals." 2012 WL 345902, at *1 (citations omitted).  Similarly, the D.C. Circuit

emphasized in *Series 7* that the Exchange Act's "multiple layers of review evince Congress's

intent to direct challenges" into "avenues Congress created."  548 F.3d at 114.[13]

Because Plaintiffs' claims impermissibly seek to challenge SRO actions outside of the

"avenues Congress created," *id.*, this Court lacks jurisdiction to entertain those claims.  The

Exchange Act and Regulation NMS vest the SEC—not federal district courts—with authority to

evaluate whether any action or failure to act constitutes a violation of Regulation NMS.

The SEC has made clear that its review authority under Rule 608(d) is implicated by

matters involving "the broad objectives of the national market system—the public interest, the

protection of investors, or the maintenance of fair and orderly markets" as well as "the fair

administration of the Plans and . . . policing against self-dealing."  *In re Boston Stock Exch., Inc.*,

Exchange Act Release No. 34-58191, 2008 WL 2783572, at *5–6 (July 18, 2008) (internal

quotation marks omitted); *see also id.* at *6 (noting that these matters implicate the SEC's

"expertise in securities law").  Here, the SCAC itself admits these standards are met.  There can

be no doubt that the claims alleged in the SCAC implicate "protection of investors":  The

putative class includes nearly every investor in the U.S. financial markets.  SCAC ¶ 36.  And the

SCAC directly accuses the Exchanges of failing to maintain "fair and orderly" markets and

engaging in self-dealing by aiding and abetting high-frequency traders in order to reap profits.

---

[13]   This exclusivity rule also holds true under many similar two-step systems in which a federal
statute gives jurisdiction first to an agency and then to a court of appeals.  "By lodging review of
agency action in the Court of Appeals, Congress manifested an intent that the appellate court
exercise *sole* jurisdiction over the class of claims covered by the statutory grant of review
power."  *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984)
(emphasis added).  A federal statute channeling review to the agency and then to a court of
appeals creates the exclusive procedure for a judicial challenge, even if there is no "express
statutory command of exclusiveness."  *Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.*,
379 U.S. 411, 422 (1965).

*See, e.g.*, *id.* ¶¶ 3, 4, 84.  Nothing could implicate the SEC's expertise more clearly than Plaintiffs' attack on the structure and function of the national market system.[14]

It would undermine Congress's goal in creating the national market system overseen by the SEC, and the SEC's goal in promulgating Regulation NMS, if the determination of what standard of liability to apply or what remedy is "necessary or appropriate" for a given breach were decided by courts or juries, rather than by the SEC under the authority granted to it by Congress.  Indeed, the SEC has considered—and *rejected*—the central assertion on which the SCAC is based.  Plaintiffs complain that the users of proprietary feeds and co-location services receive market data earlier than other investors, and that this enables those users to employ various methods (such as complex order types) to profit at other investors' expense.  *See*, *e.g.*, SCAC ¶ 9.  Plaintiffs maintain that this practice is illegal because Regulation NMS "require[s] . . . that the [Processors] transmit [market] data so as *to be received* by all market participants at the same time."  *Id.* ¶ 123 (emphasis added).  But Regulation NMS does not say that, and the SEC has rejected this interpretation of its regulation.

In adopting Regulation NMS, the SEC made clear that it was prohibiting an SRO or broker-dealer only from *sending* data to a vendor or user any sooner than it *sends* the data to a Processor; not requiring exchanges to "synchronize the delivery of [their] data to end-users with delivery of [consolidated] data by a Network processor to end-users."  NMS Adopting Release, 70 Fed. Reg. at 37,567.  In other words, the SEC has rejected the notion—essential to Plaintiffs' claims—that the Exchanges must police the order in which data *arrives* at end users.  The SEC

---

[14]  Even though the SEC's review authority under Rule 608(d) is discretionary, courts have required plaintiffs to exhaust procedures at the SEC under the general provisions of the Exchange Act.  *See Altman*, 687 F.3d at 46 (requiring use of exclusive review procedures at SEC though no express review procedure for SEC debarment in Exchange Act); *Standard Inv. Chartered*, 2007 WL 1296712, at *7 (requiring exhaustion even when no express review procedure for proxy solicitation process of SRO).

recently reiterated the fact that "information from a Network Processor generally reaches market participants later than information from exchanges' proprietary feeds." *In re NYSE*, Exchange Act Release No. 34-67857, at 9; *see also* EMS Concept Release, 75 Fed. Reg. at 3601.  Plaintiffs thus ask this Court and a jury to impose liability for conduct that the SEC has authoritatively and explicitly decided is consistent with the governing law.

The jurisdictional analysis does not change when Plaintiffs bring a claim under Section 10(b) for securities fraud, or under a purported implied right of action under Section 6(b). Plaintiffs' allegations concern conduct that the SEC has found does not violate the Exchange Act, *including* Sections 6(b) and 10(b).  Congress created an explicit procedure for reviewing the Exchanges' conduct and the rules of the SEC; Plaintiffs ask this Court to abandon that process and adopt their preferred view of how the nation's securities markets should function.  The Court should decline Plaintiffs' invitation:  Federal district courts do not have jurisdiction to bypass Congress's orderly system of review by the SEC and, on appeal, the federal courts of appeals.

## II.     Plaintiffs' Claims Are Barred By Absolute Immunity.

### A.     The Exchanges Are Immune From Private Damages Suits Challenging Their Regulatory Activities.

An unbroken chain of Second Circuit decisions has left "no question that an SRO and its officers are entitled to absolute immunity from private damages suits in connection with the discharge of their regulatory responsibilities." *Standard Inv. Chartered, Inc. v. NASD*, 637 F.3d 112, 115 (2d Cir. 2011) (per curiam); *see also NYSE Specialists*, 503 F.3d at 96; *DL Capital*, 409 F.3d at 97; *D'Alessio v. NYSE, Inc.*, 258 F.3d 93, 105–06 (2d Cir. 2001).  Numerous other courts have reached the same conclusion.  *See*, *e.g.*, *Series 7*, 548 F.3d at 114–15; *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1213–15 (9th Cir. 1998).  SRO immunity is dispositive here.

Absolute immunity is a "'matter not simply of logic but of intense practicality, since, in

the absence of such immunity, [an SRO's] exercise of its quasi-governmental functions would be unduly hampered by disruptive and recriminatory lawsuits.'"  *D'Alessio*, 258 F.3d at 105 (quoting *D'Alessio v. NYSE, Inc.*, 125 F. Supp. 2d 656, 658 (S.D.N.Y. 2000)).  Claims against an SRO are barred if they attack conduct within the scope of the SRO's regulatory role, whether the suits are pleaded as federal, state-law, statutory, or common-law claims.  *See, e.g.*, *Standard*, 637 F.3d at 116–17 (state-law claims); *DL Capital*, 409 F.3d at 96 (federal statutory and state common-law claims); *D'Alessio*, 258 F.3d at 100 (state common-law claims).[15]

The determinative question in applying SRO immunity is whether the activity "'relate[s] to the proper functioning of the regulatory system,'" and whether "the conduct is 'consistent with' the exercise of power delegated to the SRO" under the Exchange Act.  *NYSE Specialists*, 503 F.3d at 96, 99 (quoting *D'Alessio*, 258 F.3d at 106); *see also, e.g., id.* at 95–96 (motive and reasonableness are not relevant considerations in immunity determination); *Sparta*, 159 F.3d at 1215 (absolute immunity applies even if the allegations of misconduct are true).  As the Second Circuit explained in *Standard*, if the challenged SRO conduct is "intimately intertwined with the regulatory powers delegated to SROs," then absolute immunity applies.  637 F.3d at 116–17.

### B.   Plaintiffs' Damages Claims Attack The Exchanges' Exercise Of Their Regulatory Authority And Thus Are Barred By Absolute Immunity.

Plaintiffs' allegations are "intimately intertwined" with the Exchanges' regulatory functions, *Standard*, 637 F.3d at 116, and their claims are accordingly barred by absolute immunity.  The system of market data regulation is one of Congressional mandate; SEC regulation, delegation, and oversight; and SRO design, implementation, operation, and regulation.  Congress mandated that the SEC develop a system for the dissemination of

---

[15] The fact that SROs are immune from private damages suits attacking their regulatory activities does not mean that those actions are exempt from review.  As noted above, Congress created a review system involving oversight by the SEC and, on appeal, the federal courts of appeals.

consolidated market data.  *See* 15 U.S.C. § 78k-1(a)(1)-(2) (directing the SEC to use its authority to facilitate the establishment of a national market system to ensure, among other objectives, the availability to brokers, dealers, and investors of information with respect to quotations for and transactions in securities).  The SEC then directly delegated to the Exchanges, via Rule 603 (and its predecessors), among other provisions, the responsibility to jointly develop the NMS Plans to disseminate consolidated information.

Plaintiffs' claims that the Exchanges violated the Exchange Act and Regulation NMS by permitting HFT firms to access market information sooner than other market participants, through both proprietary feeds and co-location services, are allegations that they have failed to implement the national market system consistent with their regulatory responsibilities.  Because early access to market information is the centerpiece of Plaintiffs' case, their claims are barred by absolute immunity; and complex order types and PFOF programs go hand-in-hand with Plaintiffs' allegations regarding proprietary feeds and co-location, so the immunity analysis is the same.  In any event, complex order types and PFOF programs are themselves also part of the Exchanges' duty to regulate trading on their markets, and thus are covered by absolute immunity.

### 1.     The Exchanges' Implementation Of The National Market System Is A Core Regulatory Function Under The Exchange Act.

The Exchanges' dissemination of market data is a core regulatory function that falls within their statutorily delegated responsibilities under Section 11A and Regulation NMS.  *See* 15 U.S.C. § 78k-1(a)(1)(D) (noting that national market system will "foster efficiency, enhance competition, increase the information available to brokers, dealers, and investors, facilitate the offsetting of investors' orders, and contribute to [the] best execution of such orders").  Indeed, "[w]hen Congress mandated a national market system . . . it emphasized that consolidated data 'would form the heart of the national market system.'"  *In re NYSE*, Exchange Act Release No.

34-67857, at 2.  The dissemination of data further implicates the Exchanges' responsibilities under Regulation NMS to "check prices at other trading centers to determine whether they may execute an order or whether another trading center has a better price."  *Id.*  The regulatory responsibility for disseminating consolidated market data—the type of information that "ordinary investors" allegedly receive, *see* SCAC ¶ 75—is delegated specifically to the Exchanges under Section 11A and Regulation NMS.  *See* H.R. Rep. No. 94-229, at 93 (1975) (stating that the systems for collecting and distributing consolidated market data would "form the heart of the national market system").

Regulation NMS delegates to the Exchanges the regulatory responsibility of organizing themselves (and others) through NMS Plans to produce consolidated reports of market data.  *See, e.g.*, 15 U.S.C. § 78k-1(a)(3)(B) (directing SEC to "authorize or require [SROs] to act jointly with respect to matters as to which they *share authority under this chapter* in planning, developing, operating, or regulating a national market system" (emphasis added)); *see also* 17 C.F.R. § 242.603(b) (requiring the Exchanges and national securities associations that trade NMS stocks to act jointly pursuant to NMS Plans to disseminate consolidated quotation and transaction information); *id.* § 242.608(a)–(b) (setting forth the procedures for filing NMS Plans and amendments with the SEC and the standards governing SEC approval of those plans).  The NMS Plans themselves spell out (in slightly varying language) these regulatory responsibilities, including overseeing the consolidation process; periodically evaluating the Processors; setting the fees to be paid by recipients of consolidated data feeds; determining matters involving the interpretation of the NMS Plans; making policy determinations pertaining to contracts with recipients of consolidated market data; and prescribing the forms of contracts for providing consolidated data.  *See, e.g.*, NASDAQ UTP Plan § IV.B; CTA Plan §§ IV, V.

Thus, in planning and operating the national market system, the Exchanges are actively engaged in a regulatory function required by Congress and the SEC, and governed by the SEC's Regulation NMS.  Plaintiffs point to isolated statements by the Exchanges, such as that the sale of market data is "a significant product of their core business," in an attempt to distinguish regulatory conduct from business conduct.  SCAC ¶ 83 (internal quotation marks omitted). Plaintiffs' distinction is false.  The Exchanges are in the business of operating securities exchanges, so it is hard to conceive of a regulatory function that would not also be a "business" function.  Disciplining members and evaluating companies for listing with the Exchanges are also core to the business of running a securities exchange, but they are no doubt regulatory in nature.  Because Plaintiffs' claims seek damages arising from the Exchanges' alleged failure to properly exercise this regulatory authority—and in particular from their assertions that the Exchanges violated the Exchange Act and Regulation NMS by permitting HFT firms to receive information earlier than other investors, *see*, *e.g.*, SCAC ¶ 124—their claims are barred.

The Second Circuit's decision in *NYSE Specialists* is illustrative.  The plaintiffs there alleged "wide-ranging manipulative, self-dealing, deceptive, and misleading conduct" against an SRO for allowing certain market traders advanced access to trading information.  *NYSE Specialists*, 503 F.3d at 93 (internal quotation marks omitted).  These preferred traders, in turn, allegedly could avail themselves of trading advantages, including by trading ahead of other investors who lacked advanced access.  The plaintiffs alleged that the SRO had "permitted and encouraged misconduct and fraud on its trading floor," and was not entitled to immunity because such misconduct "abandoned [the SRO's] regulatory role to maintain a fair and orderly market." *Id*. at 91.  But the court held that because this obligation is a core regulatory responsibility, the plaintiffs' claims challenged the SRO's failure to properly exercise its regulatory functions, and

28

thus those claims were barred by absolute immunity. *Id.* at 99–101; *see also*, *e.g.*, *The NASDAQ OMX Group, Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1021 (2d Cir. 2014) (discussing the "federally prescribed duty to operate a fair and orderly exchange").

Similarly here, Plaintiffs allege that the Exchanges violated their regulatory duties with respect to market data by providing advance access to others, who used that purported advantage to generate trading profits. Because the alleged misconduct in this case arises from obligations imposed on the Exchanges by the Exchange Act and Regulation NMS to plan and implement the national market system, Plaintiffs' claims are barred by absolute immunity.[16]

### 2. Plaintiffs' Claims Based On Complex Order Types And PFOF Programs Are Also Barred By The Exchanges' Absolute Immunity.

Because Plaintiffs' theory depends on the *combination* of allegedly complex order types and PFOF programs with proprietary data feeds and co-location, SCAC ¶¶ 108, 119, the Exchanges' immunity for proprietary feeds and co-location is dispositive. In any event, immunity independently applies for the Exchanges' complex order types and PFOF.

**a.** <u>Complex Order Types</u>. As Plaintiffs acknowledge, the order types used by the Exchanges—whether simple or complex—reflect "preprogrammed commands traders use to tell the Exchanges how to handle their bids and offers." SCAC ¶ 4. As the SEC recently recognized in sanctioning certain exchanges for not disclosing the complete details of the functionality of their order types, "[a]n important category of exchange rules are those that govern the exchange's order types. Order types are the primary means by which market participants communicate their instructions for the handling of their orders to the exchange. Complete and

---

[16]   As the Second Circuit recognized in *DL Capital*, "safeguarding the integrity of market information was one of the purposes behind the regulation of the securities markets in the first place." 409 F.3d at 98. Because Plaintiffs allege that the Exchanges failed in their responsibilities to "safeguard[ ] the integrity of market information," *id.*, their claims would be barred by absolute immunity even apart from Section 11A and Regulation NMS.

accurate disclosure of an exchange's order types and order handling procedures is necessary to promote a fair, orderly, and free and open market." *In re EDGA Exchange, Inc.*, Exchange Act Release No. 34-74032, at 2.  In approving rules regarding order types, the adoption and use of particular order types falls squarely within the Exchanges' regulatory duties under the Exchange Act (i) to "prevent fraudulent and manipulative acts and practices," (ii) to "promote just and equitable principles of trade," (iii) to "remove impediments to and perfect the mechanism of a free and open market and a national market system," and (iv) to "protect investors and the public interest."  15 U.S.C. § 78f(b)(5); *see also*, *e.g.*, Exchange Act Release No. 34-63777, 76 Fed. Reg. 5630, 5634 (Feb. 1, 2011) (approving amendments to exchange rule regarding complex orders); Exchange Act Release No. 34-69419, 78 Fed. Reg. 24,449, 24,453 (Apr. 25, 2013) (same).  Surely decisions about order types implicate core regulatory function of the Exchanges.

Plaintiffs allege that the Exchanges have permitted complex order types that allow HFT firms to exploit their alleged informational advantage to the unlawful detriment of other traders, *see*, *e.g.*, SCAC ¶ 136, but that is simply an allegation that the Exchanges have exercised their regulatory responsibilities *improperly*.  As the Second Circuit emphasized in *NYSE Specialists*, the key question for absolute immunity is "*whether* [the] specific acts and forbearances [challenged by the plaintiff] were incident to the exercise of regulatory power," which has nothing to do with the "propriety of those actions or inactions."  503 F.3d at 98.  Plaintiffs concede that the Exchanges have a regulatory responsibility to ensure "fair[ ] and orderly markets."  SCAC ¶ 41; *see also*, *e.g.*, *id.* ¶¶ 47, 79, 84, 85, 93, 102, 133.  Because the Exchanges' promulgation of order types, including complex order types, falls well within their regulatory responsibilities to oversee and maintain their markets, Plaintiffs' allegations with respect to complex order types are barred by absolute immunity.  Indeed, the SEC recently approved one of

the primary order types, the Day ISO, about which Plaintiffs complained in the CAC, finding

that it was consistent with perfecting a "free and open market and a national market system" and

protecting the "public interest."  Exchange Act Release No. 34-73333, 79 Fed. Reg. 62,223,

62,226 (Oct. 16, 2014) (approving NYSE proposed rule change).  As a result, Plaintiffs have

been forced to backtrack in the SCAC and allege merely that the other Exchanges may not have

disclosed enough about that same order type.  SCAC ¶¶ 204–31.  But all of the Exchanges'

filings, whether allegedly "incomplete" or not, were themselves part of a regulatory rulemaking

process governed by the Exchange Act.  *See DL Capital*, 409 F.3d at 98 (holding, in a case

alleging misrepresentation, that manner in which regulatory decision is announced is also

protected by absolute immunity).  Even if this Court had jurisdiction to hear misrepresentation

claims related to regulatory matters, immunity would bar any suit against the Exchanges based

on their statements to the SEC.  *See id.*

**b.**    Maker/Taker PFOF Programs.  Plaintiffs' claims with respect to maker/taker

PFOF fees also concern conduct that arises from authority delegated to the Exchanges.  The rules

imposing the PFOF fees were promulgated pursuant to the same statutory authority as the

complex order types, *see supra* pp. 15–16; *see also* 15 U.S.C. § 78f(b)(4)–(5), and fit squarely

within this delegated authority, *see*, *e.g.*, Concept Release, Competitive Developments in the

Options Markets, 69 Fed. Reg. 6124, 6129 (Feb. 9, 2004); *Citadel*, No. 13-cv-5833, slip op. at 2

("Those fees were imposed to attract 'order flow' to a market, thereby increasing market

liquidity and benefitting investors.").  Once again, Plaintiffs' complaint about PFOF fee

structures is that the Exchanges *improperly* exercised their regulatory functions and thereby

provided "incentives to lure" HFTs and their allegedly predatory practices, rather than ensuring

an orderly and fair market.  SCAC ¶ 48.  But the creation of PFOF fee rules was an exercise of

delegated regulatory power by the Exchanges, and implementation of those rules, in tandem with the SEC's approval, was a regulatory obligation of the Exchanges under the Exchange Act. That is all that is required for absolute immunity to attach. *See NYSE Specialists*, 503 F.3d at 98 ("propriety of . . . actions or inactions" is irrelevant).

Moreover, Plaintiffs' overarching theory that complex order types and maker/taker PFOF programs constituted vehicles for defrauding investors is not only an allegation that the Exchanges aided and abetted fraud, but, fundamentally, is a claim that the Exchanges failed to properly regulate their markets (as Plaintiffs' Section 6(b) claim argues explicitly). It is the responsibility of the Exchanges to monitor trading for fraud and abuse, including the type of spoofing or layering activities the SCAC alleges. *See* SCAC ¶¶ 250–51; 15 U.S.C. § 78f(b)(5) (Exchanges are required to have rules "designed to prevent fraudulent and manipulative acts and practices"). *NYSE Specialists* involved the exact same type of allegation, that the Exchanges were engaged in fraud by knowingly turning a blind eye to allegedly fraudulent activity, and the Second Circuit held such a claim barred by absolute immunity. 503 F.3d at 98. The same result is required in this case.

### 3. Plaintiffs Cannot Plead Around Absolute Immunity By Invoking Supposed "Profit" Motivations.

Plaintiffs attempt to escape the Exchanges' absolute immunity by pleading around it. Plaintiffs allege that "[a]llowing [the Exchanges] to be immune from activities *designed* to increase order flow and trading volume from HFT firms would allow unrestrained *motives* for profit to go unchecked." SCAC ¶ 294 (emphases added).[17] Plaintiffs proclaim that "[s]elling

---

[17]  Plaintiffs are of course wrong that immunity could ever give rise to *unchecked* profit motives. Comprehensive oversight by the SEC is precisely the means that Congress has determined will best effectuate management of the Exchanges as for-profit entities. The SEC has approved the for-profit status of each of the Exchanges. *See* Exchange Act Release Nos. 34-58375, 73 Fed. Reg. 49,498 (Aug. 21, 2008) (BZX, reflecting BATS' ownership); Exchange Act Release No.

and creating products designed to cater almost exclusively to the profit motives of the Exchanges and HFT firms falls outside of the traditional, quasi-governmental role of a stock exchange." *Id.* ¶ 5.  Similar new language is scattered throughout the SCAC, attempting to defeat immunity with allegations related to the Exchanges' self-interested motivations for profit.  *See, e.g., id.* ¶¶ 10, 16, 52, 65, 78, 84, 88, 115, 134.   Even if these were not mere legal conclusions, Plaintiffs' invocation of supposed profit motivations does not abrogate immunity.  Under settled Second Circuit precedent, such motivations are *categorically* irrelevant to the immunity analysis.

      **a.**    <u>Second Circuit Precedent</u>.  The Second Circuit has repeatedly and expressly held that allegations of profit motive *cannot* defeat absolute immunity.  *See NYSE Specialists*, 503 F.3d at 98 (granting immunity to SRO even though the plaintiff had alleged that the challenged decisions were made to increase the SRO's profits); *D'Alessio*, 258 F.3d at 98 (same); *see also Dexter v. Depository Trust & Clearing Corp.*, 406 F. Supp. 2d 260, 263–64 (S.D.N.Y. 2005) (allegations of a profit motive are irrelevant to the immunity analysis), *aff'd*, 219 F. App'x 91 (2d Cir. 2007).  It does not matter *how* or *why* an SRO is alleged to have acted wrongfully.  As noted above, all that matters is "*whether* [the challenged] acts and forbearances were incident to the exercise of regulatory power."  *NYSE Specialists*, 503 F.3d at 98.[18]

---

34-62716, 75 Fed. Reg. 51,295 (Aug. 19, 2010) (BYX, reflecting BATS' ownership); Exchange Act Release No. 34-51149, 70 Fed. Reg. 7531 (Feb. 14, 2005) (CHX); Exchange Act Release No. 34-61698, 75 Fed. Reg. 13,151 (Mar. 18, 2010) (EDGA and EDGX, reflecting ownership by Direct Edge); Exchange Act Release No. 34-53128, 71 Fed. Reg. 3550 (Jan. 23, 2006) (NASDAQ); Exchange Act Release No. 34-53382, 71 Fed. Reg. 11,251 (Mar. 6, 2006) (NYSE).

[18]   Indeed, "absolute immunity applies even where the challenged conduct was motivated by a wrongful motive[,] as such intent is irrelevant."  *NYSE Specialists*, 503 F.3d at 98 n.3.  The doctrine "'accords protection from . . . any judicial scrutiny of the motive for and reasonableness of official action,' . . . even where the challenged conduct was motivated by a wrongful motive or even malice."  *Id.* at 95–96 (quoting *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005)).  Courts have thus "declined to craft exceptions [to the immunity doctrine] for bad faith (*Desiderio* [*v. NASD*], 191 F.3d [198,] 208 [(2d Cir. 1999)]), fraud (*DL Capital Grp.*, 409 F.3d at 98), negligence, or even gross negligence (*Sparta*, 159 F.3d at 1215)."  *Series 7*, 548 F.3d at 115.

In *NYSE Specialists*, the plaintiffs alleged—as here—that the SRO defendant had "abandoned its regulatory duties and oversight" because it "had a direct financial interest in the successful continuation of th[e] [challenged] scheme."  503 F.3d at 93, 98 n.3 (internal quotation marks omitted).  The Second Circuit held that these allegations were irrelevant, however, because the "focus" of the immunity inquiry must remain on the "specific function at issue in the allegations of misconduct."  *Id.* at 99.  "If such conduct was within the ambit of the SRO's delegated power," the Second Circuit held, "immunity presumptively attaches, even where the SRO wrongly exercises that power."  *Id.*

Judge Lynch considered a similar issue in *Dexter*.  In that case, the company at issue had been subject to a bankruptcy reorganization plan in which shares of the company had been cancelled and in exchange former shareholders had received interests in a litigation trust.  The SRO nonetheless continued to allow purchase of the cancelled shares and announced that holders of those shares would, in conflict with the bankruptcy plan, receive interests in the trust.  406 F. Supp. 2d at 261–62.  When the trustee distributed funds to these later purchasers, a shareholder at the time of reorganization filed suit, alleging that the SRO had diluted his value in the trust— and had, he maintained, done so because of the SRO's desire to protect its members and to increase its own profits.  *Id.*  Judge Lynch noted, however, that SROs do not "lose their immunity because, in addition to their regulatory functions, they also are profit-making and profit-seeking enterprises," and that an SRO's "'motivation in performing [its regulatory] functions is irrelevant to the applicability of absolute immunity.'"  *Id.* at 263 (quoting *Bernard v. Cnty. of Suffolk*, 356 F.3d 495, 502 (2d Cir. 2004)).  "[H]owever badly motivated, inept, or even unlawful the [SRO's] actions may have been," the court concluded, the SRO is "absolutely immune from suit on both federal and state claims" because it was performing a regulatory

34

function in permitting trading to proceed.  *Id.* at 264.  The Second Circuit summarily affirmed the decision in *Dexter*.  219 F. App'x at 92.

In this case, Plaintiffs' claims directly implicate the Exchanges' implementation of SEC-approved plans for regulating the national market system.  Just as the plaintiffs did in *NYSE Specialists*, Plaintiffs allege that the Exchanges have abandoned their regulatory role and acted based on supposed profit motivations.  *See* SCAC ¶¶ 290–94.  But just as in *NYSE Specialists*, *Dexter*, and other cases, the motivations behind the Exchanges' alleged misconduct are "irrelevant."  *Dexter*, 406 F. Supp. 2d at 263 (internal quotation marks omitted).  Absolute immunity applies with full force to Plaintiffs' claims because those claims seek damages arising from the Exchanges' alleged failure to properly perform their regulatory functions.

**b.**     The *Facebook* Decision.  Plaintiffs also cite *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428 (S.D.N.Y. 2013), which partially granted a motion to dismiss on immunity grounds but also partially denied SRO immunity with respect to claims arising from technical problems in an exchange's electronic trading systems during an initial public offering ("IPO").  *See, e.g.*, SCAC ¶ 294.  The court concluded that the SRO was immune with respect to its refusal to halt trading or cancel trades following the malfunction, but that immunity did not shield the SRO for claims relating to the pre-IPO design and promotion of its trading platform.  *See Facebook*, 986 F. Supp. 2d at 452 (discussing challenges to "software design before an IPO" and "promotion of that software before trading commence[d]").  Those claims, the court believed, related to the SRO's "own interest as a private entity to increase trading on its Exchange," *id.* at 453, rather than to its regulatory functions.

35

Even if this decision had been correct on the facts in *Facebook*—and it was not[19]—the reasoning in *Facebook* would not apply here.  The facts of this case arise in a different context from *Facebook*, which dealt with technical issues during the course of an IPO.  What matters in this case is whether the actions challenged in the SCAC, which relate to dissemination of market information to market participants, *fall within the Exchanges' duties under the Exchange Act and Regulation NMS*.  The answer to that question is yes.

## III. The Second Consolidated Amended Complaint Fails To State A Claim.

For the reasons discussed above, Plaintiffs' claims fail at the outset under settled legal doctrines.  They also fail to state a claim for violations of the Exchange Act.

### A. Plaintiffs Fail To State A Claim Because The Conduct Attacked Has Been Approved By The SEC.

Plaintiffs' claims fail as a matter of law because the practices constituting the alleged fraud—proprietary feeds, co-location, complex order types, and PFOF—have been reviewed by the SEC, and the SEC has determined them to be *consistent* with the Exchange Act pursuant to its rulemaking powers.  *See supra* pp. 9–16; 15 U.S.C. § 78s.  Such findings must receive substantial deference from this Court, and Plaintiffs point to no reason why a departure from the SEC's findings is required or permitted.  *See Roth ex rel. Beacon Power Corp. v. Perseus, LLC*, 522 F.3d 242, 247 (2d Cir. 2008) (deferring to SEC's interpretation of its rule to find no Section

---

[19] The Exchanges respectfully submit that the portion of the decision in *Facebook* denying SRO immunity is wrongly decided; the decision is currently on appeal to the Second Circuit.  Although the court in *Facebook* correctly recognized that "[t]he immunity inquiry turns on the nature of the challenged conduct, not its profitability," and that "the SRO's motive [is] not considered," it incorrectly relied on the SRO's alleged profit motive to increase revenue in denying immunity.  986 F. Supp. 2d at 448–52 & n.13.  The court also erred in concluding that the design of a trading platform by an Exchange is not a regulatory act.  *Id.* at 452–55.  The conduct at issue in *Facebook* was immune because (among other reasons) it involved the regulation of trading on the exchange—a function within the SRO's delegated duty to operate and maintain a fair and orderly market.

16(b) violation); *In re Optionable Secs. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (pointing to SEC disclosure rule to find no Section 10(b) violation).  Accordingly, Plaintiffs' claims must fail as a matter of law—the conduct alleged is, and has been determined by the SEC to be, lawful under the Exchange Act.

### B.      Plaintiffs Fail To State A Claim Under Section 6(b) Of The Exchange Act.

Plaintiffs' claim under Section 6(b) of the Exchange Act fails because that provision does not create a private right of action.  Under the statutory scheme created by Congress, the SEC alone—not a private litigant—has the power to sanction an SRO for any failure to comply with Section 6(b).  *See* 15 U.S.C. §§ 78s(c), (h)(1), (h)(4), 78u(d)(3)(A).  The Second Circuit has made clear that no private right of action should be implied to challenge SRO actions because Congress instead relied on the extensive system of administrative remedies and the plenary scope of the SEC's enforcement authority over SROs (as enhanced by the 1975 amendments to the Exchange Act) to police SRO actions.  *See Feins v. Am. Stock Exch., Inc.*, 81 F.3d 1215, 1217 (2d Cir. 1996); *Desiderio v. NASD*, 191 F.3d 198, 208 (2d Cir. 1999).[20]  Because Plaintiffs lack any express right of action under Section 6(b), and because no such right of action can be implied, this Court should dismiss Plaintiffs' claims under Section 6(b).

---

[20] Before the 1975 amendments to the Exchange Act, the Second Circuit had implied a private right of action for violations of the pre-1975 version of Section 6(b).  *See Baird v. Franklin*, 141 F.2d 238 (2d Cir. 1944).  As the Second Circuit noted in *Feins*, the 1975 statutory changes "do not suggest Congressional intent to use private parties to enforce the statute through private causes of action."  81 F.3d at 1222.  The 1975 changes, along with the Supreme Court's more restrictive approach to implied rights of action, caused the Second Circuit to express strong doubts about "the continued existence of such a private cause of action under amended [Section] 6," *id.* at 1224 (citing *Brawer v. Options Clearing Corp.*, 807 F.2d 297, 299 & n.2 (2d Cir. 1986)), and courts, including this one, have departed from *Baird*'s holding, *see*, *e.g.*, *Brawer v. Options Clearing Corp.*, 633 F. Supp. 1254, 1257–62 (S.D.N.Y. 1986) (holding that *Baird* was superseded by 1975 amendments and that there is no private right of action under Section 6(b)).

**C.    Plaintiffs Fail To State A Claim Under Section 10(b) Of The Exchange Act And The SEC's Rule 10b-5.**

Despite availing themselves of yet another opportunity to amend their pleading, Plaintiffs' amorphous claim of securities fraud against the Exchanges still fails to allege sufficient facts to establish their standing to sue, much less to plead any of the elements of a cause of action under Section 10(b) and Rule 10b-5.  To violate Section 10(b) and Rule 10b-5, conduct must be either manipulative or deceptive.  *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 473 (1977).  Plaintiffs here do not allege any conduct by the Exchanges that fits into either category.  At most, their allegations could be read as attempts to allege aiding and abetting, which is not actionable.  Plaintiffs also fail to allege reliance, loss causation, or scienter.

**1.    Plaintiffs Do Not Have Standing To Assert A Claim Under Section 10(b) And Rule 10b-5.**

Only persons who were "themselves purchasers or sellers" of securities have standing to assert a claim under Section 10(b) or Rule 10b-5.  *See*, *e.g.*, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 742 (1975); *Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27, 34 (2d Cir. 2004).  At the pleading stage, the plaintiff "bears the burden of establishing . . . standing."  *Rajamin v. Deutsche Bank Nat'l Trust Co.*, 757 F.3d 79, 84 (2d Cir. 2014); *accord*, *e.g.*, *Winer Family Trust v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007).  Plaintiffs here fail to carry that burden because the SCAC does not identify any specific purchase or sale of any specific security.

Although Plaintiffs allege vaguely that they "purchased and sold" millions of shares of stock, SCAC ¶¶ 21–25, merely purchasing or selling a security does not, standing alone, confer standing.  The Second Circuit has rejected the contention that there is "universal standing for purchasers of securities, allowing anyone who made use of the markets to sue under Rule 10b-5."  *Ontario Pub.*, 369 F.3d at 32.  Rather, the standing rule "limits the class of plaintiffs to those

who have at least dealt in the security *to which the . . . representatio[n] or omission relates*."  *Id.* (quoting *Blue Chip Stamps*, 421 U.S. at 747) (emphasis added).  This limitation is reflected in the PSLRA's certification requirements, which requires plaintiffs to list purchase and sale transactions in the security that is "the subject of the complaint."  15 U.S.C. § 78u-4(a)(2)(iv).

Here, the SCAC includes no allegations regarding the purchase or sale of any specific security by any of Plaintiffs.  Similarly, the PSLRA certifications Plaintiffs filed generally purport to list all "transaction(s) during the class period in securities that are the subject of the Complaint," but set forth nothing more than gross annual numbers of shares bought and sold, without identifying any particular stock or date of purchase or sale.  *See* D.E. 169-2 Ex. B, at 2, 7, 10, 13, 16; *see also* SCAC ¶¶ 21–25.  These submissions not only flout the clear mandate of the PSLRA, they also plainly fail to establish Plaintiffs' standing.[21]

### 2. Plaintiffs Fail To Plead A Claim For Market Manipulation And, At Most, Allege Inactionable Aiding And Abetting.

Plaintiffs' amendments did little to clarify their theory of liability.  As best can be discerned from the SCAC, Plaintiffs' securities-fraud claim appears to be based on a market-manipulation theory.  The elements of a claim for manipulation under Section 10(b) and Rule 10b-5 are "(1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an

---

[21]  *See, e.g.*, *Tannenbaum v. Walco Nat'l Corp.*, No. 83-cv-6815, 1984 WL 2374, at *2 (S.D.N.Y. Jan. 27, 1984) (holding that a Section 10(b) claim failed to satisfy the *Blue Chip Stamps* purchaser-seller rule because of the "lack of specifics as to the precise dates of purchase, the number of shares acquired, and the price"); *Spears v. Metro. Life Ins. Co.*, No. 2:07-cv-88, 2009 WL 2408928, at *6 (N.D. Ind. Aug. 4, 2009) (dismissing complaint where plaintiffs did not "identif[y] with adequate specificity any securities transaction, which is an essential element of a Rule 10b-5 claim and a mandatory part of the sworn certification required from each plaintiff under the PSLRA"); *see also Fraser v. Fiduciary Trust Co.*, No. 04-cv-6958, 2005 WL 6328596, at *4 (S.D.N.Y. June 23, 2005) (holding that the plaintiff "has not sufficiently pled a purchase or sale of securities with the particularity required by Fed. R. Civ. P. 9(b)" where the plaintiff "fail[ed] to allege the date(s) on which he acquired stock, the number of shares acquired, or the consideration given (if any)" as well as whether he "ever sold this stock").

efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *Fezzani v. Bear, Stearns & Co.*, 716 F.3d 18, 22 (2d Cir. 2013) (internal quotation marks omitted). A plaintiff seeking to state a claim for manipulation "must state what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Fezzani v. Bear, Stearns & Co.,* 384 F. Supp. 2d 618, 642 (S.D.N.Y. 2004) (internal quotation marks omitted). The SCAC does not comport with these requirements.

Manipulation is a term of art in the securities laws. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976). It connotes conduct such as "wash sales, matched orders, or rigged prices[] that are intended to mislead investors by artificially affecting market activity." *Santa Fe*, 430 U.S. at 476.[22] Thus, "the courts have recognized the concept of manipulation as a narrow one." 3 Thomas Lee Hazen, *The Law of Securities Regulation* § 12.1[2][A], at 473 (6th ed. 2009). In particular, a claim of manipulation requires an allegation that the defendant engaged in "market activity"—namely, trading—designed to convey a false impression of supply and demand for a security. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 100–01 (2d Cir. 2007); *see also*, *e.g.*, *In re Charter Commc'ns Inc. Sec. Litig.,* 443 F.3d 987, 992 (8th Cir. 2006) (manipulation claim requires that defendant "directly engage in manipulative securities trading practices"), *aff'd*, 552 U.S. 148 (2008); *Fezzani,* 384 F. Supp. 2d at 641 (market manipulation requires "direct participation" (internal quotation marks omitted)); *Hundahl v.*

---

[22]   Wash sales are "transactions involving no change in beneficial ownership," and matched orders are "orders for the purchase [or] sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale/purchase of such security." *Ernst & Ernst*, 425 U.S. at 205 n.25.

*United Benefit Life Ins. Co*., 465 F. Supp. 1349, 1360 (N.D. Tex. 1979) (manipulation requires "transactions in the marketplace"); 3 Hazen, *supra*, at 480 ("The essence of manipulation is proof that the defendant has engaged in artificial transactions").  To establish manipulation, a plaintiff also must show that the defendant acted "for the purpose of artificially depressing or inflating the price of the security."  *ATSI*, 493 F.3d at 101 (internal quotation omitted); *see also* 3 Hazen, *supra*, at 480 (manipulation requires "the express purpose of changing the market price of the stock").  The aim of such conduct typically is to permit the manipulator to realize profits by trading with innocent investors at the manipulated prices.  *See* S. Rep. No. 1455, 73rd Cong., 2d Sess. 30–31 (1934) (describing purpose of manipulation as "rais[ing] the price of [the] security by concerted activity on the part of the pool members, and thereby to enable them to unload their holdings at a profit").

The SCAC here fails to allege that the Exchanges engaged in any conduct that would meet these specific standards.  Plaintiffs do not allege that any Exchange conducted wash sales, submitted matched orders, or engaged in any other type of market transaction, let alone a transaction designed to artificially affect the market price of any security.  Rather, it is HFT firms, not the Exchanges, that the SCAC alleges "manipulate[d] the U.S. securities markets," SCAC ¶ 3.  It is the HFT firms, not the Exchanges, that the SCAC alleges engaged in "electronic front running, latency arbitrage, rebate arbitrage, spoofing, and layering."  *Id.* ¶ 297.  And it is the HFT firms, not the Exchanges, that the SCAC alleges engaged in "predatory misconduct."  *Id.* ¶ 15; *see also id.* ¶¶ 6, 145.  Yet Plaintiffs have chosen not to name any HFT firms in the SCAC.

As to the Exchanges, the SCAC at most alleges only aiding and abetting manipulation. The central thrust of Plaintiffs' claim is that the Exchanges *enabled* HFT firms to take advantage

of Plaintiffs and the Class.  Even though Plaintiffs disingenuously removed some of the most

blatant examples when they amended their complaint, the language of aiding and abetting is still

unmistakable throughout the SCAC.[23]  But aiding and abetting a violation of Section 10(b) is not

actionable in a private securities fraud suit.  *See Cent. Bank of Denver N.A. v. First Interstate

Bank of Denver, N.A.*, 511 U.S. 164 (1994).  Providing "knowing and substantial assistance" to

the violation amounts to aiding and abetting, not primary liability.  *See Fezzani*, 716 F.3d at 25;

*see also Wright v. Ernst & Young LLP*, 152 F.3d 169, 176 (2d Cir. 1998) (rejecting "substantial

participation" as the standard for primary liability); 15 U.S.C. § 78t(e) (authorizing the SEC, but

not private plaintiffs, to bring aiding-and-abetting claims against parties that "provid[e]

substantial assistance" to violators).  "[A]n allegation of acts facilitating or even indispensable to

a fraud is not sufficient" to state a private claim for market manipulation.  *Fezzani*, 716 F.3d at

24.  Under this clear Supreme Court and Second Circuit precedent, Plaintiffs' allegations could

amount to no more than non-actionable aiding and abetting.

Even if the conduct alleged could support primary liability for manipulation (which it

cannot), the market-manipulation claim still fails as a matter of law.  It is hornbook law that

conduct that is disclosed to the market cannot give rise to a claim for market manipulation.  "The

market is not misled when a transaction's terms are fully disclosed."  *Schreiber v. Burlington N.,

Inc.*, 472 U.S. 1, 8–9 (1985); *see also*, *e.g.*, *Anschutz v. Merrill Lynch & Co.*, 690 F.3d 98, 108

---

[23]   The SCAC alleges that the Exchanges designed order types with the knowledge that HFT
firms would use those order types to harm investors, *id.* ¶ 4; "encourage[d]" HFT firms to exploit
customers, *id.* ¶ 6; "provide[d] victims" to HFT firms, *id.*; "allow[ed]" HFT firms to receive
enriched trading information at faster delivery," *id.* ¶ 9; "ma[d]e it possible for [HFT] firms to
pick off of and manipulate investors' trades," *id.*; "enable[ed] [HFT] firms to front-run" other
investors, *id.* ¶ 13; "structured" their markets "such that the HFT firms were free to engage in . . .
predatory misconduct," *id.* ¶ 15; "enable[d] HFT firms to regularly and repeatedly profit," *id.* ¶
138; "enable[d] predatory HFT strategies," *id.* ¶ 145; and "incentivized HFT firms," *id.* ¶ 238.
The SCAC further alleges that that the "Exchanges' 'hide and light' orders were designed to and
did assist HFT firms in employing predatory trading strategies."  *Id.* ¶ 157.

(2d Cir. 2012); *Wilson v. Merrill Lynch & Co*., 671 F.3d 120, 130 (2d Cir. 2011); *In re JP Morgan Auction Rate Securities (ARS) Marketing Litig*., No. 10-md-2157, 2014 WL 4953554, at *8–9 (S.D.N.Y. Sept. 30, 2014); *In re Citigroup Auction Rate Sec. Litig*., 700 F. Supp. 2d 294, 307 (S.D.N.Y. 2009).  Here, because all of the conduct of which Plaintiffs complain was subject to review by the SEC and disclosed in the Exchanges' various rule filings and other disclosures, no claim for manipulation can be maintained.

### 3. Plaintiffs Fail To Plead Any Deceptive Misrepresentations Or Acts By The Exchanges.

It is not clear whether Plaintiffs' allegations in the SCAC regarding purportedly false statements are an attempt to allege a misrepresentation claim.  SCAC p. 37; *id.* ¶¶ 85, 89, 93, 97, 100.  The SCAC now includes these allegations under the more general heading of "The Exchanges' Manipulative Scheme to Defraud."  *Id.* at p. 37.  In addition, Count I invokes only the language of Rule 10b-5(a) and (c) and does not include language from Rule 10b-5(b), which addresses material misrepresentations and omissions.  *See* SCAC ¶ 297.  If Plaintiffs nevertheless intended to plead a misrepresentation claim, they have clearly failed to do so.

Any claim of misrepresentation is subject to heightened pleading requirements for fraud under Federal Rule of Civil Procedure 9(b) and the PSLRA.  As relevant here, Rule 9(b) requires a plaintiff alleging fraud to "specify the statements that the plaintiff contends were fraudulent" and "explain why the statements were fraudulent."  *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (internal quotation marks omitted).  Under the PSLRA, similarly, a securities-fraud plaintiff must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).  Under both rules, therefore, plaintiffs must do more than allege that certain statements were false and misleading:  "[T]hey must demonstrate with specificity *why* and *how* that is so."  *Rombach v.*

*Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (emphases added).  In addition, "the PSLRA requires

plaintiffs to link *each* act or omission of the defendant to the plaintiffs' alleged losses."  *Castillo*

*v. Dean Witter Discover & Co.*, No. 97 Civ. 1272, 1998 WL 342050, at *5 (S.D.N.Y. June 25,

1998) (emphasis added) (citing 15 U.S.C. § 78u-4(b)(4)).  The SCAC fails to satisfy these

heightened pleading requirements.

As an initial matter, the SCAC fails to include any particularized allegations that the

challenged statements were, in fact, false or misleading.  The challenged statements are generic

assertions to the effect that the relevant markets are "fair and orderly," but Plaintiffs never

explain why such statements would be false even if their allegations were correct that HFT firms

were able to profit from the markets more successfully than other investors.  Indeed, the SEC has

ruled that the Exchanges' actions are consistent with promoting a "free and open market" and

"just and equitable principles of trade" despite expressly acknowledging the fact that some

investors are able to capitalize on reduced latencies.  *See, e.g.*, Exchange Act Release No. 34-

59606, 74 Fed. Reg. 13,293, 13,294 & n.7 (Mar. 26, 2009); Exchange Act Release No. 34-

59039, 73 Fed. Reg. 74,770, 74,779 (Dec. 9, 2008).

In addition, "[i]t is well-established that general statements about reputation, integrity,

and compliance with ethical norms are inactionable puffery" because they are "too general to

cause a reasonable investor to rely upon them."  *City of Pontiac Policemen's & Firemen's Ret.*

*Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (internal quotation marks omitted); *accord*,

*e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d

187, 206 (2d Cir. 2009) (same).  The SCAC runs afoul of these settled principles when it seeks to

hold the Exchanges liable for statements concerning "fair and orderly" markets, a "commitment

to regulatory integrity," a desire to "work even harder to earn [investors'] trust and confidence,"

44

a focus on "restor[ing] investor confidence," and providing "access to a fair, open, and neutral market place with diverse order flow."  SCAC ¶¶ 84, 85, 93, 97, 100 (internal quotation marks omitted).[24]

### 4.  Plaintiffs Do Not Plead Reliance.

Reliance is an essential element of a private cause of action under Rule 10b-5. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008).  The reliance requirement "ensures that, for liability to arise, the requisite causal connection exists" between the defendant's conduct and the plaintiff's injury.  *Id.*  "[R]eliance must be reasonable" and cannot be established where the conduct was disclosed or the plaintiff "should have discovered the truth."  *Pivot Point Capital Master LP v. Deutsche Bank AG*, No. 08-cv-2788, 2010 WL 9452230, at *5 (S.D.N.Y. 2010) (internal quotation marks omitted).  A plaintiff may establish the necessary causal connection either through direct, "eyeball" reliance, or, in some instances, by way of a presumption of reliance.  *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988); *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).  In this case, Plaintiffs do not adequately plead reliance in either of these ways.

Plaintiffs offer only conclusory statements to the effect that "Plaintiffs and members of the Class that traded during the Class Period relied on the integrity of the market in the securities

---

[24]   Similarly, the alleged misrepresentations that market participants could trade "anonymously" and that customers would receive market data in "real-time" (SCAC ¶ 89 (internal quotation marks omitted)) are inactionable.  The SCAC contains no allegation that the Exchanges revealed the identity of any investor to anyone.  Nor does the SCAC plead any facts that could show that the Exchanges do not disseminate market information in "real time."  In any event, the fact that the Exchanges offered co-location services and proprietary data feeds that resulted in reduced latencies was repeatedly publicly disclosed in SEC filings, in materials provided by the Exchanges to investors, and otherwise.  *See supra* pp. 9–11.  These public disclosures render any statements about "real-time" market data entirely non-misleading.  *See, e.g.*, *In re JP Morgan ARS Mktg. Litig.*, 2014 WL 4953554, at *8 (S.D.N.Y. 2014) ("Plaintiff's material misrepresentation . . . claims fail . . . [because] the activity complained of was adequately disclosed to the market.").

listed and traded on the public exchanges." SCAC ¶ 301; *see also id.* ¶¶ 7, 78–83. That is

essentially the same allegation of reliance that the Second Circuit held insufficient in *Fezzani*,

716 F.3d at 30 (rejecting allegation that "[i]n reliance on the integrity of the market . . . plaintiffs

purchased the Manipulated Securities").[25] It is similarly insufficient for Plaintiffs to allege that

they relied on the Exchanges' statements regarding "orderly and honest trading." *See, e.g.*,

SCAC ¶ 4. As set forth above, these statements are "too general to cause a reasonable investor to

rely upon them." *UBS*, 752 F.3d at 183 (quotation marks omitted). And, in any event, the fact

that the Exchanges offered co-location services, proprietary feeds, and various order types was

public information and the SEC itself publicly recognized that such practices can result in

reduced latencies on which certain investors can capitalize. *See supra* pp. 9–11. In such

circumstances, the claim must fail for lack of reliance. *Pivot Point*, 2010 WL 9452230, at \*6.

The lack of any allegation of manipulative conduct by any Exchange also rules out the

application of any possible presumption of reliance to their market-manipulation claim. In any

event, the SCAC does not even attempt to allege that either the fraud-on-the-market or the

*Affiliated Ute* presumptions of reliance apply. The former would require Plaintiffs to plead the

existence of an efficient market for a specific security, *see Basic*, 485 U.S. at 247, which they do

not. The *Affiliated Ute* presumption applies only in cases of actionable omissions in the face of a

fiduciary duty to disclose; it does not apply to market-manipulation claims like the one here. *See*

*Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 940–41 (9th Cir. 2009) (per curiam).[26]

---

[25] *See* Plaintiffs' First Amended Complaint for Securities Fraud, Market Manipulation, RICO and Common Law Claims ¶ 332, *Fezzani v. Bear, Stearns & Co.*, No. 99-cv-0793 (S.D.N.Y. Apr. 7, 2005), *available at* 2005 WL 6251885.

[26] The Second Circuit has left open the issue whether the *Affiliated Ute* presumption can apply in a manipulation case, *see Levitt v. J.P. Morgan Sec. Inc.*, 710 F.3d 454, 468 n.9 (2d Cir. 2013), and district courts in this circuit have split on the question. The Exchanges submit that the Ninth Circuit's analysis in *Desai*—that "manipulative conduct has always been distinct from actionable

Moreover, even if *Affiliated Ute* could apply, Plaintiffs have not alleged any basis for a duty to disclose on the part of the Exchanges.  Indeed, the law is clear that SROs like the Exchanges owe no fiduciary duty to investors.  *See, e.g.*, *Piemonte v. Chi. Bd. Options Exch., Inc.*, 405 F. Supp. 711, 718 n.4 (S.D.N.Y. 1975) ("Securities exchanges are not in a fiduciary relationship with individuals who buy and sell shares through their facilities."); *Arneil v. Ramsey*, 414 F. Supp. 334, 343 (S.D.N.Y. 1976) (an exchange "is not in a fiduciary relationship with the public customers of its member firms"), *aff'd*, 550 F.2d 774 (2d Cir. 1977); *Steinberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 74-cv-63, 1974 WL 411, at *1 (S.D.N.Y. Jun. 14, 1974) ("The notion that [an] Exchange owes a fiduciary duty to investors who transact business with its members has been rejected . . . .").

### 5. Plaintiffs Fail To Allege Loss Causation

Loss causation also is an essential element of a private cause of action under Rule 10b-5. *See Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also In re China Organic Sec. Litig.*, No. 11-cv-8623, 2013 WL 5434637, at *7 (S.D.N.Y. Sept. 30, 2013) ("The loss causation requirement exists because private securities fraud actions are available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." (internal quotation marks omitted)) .  Loss causation is the proximate causal connection between the defendant's conduct and the plaintiff's loss.  *Dura*, 544 U.S. at 342.  That connection is required in market-manipulation cases just as it is in misrepresentation cases.  *See*, *e.g*., *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 307 (S.D.N.Y. 2009); *see also* 15 U.S.C. § 78u-4(b)(4).  The SCAC does not adequately plead loss causation.

---

omissions" that could trigger the *Affiliated Ute* presumption, *Desai*, 573 F.3d at 940—is clearly correct.

Plaintiffs allege that they "purchased and/or sold shares at artificially distorted and manipulated prices" and that they "pa[id] higher prices for stocks." SCAC ¶¶ 109, 299. But the Second Circuit has made clear that *Dura* requires not only that a plaintiff allege that it purchased securities at an inflated price, but also that the price of the stock dropped after the alleged fraud became known. *Acticon AG v. China N.E. Petro. Holdings., Ltd.*, 692 F.3d 34, 40 (2d Cir. 2012); *accord, e.g.*, *In re China Organic Sec. Litig.*, 2013 WL 5434637, at *7. Plaintiffs not only fail to identify any drop in price, but they also fail to identify the price they paid for any particular security traded on any exchange at any particular time. Because Plaintiffs fail to set forth these basic facts, *see Fezzani*, 384 F. Supp. 2d at 642, they do not even come close to alleging the "specific economic harm" that is required to plead loss causation for a market-manipulation claim. *In re Citigroup*, 700 F. Supp. 2d at 307; *see also In re China Organic Sec. Litig.*, 2013 WL 5434637, at *7. Nor do Plaintiffs make any effort to satisfy the requirement that loss causation be pleaded on a defendant-by-defendant basis. *See* 15 U.S.C. § 78u-4(b)(4) (requiring that "[i]n any private action arising under this Chapter, the plaintiff shall have the burden of proving that the act or omission *of the defendant* . . . caused the loss" (emphasis added)). The SCAC utterly fails to plead any proximate causal connection between any specific allegedly manipulative conduct attributed to any Exchange and any specific loss suffered by Plaintiffs.

### 6.     Plaintiffs Fail To Plead Scienter

A claim under Section 10(b) and Rule 10b-5 requires scienter. *See Ernst & Ernst*, 425 U.S. at 193. The PSLRA imposes a heightened standard for pleading scienter. 15 U.S.C. § 78u-4(b)(2). Under that standard, in a market-manipulation case, the SCAC "must plead with particular[ity] facts giving rise to a strong inference that the defendant intended to deceive investors by artificially affecting the market price of securities." *ATSI*, 493 F.3d at 102.

48

Similarly, in a misstatement case, "the pleaded facts must give 'rise to a strong inference' of fraudulent intent." *Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013) (quoting 15 U.S.C. § 78u-4(b)(2)(A)). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 324 (2007); *accord, e.g.*, *Hensley v. IEC Elecs. Corp.*, No. 13-cv-4507, 2014 WL 4473373, at *3 (S.D.N.Y. Sept. 11, 2014). The SCAC fails that test.

As described above, the SCAC alleges only conduct that is within the core function of the Exchanges to disseminate market data and regulate trading through, among other things, specifying order types. Plaintiffs plead no facts from which one could infer that any Exchange had any intent to deceive investors or artificially affect the price of any specific security at any time. Indeed, there is no plausible argument that the Exchanges engaged in deceptive or manipulative conduct given that the existence of proprietary data feeds, co-location services, order types, and PFOF fees has repeatedly been disclosed publicly. *See supra* pp. 9–16. Instead, the far more "plausible opposing inference" is that the Exchanges were merely acting within the scope of their regulatory responsibilities, especially given that the SEC has continuously held that the Exchanges' actions in this regard are "consistent with the requirements of the [Exchange] Act" and "protect investors and the public interest." *E.g.*, Exchange Act Release No. 34-59606, 74 Fed. Reg. 13,293, 13,294 (proprietary feeds); Exchange Act Release No. 34-62960, 75 Fed. Reg. 59,299, 59,299 (co-location services); Exchange Act Release No. 34-73333, 79 Fed. Reg. 62,223, 62.226 (order types); Exchange Act Release No. 34-59714, 74 Fed. Reg. 17,264 (Apr. 14, 2009) (PFOF fees).

## <u>CONCLUSION</u>

For the numerous reasons stated above, this Court should dismiss the SCAC under Rules 12(b)(1) and 12(b)(6).  Plaintiffs already had two opportunities to amend their complaint, including after seeing the Exchanges' initial brief in support of their motion to dismiss, and any further attempt at amendment would be futile.  The dismissal should therefore be with prejudice. *See*, *e.g.*, *Baiul v. Williams Morris Agency, LLC*, No. 13-cv-8683, 2014 WL 1804526, at *13 (S.D.N.Y. May 6, 2014) (denying leave to amend after plaintiff had twice amended, including after seeing the motion to dismiss filed by certain defendants); *see also, e.g.*, *Smith v. Seinfield*, No. 13-cv-4211, 2014 WL 700202, at *3 (S.D.N.Y. Feb. 24, 2014) (dismissing with prejudice because amendment would be futile).

January 23, 2015

Respectfully submitted,

By: /s/ Douglas R. Cox
Douglas R. Cox
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 955-8500
Facsimile: (202) 530-9539
DCox@gibsondunn.com

*Counsel for The NASDAQ Stock Market LLC and NASDAQ OMX BX, Inc.*

By: /s/ George A. Borden (with permission)
George A. Borden
Steve M. Farina (admitted *pro hac vice*)
Jessica L. Pahl (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street NW
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
GBorden@wc.com
SFarina@wc.com
JLPahl@wc.com

*Counsel for Defendants New York Stock Exchange LLC and NYSE Arca, Inc.*

By: /s/ James A. Murphy (with permission)
James A. Murphy
Joseph C. Lombard (admitted *pro hac vice*)
Theodore R. Snyder
MURPHY & McGONIGLE, PC
1185 Avenue of the Americas, 21st Floor
New York, NY 10036
Telephone: (212) 880-3968
Facsimile: (212) 880-3998
James.Murphy@mmlawus.com
Joseph.Lombard@mmlawus.com
Theodore.Snyder@mmlawus.com

*Counsel for BATS Global Markets, Inc. and Direct Edge ECN, LLC*

51

By: /s/ Seth L. Levine (with permission)
Seth L. Levine
Christos Papapetrou
LEVINE LEE LLP
666 Fifth Avenue
New York, NY 10103
Telephone: (212) 223-4400
Facsimile: (212) 223-4425
SLevine@levinelee.com
CPapapetrou@levinelee.com

*Counsel for Chicago Stock Exchange, Inc.*