UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

IN RE:                                    :    Civil Action No. 14-MD-2589 (JMF)
                                          :
BARCLAYS LIQUIDITY CROSS                  :    **AMENDED CLASS ACTION**
AND HIGH FREQUENCY                        :    **COMPLAINT FOR:**
TRADING LITIGATION                        :
                                          :    **(1)    CONCEALMENT;**
This Document Relates to:                 :
                                          :    **(2)    VIOLATION OF CAL. BUS.**
*Great Pacific Securities v. Barclays*    :    **        & PROF. CODE § 17200;**
*PLC*,                                    :    **        and**
No. 14-cv-1210 DDP (SHx) (C.D. Cal.)      :
No. 15-cv-0168-JMF (S.D.N.Y.)             :    **(3)    VIOLATION OF CAL. BUS.**
                                          :    **        & PROF. CODE § 17500**
                                          :
                                          :    **JURY TRIAL DEMAND**
                                          :
——————————————————————— x

BOTTINI & BOTTINI, INC.                   COTCHETT, PITRE & MCCARTHY, LLP
Francis A. Bottini, Jr.                   Joseph W. Cotchett
Albert Y. Chang (AC-5415)                 Mark C. Molumphy
Yury A. Kolesnikov                        Nanci E. Nishimura
7817 Ivanhoe Avenue, Suite 102           Kevin P. O'Brien
La Jolla, California 92037                Elizabeth T. Tran
Telephone:   (858) 914-2001              San Francisco Airport Office Center
Facsimile:   (858) 914-2002              840 Malcolm Road, Suite 200
E-mail:      fbottini@bottinilaw.com     Burlingame, California 94010
             achang@bottinilaw.com       Telephone:    (650) 697-6000
             ykolesnikov@bottinilaw.com  Facsimile:    (650) 697-0577

*Attorneys for Plaintiff Great Pacific Securities*

Dated:  February 6, 2015

## Table of Contents

I.      OVERVIEW ....................................................................................................... 1

II.     JURISDICTION AND VENUE .......................................................................... 3

III.    THE PARTIES ................................................................................................. 4

        A.     Plaintiff ............................................................................................... 4

        B.     Defendants .......................................................................................... 5

IV.     FACTUAL ALLEGATIONS ............................................................................. 6

        A.     The Evolution of "Dark Pools" .................................................... 6

        B.     Barclays and the Expansion of Its LX Dark Pool ................... 8

        C.     Barclays Provides Marketing Material to Plaintiff and the Class
               to Convince Them to Trade on Barclays' LX ......................................... 12

        D.     Barclays' Marketing Material Concealed Material Information.......... 14

V.      CLASS ALLEGATIONS ................................................................................. 23

VI.     CAUSES OF ACTION .................................................................................... 25

        FIRST CAUSE OF ACTION - CONCEALMENT .................................. 25

        SECOND CAUSE OF ACTION - UNFAIR COMPETITION
        CALIFORNIA BUS. & PROF. CODE § 17200 ..................................... 26

        THIRD CAUSE OF ACTION - FALSE ADVERTISING
        CALIFORNIA BUS. & PROF. CODE § 17500 ..................................... 28

VII.    REQUEST FOR RELIEF................................................................................. 29

VIII.   JURY TRIAL DEMAND ................................................................................. 30

Plaintiff Great Pacific Securities, on behalf of itself and all others similarly situated, makes the following allegations, except as to allegations pertaining to Plaintiff, based on its investigation and the investigation of its counsel, including a review of legal and regulatory filings, press releases, media reports about Barclays PLC and Barclays Capital, Inc., the allegations in the Complaints filed on June 25, 2014, and February 3, 2015 against Barclays by the New York Attorney General, and other public statements issued by Barclays.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    OVERVIEW

1.      Plaintiff alleges a concealment claim against defendants Barclays PLC and Barclays Capital, Inc. ("Barclays") on behalf of a Class of all institutional trading and/or brokerage persons and entities who were clients of Barclays and whose trades were submitted for execution by Barclays from January 1, 2011 to the present and were harmed (the "Class").  Plaintiff also asserts claims under Cal. Bus. & Prof. Code §§ 17200 and 17500 on behalf of all Class members who are California persons (the "Sub-Class").

2.      Barclays runs one of Wall Street's largest "dark pools," a private trading venue where investors can trade stocks almost anonymously.  Unlike national exchanges, like the New York Stock Exchange or NASDAQ, investors trading in a dark pool do not have to contemporaneously reveal their buy or sell orders to other investors.  Thus, they are less likely to be victimized by high frequency traders who use their rapid access to information to trade ahead of an anticipated stock purchase or sale and exploit pricing inefficiencies.

3.      Dark pools have proliferated over the past three years, as modern technology has changed the landscape of the securities markets.  Billions of dollars

now change hands in thousandths of a second, or milliseconds, and speed has become the "holy grail" on Wall Street.

4.      In 2010, Barclays decided to dramatically expand its dark pool business in a quest to boost profits.  Beginning no later than 2011, and continuing to the present, Barclays promoted its dark pool platform as a means to avoid high frequency traders, providing safeguards to detect and deter "aggressive" traders and ensure that clients of its platform received the best prices for their trades. Unfortunately, Barclays' dark pool – called **Barclays LX** – was not the safe haven it was promoted and advertised to be.  Rather, under the supposedly watchful eyes of Barclays, high frequency traders were not only allowed to trade on Barclays LX, but given unfair perks over other traders to encourage them.  Indeed, contrary to Barclays' marketing materials, aggressive high frequency trading activity was rampant in Barclays LX.  While Barclays promoted and touted a proprietary system designed to monitor and curtail aggressive trading called "Liquidity Profiling," it provided little protection to its client base.

5.      In June 2014, New York Attorney General Eric T. Schneiderman ("NYAG") filed a Complaint against Barclays under the New York Martin Act.  The NYAG alleged that Barclays concealed material information to clients about the way its dark pool was operated and did not have in place the safeguards it said it did to protect against "predatory" high frequency traders.  The NYAG also cited internal documents and emails, as well as statements by Barclays' former employees, revealing that Barclays intentionally **"falsified marketing materials"** showing the type of trading in its dark pool as part of a business strategy to dramatically increase its market share.  When asked whether other institutions were being probed, the NYAG said, referring to Barclays:  "I cannot comment on ongoing investigations.  The conduct here was so egregious and ongoing we felt we had to move on this."

6.     This conduct is substantially similar to that experienced by Plaintiff and other institutional clients of Barclays who submitted trades for execution by Barclays.  When one of Barclays' clients submitted a trade for execution, Barclays swept its own LX dark pool with the requested trades, in addition to sweeping other trading venues.  The purpose of sweeping multiple trading venues, including both traditional exchanges and dark pools, was purportedly to try to obtain the most advantageous execution for the client.  However, unbeknownst to Barclays' clients, when Barclays swept its LX dark pool with the information about the requested trades, large numbers of predatory traders were lurking.  They were able to obtain information about the desired trades before the trades were executed, and then trade ahead of the Barclays client, either in the LX dark pool or on any other exchange or ATS.  Thus, whenever a Barclays' client submitted a trade for execution through Barclays, and Barclays submitted the trade for potential execution in the Barclays LX dark pool, the client was harmed by the skimming of information by the predatory traders lurking in the LX dark pool, regardless of whether the Barclays' client's order ended up being executed in the LX dark pool, in another Alternative Trading System or "ATS," or on a traditional "lit" exchange.

7.     Plaintiff and other Barclays' clients wanted to avoid trading in venues where proprietary or predatory traders existed.  To convince Plaintiff and Class Members to allow their trades to be swept through the LX dark pool, Barclays concealed material information about the identity of predatory traders in LX, as well as the volume of trading in its LX dark pool being conducted by predatory traders.  By this action, Plaintiff seeks to hold Barclays responsible for the losses it has suffered from such deceptive marketing practices.

## II.     JURISDICTION AND VENUE

8.     The Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1332.  Jurisdiction under § 1332(a) is proper because (a) complete diversity

exists between Plaintiff and Defendants; and (b) the amount in controversy exceeds $75,000, exclusive of interest and costs.  Furthermore, jurisdiction under § 1332(d) is proper because (a) the number of members of the Class or Sub-Class exceeds 100; (b) at least one member of the Class or Sub-Class is a citizen of a state different from any Defendant; (c) at least one member of the Class or the Sub-Class is a citizen of a state, and one Defendant is a subject of a foreign state; and (d) the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

9.     This action was brought in California.  Each Defendant has sufficient minimum contacts with California, purposefully avails itself of benefits from California, and/or has property in California, so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.  Barclays advertises and markets products and services—"from credit cards to corporate banking"—to individuals, small and medium business, and corporations and institutions in California.

10.     This action was commenced in the Central District of California.  Each Defendant conducts business in that District.  Barclays has investment bank offices in Los Angles, Menlo Park, San Francisco, and Santa Monica.  Barclays' investment banking services include financial advisory, capital raising, financing and risk management to corporations, governments and financial institutions.  Barclays also has wealth management offices in Los Angeles and San Francisco.  Barclays' wealth management services include wealth planning, trust and fiduciary services, investment management, and brokerage services to clients.

### III.   THE PARTIES

**A.   Plaintiff**

11.     Plaintiff **Great Pacific Securities** is an institutional financial services firm with its principal place of business in Costa Mesa, California. Plaintiff is a Barclays' client.  Plaintiff is a citizen of California.

12.     During the Class Period, Plaintiff was a Barclays' client and submitted trades to Barclays for execution on behalf of its clients.  Plaintiff conducted business with Barclays in reliance on omissions by Defendants and suffered damages.  Plaintiff's trades were executed by Barclays on both the Barclays LX dark pool, on traditional exchanges, and on other dark pools.  During the Class Period, Plaintiff paid Defendants a per-share commission for each trade executed by or through Barclays.

13.     Plaintiff has been harmed as a result of Defendants' wrongdoing. Defendants acquired money from Plaintiff during the time that Defendants were engaged in deceit, unfair competition, false advertising and violations of California law, including but not limited to commissions paid to Barclays for trade execution. Moreover, Plaintiff's customers submitted trades for execution by Plaintiff, and based the amount of trades given to Plaintiff on Plaintiff's performance in executing such trades.  Because of Defendants' wrongdoing, Plaintiff was damaged and suffered economic harm and damages.  Plaintiff seeks recovery for itself and other institutional class members of its own damages, lost profits, and for restitution.

**B.     Defendants**

14.     Defendant **Barclays PLC** is a British multinational banking and financial services firm with its principal place of business in London, England. Barclays PLC—directly and/or through its subsidiaries—dramatically increased the market share of its dark pool by misleading clients about its operations and treatment of high-frequency traders, including in this district, during the Class Period.  Barclays PLC is a subject of a foreign state.

15.     Defendant **Barclays Capital, Inc.** ("BCI") is a securities brokerage and financial advisory services firm incorporated under the laws of Connecticut, and with its principal place of business in New York, New York.  BCI is a subsidiary of Barclays Group US, Inc., a Delaware corporation, which is a subsidiary of

Barclays PLC.  BCI dramatically increased the market share of its dark pool by
misleading clients about its operations and treatment of high-frequency traders,
including in this district, during the Class Period.  At all times during the Class
Period, its activities in the United States were under the control and direction of its
British parent.  BCI is a citizen of Connecticut and New York.

16.     Defendants Barclays PLC and BCI shall together be referred to herein
as "Barclays" or "Defendants."

17.     Various other individuals, partnerships, corporations, and other
business entities, unknown to the Plaintiff, have participated in the violations
alleged herein and have performed acts and made statements in furtherance
thereof.  The true names and capacities, whether individual, corporate, associate, or
otherwise of Defendants Does 1 through 10, inclusive, are unknown to Plaintiff who
therefore sues said Defendants by such fictitious names.  Plaintiff further alleges
that each of said fictitious Doe Defendants is also responsible for the acts and
occurrences hereinafter set forth.  Plaintiff will amend this Complaint to show their
true names and capacities when the same are ascertained, as well as the manner in
which each fictitious Defendant is responsible for the damages sustained by
Plaintiff and other members of the Class and the Sub-Class.

## IV.     FACTUAL ALLEGATIONS

### A.     The Evolution of "Dark Pools"

18.     Dark pools are electronic trading venues that, unlike national public
exchanges, don't contemporaneously post investors' buy and sell orders and only
report trades to the public after they take place.  Dark pools are also known as
Alternative Trading Systems or "ATS."

19.     Dark pools were first established to avoid large block orders from
influencing financial markets and ensure privacy, and until recently, dark pool
activity constituted a mere three to five percent of all trading in the market.

20.    In 2007, however, the SEC passed Regulation NMS (National Market System), which allowed investors to bypass public exchanges to gain price improvements.  Investors took advantage of Regulation NMS and started to send more trades to dark pools for execution.  Thus, the volume of trades executed by the dark pools significantly increased after 2007, and trading volume on the eleven traditional public stock exchanges decreased.

21.    Today, an estimated 14% of United States stock-market volume is executed in dark pools.  According to FINRA, the three largest dark pools in the United States are run by large institutional banks, Credit Suisse, UBS AG, and Barclays.  According to estimates, the combined commissions for the three banks alone, based on executed trades, was $800 million in 2013.  There are a number of smaller dark pools that are either independently owned or controlled by consortia of banks, but they typically represent a small percentage of daily trading volume of stocks.

22.    Ironically, while dark pools were designed to help give investors a safe haven from rapid traders, many dark pools are now "stomping grounds" for high-speed firms.  In high frequency trading, investors use computers to buy and sell stock at extremely quick speeds to take advantage of small, momentary changes in stock prices.  According to some reports, over 50% of all equity trading volume is from high frequency traders.  Because trading details in dark pools are typically delayed, high frequency traders try to link their computers with those of the public exchanges and dark pools and often pay for direct feeds of information that retail investors cannot get.  This allows them to identify large trades, often from institutional investors, and then "trade ahead" of the purchase and exploit the inefficiencies of price delays.

23.    In his book, "Flash Boys," released in 2014, Michael Lewis wrote that bank-owned dark pools now often serve as a key intersection between high-

frequency traders and banks' investor clients.  The banks charge high-frequency traders for the right to trade against orders placed by their brokerage customers. "Why would anyone pay for access to the customers' orders inside a Wall Street bank's dark pool?" Lewis wrote.  "The straight answer was that a customer's stock market order, inside a dark pool, was fat and juicy prey."

**B.**     **Barclays and the Expansion of Its LX Dark Pool**

24.     Barclays describes itself as a major global financial services provider engaged in personal banking, credit cards, corporate and investment banking, and wealth and investment management with an extensive international presence in Europe, the Americas, Africa and Asia.  Barclays operates in over 50 countries and, according to its website, "moves, lends, invests and protects money for customers and clients worldwide."

25.     According to Barclays, its "business model" offers clients "a rounded value proposition – a full range of products and services – and thereby, we aim to achieve a smoother income stream and sustainable returns."  Its operations include retail banks in the UK, Africa, and Europe, as well as investment banking and wealth management services that it offers on a global basis, including in California. With respect to such services, Barclays has declared its commitment to working with regulators to reduce risk to both clients and the industry as a whole, stating "Our international reach and scale means we have the responsibility, indeed obligation following our designation as a Global Systemically Important Financial Institution, to work together with our regulators to de-risk the industry and provide a more sustainable banking landscape over the long term."

26.     By 2010, just prior to the start of the Class Period, Barclays had become one of the largest banks in the world, with extensive operations in the United States and in California specifically.  However, internally, it was on a desperate quest to boost revenues.

27.     In 2010, executives at Barclays initiated a concerted plan to expand its stock-trading business, and a core ingredient of the plan was to boost trading in its dark pool ATS, known as Barclays LX, shorthand for "Liquidity Cross."

28.     Barclays asked Bill White to spearhead the effort.  White had worked on Wall Street for years and ran Barclays' market-making unit on the floor of the New York Stock Exchange.

29.     In 2011, Barclays informed its employees to push more order flow to the dark pool.  According to the NYAG Complaint, Barclays told employees that "[a]ggregating [order] flow into Barclays LX has strategic and economic value for the entire Equities business," allowing the bank to earn more fees and avoid paying commissions for trades on other venues.  According to the NYAG, internal Barclays' documents valued this growth opportunity at between $37 and $50 million per year. The project was so important to Barclays that employees internally referred to the dark pool as "The Franchise."

30.     According to a former senior Director at Barclays cited by the NYAG, "[a]t every sales meeting or product meeting, the main goal they were talking about was to grow the size of [Barclays' dark pool] to become the largest pool.  All the product team's goals, which would also include their compensation[,] were tied to making the pool bigger.  [Barclays had] great incentive at all costs to make the pool bigger."

31.     Barclays' strategy was to increase the number of orders that clients sent to Barclays for handling and execution.  Barclays also wanted to increase the market share of its dark pool.  To achieve this, Barclays had to route more of its clients' orders through Barclays LX.  Barclays also had to ensure that there was sufficient liquidity in its dark pool to fill the increasing number of orders, which it achieved by attracting high frequency traders to the LX.

32.     At the same time it was increasing the volume of trades in its LX and courting high frequency traders to obtain liquidity in its dark pool, Barclays sought to convince Plaintiff and other brokerage clients that the LX was a safe place to trade and that it was insulated from aggressive and predatory practices employed by high frequency traders.

33.     In 2012, White hired a trusted friend to help his efforts, Dave Johnsen, to help run electronic trading at Barclays.  Johnsen had previously served as a senior executive at Goldman Sachs Group Inc.'s dark pool, but was reportedly fired in 2012 by Goldman Sachs for "concerns relating to the performance of his supervisory responsibilities," including not completing certain reports on a timely basis, according to FINRA's BrokerCheck.  In the BrokerCheck report, Johnsen admitted that "the dates didn't reflect the date I completed the reports."  After joining Barclays, Johnsen worked closely with White, and soon was running the day-to-day operations of Barclays LX while White worked on client relationships.

34.     Barclays contacted existing brokerage clients and other investors, to steer their business to its dark pool, and to convince them to allow their trades to be submitted for potential execution in Barclays LX.  Barclays used a full court press of marketing materials representing that its dark pool provided a safe, transparent trading environment, and helped protect its clients from the risks of aggressive high frequency traders.

35.     Part of the selling point of dark pools is that by keeping orders to transact securities private, they are less likely to be prowled by speed traders looking to beat investors who are slower to react to new information.  Seeking to reassure customers that their stock orders wouldn't be picked off by predatory counterparties, Barclays's marketing materials touted its "Liquidity Profiling" service by which it purportedly monitored and policed trading behavior in its dark pool.  As described below, these materials purported to show that very little of the

trading within its dark pool was "aggressive" and that operating there was safe for its clients.

36.     Consistent with the above, and as detailed by the NYAG, Barclays' marketing strategy was premised on "End-to-End Client Order Protection," pursuant to which Barclays represented to its clients that its electronic trading products and services worked together to "protect client orders and minimize information leakage," in order to "maximize fill rates" and "minimize market impact." Specifically, Barclays represented to its clients that it would use its algorithms, router, and dark pool to increase the number of its clients' trades that were executed, secure better prices for those trades, and minimize the ability of high frequency traders to anticipate orders and trade ahead of them.

37.     Barclays' executives made similar statements to the financial press. For example, in "Finding the 'Right' Liquidity, published on March 14, 2013 on marketsmedia.com, Barclays' White touted the Liquidity Profiling feature on its LX dark pool to protect clients trading in the dark: "It's a sophisticated surveillance framework that protects clients from predatory trading activity in LX, the second-largest broker-dealer dark pool in the U.S. . . . By identifying aggressive behavior, we can take corrective action with clients who exhibit opportunistic behavior in the pool." Similarly, in "Dark Pools deliver price improvement and anonymity," published on June 6, 2013 in Hedgeweek, White touted the firm's ability to identify "low toxicity flow" in its pool and "to restrict HFTs [High Frequency Traders] interacting with our clients."

38.     Barclays' marketing efforts were hugely successful. Today, Barclays LX is the second-largest dark pool in the United States, according to data from FINRA. However, as alleged herein, Barclays achieved such success only by concealing from its clients the actual operations of its dark pool, the true extent of

aggressive high frequency trading activity in the pool, and the level of protection Barclays provided from such activity.

**C.    Barclays Provides Marketing Material to Plaintiff and the Class to Convince Them to Trade on Barclays' LX**

39.     During the Class Period, Plaintiff Great Pacific Securities was contacted by Barclays and provided with marketing materials describing the Barclays LX pool.  One of such documents, entitled, "Liquidity Products," dated February 2012, and attached hereto as **Exhibit A**, purported to show Plaintiff how it would be protected from aggressive high frequency trading activity, and underscored Barclays' purported commitment to transparency.  Barclays represented that its LX dark pool provided "continued quantitative research on the Liquidity Profiling initiative to protect customer order flow."  Specifically, "[t]he objective of the new LX Liquidity Profiling framework is to increase fill rates and improve performance for institutions trading in LX by targeting beneficial counterparties."  With respect to the Electronic Liquidity Provider or "ELP" segment –Barclays' term for high frequency traders – Barclays reassured investors that it was able to "proactively monitor" and distinguish between "aggressive" clients and those who provided "beneficial liquidity" in order to "improve the quality of flows into the pool."

40.     The marketing materials provided to Plaintiff also contained a number of misleading, graphical charts.  One chart contained a number of colored circles, representing "the top 100 clients in LX."  The size of the circles on the chart corresponded to the level of trading activity conducted in the dark pool by that firm, with traders assigned colored circles based on their trading characteristics.  Within the chart are two color-coded, rectangle regions, a green region representing "passive clients" with safe trading activity, and a red rectangle representing

"aggressive clients" with unsafe trading, leaving the clear message that very little trading in the pool was "aggressive."

41.    Another chart in the materials stated that only 14% of trading in the pool was by aggressive high frequency traders.  Alongside both charts, Barclays reaffirmed its ability to "constantly monitor flow quality" with the "Liquidity Profiling" framework, providing "transparency" and "improving the overall quality" of LX.  Specifically, Barclays touted its ability to hold aggressive traders "accountable" by "refusing a client access" and "suppress[ing]" "aggressive flows." The chart is reproduced below:



42.    Based on allegations in the NYAG Complaint, Barclays used virtually identical marketing materials with other clients during the Class Period, including a widely-disseminated document intended for institutional clients entitled, "Liquidity Profiling – Protecting You in the Dark."  Like the brochure provided to

Plaintiff, that document included an analysis purporting to represent the "liquidity landscape" of Barclays' dark pool, along with colored circles supposedly representing firms trading in Barclays' dark pool and the level of their trading activity.  The document also contained the same color-coded regions, a green rectangle representing "passive" trading activity, and a red rectangle representing "aggressive" trading.  As with the materials provided to Plaintiff, Barclays' chart represented that very little of the trading in Barclays' dark pool was "aggressive," that most trading in the dark pool was "passive," and that most of the high frequency activity was "passive."

**D.    Barclays' Marketing Material Concealed Material Information**

43.    These charts, substantially similar in their form and message, and distributed throughout the Class Period to Class members, concealed the true nature and extent of aggressive, high-frequency trading within Barclays' dark pool.

**1.    Barclays Conceals the Presence in LX of a Particularly Large HFT Firm**

44.    Indeed, the NYAG Complaint cites several October 2012 emails from Barclays employees regarding a decision to remove data from a version of this chart used in marketing materials showing that a particularly large high-frequency firm, Tradebot Systems Inc., participated in its dark pool.  Specifically, on October 5, 2012, a draft version of the analysis was emailed to senior executives in Barclays' Equities Electronic Trading division, with a note that Barclays "de-emphasized the number of ELPs [electronic liquidity providers, or high frequency traders] by moving them to the back."  The email also stated that the chart "remov[es] Tradebot," which on information and belief was the largest participant in Barclays' dark pool.  When one employee objected to the modified chart, stating that removing Tradebot from the analysis was a falsification of the data, Roland Jarquio, a Director in the Equities Division, allegedly responded that "the point of the chart is

14

not to show what's in the pool.  The point is to market our capability . . . to monitor individual participants in the pool."

45.     The issue did not die, however.  According to the Wall Street Journal article, "Barclays Pool Drew Fast-Trade Alarms," dated July 21, 2014, other employees continued to raise concerns.  Further, as alleged by the NYAG, Sarah Naegele, a Vice President responsible for selling the dark pool to clients, confirmed that the chart was meant to show the actual traders, replying to the group that "[m]y point when selling that picture was always:  'here is a snapshot of the participants in [Barclays' dark pool] as an accurate view of our pool.'  I was never using it like an 'illustration'" of Barclays' capability to monitor the pool.  "I had always liked the idea that we were being transparent, but happy to take liberties if we can all agree."

46.     According to the NYAG, Jarquio responded, indicating that the doctored chart would help Barclays appeal to institutional investors concerned with the amount of high frequency trading in the LX:

"The answer is simple:  we are talking to institutional, long only, nervous clients.  That's the target audience.  Our solution to calm their fears could be 1/ show them we have the capability . . . to police and/or 2/ show them exactly what is in the pool."

Jarquio ultimately concluded that showing the clients "exactly what [was] in the pool" was "the wrong way to go" in quelling their fears.

47.     Ultimately, according to the NYAG's complaint, Dave Johnsen agreed and responded, "I think the accuracy [of the chart] is secondary to [the] objective" of showing clients that Barclays monitors the trading in its dark pool, and "so if you want to move/kill certain bubbles, it doesn't really matter."  Barclays' Head of Equities Sales responded, "Yes! U smart."

48.     According to the NYAG, in another email that same day, Barclays' Head of Equities Sales noted in reference to the analysis that some in the industry viewed Barclays' dark pool as a "toxic landfill," and so "[i]f we can help ourselves we should[;] its in our control."

49.     Notably, as alleged by the NYAG, Tradebot was concealed from the subject chart *after* the Compliance Department at Barclays had approved the content of the chart and *after* the Compliance Department had questioned the accuracy of the chart and its potential to mislead.

### 2.     Barclays Conceals the Extent of Aggressive Trading in LX

50.     The marketing materials also concealed information about the level of aggressive trading activity occurring in Barclays' dark pool.  For example, in the materials sent to Plaintiff in 2012, Barclays claimed that the trading in its dark pool was "23% passive," "63% neutral," and just "14% aggressive."  Similarly, in marketing materials released in early 2013, Barclays claimed that the trading in its dark pool was "48% passive," "43% neutral," and "9% aggressive."  In March 2014, Barclays said that trading in its dark pool was "36% passive," "58% neutral," and just "6% aggressive."  These progressively improving figures concealed the actual nature and extent of "aggressive" activity in Barclays' dark pool.

51.     For example, according to the NYAG Complaint, an "Execution Aggressiveness" analysis of trading in the LX conducted in August 2012 revealed that *between 25% and 30%* of all activity in the LX was, in Barclays' own terminology, "aggressive."  The same analysis conducted in August 2013 revealed that *32%* of the activity in the LX was "aggressive."  The "Execution Aggressiveness" analysis also included a breakdown of traders in the LX, which showed that eight out of the ten largest traders by volume of shares were known HFT firms.

52.     The above numbers remained consistent.  For example, according to the NYAG, in March 2014, Barclays admitted to one HFT firm that ***about 25% of the orders taking liquidity in its dark pool were aggressive***.  In an internal document identified by the NYAG, the same firm concluded, based on the data provided by Barclays, that the trading activity in Barclays' dark pool was in fact "50% aggressive."  According to the NYAG, Barclays' own analysis in May 2014 revealed that ***over 30%*** of all activity in the LX was "aggressive".

53.     In fact, according to the NYAG Complaint, Barclays has never prohibited a single firm from participating in its dark pool, despite knowledge of aggressive trading in its dark pool.  For example, according to the NYAG, on January 16, 2014, senior leaders in the Equities Electronic Trading division were told of over a dozen major high frequency trading firms engaged in significant trading activity in Barclays' dark pool, including one firm whose trades were described as "historically . . . very toxic."  Barclays did not deny them access to its dark pool.  This contradicts representations in materials provided to clients, including Plaintiff, that Barclays will try to identify "aggressive" flows, hold such traders "accountable," and "refuse a client access" to the dark pool if such aggressive trading strategies are discovered.

### 3.     Barclays Concealed that Liquidity Profiling Did Not Protect Its Clients

54.     One of the benefits that Barclays purports to offer to its clients trading in the LX is a proprietary service called "Liquidity Profiling."  Barclays represented that Liquidity Profiling monitors each trade in the LX, objectively and fairly grades traders by how "toxic" or "aggressive" their trading activity is, and allows clients to decline to trade with "toxic" traders.

55.     According to the NYAG's complaint, Liquidity Profiling was intended to group traders in the LX into six categories based on their trading behavior,

ranked "0" through "5," with "0" and "1" representing the most "aggressive" traders and "4" and "5" representing the most "passive" traders.  Barclays told its clients that they could disable their orders from interacting with traders falling into any of the above categories.

56.  As revealed in the NYAG's complaint, however, Liquidity Profiling offered little or no benefit to Plaintiff and Barclays' other clients for five reasons:  (i) Barclays did not actually police or punish bad trading behavior; (ii) Barclays failed to regularly update the profiles of traders in the LX; (iii) Barclays altered the profiles of certain predatory traders when that benefitted Barclays; (iv) Liquidity Profiling did not apply to the bulk of orders submitted to LX; and (v) Barclays' employees knew that the service was of little benefit to investors.

57.  Barclays also concealed from Plaintiff and the Class that it applied "overrides" to a number of traders in the dark pool, improperly assigning them safe Liquidity Profiling ratings, and further concealed that Liquidity Profiling did not apply to a significant portion of the trading activity in Barclays' dark pool, such as when client orders are routed to the dark pool via Barclays' proprietary algorithms.

58.  As revealed in the NYAG investigation, Barclays was well aware of these Liquidity Profiling issues, and in an internal document dated December 2013, admitted that "Liquidity Profiling reviews may not be completed for all clients, may rely on inaccurate information and results and rationale for profiling changes may not be evidenced; leading to reputational damage as the service . . . may not function as advertised to clients."

59.  The NYAG also cited interviews with high ranking employees, including a former Barclays Director in the Equities Electronic Trading division, who said that Barclays "purport[s] to have a toxicity framework that will protect you when everybody knows internally that that thing is done manually with outliers removed and things are classified [only] if they feel like it." Another former

Director in the Equities Electronic Trading division allegedly told the NYAG that
Liquidity Profiling is "a scam."

### 4.  Barclays Catered to HFT Traders

60.     Barclays not only failed to weed out high frequency traders, but
actually encouraged them to continue using its pool, all the while concealing this
from Plaintiff and other members of the Class and the Sub-Class.  For example,
while Barclays told clients like Plaintiff that it was able to "refuse" access to
aggressive, high frequency traders, it supplied high frequency trading firms with
advantages over more traditional investors trading in its dark pool.

61.     As described by one former senior-level Director within the Equities
Electronics Trading division, cited by the NYAG Complaint:  "Barclays was doing
deals left and right with high frequency firms to invite them into the pool to be
trading partners for the buy side.  So the pool is mainly made up of high frequency
firms."  "[T]he way the deal would work is [Barclays] would invite the high
frequency firms in.  They would trade with the buy side.  The buy side would pay
the commissions.  The high frequency firms would pay basically nothing.  They
would make their money off of manipulating the price.  Barclays would make their
money off the buy side.  And the buy side would totally be taken advantage of
because they got stuck with the bad trade . . . this happened over and over again."

62.     Further, as alleged by the NYAG, Barclays repeatedly disclosed
information to high frequency trading firms to encourage them to increase their
activity in Barclays' dark pool, including data that helped those firms maximize
their aggressive trading strategies, such as the routing logic of Barclays' order
router, the percentage of Barclays' internal order flow that was first directed into its
own dark pool, and a breakdown of trades executed in the dark pool by participant
type and "toxicity" level.

63.     Barclays also reportedly charged little or nothing to high frequency trading firms to trade in its dark pool, and allowed high frequency traders to "cross-connect" to its servers.  According to the NYAG, this practice continues even today and several dozen HFT firms are still linked to Barclays and able to take advantage of Barclays' non-HFT clients.

64.     For example, according to the NYAG's complaint, on January 3, 2013, Dave Johnsen met with representatives from Tradebot (the particularly "toxic" HFT firm that was concealed from the chart that Barclays provided to its clients) regarding Tradebot's request to lower its already-favorable pricing on additional trading.  In his "talking points" notes, Johnsen noted that Tradebot was "already [Barclays'] largest toxic client" and that Barclays "already dropped [Tradebot's] rate 40% for the month."  According to the NYAG, Johnsen further noted that in his previous employment with Golden Sachs, "there was real pressure to boot [Tradebot]" from the dark pool because it conducted abusive latency arbitrage in the pool, but that Tradebot had the attitude that "we took care of you then . . . need you to return the favor now."

65.     According to the allegations in the NYAG's complaint, in April 2014, multiple senior Barclays' employees worked with Tradebot to find ways to help it avoid being classified as "toxic" by Liquidity Profiling, without changing any of the predatory trading practices that it was engaged in.  As a result, in a series of emails in March and April 2014, Barclays' employees discussed ways Tradebot could modify its trading to avoid being blocked by institutional traders in the LX who sought to avoid trading with aggressive counterparties.  Indeed, according to the NYAG, Jacek Janczewski, the head of Barclays' dark pool operations, wrote to Tradebot, explaining the options and even apologizing for the process by stating:

"Let me know how best to proceed.  If these options do not work for

you, we can explore other ways to do this.  Sorry for the hoops to jump

through here."

*    *    *

66.     Barclays' concealment about the identity and volume of predatory

traders in its LX dark pool was harmful to Plaintiff and the Class regardless of

whether the clients' trades were ultimately executed in the LX dark pool or some

other exchange or dark pool, since the predatory traders in LX obtained information

from the requested trades that Barclays swept across LX and then traded ahead of

the trades of Barclays' clients, harming Barclays' clients.

67.     During the Class Period, when Barclays' clients submitted a trade for

execution to Barclays, Barclays swept its own LX dark pool with the requested

trades, in addition to sweeping other trading venues.  The purpose of sweeping

multiple trading venues, including both traditional exchanges and dark pools,

purportedly was to try to obtain the most advantageous execution for the client.

However, unbeknownst to Barclays' clients, when Barclays swept its LX dark pool

with the information about the requested trades, large numbers of predatory

traders were lurking.  They were able to obtain information about the desired

trades before the trades were executed, and then trade ahead of the Barclays' client,

either in the LX dark pool or on any other exchange.  Thus, whenever a Barclays'

client submitted a trade for execution through Barclays, they were harmed by the

skimming of information by the predatory traders lurking in the LX dark pool,

regardless of whether the Barclays' client's order ended up being executed in the LX

dark pool, another ATS, or any other traditional "lit" exchange.

68.     Plaintiff and other Barclays' clients wanted to avoid trading in venues

where proprietary or predatory traders existed.  To convince Plaintiff and Class

Members to allow Barclays to execute their trades, and to allow their trades to be

21

swept through the LX dark pool for potential execution, Barclays concealed material information about the identity of predatory traders in LX, as well as the volume of trading in its LX dark pool being conducted by predatory traders.  Barclays concealed these material facts from both its retail and institutional clients, since it wanted to maximize volume and liquidity in its LX dark pool.  Regardless of whether trades ended up being executed in its LX dark pool, Barclays wanted to increase the liquidity and volume of requested trades in the LX dark pool, since increased liquidity and volume were attractive to clients, and thus increased the willingness of clients to trade in the LX dark pool.  Thus, Barclays concealed material facts from Plaintiff and the Class in order to induce them to allow their trades to be submitted for potential execution in the LX dark pool.

69.     The advantage to the predatory traders, however, was unique – they would be allowed to see the requested trades and then utilize that information to their advantage, either by trading ahead of Barclays' other clients on the LX or other trading venues, or otherwise utilizing the information to their advantage and to the disadvantage of Barclays' other clients.

70.     Barclays' conduct with respect to its LX dark pool appears to be part of a systemic, firm-wide pattern of deceptive and unfair business practices.  Barclays was the first bank to be fined for rigging the benchmark interest rates, costing Bob Diamond, the bank's CEO at the time, his job.  It was also fined in May 2014 for manipulating gold prices.  On July 29, 2014, the *Wall Street Journal* reported that banking regulators may install government monitors inside Barclays' United States offices after concluding that the bank may have manipulated the foreign-exchange market.  According to the London Times, Barclays recently created a Compliance Career Academy in partnership with Cambridge University to try to restore its reputation.  The bank's chairman, David Walker, conceded:

> "Compliance has not been seen as a serious enough specialist activity.
> Our track record in culture has not been good.  It's important for us all
> to have a concept of culture, conduct and compliance."

Given the series of incidents, Walker also said the bank had to work on the basis
that "we are guilty until we prove ourselves to be innocent."

## V.    CLASS ALLEGATIONS

71.    Plaintiff brings this action as a class action under Rule 23 of the
Federal Rules of Civil Procedure on behalf of the following Class:

> **All institutional trading and/or brokerage persons and entities**
> **who, during the Class Period (January 1, 2011 to the present),**
> **were clients of Barclays and whose trades were submitted for**
> **execution by Barclays and suffered harm as a result (the**
> **"Class").**

Plaintiff further brings this action on behalf of the following Sub-Class:

> **All Class Members who, during the Class Period (January 1,**
> **2011 to the present), were California residents (the "Sub-**
> **Class").**

Excluded from the Class and Sub-Class are the Defendants herein and their
subsidiaries, parents, affiliates, and controlled persons or entities, including
specifically all of their past or present officers and directors.  For the
avoidance of any doubt, also excluded from the Class and Sub-Class are the
predatory and proprietary traders who utilized any information obtained
from Class and Sub-Class members from the LX dark pool exchange to
benefit themselves and harm the Class and Sub-Class members.

72.    The members of the Class and Sub-Class are so numerous that joinder
of all members is impracticable.  Plaintiff does not know the exact number of Class
and Sub-Class members because such information is in the exclusive control of

Defendants.  Upon information and belief, there are hundreds or thousands of Class and Sub-Class members, geographically dispersed, such that joinder of all class members is impracticable.

73.    Plaintiff's claims are typical of the claims of the members of the Class and Sub-Class, as Plaintiff used the Barclays LX and the claims are based upon similar conduct affecting all Class and Sub-Class members.

74.    Plaintiff will fairly and adequately protect the interests of the members of the Class and Sub-Class and has retained counsel competent and experienced in class litigation.  Plaintiff has no interests which are contrary to or in conflict with those of the Class and Sub-Class members which it seeks to represent.

75.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class and Sub-Class members to individually seek redress for the wrongs done to them.  Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

76.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class and Sub-Class, and predominate over any questions affecting solely individual members of the Class and Sub-Class.  Questions of law and fact common to the Class and/or Sub-Class include, but are not limited to:

(a)    whether Plaintiff and the Class and Sub-Class members were Barclays' clients during the Class Period;

(b)    whether Plaintiff and the Class and Sub-Class members submitted trades for execution by Barclays during the Class Period, and had one or

more of such trades submitted by Barclays for potential execution in the Barclays LX dark pool;

      (c)     whether Defendants engaged in unfair and/or unlawful business practices;

      (d)     whether Defendants disseminated advertisements that had a tendency to mislead a reasonable person;

      (e)     whether Defendants had a duty to disclose and omitted to disclose material facts;

      (f)     whether Class and Sub-Class members were harmed; and

      (g)     whether declaratory, injunctive and/or restitutionary relief is appropriate and, if so, the proper measure of the relief.

77.     The names and address of the Class and Sub-Class members are available from the business records of Defendants.  Notice can be provided by first class mail and by using other techniques customarily used in class actions.

## VI.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### CONCEALMENT

### (On Behalf of Plaintiff and the Class)

78.     Plaintiff hereby incorporates all of the foregoing paragraphs.

79.     As a result of the conduct described herein, Barclays committed deceit by concealment.

80.     Barclays intentionally failed to disclose important facts to Plaintiff and the Class concerning the LX exchange, including the nature and extent of aggressive high frequency trading activity in the LX dark pool and its efforts to monitor and curb such trades.

81.     Barclays further disclosed some facts to Plaintiff and the Class but intentionally failed to disclose other important facts, making the disclosure deceptive.

82.     Barclays further actively concealed important facts from Plaintiff and the Class and/or prevented Plaintiff and the Class from discovering such facts.

83.     Plaintiff and the Class were unaware of the true facts that were concealed, and had no means of ascertaining such concealed facts.

84.     Barclays intended to deceive Plaintiff and the Class by concealing these facts.

85.     At all relevant times, Plaintiff and the Class reasonably relied on Barclays' deception and would have acted differently had they known the true facts. Moreover, these concealed facts were highly material to Plaintiff and the Class, and Plaintiff and the Class would not have paid fees or commissions, or allowed Barclays to submit their trades for potential execution in the LX dark pool, had they known the true facts.

86.     As a result of Barclays' concealment, Plaintiff and the Class were harmed and Barclays' concealment was a substantial factor in causing the harm.

## SECOND CAUSE OF ACTION

### UNFAIR COMPETITION
### CALIFORNIA BUS. & PROF. CODE § 17200
### (On Behalf of Plaintiff and the Sub-Class)

87.     Plaintiff hereby incorporates all of the foregoing paragraphs.

88.     The California Unfair Trade Practices Act defines unfair competition to include any "unfair," "unlawful," or "fraudulent" business act or practice.  Cal. Bus. & Prof. Code § 17200.  Unfair competition also includes "unfair, deceptive,

untrue or misleading advertising." *Id.*  The Act also provides for injunctive relief and restitution for violations.  *Id.*  § 17203.

89.     This cause of action is brought on behalf of Plaintiff, members of the Sub-Class, and members of the California general public pursuant to California Bus. & Prof. Code § 17200 *et seq.*  Under Bus. & Prof. Code § 17200 *et seq.*, Plaintiff is entitled to enjoin Barclays' wrongful practices and to obtain restitution for the monies paid to Barclays by reason of Barclays' unlawful, unfair, and/or deceptive acts and practices.

90.     As a direct and proximate result of the acts and practices alleged above, Plaintiff, and members of the Sub-Class and the general public who were clients of Barclays and had their trades submitted by Barclays for potential execution in Barclays' LX dark pool have been injured.

91.     Barclays' unlawful, unfair, and fraudulent business acts and practices, as described above, present a continuing threat to Plaintiff and members of the Sub-Class and of the general public, in that Barclays is continuing, and will continue, unless enjoined, to commit violations of Bus. & Prof. Code § 17200 and other laws. This Court is empowered to, and should, grant preliminary and permanent injunctive relief against such acts and practices.

92.     Barclays' conduct is "unlawful" because Barclays committed false or untrue advertising in violation of Cal. Bus. & Prof. Code § 17500.

93.     Barclays' conduct also is "unfair" due to the conduct alleged herein.

94.     Barclays' conduct also violates Bus. & Prof. Code § 17200 because Barclays' conduct, as alleged herein, is "fraudulent."

95.     Plaintiff, on behalf of itself and the Sub-Class, seeks restitution of all money and property which Barclays obtained or may have obtained from Plaintiff and the Sub-Class as a result of its unfair business practices.

### THIRD CAUSE OF ACTION

**FALSE ADVERTISING**
**CALIFORNIA BUS. & PROF. CODE § 17500**
**(On Behalf of Plaintiff and the Sub-Class)**

96.     Plaintiff hereby incorporates all of the foregoing paragraphs.

97.     Barclays, acting directly or indirectly with intent to induce Plaintiff, the Sub-Class, and members of the California general public to allow Barclays to execute their trades, in violation of Cal. Bus. & Prof. Code § 17500, made or disseminated or caused to be made or disseminated the deceptive statements alleged in this Complaint.

98.     The statements and representations made by Barclays were deceptive and concealed important information, and were known, or which by the exercise of reasonable care should have been known, to be deceptive and misleading.

99.     Barclays made or disseminated or caused to be made such statements as part of a plan or scheme with no intent to sell its services as so advertised.

100.    Plaintiff actually saw and relied upon one or more of Barclays' advertisements, representations, and statements, and suffered actual injury and harm as a result of Barclays' violation of Cal. Bus. & Prof. Code § 17500.

## VII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

A.      A declaration that this action is a proper class action under F.R.C.P. 23 on behalf of the Class and Sub-Class as defined herein, and an order directing that reasonable notice of this action be given to each member of the Class and Sub-Class;

B.      A declaration that Barclays' conduct alleged herein constitutes a violation of California Bus. & Prof. Code § 17200 and a violation of Bus. & Prof. Code § 17500;

C.      An injunction enjoining, preliminarily and permanently, Barclays from continuing the unlawful conduct alleged herein;

D.      An award for Plaintiff and the Class and Sub-Class for the costs of this suit (including expert fees), and reasonable attorneys' fees, as provided by law;

E.      Restitution for Plaintiff and the Class and Sub-Class on the claims; and

F.      All such other and further relief as the Court deems just and proper.

## VIII.  JURY TRIAL DEMAND

Plaintiff demands a jury trial of all issues subject to adjudication by a trier of fact.

Dated:  February 6, 2015

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.
Albert Y. Chang (AC-5415)
Yury A. Kolesnikov

s/ Albert Y. Chang
Albert Y. Chang

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:   (858) 914-2001
Facsimile:   (858) 914-2002
E-mail:       fbottini@bottinilaw.com
             achang@bottinilaw.com
             ykolesnikov@bottinilaw.com

COTCHETT, PITRE & McCARTHY, LLP
Joseph W. Cotchett
Mark C. Molumphy
Nanci E. Nishimura
Kevin P. O'Brien
Elizabeth T. Tran
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:   (650) 697-6000
Facsimile:   (650) 697-0577

*Attorneys for Plaintiff*
*Great Pacific Securities*