UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ──────────────────────── x | | |
| In re: | : | Case No. 14-MD-2589 (JMF) |
| | : | |
| BARCLAYS LIQUIDITY CROSS AND | : | LEAD PLAINTIFFS' OMNIBUS |
| HIGH FREQUENCY TRADING | : | MEMORANDUM OF LAW IN |
| LITIGATION | : | OPPOSITION TO DEFENDANTS' |
| ──────────────────────── | : | MOTIONS TO DISMISS |
| | : | |
| This Document Relates To: | : | |
| | : | |
| *City of Providence, Rhode Island, et al. v.* | : | |
| *BATS Global Markets, Inc., et al.,* No. 1:14-cv- | : | |
| 02811-JMF | : | |
| ──────────────────────── x | | |

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................1

II.  STATEMENT OF FACTS ....................................................................6

     A.   THE EXCHANGES.....................................................................6

          1.   The Exchanges Now Cater to HFT Firms....................................6

          2.   The Exchanges' Manipulative Scheme......................................7

          3.   Proprietary Data Feeds.....................................................8

          4.   Co-Location Services.......................................................9

          5.   Complex Order Types......................................................10

          6.   Plaintiffs Relied on the Fairness of the Exchanges' Markets ...................11

          7.   The Exchanges Knowingly Deceived Plaintiffs ........................................12

     B.   Barclays.................................................................................13

          1.   The Rise of Dark Pools.....................................................13

          2.   Barclays' Manipulative Scheme .......................................14

          3.   Plaintiffs Relied on Barclays' Scheme ......................................14

III. THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THIS
     ACTION .................................................................................................15

          1.   Plaintiffs' Claims for Market Manipulation Under §10(b) of the
               Exchange Act and SEC Rule 10b-5 Do Not Require Exhaustion of
               Administrative Remedies..............................................................17

          2.   Even If Plaintiffs' Claims Implicate Those Portions of the
               Exchange Act and Reg NMS Providing for Administrative Review
               Procedures, Exhaustion Is Not Required .........................................19

               a.   Statutory Exhaustion Does Not Apply..........................................19

               b.   Judicial Exhaustion Does Not Apply...............................................21

               c.   The Court Should Waive Any Administrative Exhaustion
                    Requirement..................................................................25

**Page**

IV.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY ABSOLUTE IMMUNITY ...............27

    A.    The Exchanges of 1934 Versus the Exchanges of Today......................................27

    B.    The Exchanges Are Not Immune from Private Damages Suits Challenging Their Business Activities ....................................................................................29

        1.    The Exchanges' Marketing and Sale of Proprietary Data Feeds Is a Business Function ...................................................................33

        2.    The Exchanges' Marketing and Sale of Co-Location Services Is a Business Function ...................................................................35

        3.    The Exchanges' Creation of Undisclosed Complex Order Types at the Request of Select Market Participants Is a Business Function ...........37

    C.    Regulated Activity Is Not the Same as Core Regulatory Functions......................38

    D.    Policy Justifications for Immunity Are Not Present Here .....................................42

    E.    Immunity Should Not Apply Without the Parties Conducting Discovery ............44

V.    PLAINTIFFS HAVE PROPERLY PLED A FRAUDULENT SCHEME UNDER §10(b) AND RULE 10b-5(a) AND (c)..................................................................45

    A.    Legal Standards...................................................................................................46

    B.    The Exchanges Engaged in Manipulative Acts ...................................................48

        1.    Direct and Enhanced Data Feeds .............................................................48

        2.    Co-Location Services .................................................................................50

        3.    Complex Order Types ................................................................................50

    C.    Plaintiffs Alleged a Primary Violation of §10(b) and Rule 10b-5.......................52

    D.    Plaintiffs Have Adequately Alleged Reliance .....................................................55

    E.    Plaintiffs Have Adequately Alleged Scienter .....................................................56

    F.    Plaintiffs Have Adequately Alleged Damages ...................................................59

    G.    Plaintiffs Have Standing to Assert a Claim Under §10(b) and Rule 10b-5 ..........60

- ii -

**Page**

VI.      PLAINTIFFS HAVE A PRIVATE RIGHT TO ACTION UNDER §6(b) OF THE EXCHANGE ACT...........................................................................................62

VII.     PLAINTIFFS' COMPLAINT STATES A MARKET MANIPULATION CLAIM AGAINST BARCLAYS UNDER §10(b) OF THE EXCHANGE ACT .........................64

      A.     Barclays' Rule 12(f) Motion to Strike Should Be Denied......................................64

      B.     Plaintiffs Have Adequately Alleged Reliance on Barclays' Fraudulent Scheme .......................................................................................................................68

             1.     Barclays Schemed to Manipulate the Market ............................................69

             2.     Plaintiffs Have Adequately Alleged Reliance ...........................................72

      C.     Barclays Did Not Disclose Its Fraudulent Scheme and Misrepresented Its Conduct to Conceal the Scheme ...........................................................................73

             1.     Barclays HFTs from Barclays LX .............................................................74

             2.     Barclays Failed to Disclose, and Otherwise Concealed, the Truth About Its Manipulative and Unfair Operation of Its Dark Pool ...............75

      D.     Plaintiffs Have Adequately Pled Barclays' Scienter .............................................75

      E.     Plaintiffs Have Adequately Alleged Loss Causation...............................................77

VIII.    CONCLUSION.............................................................................................................79

# TABLE OF AUTHORITIES

Page

## CASES

*380544 Can., Inc. v. Aspen Tech., Inc.*,
544 F. Supp. 2d 199 (S.D.N.Y. 2008)..................................................................................67

*Affiliated Ute Citizens v. United States*,
406 U.S 128 (1972) ...................................................................................... *passim*

*Aldrich v. New York Stock Exch., Inc.*,
446 F. Supp. 348 (S.D.N.Y. 1977) ...............................................................................63

*Altman v. SEC*,
687 F.3d 44 (2d Cir. 2012)..............................................................................................23

*Angelastro v. Prudential-Bache Sec., Inc.*,
764 F.2d 939 (3d Cir. 1985).............................................................................................25

*Arneil v. Ramsey*,
550 F.2d 774 (2d Cir. 1977)..............................................................................................63

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)......................................................................... *passim*

*Avocados Plus Inc. v. Veneman*,
370 F.3d 1243 (D.C. Cir. 2004) .........................................................................19, 20, 21

*Baird v. Franklin*,
141 F.2d 238 (2d Cir. 1944)......................................................................................62, 63, 64

*Barbara v. New York Stock Exch.*,
99 F.3d 49 (2d Cir. 1996)...........................................................................20, 25, 26, 30

*Barrett v. United States*,
798 F.2d 565 (2d Cir. 1986).............................................................................................27

*Bastek v. Fed. Crop Ins. Corp.*,
145 F.3d 90 (2d Cir. 1998)...............................................................................................16

*Bechtel v. Competitive Techs., Inc.*,
448 F.3d 469 (2d Cir. 2006).............................................................................................22

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975).........................................................................................................60

- iv -

**Page**

*Brawer v. Options Clearing Corp.*,
807 F.2d 297 (2d Cir. 1986)..............................................................62, 63, 64

*Castellano v. Young & Rubicam, Inc.*,
257 F.3d 171 (2d Cir. 2001)..........................................................................77

*Cent. Bank, N.A. v. First Interstate Bank, N.A.*,
511 U.S. 164 (1994)...............................................................................54, 78

*Charles Schwab & Co v. Fin. Indus. Regulatory Auth.*,
861 F. Supp. 2d 1063 (N.D. Cal. 2012) .......................................................22

*Cleantech Innovations, Inc. v. NASDAQ Stock Mkt., LLC*,
No. 11 Civ. 9358 (KBF), 2011 U.S. Dist. LEXIS 153142
(S.D.N.Y. Dec. 30, 2011)..............................................................................23

*Cleantech Innovations, Inc. v. NASDAQ Stock Mkt., LLC*,
No. 11 Civ. 9358 (KEF), 2012 U.S. Dist. LEXIS 13707
(S.D.N.Y. Jan. 31, 2012)...............................................................................23

*Cleavinger v. Saxner*,
474 U.S. 193 (1985).......................................................................................27

*Compudyne Corp. v. Shane*,
453 F. Supp. 2d 807 (S.D.N.Y. 2006).......................................45, 46, 47, 70

*Cooper v. Parsky*,
140 F.3d 433 (2d Cir. 1998)..........................................................................47

*Crawford-El v. Britton*,
523 U.S. 574 (1998).......................................................................................44

*D'Alessio v. N.Y. Stock Exch., Inc.*,
258 F.3d 93 (2d Cir. 2001)......................................................................27, 30

*de la Fuente v. DCI Telecomms., Inc.*,
259 F. Supp. 2d 250 (S.D.N.Y. 2003)................................................. *passim*

*Desiderio v. NASD*,
191 F.3d 198 (2d Cir. 1999)..........................................................................63

*Dexia SA/NV v. Deutsche Bank AG*,
No. 11 Civ. 5672 (JSR), 2013 U.S. Dist. LEXIS 3482
(S.D.N.Y. Jan. 4, 2013)...........................................................................66, 67

- v -

Page

*Dietrich v. Bauer*,
    76 F. Supp. 2d 312 (S.D.N.Y. 1999)..................................................................47, 70

*DL Capital Grp., LLC v. Nasdaq Stock Mkt., Inc.*,
    409 F.3d 93 (2d Cir. 2005)......................................................................................30

*Dubois v. U.S. Dep't of Agric.*,
    270 F.3d 77 (1st Cir. 2001)......................................................................................67

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................................59

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)................................................................................................25

*FDIC v. Scott*,
    125 F.3d 254 (5th Cir. 1997) ..................................................................................21

*Feins v. AMEX*,
    81 F.3d 1215 (2d Cir. 1996)....................................................................................63

*Fezzani v. Bear, Stearns & Co.*,
    384 F. Supp. 2d 618 (S.D.N.Y. 2004)....................................................................61

*Fezzani v. Bear, Stearns & Co.*,
    716 F.3d 18 (2d Cir. 2013)......................................................................................54

*First Jersey Sec., Inc. v. Bergen*,
    605 F.2d 690 (3d Cir. 1979)....................................................................................20

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
    376 F. Supp. 2d 385 (S.D.N.Y. 2005)..............................................................65, 66

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................................................56

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)....................................................................................57

*Garr v. U.S. Healthcare*,
    22 F.3d 1274 (3d Cir. 1994)....................................................................................67

*Grimes v. Fremont Gen. Corp.*,
    933 F. Supp. 2d 584 (S.D.N.Y. 2013)....................................................................66

1014673_1

Page

*Gross v. Weingarten*,
   217 F.3d 208 (4th Cir. 2000) ................................................................17

*Guitard v. U.S. Sec'y of Navy*,
   967 F.2d 737, 741 (2d Cir. 1992),
   *aff'd*, 591 F. App'x 32 (2d Cir. 2015)...........................................25, 26

*Gurary v. Winehouse*,
   190 F.3d 37 (2d Cir. 1999)....................................................................46

*Hall v. Children's Place Retail Stores, Inc.*,
   580 F. Supp. 2d 212 (S.D.N.Y. 2008)............................................56, 58

*Hayden v. New York Stock Exch.*,
   4 F. Supp. 2d 335 (S.D.N.Y. 1998) .....................................................20

*Hughes v. Dempsey-Tegeler & Co.*,
   534 F.2d 156 (9th Cir. 1976) ................................................................63

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
   No. 11 Civ. 4209 (KBF), 2013 U.S. Dist. LEXIS 43774
   (S.D.N.Y Mar. 27, 2013) ............................................................ *passim*

*In re Beacon Assocs. Litig.*,
   745 F. Supp. 2d 386 (S.D.N.Y. 2010)..................................................68

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
   851 F. Supp. 2d 746 (S.D.N.Y. 2012)..................................................65

*In re Blech Sec. Litig.*,
   928 F. Supp. 1279 (S.D.N.Y. 1996)......................................................47

*In re Blech Sec. Litig.*,
   961 F. Supp. 569 (S.D.N.Y. 1997) .................................................61, 70

*In re Charter Commc'ns, Inc.*,
   443 F.3d 987 (8th Cir. 2006),
   *aff'd*, 552 U.S. 148 (2008) ..................................................................54

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
   235 F. Supp. 2d 549 (S.D. Tex. 2002) .................................................72

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
   469 F. Supp. 2d 88 (S.D.N.Y. 2006).....................................................76

- vii -

**Page**

*In re Facebook, Inc.*,
  42 F. Supp. 3d 556, 2014 U.S. Dist. LEXIS 119595
  (S.D.N.Y. 2014) ..................................................................................44

*In re Facebook, Inc., IPO & Sec. & Derivative Litig.*,
  986 F. Supp. 2d 428 (S.D.N.Y. 2013)............................................ *passim*

*In re Fannie Mae 2008 Sec. Litig.*,
  891 F. Supp. 2d 458 (S.D.N.Y. 2012)....................................................65

*In re Global Crossing, Ltd. Sec. Litig.*,
  322 F. Supp. 2d 319 (S.D.N.Y. 2004)................................45, 69, 70, 71

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)............................................ *passim*

*In re Initial Pub. Offering Sec. Litig.*,
  358 F. Supp. 2d 189 (S.D.N.Y. 2004)....................................................25

*In re ITT Educ. Servs.*,
  34 F. Supp. 3d 298 (S.D.N.Y. 2014)......................................................57

*In re Lehman Bros. Sec. & Erisa Litig.*,
  No. 09 MD 2017 (LAK), 2013 U.S. Dist. LEXIS 107559
  (S.D.N.Y. July 31, 2013) ......................................................................66

*In re Lernout & Hauspie Sec. Litig.*,
  236 F. Supp. 2d 161 (D. Mass. 2003) ...................................................78

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  218 F.R.D. 76 (S.D.N.Y. 2003) .............................................................67

*In re Merrill Lynch Auction Rate Sec. Litig.*,
  704 F. Supp. 2d 378 (S.D.N.Y. 2010)....................................................73

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
  988 F. Supp. 2d 406 (S.D.N.Y. 2013)....................................................46

*In re NYSE Specialists Sec. Litig.*,
  405 F. Supp. 2d 281 (S.D.N.Y. 2005)....................................................59

*In re NYSE Specialists Sec. Litig.*,
  503 F.3d 89 (2d Cir. 2007)........................................................39, 40, 41

- viii -

Page

*In re OSG Sec. Litig.*,
    12 F. Supp. 3d 619 (S.D.N.Y. 2014)........................................................................65, 66, 67

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 472 (S.D.N.Y 2005).......................................................... *passim*

*In re Platinum & Palladium Commodities Litig.*,
    828 F. Supp. 2d 588 (S.D.N.Y. 2011)......................................................................66

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
    548 F.3d 110 (D.C. Cir. 2008) .................................................................................19, 23

*In re Stillwater Capital Partners Inc.*,
    858 F. Supp. 2d 277 (S.D.N.Y. 2012).......................................................................46

*In re UBS AG Sec. Litig.*,
    No. 07 Civ. 11225 (RJS), 2012 U.S. Dist. LEXIS 141449
    (S.D.N.Y Sept. 28, 2012), *aff'd*, 752 F.3d 173 (2d Cir. 2014) ...............................67

*In re UBS Auction Rate Sec. Litig.*,
    No. 08 Civ. 2967 (LMM), 2010 U.S. Dist. LEXIS 59024
    (S.D.N.Y. June 10, 2010).......................................................................... *passim*

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001).....................................................................................76

*Landesbank Baden-Württemberg v. RBS Holdings USA, Inc.*,
    14 F. Supp. 3d 488 (S.D.N.Y. 2014).........................................................................65

*Last Atlantis Capital LLC v. Chi. Bd. Options Exch., Inc.*,
    455 F. Supp. 2d 788 (N.D. Ill. 2006) ........................................................................73

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007)......................................................................................59

*Lipsky v. Commonwealth United Corp.*,
    551 F.2d 887 (2d Cir. 1976)......................................................................................66, 67

*Low v. Robb*,
    No. 11-CV-2321 (JPO), 2012 U.S. Dist. LEXIS 6836
    (S.D.N.Y. Jan. 20, 2012)..........................................................................................67

*MacDraw, Inc. v. CIT Grp. Equip. Fin.*,
    73 F.3d 1253 (2d Cir. 1996)......................................................................................67

Page

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ...................................................................76

*Manning v. Smith Barney, Harris Upham & Co.*,
    828 F. Supp. 256 (S.D.N.Y. 1993) ...........................................................62

*McCarthy v. Madigan*,
    503 U.S. 140 (1992).............................................................................16, 26

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006)....................................................................................61

*MFS Sec. Corp. v. SEC*,
    380 F.3d 611 (2d Cir. 2004)......................................................................20

*Miller v. Asensio & Co.*,
    364 F.3d 223 (4th Cir. 2004) ....................................................................79

*Millionerrors Inv. Club v. GE, P.L.C.*,
    No. 99-781, 2000 U.S. Dist. LEXIS 4778
    (W.D. Pa. Feb. 8, 2000) ...........................................................................25

*Morris v. Wachovia Sec., Inc.*,
    No. 3:02cv797, 2007 U.S. Dist. LEXIS 52675
    (E.D. Va. July 20, 2007) ...........................................................................67

*NetCoalition & Sec. Indus. & Fin. Mkts. Ass'n v. SEC*,
    715 F.3d 342 (D.C. Cir. 2013) .....................................................3, 4, 34, 39

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).....................................................................58

*Opulent Fund, L.P. v. Nasdaq Stock Mkt., Inc.*,
    No. C-07-03683 RMW, 2007 U.S. Dist. LEXIS 79260
    (N.D. Cal. Oct. 12, 2007).........................................................31, 32, 40, 42

*Patsy v. Bd. of Regents*,
    457 U.S. 496 (1982).............................................................................16, 21

*Platinum Partners Value Arbitrage Fund, L.P. v. Chi. Bd. Options Exch.*,
    976 N.E. 2d 415 (1st Dist. 2012) ..........................................................32, 38

*Reed Elsevier, Inc. v. Muchnick*,
    559 U.S. 154 (2010)..................................................................................22

- x -

Page

*Rich v. New York Stock Exch., Inc.,*
    509 F. Supp. 87 (S.D.N.Y. 1981) ...........................................................................63

*RSM Prod. Corp. v. Fridman,*
    643 F. Supp. 2d 382 (S.D.N.Y. 2009),
    *aff'd on other grounds,* 387 F. App'x 72 (2d Cir. 2010) ........................................67

*Santa Fe Indus., Inc. v. Green,*
    430 U.S. 462 (1977)...........................................................................................18, 52

*Santos-Buch v. Fin. Indus. Regulatory Auth.,*
    32 F. Supp. 3d 475, 482 (S.D.N.Y. 2014) ......................................................25, 26

*Scone Invs., LP v. Am. Third Mkt. Corp.,*
    No. 97 Civ. 3802 (SAS), 1998 U.S. Dist. LEXIS 5903
    (S.D.N.Y. Apr. 28, 1998)..................................................................................72, 73

*SEC v. Capital Gains Research Bureau, Inc.,*
    375 U.S. 180 (1963)...............................................................................................60

*SEC v. Dorozhko,*
    574 F.3d 42 (2d Cir. 2009)....................................................................................24

*SEC v. Lee,*
    720 F. Supp. 2d 305 (S.D.N.Y. 2010)..........................................................5, 65, 66

*SEC v. Zandford,*
    535 U.S. 813 (2002)...........................................................................45, 51, 60, 61

*Shweika v. Dep't of Homeland Sec.,*
    723 F.3d 710 (6th Cir. 2013) ...............................................................................22

*Silverberg v. Thomson McKinnon Sec., Inc.,*
    787 F.2d 1079 (6th Cir. 1986) ..............................................................................17

*Standard Inv. Chartered, Inc. v. NASD,*
    637 F.3d (2d Cir. 2011).........................................................................................31

*Standard Inv. Chartered, Inc. v. NASD,*
    No. 07 Civ. 2014 (SWK), 2007 U.S. Dist. LEXIS 32566
    (S.D.N.Y. May 2, 2007).........................................................................................26

*Superintendent of Ins. v. Bankers Life & Cas. Co.,*
    404 U.S. 6 (1971)............................................................................................46, 60

- xi -

Page

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..................................................................................46, 57

*Weinberger v. Salfi*,
   422 U.S. 749 (1975)............................................................................................20

*Weissman v. Nat'l Ass'n of Sec. Dealers, Inc.*,
   500 F.3d 1293 (11th Cir. 2007) ................................................................ *passim*

## STATUTES, RULES AND REGULATIONS

8 U.S.C.
   §1421(c) ..............................................................................................................22

15 U.S.C.
   §78a ................................................................................................................16, 17
   §78aa ..............................................................................................16, 17, 18, 20
   §78d(3) ..........................................................................................................20, 23
   §78f ..............................................................................................16, 62, 63, 69
   §78f(a) ................................................................................................................62
   §78f(b) ......................................................................................................3, 17, 69
   §78f(b)(5) ................................................................................................4, 62, 64
   §78j(b) ........................................................................................................ *passim*
   §78s ......................................................................................................................23
   §78s(d) ....................................................................................................17, 20, 23
   §78s(d)(2) ............................................................................................................24
   §78s(g) ........................................................................................................23, 63
   §78u-4(b)(2) ........................................................................................................56
   §78y ..............................................................................................................17, 20
   §78y(a)(1) ............................................................................................................18

16 U.S.C.
   §825l ....................................................................................................................20

26 U.S.C.
   §7429 ..................................................................................................................22

42 U.S.C.
   §405(h) ................................................................................................................20

**Page**

Federal Rules of Civil Procedure
    Rule 8 .................................................................................................................59, 60
    Rule 9(b) ....................................................................................................... *passim*
    Rule 11 .............................................................................................................67, 68
    Rule 11(b) ............................................................................................................67
    Rule 12(b)(1)..........................................................................................................1
    Rule 12(b)(6)..............................................................................................1, 46, 47
    Rule 12(f) .................................................................................................64, 66, 68

Federal Rules of Evidence
    Rule 410 ...........................................................................................................66, 67

17 C.F.R.
    §240.10b-5 ....................................................................................................3, 17, 46
    §240.10b-5(a)...................................................................................................46, 69
    §240.10b-5(b)........................................................................................................46
    §240.10b-5(c)...................................................................................................46, 69
    §242.608(d) ................................................................................................. *passim*
    §242.608(d)(1) ......................................................................................................22

New York General Business Law
    §352 *et seq.*.........................................................................................................68

Lead Plaintiffs City of Providence, Rhode Island, Plumbers and Pipefitters National Pension Fund, Employees' Retirement System of the Government of the Virgin Islands, State-Boston Retirement System, and Första AP-fonden (collectively, "Plaintiffs") respectfully submit this Omnibus Memorandum of Law in Opposition to Defendants'[1] Motions to Dismiss[2] the Second Consolidated Amended Complaint for Violation of the Federal Securities Laws (Dkt. No. 252) (the "Complaint" or "SCAC")[3] filed in this action by the Exchanges and Barclays. Plaintiffs respectfully request that the Court deny the motions to dismiss.

## I.   PRELIMINARY STATEMENT

This class action is brought on behalf of purchasers and sellers of securities executed on U.S. public stock exchanges between April 18, 2009 and the present (the "Class Period"), to recover damages caused by Defendants in violation of §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). The action arises from a multi-year stock market manipulation scheme – orchestrated by the Exchanges and Barclays – at the expense of Plaintiffs and the Class.

The Exchanges are the largest stock exchanges in this country, upon which the vast majority of equity trades occur. Rather than maintain "fair and orderly" markets as they claimed, these

---

[1]   Defendants in this action include BATS Global Markets, Inc. ("BATS"), Chicago Stock Exchange, Inc. ("CHX"), Direct Edge ECN, LLC ("Direct Edge"), The NASDAQ Stock Market LLC ("NASDAQ"), NASDAQ OMX BX, Inc. ("BX"), New York Stock Exchange, LLC ("NYSE") and NYSE Arca, Inc. ("ARCA") (collectively, the "Exchanges"), and Barclays PLC and Barclays Capital, Inc. (collectively, "Barclays") (together, the Exchanges and Barclays referenced herein as "Defendants").

[2]   References to "Exch. Mem. __" are to the Memorandum of Law in Support of the Exchanges' Motion to Dismiss the Second Consolidated Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (Dkt. No. 8); references to "Barclays Mem. __" are to Barclays Memorandum of Law in Support of Its Motion to Dismiss the Second Consolidated Amended Complaint (Dkt. No. 16).

[3]   All "¶__" or "¶¶__" references are to the Complaint, unless otherwise noted. All terms not otherwise defined herein have the same meaning as they have in the Complaint.

- 1 -

defendants purposely empowered their favorite customers to exploit their less sophisticated ones. For millions and millions of dollars, the Exchanges created and operated a structure for high-frequency trading ("HFT") firms to obtain and react to more market data faster, using unexplained and in some cases unknown order types, all of which were unavailable to Plaintiffs and the class of investors they represent. These HFT firms in turn did what the Exchanges knew they would do – create the appearance of liquidity with "spam" orders, front run legitimate orders, queue-jump to take advantage of a profitable trade and/or to steal "market" rebates and cancel out of toxic trades before they occurred.

The SCAC's detailed allegations demonstrating the Exchanges' primary liability for scheming and manipulating the markets are overwhelming. The factual bases for the SCAC are now common knowledge, having been the subject of heavy media attention including books, magazine and newspaper articles, and television news reports. The Exchanges cannot and do not deny the underlying facts of their market manipulation scheme, or their profiteering from it, at Plaintiffs' expense.

In spite of all this, or perhaps because of it, the Exchanges claim they cannot be held accountable for their fraud in this Court. Cleverly relying on archaic rules and procedural requirements – none of which apply here – the Exchanges argue that only the U.S. Securities and Exchange Commission ("SEC"), or Congress, can stop them. More specifically, the Exchanges contend Plaintiffs' lawsuit must be dismissed in its entirety because: (1) the SEC has "approved" the "exact services" (Exch. Mem. at 3), allowing them to engage in market manipulation; (2) the Exchanges are immune from suit given their status as self-regulatory organization ("SROs") under the Exchange Act; and (3) at best, Plaintiffs only allege that the Exchanges were peripherally involved as "aiders and abettors" in a market manipulation scheme employed by others, namely,

HFT firms.  They are wrong.  "Any person" can be liable for a violation of §10(b) and SEC Rule

10b-5, including stock exchanges.  15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5.

In stark contrast to what the Exchanges contend, none of the "exact" manipulative conduct

complained of in the SCAC – enhanced data feeds, co-location services, and complex order types –

is "core regulatory" conduct approved by the SEC, through Regulation NMS ("Reg NMS") or

otherwise.  Federal courts and the SEC support this view.  For example, with respect to data feeds:

> [The Exchange Act] has established two categories of data – core and non-core.
> Core data, which "form the heart of the national market system," is reported by the
> exchanges to data processors, which then consolidate it into a single stream of data
> for each NMS stock. . . .  ***All other market data falls into the non-core category.
> The SEC does not require exchanges to provide specific non-core data but instead
> allows market forces to determine which non-core data are provided***.[4]

The same can be said of the Exchanges' provision of co-location services, which is not

referenced in either the Exchange Act or Reg NMS.  Semantics aside, like the non-core data

services, co-location services have nothing to do with the "core" regulatory function of an SRO.

Instead, they are purely business-related activities, recently instituted and solely designed to generate

new revenues for the Exchanges and their shareholders.

And the complex order types are devices that even the Exchanges acknowledge are only

recently "approved" (Exch. Mem. at 30-31) by the SEC.  But these order types and how they

operated were never fully disclosed to the SEC, and the Exchanges do not explain how misleading a

regulator constitutes a "core regulatory" function.  In addition to keeping the true functionality of

these devices from the investing public, as Plaintiffs' allegations make clear, the order types at issue

in the SCAC were designed and implemented by the Exchanges, at the request of the HFT firms.

---

[4]   *NetCoalition & Sec. Indus. & Fin. Mkts. Ass'n v. SEC*, 715 F.3d 342, 345 (D.C. Cir. 2013).
Unless otherwise noted, citations and footnotes are omitted and emphasis is added.

Nor are the Exchanges immune from suit, nor Plaintiffs required to "exhaust" their administrative remedies before suing.  In stating that their actions are wholly protected by immunity, the Exchanges do little more than recast Plaintiffs' allegations and espouse well-established principles of "promot[ing] just and equitable principles of trade [and] protect[ing] investors" (15 U.S.C. §78f(b)(5)), concepts that have been part of the Exchange Act's SRO regulatory framework for decades.  While these principles are of course important to the administration and function of an SRO, they do not shield the Exchanges from any and all securities fraud liability.  This is particularly true in an age where the Exchanges – as private corporations rather than member-owned exchanges – are run to simply promote and advance their own pecuniary interests.

The Exchanges' contention that market data dissemination is a regulatory function governed by Reg NMS (Exch. Mem. at 26-28) does nothing to change this and, if anything, supports Plaintiffs' position that the SEC has elected ***not to regulate*** the conduct described in the SCAC.  On this point, the Exchanges confuse Reg NMS's requirement that certain SROs provide the consolidated Securities Information Processor ("SIP") data feed with ***permissive*** language that allows SROs, if they so choose, to sell other "enhanced" trading data at prices that the Exchanges themselves are free to set based on their own business objectives.[5]  In the end it is the business-related – and not "purely" regulatory – interests in selling services and increasing order flow that drives the manipulative scheme described in the SCAC.  This alone renders immunity inappropriate. *See, e.g.*, *Weissman v. Nat'l Ass'n of Sec. Dealers, Inc*., 500 F.3d 1293, 1297 (11th Cir. 2007).

---

[5]    *See In the Matter of New York Stock Exch. LLC, & NYSE Euronext*, Release No. 67857 at 2 (Sept. 14, 2012) ("[E]xchanges are ***required*** to send their best-priced quotations . . . to be included in the consolidated feeds.  Exchanges also are ***permitted*** to distribute customized market data products directly to customers."), *available at* http://www.sec.gov/litigation/admin/2012/34-67857.pdf; *see also NetCoalition*, 715 F.3d at 345.

By any measure, the SCAC alleges that the Exchanges are ***primary*** actors in the overarching market manipulation scheme – not bystanders or "aiders and abettors."  Indeed, it is undisputed that the Exchanges created, designed, and promoted the enhanced data feeds, co-location services, and complex order types during the Class Period.  They did so knowing how those services would be used on their trading platforms, and profited from them.  Those same Exchanges, then, are responsible for their own conduct in creating, operating, and profiting from their manipulated markets.  They cannot avoid liability by simply blaming HFT firms for using the manipulative products and services that the Exchanges themselves created, particularly when it was the Exchanges who specifically marketed the manipulative devices to HFT firms.  It is the Exchanges that bear responsibility for the rigged, two-tiered market, and their motion to dismiss should be denied.

For similar reasons, Barclays' motion to dismiss must also fail.  Not only did Barclays, like the Exchanges, create and maintain a dark pool for their manipulative products and services to operate, but Barclays also specifically told users of that same platform that its dark pool was free of the predatory conduct occurring on other trading venues like the Exchanges.  As Plaintiffs have alleged, the exact opposite was true.  Worse still, Barclays' proprietary trading desk took part in the same predatory schemes, *e.g.*, frontrunning, spoofing, and queue jumping, that were occurring on the Exchanges as part of a *quid pro quo* with HFT firms to increase order flow.

Barclays makes much of the fact that Plaintiffs rely on some of the allegations made by the New York Attorney General's ("NYAG") Office.  Yet, other courts in this District have stated repeatedly that a private plaintiff may, and indeed should, consider allegations made by state and federal governments with subpoena power.  *See SEC v. Lee*, 720 F. Supp. 2d 305, 340 (S.D.N.Y. 2010) ("There is no absolute rule barring a private plaintiff from relying on government pleadings and proceedings in order to meet the Rule 9(b) and [the Private Securities Litigation Reform Act of

1995 ('PSLRA')] thresholds."); *see also de la Fuente v. DCI Telecomms., Inc.*, 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003) ("I agree with plaintiff that there is nothing improper about utilizing information from [a government case] as evidence to support private claims. . . . [It is] not require[d] that a plaintiff re-invent the wheel before filing a complaint; and one could argue that a complaint predicated on the results of [a government] investigation has far more 'evidentiary support' than one based on rumor and innuendo . . . .").

Alternatively, Barclays claims that it played no role in any fraudulent scheme alleged in the SCAC, and that any alleged false statements regarding the lack of predatory conduct occurring in its dark pool were taken out of context or misconstrued in some way. These arguments simply contest the merits of the SCAC's allegations, and are improper here. Barclays can deny the allegations when it answers the SCAC, but for this motion the allegations are assumed true. *See infra*, §V.A. Like the Exchanges, Barclays' motion to dismiss should be denied.

## II.    STATEMENT OF FACTS

### A.    THE EXCHANGES

#### 1.    The Exchanges Now Cater to HFT Firms

National securities exchanges have changed dramatically over the years as they have shifted from non-profit, member-owned entities to massive for-profit, publicly traded corporations. ¶¶3, 26-33. As a result, the Exchanges have shifted their focus. Now, instead of focusing on trade-matching, the Exchanges must cater to shareholders and seek profits. ¶¶3, 290. Three of the Exchanges are publicly-traded companies and all are for profit entities. In order to ensure profitability, the Exchanges entered into a Faustian bargain with HFT firms, as HFT firms provide the Exchanges with the increased trading volume, or "order flow," that they so desperately require to

generate more profits.  *See, e.g.*, ¶87 (NASDAQ admitting that "a significant percentage of our revenues is tied directly to the volume of securities traded and cleared on our markets").

HFT firms have grown exponentially since their introduction in 1999, accounting for an outsized portion of trading activity compared to what their small numbers would suggest.  In the U.S., dedicated HFT firms represent 2% of the approximately 20,000 firms operating today, yet account for as much as 73% of all equity bids and orders volume.  ¶68.  And by value, HFT was estimated in 2010 to make up 56% of equity trades in the U.S.  ¶66.  The financial incentives provided by the order flow generated by HFT firms proved too great for the Exchanges to pass up, and consequently, the Exchanges engaged in a manipulative and deceptive course of conduct by providing these firms with enhanced proprietary data feeds, co-location services, and complex order types, allowing them to, *inter alia*, access enhanced trading information at faster speeds and position their trades to the detriment of Plaintiffs and the Class.  In short, in exchange for significant payment from HFT firms, the Exchanges rigged their markets in favor of HFT firms and to the substantial detriment of Plaintiffs and the Class.

### 2.     The Exchanges' Manipulative Scheme

The Exchanges' manipulative and deceptive scheme relied primarily on providing HFT firms with proprietary data feeds, co-location services, and complex order types that were virtually inaccessible for non-HFT market participants.  These products and services allowed HFT firms to gain an unfair advantage against all other investors, including Plaintiffs and the Class, by providing HFT firms with material, non-public information and then enabling these same firms to leverage this information to their significant advantage – diverting billions of dollars from Plaintiffs and the Class in the process.  ¶¶13-16.  The Exchanges benefitted greatly from their manipulative scheme, collecting large sums in fees from HFT firms for these services and profiting from the transaction

- 7 -

fees that resulted from increased order flow generated by HFT firms trading on their respective venues. ¶¶13, 64-65; *see also* ¶110 (estimating the Exchanges' annual revenue from co-location fees at $1.8 billion); ¶90 (noting that NYSE's Information Services and Technology Solutions segment's annual revenues increased by roughly $50 million each year during the Class Period and setting a target of $1 billion in revenues by 2015). Indeed, the Exchanges "now receive most of their revenue from transactions and the sale of market data and related services based on those transactions." ¶64.

Traditionally, the Exchanges utilized a "customer priority" fee structure whereby the customer accounts were given order priority without having to pay exchange transaction fees. ¶51. Motivated by the robust order flow generated by the HFT firms, the Exchanges began charging fees to investors who merely accepted the prices the market makers quoted (the "takers"), while offering a small rebate to the "makers" of liquidity. ¶¶48-49. This "maker-taker" fee system incentivized the HFT firms to trade on the Exchanges in order to capture the maker rebate. ¶¶49, 51, 134. It also helped to solidify a symbiotic relationship between the Exchanges and the HFT firms and led to the Exchanges' creation and provision of the manipulative products and services explained more fully below, to the detriment of Plaintiffs and the Class.

### 3.   Proprietary Data Feeds

Each of the Exchanges sold proprietary data feeds directly to HFT firms at exorbitantly high prices and for the purpose of encouraging HFT firms to send their order flow to the Exchanges. ¶¶86-87 (NASDAQ's and BX's sale of proprietary data feeds); ¶89 n.36 (NYSE's sale of "real-time information relating to price, transaction and order data on all of the instruments traded on . . . our exchanges," which necessarily includes ARCA); ¶93 (BATS' sale of proprietary data feeds); ¶98 (Direct Edge's sale of enhanced data feeds); *see also* ¶¶118, 123 (alleging that the Exchanges sold HFT firms enhanced trading information through "direct data feeds").

- 8 -

Proprietary data feeds place HFT firms at a significant informational advantage when compared to non-HFT market participants, because they provide HFT firms with early and (virtually) exclusive access to pricing and depth of order book trading data that is unavailable to non-subscribers.  ¶¶3-4, 9, 13, 15, 64-65, 86-88, 90-91, 95, 98, 107, 117-119, 123-124.   The informational asymmetries are even more pronounced given the exceedingly high access fees that the Exchanges charge for these services.  ¶¶127-129 (alleging cost-prohibitive access fees to proprietary data feeds ranging from $10,000 to $500,000 a month); *see also* ¶98 (Direct Edge discriminatorily marketed such services because acquiring and utilizing the data was too "cumbersome and expensive" for most).  The Exchanges cater to HFT firms because it is highly profitable for the Exchanges to do so: first, the Exchanges earn revenues from the fees charged for these data feed services; second, and even more importantly, HFT firms' activities generate order flow (which, in turn, generates millions in transaction fees) for the Exchanges.[6]  ¶¶13, 64-65; *see also* ¶¶86-88, 90 (describing the high revenues earned by NASDAQ OMX Group and NYSE for proprietary data feeds).  In return, the HFT firms receive near-exclusive access to enhanced data because the Exchanges price these services at a level that is not accessible to non-HFT market participants.  This *quid pro quo* (*i.e.*, increased order flow in return for near-exclusive access to trading data) between the Exchanges and HFT firms results in market manipulation because that same data is then used to manipulate the price of stocks traded on the public exchanges.  ¶¶109, 299.

### 4.    Co-Location Services

The Exchanges engaged in a manipulative scheme to sell exclusive access to trading data by providing co-location services – physical computer server space in close proximity to their own data

---

[6]    The NYSE charges a small fee of .0003 per 100 share transaction, which when applied to the millions of such transactions per day results in hundreds of thousands of dollars in daily revenue.

servers – at exorbitantly high prices and for the purpose of encouraging HFT firms to generate order flow.  *See generally* ¶¶108-117 (alleging that NASDAQ, BX, NYSE, ARCA, BATS, CHX and Direct Edge sell co-location services that are cost-prohibitive for non-HFT investors).  These services, which have nothing in common with the "core regulatory" function of an exchange, are marketed and sold to HFT firms who then use it to gain early access to trading data.  *Id.*  The data is then used to alter the price that investors pay for stocks traded on the Exchanges.  ¶¶110-112.  Thus, the same *quid pro quo* referenced above regarding enhanced data feeds (*i.e.*, increased order flow in return for near-exclusive access to trading data) also applies to co-location services and, in similar fashion, results in market manipulation.  ¶¶108-109.

## 5.    Complex Order Types

The Exchanges also created complex order types that facilitated the manipulation of the markets to their benefit and to the detriment of Plaintiffs and the Class.  *See, e.g.*, ¶¶173-175 (ARCA); ¶285 (NYSE);  ¶¶163-168, 228-230 (NASDAQ and BX); ¶¶158-162, 212-215 (Direct Edge); ¶¶169-172, 208-211 (BATS); ¶¶176-181, 216-227 (CHX).  Complex order types provided HFT firms various ways to profit at the expense of Plaintiffs and the Class, including:

- Order handling practices that permit HFT firms to step ahead of investor orders in violation of established rules of priority and precedence;

- Rebooking and repositioning of investor orders that permit HFT firms to escape disadvantageous trades;

- Conversion of investor orders eligible for maker rebates into unfavorable executions incurring taker fees (under the maker-taker pricing model);

- Insertion of HFT intermediaries in between legitimate customer-to-customer matching; and

- Discriminatory order handling of investor orders during sudden price movements.

¶138.

These complex trade commands, many of which were never fully disclosed to investors other than HFT firms, provide what some commentators have labeled "guaranteed economic results." ¶¶141-142; *see also* ¶14 (referencing HFT firm with only one day of trading losses in five years). Again, the Exchanges were willing to pander to HFT firms in this way in order to increase trading volume on their venues, which in turn increased the Exchanges' revenues. ¶¶139-141. To the extent some of these commands were disclosed by the Exchanges to investors other than HFT firms, the full functionality of these order types was not. ¶¶137-138, 140, 146-147, 160-161, 178, 181, 203, 205, 207, 215. On this point, on January 12, 2015, the SEC announced an agreement with BATS to pay a $14 million penalty to settle allegations that EDGX and EDGA (national securities exchanges which BATS acquired from Direct Edge) gave unfair advantages to high-speed traders by failing to fully and accurately disclose the use of order types that gave HFT firms advantages over other investors in their markets.[7]

### 6.    Plaintiffs Relied on the Fairness of the Exchanges' Markets

Plaintiffs expected to be treated fairly on the Exchanges' venues, not subject to informational asymmetries and complex order types which left them subject to predation by HFT firms. ¶¶7-8, 16, 78-83. In particular, Plaintiffs believed that the duties imposed upon the Exchanges by law, the SEC rules, the Financial Industry Regulatory Authority ("FINRA"), and the Exchanges' own rules and regulations would serve to create a level playing field for all market participants. ¶¶8, 16, 47, 78-83. Certainly the Exchanges promised investors this much.  *See generally* ¶¶79, 84; *see also* ¶85 (NASDAQ's statements); ¶89 (NYSE's statements); ¶93 (BATS' statements); ¶97 (Direct Edge's statements); ¶100 (CHX's statements). Unfortunately, Plaintiffs' justifiable reliance was misplaced

---

[7]    SEC Charges Direct Edge Exchanges with Failing to Properly Describe Order Types (Jan. 12, 2015), *available at* http://www.sec.gov/news/pressrelease/2015-2.html. ***The penalty was the largest ever against a national securities exchange***. *Id.*

as the Exchanges manipulated their securities markets by catering almost exclusively to their preferred market participants, HFT firms, in exchange for the increased revenues generated by HFT order flow – all to the substantial detriment of Plaintiffs and the Class.

### 7.       The Exchanges Knowingly Deceived Plaintiffs

The Exchanges' intent to defraud is evident in their selective disclosure of complex order types. ¶¶137-138, 140, 146-147, 160-161, 178, 181, 203, 205, 207, 215.  The Exchanges knew that they had a great deal to gain from providing HFT firms with complex order types – *i.e.*, they understood that catering to HFT firms with complex (and oftentimes selectively or incompletely disclosed) order types would result in increased trading volume and hence increased transaction fees. *See, e.g.*, ¶139 ("'We're always competing for market share, so we try to create products that will attract more volume.'"); *id.* ("'Exchanges are losing out to dark pools, so when HFTs ask for a new order type, they get a new order type.'"); ¶149 ([I]nferior queue positioning can cost investors 1.7 cents per share, resulting "in tens of millions of dollars (conservatively) of extra trading costs for investors (and profits for HFTs)."). The Exchanges also knew that the "guaranteed economics" provided to HFT firms by such order types would come at the expense of Plaintiffs and the Class. ¶¶138-141, 149.  So, the Exchanges selectively disclosed the functionality (and sometimes even the existence) of their complex order types, content to sacrifice Plaintiffs and the Class in the process. ¶¶140-150.[8]

---

[8]    Indeed, the Exchanges are coming under increasing regulatory scrutiny for their deceptive and manipulative behavior, including, as noted above, the selective and/or incomplete disclosure of complex order types. *See* ¶¶8 n.4, 280-289 (highlighting various governmental investigations and penalties related to the Exchanges' manipulative scheme).

B.      Barclays

Plaintiffs and the Class were similarly disadvantaged on the dark pool called Barclays LX, which was operated by Barclays.  ¶¶1, 34-35.  Barclays engaged in a similarly manipulative and deceptive scheme to defraud Plaintiffs and the Class by manipulating the market for securities on Barclays LX.

In an effort to grow its dark pool, and unbeknownst to Plaintiffs and the Class, Barclays, like the Exchanges, actively catered to HFT firms and provided them with informational and operational advantages which Barclays knew HFT firms used to prey on unsuspecting institutional investors; and Barclays itself engaged in manipulative HFT practices on Barclays LX, subjecting Plaintiffs and the Class to the same informational and operational asymmetries, resulting in substantial financial harm to Plaintiffs and the Class.  ¶11.  Barclays has been sued by the NYAG for this and related misconduct.  *Id.*

1.      The Rise of Dark Pools

Dark pools have become an increasing presence in the domestic market for securities.  *See generally* ¶¶55-61; *see also* ¶61 (dark pools' overall percentage of daily trading volume increased from 16% in 2008 to over 40% in 2013, with more trades often occurring on dark pools in any given month than NYSE).  Dark pools provide broker-dealers, such as Barclays, with an independent source of revenue, but this revenue is highly dependent on significant order flow and execution rates. ¶59.  Traditionally, the predecessors to dark pools provided institutional investors with the ability to trade large blocks of shares without tipping their hand to the market, thereby maintaining the exchange-quoted price for such shares.  ¶¶56-57.  Broker-dealers have continued to market their dark pools as providing similar services to institutional investors, including safe havens for institutional investors free from the manipulative practices of HFT firms.  ¶60.  Barclays itself marketed Barclays

- 13 -

LX as a place to trade securities that was free from the predatory trading employed by HFT firms. ¶¶268-274. In particular, Barclays touted its "Liquidity Profiling" service as a tool to monitor the toxicity of entities' trading behavior in Barclays LX. ¶¶269-270. As part of the service, Barclays supposedly grouped traders according to their trading behavior and told investors that they could use the Liquidity Profiling feature to avoid interacting with entities which Barclays had categorized as employing HFT strategies. ¶¶70-74.

### 2.   Barclays' Manipulative Scheme

Notwithstanding its statements to the contrary, Barclays actively catered to HFT firms in order to drive up the volume of dark pool trading on its Barclays LX platform. ¶275; *see also* ¶59 (revenue generated on dark pools is highly dependent on order flow and execution rates). Rather than monitor aggressive trading tactics, Barclays never prohibited a firm from participating in its dark pool and was well aware of the high levels of toxic trading that was actually occurring. ¶¶276-277. In furtherance of this manipulative scheme, Barclays would override certain Liquidity Profiling ratings in order to assign "safer" scores to aggressive HFT traders, including to Barclays' own internal HFT proprietary trading desks. ¶277. And, similar to actions taken by the Exchanges, Barclays provided HFT firms with certain benefits and information, such as allowing latency arbitrage, cross connecting, and financial incentives, thereby allowing the HFT firms to effectively engage in predatory trading. ¶278. This caused Plaintiffs and the Class to lose money on trades whose terms were substantially less favorable to them than they would have been on a fair and unmanipulated market. ¶279.

### 3.   Plaintiffs Relied on Barclays' Scheme

Plaintiffs and the Class relied on Barclays' compliance with the applicable regulatory framework, which requires fairness in the operation of dark pools, when deciding to trade on

Barclays LX. ¶¶263-268.  Barclays did nothing to dispel this reliance.  ¶¶268-274.  In fact, Barclays actively reinforced Plaintiffs' belief in the fairness of Barclays LX by marketing the dark pool as safe from the predations of HFT firms.  *Id.*  However, in reality, Barclays was actively courting HFT firms to increase the volume of trading on its dark pool, enticing them with informational and operational advantages which these firms utilized to the detriment of Plaintiffs and the Class.  ¶278.

In this way, Barclays rapidly grew its dark pool, attracting precious order flow to Barclays LX from institutional investors as well as HFT firms, telling both groups of traders that it would meet their respective needs.  But far from providing a fair and level playing field, Barclays catered almost exclusively to HFT firms, sacrificing Plaintiffs' and the Class' orders to these firms in the process.  Barclays' scheme helped Barclays LX become the leading dark pool by the end of 2013. ¶¶34-35, 274.  More recently, however, Barclays has faced increasing scrutiny for its manipulative scheme, including a lawsuit brought by NYAG Eric Schneiderman.  ¶289.

## III.    THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THIS ACTION

The Exchanges argue this Court lacks jurisdiction because Plaintiffs' claims are premised on a violation of the Exchange Act or Reg NMS, which, according to the Exchanges, provide a comprehensive administrative review procedure that leaves no room for a district court.  In other words, Plaintiffs should have exhausted their administrative remedies, and because they failed to do so, this Court lacks jurisdiction.  As explained more fully below, the Exchanges are wrong.

Plaintiffs' claims are premised on the Exchanges' manipulative behavior in rigging the registered public stock exchanges, which they run and operate, in favor of their preferred HFT customers in efforts to further their own private business interests.  Accordingly, Plaintiffs seek

relief under §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.[9]  This Court is the appropriate venue to hear such claims.  Indeed, Congress specifically appointed the district courts of the United States to hear such claims.  *See* 15 U.S.C. §78aa ("The district courts of the United States . . . shall have exclusive jurisdiction of violations of this title [15 U.S.C. §§78a *et seq.*] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title . . . .").

Even if Plaintiffs' claims fall under the purview of those discreet sections of the Exchange Act or Reg NMS providing for recourse through administrative remedies, exhaustion still would not be required.  When administrative remedies are available, courts must still determine whether the relevant statutory scheme requires exhaustion.  In making this determination, courts have developed two theories of exhaustion – either statutory or judicial exhaustion.  *Bastek v. Fed. Crop Ins. Corp.*, 145 F.3d 90, 94 (2d Cir. 1998).  Statutory exhaustion applies only "'where Congress specifically mandates'" exhaustion.  *Id.* (quoting *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992)).  Here, neither the Exchange Act nor Reg NMS makes administrative exhaustion mandatory.  Alternatively, judicial exhaustion applies only where exhaustion is "consistent" with "congressional intent," but neither Congress nor the SEC intended for exhaustion to apply to cases like this.  *Patsy v. Bd. of Regents*, 457 U.S. 496, 502 n.4 (1982).

---

[9]    The Exchanges also argue that Plaintiffs' §6(b) claims fail due to a lack of subject matter jurisdiction because Plaintiffs did not exhaust administrative remedies. Exch. Mem. at 24.  Plaintiffs contend that this Court has jurisdiction to hear their §6(b) claims for the same reasons this Court has jurisdiction to hear Plaintiffs' §10(b) claims – namely, and as described in greater detail below, that 15 U.S.C. §78aa controls and provides for jurisdiction in this Court over such claims, and nothing in §6(b) says otherwise.  Plaintiffs also direct the Court's attention to §VI, *infra*, for further support that Plaintiffs can bring a claim under §6(b) in this Court.

### 1. Plaintiffs' Claims for Market Manipulation Under §10(b) of the Exchange Act and SEC Rule 10b-5 Do Not Require Exhaustion of Administrative Remedies

At the heart of their allegations, Plaintiffs contend that the Exchanges engaged in an overarching scheme to manipulate the registered public stock exchanges, the same markets that each of the Exchanges operates. While the Exchanges' market manipulation scheme is arguably *incidental* to the Exchanges' rules and rulemaking authority, that may be said of everything an exchange does. But it does not challenge the Exchanges' rule making authority. Nor do Plaintiffs simply ask that this Court review the propriety of individual rules or the processes used to establish such rules.

"The district courts of the United States . . . shall have exclusive jurisdiction of violations of this title [15 U.S.C. §§78a *et seq.*] or the rules and regulations thereunder," which include §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. 15 U.S.C. §78aa. That certain other sections of this same title may detail "a two-tiered, 'self-contained process' to 'review and remedy . . . complaints' about SRO actions" (Exch. Mem. at 21) does not mean that claims arising under §10(b) and Rule 10b-5 are also subject to such a system of review. *See, e.g.*, 15 U.S.C. §78y (establishing that "[a] person aggrieved by a final order" or "adversely affected by a rule" of the SEC may obtain review of such order or rule in the United States Court of Appeals); 15 U.S.C. §78s(d) (establishing that any disciplinary action taken by a self-regulatory agency "shall be subject to review by the appropriate regulatory agency"). Indeed, nothing in §10(b) or Rule 10b-5 prescribes a series of administrative remedies which must be exhausted before seeking redress before a federal district court. To the contrary, "[a] direct action alleging violations of section 10(b) and Rule 10b-5 is subject to exclusively federal jurisdiction." *Gross v. Weingarten*, 217 F.3d 208, 224 (4th Cir. 2000) (citing 15 U.S.C. §78aa); *see Silverberg v.*

- 17 -

*Thomson McKinnon Sec., Inc.*, 787 F.2d 1079, 1082 (6th Cir. 1986) ("[F]ederal securities law expressly and unambiguously vests exclusive jurisdiction of a §10(b) claim in federal district courts.") (citing 15 U.S.C. §78aa).  Plaintiffs bring claims alleging the Exchanges violated §10(b) and Rule 10b-5, and thus, their claims are subject to the jurisdiction of this Court.  *See* ¶¶17-18.[10]

Perhaps realizing the folly of their position, the Exchanges go to great lengths to recast Plaintiffs' allegations as market-data violations subject to review under Reg NMS.  *See* Exch. Mem. at 20 ("Significantly, Plaintiffs' case rests on their assertion that proprietary data feeds and co-location services violate Regulation NMS.").  But Plaintiffs' claims are not so narrow – they go far beyond challenging the Exchanges' ***mandatory*** "market-data dissemination" policies or "a final order of the SEC."  *See id.* at 18 (citing 17 C.F.R. §242.608(d); 15 U.S.C. §78y(a)(1)).  Plaintiffs allege a widespread manipulative scheme through the use of data feeds, co-location services, and complex order types, whereby the Exchanges, in order to increase order flow on their respective venues, "provided certain market participants . . . with material, non-public information and trading advantages so that those market participants could use the advantage obtained to manipulate the U.S. securities markets to the detriment of Plaintiffs and the Class."  ¶3.  This is textbook market manipulation.  *See, e.g.*, *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977) (market manipulation involves "wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity"); *see also In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 504 (S.D.N.Y 2005).  What is more, they did so in furtherance of their own business interests and not as part of any core regulatory function delegated to them by the SEC.  *See*

---

[10]   Under the Exchanges' theory, they could ***never*** be subject to the jurisdiction of the federal courts for manipulation claims under §10(b) and Rule 10b-5.  This would be an absurd result and essentially operate as a carve out for SROs that was never intended by the Exchange Act or Reg NMS.

*infra*, §VII.  Because Plaintiffs allege that the Exchanges manipulated the market for securities on their trading venues in violation of §10(b) and Rule 10b-5, this Court undoubtedly has jurisdiction and has always served as a competent forum for these and other Exchange Act claims.

Contrary to the Exchanges' assertion, the SEC ***cannot*** "address the central element on which Plaintiffs' entire theory of liability depends" by simply "requir[ing] the Exchanges to eliminate proprietary data feeds and co-location services."  Exch. Mem. at 21.  While the Exchanges' provision of proprietary data feeds and co-location services to HFT firms is part of the Exchanges' market manipulation scheme, the mere creation of these products and services would not have been enough alone to effectuate the scheme.  In addition to these products and services, the Exchanges also relied heavily on the use of complex order types to defraud Plaintiffs and the Class.  *See* ¶¶136-150.  Moreover, the SEC cannot make Plaintiffs and the Class whole for the damages they have ***already*** suffered as a result of the Exchanges' manipulative scheme.  The Exchanges' contention that "Congress has created a two-tiered, 'self-contained process' to 'review and remedy . . . complaints' about SRO actions such as those challenged here that does not include any role for the district courts" (Exch. Mem. at 21 (quoting *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008))), should be rejected.[11]

### 2.     Even If Plaintiffs' Claims Implicate Those Portions of the Exchange Act and Reg NMS Providing for Administrative Review Procedures, Exhaustion Is Not Required

#### a.     Statutory Exhaustion Does Not Apply

Statutory exhaustion only applies "when Congress requires resort to the administrative process as a predicate to judicial review."  *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247

---

[11]   The Exchanges' authority cited for this mistaken proposition is factually inapposite to the present action.  Plaintiffs' claims under §10(b) and Rule 10b-5 are subject to the jurisdiction of this Court.

(D.C. Cir. 2004). "[T]o mandate exhaustion, a statute must contain "'sweeping and direct" statutory language indicating that there is no federal jurisdiction prior to exhaustion, or the exhaustion requirement is treated as an element of the underlying claim.'" *Id.* at 1248 (quoting *Weinberger v. Salfi*, 422 U.S. 749, 757 (1975)). Statutory exhaustion applies only where "'Congress states in clear, unequivocal terms that the judiciary is barred from hearing an action until the administrative agency has come to a decision.'" *Avocados Plus*, 370 F.3d at 1248.[12] Given the conflicting directives contained within the Exchange Act (*compare* 15 U.S.C. §78aa, *with* 15 U.S.C. §§78s(d), 78y), statutory exhaustion is not appropriate here. And indeed, the Second Circuit has already held that the Exchange Act does not explicitly mandate exhaustion. *MFS Sec. Corp. v. SEC*, 380 F.3d 611, 623 n.3 (2d Cir. 2004) ("Although we said in [*Barbara v. New York Stock Exch.*, 99 F.3d 49, 57 (2d Cir. 1996)] that we thought that 'Congress intended' the exhaustion doctrine to apply to Commission review of SROs [under the Exchange Act], we did not conclude that the requirement was either statutorily imposed or mandatory.");[13] *see also First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 695

---

[12]   For examples of such statutory schemes, *see Avocados Plus*, discussing exhaustion requirements under the Social Security Act and the Federal Power Act. 370 F.3d at 1248 (citing 42 U.S.C. §405(h); 16 U.S.C. §825l). No portion of the Exchange Act contains the same kind of explicit language contained in these two Acts, however.

[13]   The Exchanges cite *Hayden v. New York Stock Exch.*, 4 F. Supp. 2d 335, 340 (S.D.N.Y. 1998), for the proposition that "district courts lack subject matter jurisdiction over claims against SROs raising issues that 'Congress intended to subject to the comprehensive enforcement structure created by the Exchange Act.'" Exch. Mem. at 21. The district court in *Hayden* interpreted the Second Circuit's decision in *Barbara* to hold that statutory exhaustion was required under the Exchange Act. *Hayden*, 4 F. Supp. 2d at 338 n.3. However, *Barbara* stands for the proposition that exhaustion is required for challenges to SRO "disciplinary proceedings" only "in appropriate circumstances." *Barbara*, 99 F.3d at 57. And, it is clear from the Second Circuit's decision in *MFS* that the *Hayden* court was wrong to find that the Exchange Act gave rise to statutory exhaustion. *See MFS*, 380 F.3d at 623 n.3. Moreover, unlike *Barbara* and *Hayden*, this case does not involve disciplinary proceedings under §19(d) or §4C of the Exchange Act. Nor does it involve contesting a final order or rule of the SEC under §78y.

- 20 -

(3d Cir. 1979) (stating that the Exchange Act does not "[e]xplicitly preclude an aggrieved party from seeking relief in a federal district court").

Nor does statutory exhaustion apply under Reg NMS. Like the Exchange Act, Rule 608(d) of Reg NMS does not contain any "clear, unequivocal terms" barring the district court from hearing a matter until the SEC has first reviewed it. Indeed, the permissive language in Rule 608(d) confers only discretionary jurisdiction on the SEC – the SEC "*may, in its discretion*, entertain appeals." 17 C.F.R. §242.608(d). The Exchanges even admit that "the SEC's review authority under Rule 608(d) is discretionary." Exch. Mem. at 23 n.14. Statutory exhaustion simply does not apply in this case.

### b.      Judicial Exhaustion Does Not Apply

In deciding whether judicial exhaustion is required, courts focus on whether application of the doctrine is consistent with congressional intent. *Patsy*, 457 U.S. at 502 n.4; *Avocados Plus*, 370 F.3d at 1248-50 (recognizing that courts are guided by legislative intent when determining whether judicial exhaustion applies). If exhaustion would promote congressional goals, courts "may exercise their discretion and require claimants to exhaust administrative remedies." *FDIC v. Scott*, 125 F.3d 254, 257 (5th Cir. 1997). Exhaustion here is inconsistent with Rule 608(d) of Reg NMS.

Even if Rule 608(d) applied to Plaintiffs' claims (and it does not), no case has ever held that the Rule evidences an intent to require exhaustion. Rule 608(d) clearly does not require the SEC to accept jurisdiction over issues covered under the rule. *See* 17 C.F.R. §242.608(d) (the SEC "*may, in its discretion*, entertain appeals"). The use of permissive language in Rule 608(d) shows exhaustion should not be required because it signals that the SEC did not desire complete authority over disputes implicating the rule.

The Exchanges, however, quote from Rule 608(d)'s language that states "[a]ny action taken or failure to act by any person in connection with an effective national market system plan . . . shall

- 21 -

be subject to review by the [SEC]" (17 C.F.R. §242.608(d)(1)), and claim that Plaintiffs had the "opportunity" to complain to the SEC.  Exch. Mem. at 20.  ***But the SEC itself has interpreted the language cited by the Exchanges to confer only discretionary jurisdiction on the SEC***:

> Rule 11Aa3-2(e)(1) [the predecessor to Rule 608(d)] grants the Commission the "discretion," but not the obligation, to entertain an appeal from action taken in connection with the CTA Plan. ***The language "shall be subject to review" does not make Commission review of national market system plan action mandatory***. Rather, when read in light of Rule 11Aa3-2(e)'s leading sentence, this language indicates that national market system plan action will be subject to the Commission's review only if [it] decides to exercise its discretion to consider an appeal.  As a result, Commission review of appeals under Rule 11Aa3-2(e) is discretionary.  None of the parties to this proceeding argues to the contrary.

*In the Matter of the Application of the Am. Stock Exch., Inc.*, Release No. 34-42312, 2000 WL 3804, at *3 (Jan. 4, 2000).[14]

Moreover, "the Supreme Court has recently cautioned courts to be more careful to distinguish between true jurisdictional conditions and non-jurisdictional limitations on bringing claims."  *Charles Schwab & Co v. Fin. Indus. Regulatory Auth.*, 861 F. Supp. 2d 1063, 1073 (N.D. Cal. 2012) (citing *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 160-61 (2010)).  Where, as here, the statutory scheme uses "permissive . . . language to establish . . . jurisdiction," courts should exercise caution and find such requirements nonjurisdictional.  *See Shweika v. Dep't of Homeland Sec.*, 723 F.3d 710, 716 (6th Cir. 2013) (interpreting 26 U.S.C. §7429 and 8 U.S.C. §1421(c) which use similar permissive language).[15]

---

[14]   In *Am. Stock Exch.*, several of the Exchanges, as parties to that proceeding, took the position in their briefing that Rule 608(d) confers only discretionary jurisdiction on the SEC.  *See, e.g.*, 2000 WL 3804, at *3.

[15]   Even if Rule 608(d) clearly established an exhaustion requirement, it would not control the issue because the court need not defer to the SEC's regulations in interpreting the scope of its jurisdiction.  *See Bechtel v. Competitive Techs., Inc.*, 448 F.3d 469, 478 (2d Cir. 2006) (Leval, J., concurring in the judgment) ("[B]ecause the statutory interpretation at issue concerns the scope of federal court jurisdiction, it is not a proper subject of deference.").

The cases the Exchanges cite to support judicial exhaustion are also inapposite. The claims in those cases directly implicated violations of provisions of the Exchange Act that have no relevance to this lawsuit. For example, in *Cleantech Innovations, Inc. v. NASDAQ Stock Mkt., LLC* ("*Cleantech I*"), No. 11 Civ. 9358 (KBF), 2011 U.S. Dist. LEXIS 153142 (S.D.N.Y. Dec. 30, 2011), and *Cleantech Innovations, Inc. v. NASDAQ Stock Mkt., LLC* ("*Cleantech II*"), No. 11 Civ. 9358 (KEF), 2012 U.S. Dist. LEXIS 13707 (S.D.N.Y. Jan. 31, 2012), the plaintiff alleged violations of §19(g) of the Exchange Act. *Cleantech I*, 2011 U.S. Dist. LEXIS 153142, at *3. This Court held that a company seeking to contest the delisting of its stock must exhaust its remedies with the SEC pursuant to §19 because "'the Exchange Act's text, structure, and legislative history reveal a clear Congressional intent to preclude district court review of SRO disciplinary proceedings.'" *Cleantech II*, 2012 U.S. Dist. LEXIS 13707, at *3. The Exchanges' other cases involve denials of membership (*Series 7*, 548 F.3d at 110 (citing §19(d)));[16] and other disciplinary proceedings (*Altman v. SEC*, 687 F.3d 44 (2d Cir. 2012) (citing §4C)).

Of course, §19(d) has nothing whatsoever to do with the Exchanges' manipulative market conduct. Instead, that section provides a right to review ***the Exchanges' disciplinary sanction of a member or a denial of membership***. It plainly does not apply here. Similarly, §4C provides the SEC the right to bar people, such as attorneys, from practicing before the SEC. In sum, in these limited instances where courts have found judicial exhaustion applies, they have done so with regard to statutes that require the SEC to accept jurisdiction and which involve matters that unquestionably

---

[16]   In *Series 7*, plaintiffs brought common law claims seeking remedies for negligent performance of an SRO's regulatory duties and "concede[d] there is no federal implied private right of action." 548 F.3d at 112-13. The court found that "[a] common law suit for recovery of monetary damages is merely an 'attempt . . . to bypass the Exchange Act' and the process Congress envisioned therein." *Id.* at 114. Plaintiffs here make no efforts to bypass the Exchange Act. Exactly the opposite, they seek relief under it.

- 23 -

address internal regulatory functions.  *See, e.g.*, 15 U.S.C. §78s(d)(2) ("Any action . . . shall be subject to review by the appropriate regulatory agency.").

Finally, the Exchanges posit a number of policy arguments supporting their contention that Plaintiffs cannot bypass Reg NMS's review process.  They argue that Plaintiffs' claims are subject to the review authority of the SEC under Rule 608(d) because they implicate "'the broad objectives of the national market system – the public interest, the protection of investors, or the maintenance of fair and orderly markets.'"  Exch. Mem. at 22.  Similarly, the Exchanges argue that it would undermine Congress' goal in creating a national market system overseen by the SEC to allow Plaintiffs' claims to proceed, especially since the SEC has already considered and reviewed Plaintiffs' central assertion that the Exchanges have allowed HFT firms to receive market data sooner than other market participants.  *Id.* at 23.  Yet again, the Exchanges fundamentally mischaracterize Plaintiffs' allegations as claims that directly confront Reg NMS's requirement that certain exchanges provide and maintain the SIP data feed when in fact they do not: it is the unique combination of the Exchanges' manipulative and deceptive practices – including, ***but not limited to***, the provision of co-location services, proprietary data feeds, and complex order types – that has worked a fraud upon Plaintiffs and the Class and from which they now seek relief.  As such, Plaintiffs bring suit under §10(b) and Rule 10b-5, and this Court has jurisdiction over claims arising under §10(b) and Rule 10b-5.

Ironically, that Plaintiffs' claims implicate broad objectives such as "the public interest, the protection of investors, or the maintenance of fair and orderly markets" only makes the Court's exercise of jurisdiction over this case more appropriate, as §10(b) and Rule 10b-5 are meant to address such objectives.  *See SEC v. Dorozhko*, 574 F.3d 42, 48 n.5 (2d Cir. 2009) (noting that to penalize the behavior in question "'is consonant with the underlying policy of Section 10(b) –

- 24 -

*investor protection*'"); *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 206 (S.D.N.Y. 2004) ("Section 10(b) of the Exchange Act in particular is designed to ***protect investors*** by serving as a 'catchall provision' which prohibits manipulative practices by defendants acting in bad faith.") (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976)); *see also Millionerrors Inv. Club v. GE, P.L.C.*, No. 99-781, 2000 U.S. Dist. LEXIS 4778, at *20 (W.D. Pa. Feb. 8, 2000) ("'The purpose of this section [10(b)] is to ***protect the public at large*** through the better operation of the securities market . . . .'") (citing *Angelastro v. Prudential-Bache Sec., Inc.*, 764 F.2d 939, 949 (3d Cir. 1985)).

For all of the above reasons, the Court should find that judicial exhaustion is not required.

### c.    The Court Should Waive Any Administrative Exhaustion Requirement

Even if this Court were to hold that exhaustion applies in this case, the Court has discretion to invoke a broad array of exceptions to allow a claim to be brought in district court without first pursuing the administrative review process. *See, e.g.*, *Santos-Buch v. Fin. Indus. Regulatory Auth.*, 32 F. Supp. 3d 475, 482 (S.D.N.Y. 2014) (listing four such exceptions) (citing *Guitard v. U.S. Sec'y of Navy*, 967 F.2d 737, 741 (2d Cir. 1992)), *aff'd*, 591 F. App'x 32 (2d Cir. 2015).  For instance, "exhaustion will not bar a suit when 'available [administrative] remedies provide no "genuine opportunity for adequate relief."'"  *Barbara*, 99 F.3d at 57 (quoting *Guitard*, 967 F.2d at 741); *see Santos-Buch*, 32 F. Supp. 3d at 481-82 (same).[17]  Such a situation arises when a plaintiff seeks

---

[17]    "In *Guitard v. U.S. Secretary of Navy*, the Second Circuit acknowledged that a party may not need to exhaust administrative remedies when:

> (1) available remedies provide no genuine opportunity for adequate relief;

> (2) irreparable injury may occur without immediate judicial relief;

> (3) administrative appeal would be futile; and

monetary relief and "the administrative review provisions of the [relevant] Act do not provide for money damages." *Barbara*, 99 F.3d at 57 (citing *McCarthy*, 503 U.S. at 154); *see Standard Inv. Chartered, Inc.  v. NASD*, No. 07 Civ.  2014 (SWK), 2007 U.S. Dist. LEXIS 32566, at *21-*22 (S.D.N.Y. May 2, 2007) ("[T]he Second Circuit has indicated that damages claims should generally not be dismissed on exhaustion grounds."). In this case, the available administrative remedies are inadequate because the administrative review procedures of the Exchange Act do not provide for monetary relief and Plaintiffs seek significant money damages. As the court explained in *Barbara*, "this fact counsels strongly against requiring exhaustion." *See Barbara*, 99 F.3d at 57.

Just like the plaintiff in *Barbara*, Plaintiffs here seek, in part, "compensation for past harms," and as such, the Court should not dismiss Plaintiffs' claims for failure to exhaust administrative remedies. *See id.* Plaintiffs' demands for money damages "are [not] based entirely on a future contingency." *Standard Inv. Chartered*, 2007 U.S. Dist. LEXIS 32566, at *21. To the contrary, Plaintiffs' claims are nonspeculative and concrete, seeking relief for public investors harmed by the Exchanges' (at least) five-year long scheme manipulating the market on the registered public stock exchanges. In other words, the SCAC does not "merely include[] a speculative claim for future damages in the event a companion request for injunctive relief is denied." *Id.* at *22. While it is true that Plaintiffs seek injunctive relief, Plaintiffs have already suffered significant damages related to the Exchanges' manipulative scheme. This harm is not contingent on an adverse ruling related to Plaintiffs' request for injunctive relief, and "allowing [Plaintiffs'] monetary claims to proceed on their own would [not] unduly circumvent the purpose of the exhaustion doctrine." *Id.* Thus, this Court has jurisdiction to hear Plaintiffs' claims.

---

(4) in certain instances a plaintiff has raised a substantial constitutional question." *Santos-Buch*, 32 F. Supp. 3d at 482 (citing *Guitard*, 967 F.2d at 741).

## IV.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY ABSOLUTE IMMUNITY

An SRO is immune only when it is performing a purely regulatory function and exercising quasi-governmental powers consistent with the Exchange Act.  *See Weissman*, 500 F.3d at 1297. The doctrine of SRO immunity is "of a 'rare and exceptional character.'"  *Barrett v. United States*, 798 F.2d 565, 571 (2d Cir. 1986) (citing *Cleavinger v. Saxner*, 474 U.S. 193, 106 (1985)).  The party asserting immunity bears the burden of demonstrating that it applies.  *D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 104 (2d Cir. 2001).  The Exchanges fail to meet this burden because:  (1) the sale of proprietary data feeds, the provision of co-location services, and the creation of complex order types are pure business activities and not delegated regulatory functions; (2) regulated conduct is not the same as core regulatory conduct entitled to absolute immunity; and (3) the Exchanges cannot exploit their dual roles as businesses and SROs to avoid accountability for a fraudulent scheme.

At a minimum, there are genuine issues of material fact as to whether the Exchanges' conduct, as described in the SCAC, is a delegated regulatory function or whether the conduct predominately serves to advance the Exchanges' business interests.

### A.    The Exchanges of 1934 Versus the Exchanges of Today

Securities markets have changed dramatically in recent years and the interests, incentives, and functions of the member-owned cooperative exchange of 1934 bear little resemblance to those of the for-profit publicly traded exchange of today.  ¶290.  As explained by SEC Commissioner Daniel Gallagher ("Gallagher"), if the legislators that passed the Securities Act of 1933 and the Exchange Act were transported to today, they "would be confronted with markets altered beyond

- 27 -

recognition, with computers tied into demutualized, for-profit exchanges, some now global in nature, and using algorithms to trade decimalized securities at speeds measured in microseconds."[18]

In the context of SEC rulemaking, Commissioner Gallagher further stated: "we've been building upon a self-regulatory framework premised on circumstances that no longer exist."[19] This same notion applies to the body of SRO immunity case law, as realities once present no longer apply today.  While the immunity protections recognized in earlier cases (such as those cited by the Exchanges here) were understandable when exchanges were not-for-profit, member-owned utilities that actually (and almost exclusively) performed regulatory functions, they have become less so as exchanges have outsourced most regulatory functions to FINRA (previously known as the National Association of Securities Dealers or "NASD").[20]  Recently, the Securities Industry and Financial

---

[18]   Daniel M. Gallagher, Commissioner, Time for a Fresh Look at Equity Market Structure and Self-Regulation Remarks to SIFMA's 15th Annual Market Structure Conference (Oct. 4, 2012), *available at* http://www.sec.gov/news/speech/2012/spch100412dmg.htm.

[19]   *Id.*

[20]   *See* Release No. 34-63430 (Dec. 3, 2010) (Order approving plan (File No. 4-618) whereby BATS, CHX, NASDAQ, NYSE, BX, ARCA, EDGA and EDGX allocate certain Reg NMS regulatory responsibilities to FINRA), *available at* http://www.sec.gov/rules/sro/17d-2/2010/34-63430.pdf; Release No. 34-62866 (Sept. 8, 2010) (program for allocation of certain regulatory responsibilities from CHX to FINRA), *available at* http://www.sec.gov/rules/sro/17d-2/2010/34-62866.pdf; Release No. 34-54136 (July 12, 2006) (program for allocation of certain regulatory responsibilities from NASDAQ to NASD), *available at* http://www.sec.gov/rules/other/2006/34-54136.pdf; Release No. 34-55505 (Mar. 22, 2007) (revised program for allocation of certain regulatory responsibilities from ARCA to NASD), *available at* http://www.sec.gov/rules/other/2007/34-55505.pdf; Release No. 34-56148 (July 26, 2007) (program for allocation of certain regulatory responsibilities from NYSE to NASD), *available at* http://www.sec.gov/rules/other/2007/34-56148.pdf; Release No. 34-58818 (Oct. 20, 2008) (program for allocation of certain regulatory responsibilities from BATS to FINRA), *available at* http://www.sec.gov/rules/other/2008/34-58818.pdf; Release No. 34-62078 (May 11, 2010) (program for allocation of certain regulatory responsibilities from EDGA to FINRA), *available at* http://www.sec.gov/rules/sro/17d-2/2010/34-62078.pdf; Release No. 34-62079 (May 11, 2010) (program for allocation of certain regulatory responsibilities from EDGX to FINRA), *available at* http://www.sec.gov/rules/sro/17d-2/2010/34-62079.

- 28 -

Markets Association ("SIFMA") argued to the SEC that "as exchanges have converted into for-profit enterprises, most, if not all, of their activities have become commercial in nature and not deserving of immunity."[21]

     As businesses and SROs, the Exchanges now have separate and conflicting allegiances to their own shareholders and to the investing public.  In fact, while exchanges used to relieve the government of some of the burden of regulating securities markets, the SEC is increasingly forced to devote its attention to regulating – and disciplining – the exchanges.[22]   Given the SEC's "unprecedented current workload,"[23] the fallacy of SRO immunity should not prevent civil courts from holding exchanges accountable for wrongdoing.  Courts are increasingly rejecting this unwarranted "blanket [of] protection."  *See, e.g.*, *In re Facebook, Inc., IPO & Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 453 (S.D.N.Y. 2013) (SRO immunity "cannot be applied to allow blanket protection for exchanges when they fail to exercise due care in their pursuits of profit").

### B.    The Exchanges Are Not Immune from Private Damages Suits Challenging Their Business Activities

     The Exchanges refer to an "unbroken chain" of Second Circuit cases to shroud themselves in blanket immunity.  Exch. Mem. at 24.  That authority, however, will not support the weight they ask it to bear.  The primary opinion cited by the Exchanges was issued in 2001, before any of the

---

[21]   Comment Letter from the Securities Industry and Financial Markets Association to SEC Chair Mary Jo White at 1 (July 31, 2013), *available at* http://www.sifma.org/comment-letters/2013/sifma-submits-comments-to-the-sec-requesting-a-review-of-the-self-regulatory-structure-of-securities-markets/; *see also* ¶291 n.159.

[22]   *See* Luis A. Aguilar, Commissioner, Commission, The Need for Robust SEC Oversight of SROs (May 8, 2013) (listing several SEC enforcement actions against the Exchanges), *available at* http://www.sec.gov/news/speech/2013/spch050813laa.htm.

[23]   *See supra*, n.8 (Commissioner Gallagher arguing for a "review of the self-regulation paradigm as a whole").

Exchanges were operating as for-profit entities.[24]  In *D'Alessio*, the court held that NYSE, "**when acting in its capacity as a SRO**, is entitled to immunity from suit **when it engages in conduct consistent with the quasi-governmental powers delegated to it** pursuant to the Exchange Act and the regulations and rules promulgated thereunder."  258 F.3d at 106.  It was impossible for the Second Circuit to consider, let alone address, NYSE's **business functions** because they did not exist at that time.   Nonetheless, the *D'Alessio* case still supports a denial of immunity here because the Exchanges were not merely acting **in their capacity as SROs**.  Instead, by engaging in the fraudulent scheme, they were engaging in business and commercial activities inconsistent with any "quasi-governmental" function.  *See infra*, §IV.

The other cases in the "chain" uniformly held that **purely regulatory** conduct is immune, but never address whether conduct undertaken in furtherance of the Exchanges' private business interests was likewise immune from liability.   These courts only found immunity when the Exchanges engaged in purely regulatory functions such as: (1) disciplinary proceedings **against exchange members** (*Barbara*, 99 F.3d at 59); (2) the enforcement of security rules and regulations and general regulatory oversight **over exchange members** (*D'Alessio*, 258 F.3d at 106); (3) the interpretation of the securities laws and regulations **as applied to the exchange or its members** (*id.*); (4) **the referral of exchange members** to the SEC and other government agencies for civil enforcement or criminal prosecution under the securities laws (*id.*); (5) the public announcement of regulatory decision (*DL Capital Grp., LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 98 (2d Cir. 2005)); and (6) **an SRO's amendment of its own bylaws** where the amendments are inextricably

---

[24]   Jaclyn Freeman, "Limiting SRO Immunity to Mitigate Risky Behavior," 12 J. on Telecomm. & High Tech. L. 193, 210 (2014) (NASDAQ was first to become a publicly-traded company in 2006).

intertwined with the SRO's role as a regulator (*Standard Inv. Chartered, Inc. v. NASD*, 637 F.3d at 112, 116 (2d Cir. 2011)).

To address injuries caused by the Exchanges' recent commercial pursuits, the courts now recognize a "business function" exception to SRO immunity. For example, in 2007, the Eleventh Circuit held that SROs were not entitled to absolute immunity, finding that "[w]hen an SRO is not performing a purely regulatory, adjudicatory, or prosecutorial function, but rather acting in its own interest as a private entity, absolute immunity from suit ceases to obtain." *Weissman*, 500 F.3d at 1297. In *Weissman*, the Eleventh Circuit rejected NASDAQ's contention that the court should "find an SRO absolutely immune for all activity that is 'consistent with' its powers and functions under the Exchange Act and SEC regulations." *Id.* The court concluded that the act of advertising certain companies on its exchange was a private business activity and that "NASDAQ represents no one but itself when it entices investors to trade on its exchange . . . ." *Id.* at 1299.

In 2013, Hon. Robert W. Sweet in the Southern District of New York found that NASDAQ was not entitled to immunity related to its negligent design, testing, and promotion of the software used in the Facebook, Inc. initial public offering ("IPO"). *Facebook*, 986 F. Supp. 2d at 428. In declining to extend immunity to the plaintiffs' technology claims, the Court held that NASDAQ's software was "an integral part of NASDAQ's overall business package, intended to create a market for new, revenue-producing IPO business, not in furtherance of any purported regulatory function." *Id.* at 452. NASDAQ's actions "functioned to create a market and increase its private trading capacities, conduct which is not protected by SRO immunity." *Id.*

Similarly, in *Opulent Fund, L.P. v. Nasdaq Stock Mkt., Inc.,* No. C-07-03683 RMW, 2007 U.S. Dist. LEXIS 79260, at *12 (N.D. Cal. Oct. 12, 2007), the court found that NASDAQ's

- 31 -

marketing and pricing of an index fund were not regulatory functions that would otherwise be carried out by the SEC.  The court explained:

> Nasdaq proposed, and the SEC authorized, the Nasdaq-100 index.  Nasdaq encouraged investors to create instruments based on the index's value and chose to disseminate this information.  Nasdaq took this course of action because it profits from selling the market price data.

*Id.*  Moreover, the *Opulent Fund* court also held that **the SEC's approval did not convert the conduct into an immunized regulatory function**.  *Id.*  In holding that NASDAQ's conduct was not immune from suit, the court explained that NASDAQ's actions "function to create a market and increase trading" rather than any regulatory function.  *Id.* at *14.

In *Platinum Partners Value Arbitrage Fund, L.P. v. Chi. Bd. Options Exch.*, 976 N.E. 2d 415 (1st Dist. 2012), a case heard by the Illinois Court of Appeals, SROs were denied immunity for claims related to a strike price adjustment.  There the court held that although the conduct complained of may have been a regulatory decision, the manner in which it was disclosed – privately and prematurely – was not.  *Id.* at 422.  Ultimately, the court ruled that SROs were "acting in their private capacity and for their own corporate benefit" when they prematurely released privileged information to select members.  *Id.*

As in *Weissman*, *Facebook*, *Opulent Fund*, and *Platinum Partners*, here the Exchanges are representing no one but themselves while engaging in the commercial conduct complained of in the SCAC.  The manipulative conduct and marketed products and services referenced in the SCAC are pure business functions – unrelated to any core regulatory conduct – as demonstrated by the Exchanges' target audience for these services (¶¶65, 87, 93, 96, 100, 112, 115, 135, 138, 141), their exclusivity (¶¶91, 98, 107-108, 113, 123, 127-129, 165, 231), their dispensability to the function of markets (¶¶110, 118), their concealment (¶¶98, 116-117, 137, 140, 142-143, 150, 152, 160, 167,

172, 175, 178, 203, 210, 226), and most notably, the Exchanges' own statements of these activities as competitive business products and services (¶¶83, 86, 115, 139, 241, 291, 293).

### 1. The Exchanges' Marketing and Sale of Proprietary Data Feeds Is a Business Function

The Exchanges do not act in their capacity as SROs when marketing and selling proprietary data feeds to third parties, which provide HFT firms with the ability to receive enhanced trading information at faster speeds than the SIP.  Rather, the Exchanges do it solely for the purpose of increasing revenues by enticing HFT order flow to their venues. ¶118.  Now that the Exchanges are focused on their bottom line, they must "fight for survival and primacy by offering more desirable products and attracting more buyers than their competitors."[25]  The sale of enhanced data feeds is critical to this competition, as affirmed by several of the Exchanges:

> [W]hile Exchanges are in the business of helping business, they are also businesses themselves. Like all businesses, the Exchanges exist to produce products and services and to provide them to willing consumers to further their business objectives.
>
> *            *            *
>
> [E]ach Exchange certainly considers market data to be a significant product of their core business . . . .[26]

Significantly, these alternative data feeds are separate and distinct from the SIP feed that is regulated by Reg NMS.  ¶118.  The SEC has classified these alternative feeds as "non-core" – and therefore not a delegated regulatory function – because the "SEC does not require exchanges to

---

[25]   Exchange Market Data Coalition, Comments on NetCoalition Petition for Review, Release No. 34-55011 at 3 (Jan. 26, 2007), *available at* https://www.sec.gov/comments/34-55011/3455011-9.pdf. Notably, Defendants CHX, NASDAQ, BX, NYSE, and ARCA jointly urged the SEC to affirm the order of the Division of Market Regulation approving SR-NYSE Arca-2006-021, where they advocated for less regulation of market data, stating that "[i]t is in each Exchange's best interest to provide proprietary information to investors ***to further their business objectives***, and each Exchange chooses how best to do that."  *Id.* at 4.

[26]   *Id.* at 3, 5; ¶83.

provide specific non-core data but instead allows market forces [rather than regulatory requirements] to determine which non-core data are provided." *NetCoalition*, 715 F.3d at 345.

Moreover, these services cannot be considered "core regulatory functions" because access to these enhanced data feeds is *de facto* exclusive and unattainable for most investors other than HFT firms because the costs of such services are only commercially viable for those participating in HFT. Direct Edge's CEO admitted as much:

> "The process for acquiring and using this [market] data is currently cumbersome and expensive," and "entails significant fixed costs even before any explicit exchange market data fees are paid, with total costs for retail firms of upwards of $1 million or more per month. This leads to such information being restricted to investors, creating the perception of 'haves' and 'have nots.'"[27]

¶98.  Indeed, the Exchanges have created a multiple-tier system whereby they are charging higher rates for faster speeds and more data with access only available to an elite sector of customers. ¶107. They do this not for regulatory reasons – but for business reasons. *See Weissman*, 500 F.3d at 1299 (recognizing that conduct in furtherance of business interests is "distinctly non-governmental conduct [that] is not protected by absolute immunity").

In 2012, the SEC sanctioned NYSE in the amount of $5 million for sharing market data through its proprietary feeds (which made up 80% of NYSE's trading volume), which released data to its subscribers sooner than to the rest of the market through the consolidated SIP feed. *In the Matter of New York Stock Exchange LLC, & NYSE Euronext*, Release No. 67857 (Sept. 14, 2012). Apparently, NYSE did not view this service as regulatory in nature because although "[t]he ***business***

---

[27]  Press Release, Direct Edge Statement of Market Structure Principles, Prepared Remarks of Direct Edge CEO William O'Brien to be delivered June 20, 2012 before The Committee on Financial Services Subcommittee on Capital Markets and Government Sponsored Enterprises, United States House of Representatives at a hearing titled "Market Structure: Ensuring Orderly, Efficient, Innovative and Competitive Markets for Issuers and Investors" (June 19, 2012), *available at* http://www.directedge.com/About/PressReleases/tabid/363/articleType/ArticleView/articleId/79/ Direct-Edge-Statement-of-Market-Structure-Principles.aspx. ¶98.

*units* responsible for NYSE market data distribution made some efforts to ensure that their systems complied with [Reg NMS] . . . .   The Compliance Department ***played no role*** in the decision-making process that led to the design and implementation of [the proprietary data feed] in 2008 . . . ."   *Id.*

Likewise, NASDAQ, in comments to the SEC, was adamant in ensuring the distinction between its market data "commercial revenues" and its "regulatory funds," stating:

> The Commission should clarify the definition of regulatory revenues.  Specifically, although Nasdaq collects some regulatory fees through, for example, its program for reviewing decisions to delist an issuer, most of the types of charges mentioned by the Commission in the release – member dues and regulatory fines or penalties – are assessed by the NASD but not by Nasdaq.  Nasdaq does, however, use substantial amounts of its commercial revenues to fund regulation.  The Commission must make it clear that the use of a particular revenue source, such as market data revenue, to fund a portion of an SRO's regulatory costs does not transform that revenue source into regulatory funds.[28]

### 2.     The Exchanges' Marketing and Sale of Co-Location Services Is a Business Function

The marketing and sale of co-location services is another way the Exchanges generate increased order flow from HFT firms – services that are completely unrelated to any core regulatory function.  This is accomplished through the Exchanges' sale or leasing of server space in close proximity to the Exchanges' servers so that the HFT firms can gain access to trading activity before trades are executed (but after a trade is initiated).  ¶107.  Like the sale of enhanced data feeds, the Exchanges act outside of their capacity as SROs in providing co-location services.  Direct Edge previously recognized the potential "conflicts of interest" that may develop "between the exchanges' roles as market centers and their provision of [co-location] technology services," stating that evidence exists that "material aspects of the space allocation process, tying arrangements and other

---

[28]   The Nasdaq Stock Market, Inc., Comments on Concept Release Concerning Self-Regulation, Release No. S7-40-04 at 5 (Mar. 8, 2005), *available at* http://www.sec.gov/rules/concept/s74004/esknight030805.pdf.

pre-conditions for the access to proprietary networks and other capabilities, remain shrouded in relative mystery."[29]

Apart from the exclusive nature of these services, which, like enhanced data feeds, are priced at a level that is only commercially viable for HFT firms, the provision of co-location services is dispensable to the function of the market.  The use of co-location services is "completely voluntary," and these gratuitous services are in existence not to facilitate the Exchanges' delegated regulatory duties, but to generate revenues.[30]  NASDAQ acknowledged as much in a "Notice of Filing" with the SEC in September 2014:

> [NASDAQ] believes that fees for co-location services . . . are constrained by the robust competition for order flow among exchanges and non-exchange markets, because co-location exists to advance that competition.  Further, excessive fees for co-location services, including for wireless technology, would serve to impair an exchange's ability to compete for order flow rather than burdening competition.

¶110.

Moreover, entities other than SROs also provide co-location services; thus, it cannot be a quasi-governmental action entitled to immunity.  Indeed, two of the Exchanges – Direct Edge and BATS – do not maintain their own co-location data centers, but instead, provide the service through an unregulated third party – Equinix, Inc.[31]  In its comments to the SEC, this unregulated data center

---

[29]   Direct Edge Holdings, LLC, Comments on Concept Release on Equity Market Structure, File No. S7-02-10 at 19 (April 28, 2010), *available at* https://www.sec.gov/comments/s7-02-10/s70210-159.pdf.

[30]   *See* Release No. 34-72721 (July 30, 2014) ("As is the case with all Exchange co-location arrangements . . . use of the co-location services proposed herein would be completely voluntary . . . ."), *available at* http://www.sec.gov/rules/sro/nyse/2014/34-72721.pdf.

[31]   *See* Release No. 34-68085 (Oct. 23, 2012), *available at* http://www.sec.gov/rules/sro/nasdaq/2012/34-68085.pdf.

stated that "[i]ndependent data centers such as Equinix . . . should *not* be the subject of Commission

regulatory action . . . ." (emphasis in original).[32]  Equinix, Inc. went on to explain that:

> As a threshold issue, it must be noted that colocation is an infrastructure tool
> and *is not a trading practice*.  Thus, it is not appropriate to consider Equinix data
> centers as "facilities" of an exchange . . . even if exchanges have good reason to
> consider them as a potential new profit center.[33]

As NYSE recognized, this practice takes co-location "out of the realm of regulation simply by virtue

of the structuring of the offering."  ¶113.

"[E]fforts to increase trading volume and company profit" serve only "private business

interests."  *See Weissman*, 500 F.3d at 1296; *Facebook*, 986 F. Supp. 2d at 453 (noting that SRO

immunity does not afford "blanket protection for exchanges when they fail to exercise due care in

their pursuits of profit").  Contrary to the Exchanges' argument, Plaintiffs are not simply relying on

"profit motives" to transform core regulatory conduct into business conduct.  *See* Exch. Mem. at 32-

35.  Rather, the products and services offered by the Exchanges, and done so in furtherance of their

fraudulent scheme, are unnecessary to the function of the markets – and with a primary purpose of

advancing an SRO's business interests.  That conduct should not be immune from challenge.

### 3. The Exchanges' Creation of Undisclosed Complex Order Types at the Request of Select Market Participants Is a Business Function

The Exchanges' creation of undisclosed complex order types is outside of their capacity as

SROs.  Like enhanced data feeds and co-location services, the purpose of these new order types is to

enable the Exchanges to compete with one another and with alternative trading venues like the dark

pools to increase order flow and revenues for those trading platforms.  ¶139.  Notably, access to

---

[32]   Comments of Equinix, Inc., on the Commission's Concept Release on Equity Market Structure
(Apr. 21, 2010), *available at* https://www.sec.gov/comments/s7-02-10/s70210-126.pdf.

[33]   *Id.* at 3-4 (emphasis in original).

these complex order types is severely limited and their creation is shrouded in secrecy.  Indeed, they are developed by the Exchanges through backroom communications with elite HFT firms.  ¶140.  Afterward, the availability (and significantly, the true functionality) of these order types is marketed only to a select group of favored HFT firms and other elite investors.  *Id.*  Even if regular investors were aware of these advanced order types, one would have to be an exceedingly sophisticated investor to understand how to use it.  ¶141.

In January 2015, the SEC announced that BATS was penalized $14 million because, among other reasons, it "separately disclosed information about how those order types operated to some but not all of their members . . . including certain high-frequency trading firms."[34]  This same type of deceptive behavior was held to be non-immune in *Platinum Partners*, where the court found that the SROs "did not **publicly** announce this regulatory decision [strike price adjustment]: the price reduction was privately disseminated only to certain market participants, and that disclosure did not serve any regulatory or governmental purpose."  976 N.E.2d at 422 (emphasis in original).

Like the sale of proprietary data feeds and co-location services, the creation of complex order types is beyond the scope of the Exchanges' delegated regulatory functions; these services exist only to increase the Exchanges' revenues by catering to their top order-flow-generating customers, namely HFT firms, causing substantial harm to the investing public in the process.

### C.     Regulated Activity Is Not the Same as Core Regulatory Functions

Seeking to stretch their immunity beyond rule or reason, the Exchanges argue that because their activities "implicate" or are "consistent with" their general duties as SROs, or "arise from obligations imposed" by Reg NMS and the Exchange Act, they are therefore entitled to absolute

---

[34]   SEC Charges Direct Edge Exchanges with Failing to Properly Describe Order Types (Jan. 12, 2015), *available at* http://www.sec.gov/news/pressrelease/2015-2.html.

immunity.  *See* Exch. Mem. at 26-27, 29.  Not so.  The dissemination of market information is a field in which the Exchanges *are* regulated, but *not themselves* regulators.  ¶81.  The Exchanges themselves state that Reg NMS "recognized that market-based solutions, not regulatory mandates, would best serve investors."  ¶52.  Moreover, the Exchanges themselves and courts recognize that some data services are "non-core."  *See NetCoalition*, 715 F.3d at 345 ("Core data [is] consolidate[d] . . . into a single stream of data for each NMS stock. . . .  All other market data falls into the non-core category.  The SEC does not require exchanges to provide specific non-core data but instead allows market forces to determine which non-core data are provided.").

Like all corporations, the Exchanges are required to comply with applicable laws governing their business activities.  This does not mean that the regulated conduct is transformed into a core regulatory function.  The Exchanges argue that the "dissemination of market data is a core regulatory function that falls within their statutorily delegated responsibilities" and that the provision of "*consolidated* data . . . 'form[s] the heart of the national market system.'"  Exch. Mem. at 26.  But Plaintiffs do not allege the Exchanges manipulated the consolidated data feeds – the SIP.  This case only concerns *proprietary* data feeds.  So while it may be true that consolidated data "'form[s] the heart of the national market system,'" the "Exchanges *also are permitted* to distribute customized market data products directly to customers."  *In the Matter of New York Stock Exch. LLC, & NYSE Euronext*, Release No. 67857 at 2 (Sept. 14, 2012).  Reg NMS simply does not delegate the provision of proprietary market data feeds as a core regulatory function.

The relevant inquiry, then, is whether the activity is a quasi-governmental function – similar to the functions performed by the SEC.  *See In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 98 (2d Cir. 2007) ("[T]he central question . . . is not whether the SRO is acting (or not acting) 'consistent with' the laws it is supposed to apply but rather whether the plaintiff's allegations concern the

exercise of powers within the bounds of the government functions delegated to it."); *see also Facebook*, 986 F. Supp. 2d at 452 ("The SEC has never engaged in the business aspects of . . . creating technology to increase trading, nor has Congress authorized it to do so."); *Opulent Fund*, 2007 U.S. Dist. LEXIS 79260, at \*12 (finding no immunity where "[t]he SEC . . . would not create an index and volunteer to disseminate pricing data if Nasdaq did not exist"). Nothing in the Exchange Act or Reg NMS transforms the sale of enhanced data feeds, the provision of co-location services, or the creation of complex order types into core regulatory activities.

Furthermore, even if the effects of the Exchanges' actions "impact" an overarching regulatory duty – such as the duty to protect investors – this does not transform the specific conduct into a delegated regulatory function. For example, in *Facebook*, the Court stated that "NASDAQ had a 'duty to protect' Plaintiffs against economic losses for orders entered into NASDAQ's systems, which NASDAQ had improperly processed." 986 F. Supp. 2d at 461. Citing an SEC Order, the Court found that an exchange has an obligation to manage the IPO without disruption to the market. *Id.* The Court emphasized, however, that a "business decision regarding the suitability of operational systems to complete a pre-opening Cross, whether or not mandated in a certain way, is not the same as NASDAQ's power to regulate active, ongoing trading." *Id.* at 451 n.11.

The Exchanges largely rely (Exch. Mem. at 28-29) on the Second Circuit's decision in *NYSE Specialists* to advance their position that their fraudulent scheme implicates the Exchanges' core regulatory functions. In *NYSE Specialists*, unlike here, the plaintiffs repeatedly alleged that the SRO committed numerous "regulatory failures" related to its seven member "Specialist Firms," entities

that were specifically delegated authority by NYSE[35] with "managing 'the stocks assigned to them to create a fair, competitive, orderly and efficient market.'"  503 F.3d at 91-92.  Regarding this delegated authority, the Court explained that the Specialist Firms had "substantial powers . . . and the near-total control . . . over any given stock on the NYSE."  *Id.* at 92.  Among other potential wrongdoing, the complaint alleged that the Specialist Firms manipulated the stock market by violating "internal" exchange rules that were specifically promulgated by NYSE to govern those firms' conduct and that NYSE "neglected or abandoned its regulatory duties and oversight of the Specialist Firms."  *Id.* at 93.  In holding that SRO immunity barred plaintiffs' claims, the Second Circuit noted that the complaint "implicitly concede[d]" that NYSE "was acting within the realm of the oversight powers [over the Specialists Firms] delegated to it by the SEC."  *Id.* at 99 (recognizing that the allegations included the "'deliberate failure to properly oversee, regulate or supervise its securities exchange'" and that "'NYSE deliberately failed to halt, expose or discipline the illegal trading practices [of member firms] to the extent necessary to deter, stop or prevent them'").  As for the remaining claims, the Court observed:

> The gravamen of the Lead Plaintiffs' [other] claims . . . centers on the functions performed by NYSE in its supervisory and regulatory role:  announcing investigations, signing off on regulatory reports on the stock exchange floor, and examining the Form 81s for content and legality.  While these actions may not appear to the form the heart of the regulatory functions delegated to the NYSE as an SRO, they are nonetheless central to effectuating the NYSE's regulatory decisionmaking.

*Id.* at 100.

Here, the SCAC makes no such concessions about regulatory conduct.  Moreover, Plaintiffs' allegations do not concern internal control or the discipline of member firms, and are in no way

---

[35]   NYSE was a non-profit SRO at the time this opinion was issued and not the publicly-listed, for-profit company that it is today.

"central to effectuating the NYSE's regulatory decisionmaking." Rather, Plaintiffs have alleged that the Exchanges exploited their dual roles as SRO-regulated stock exchanges by furthering their business interests in pursuit of profits under the guise of their status as SROs.[36]

### D.    Policy Justifications for Immunity Are Not Present Here

The justification for SRO immunity is that Congress has enabled SROs to perform "'a variety of regulatory functions that would, in other circumstances, be performed by a government,'" and that the government would be immune when performing these functions. *Facebook*, 986 F. Supp. 2d at 449.  But there is little justification for blanket immunity where the Exchanges' actions, as is the case here, go far beyond what the government could and would do.  There is no public policy rationale in this case for allowing the Exchanges to exploit their status as SROs to escape liability for conduct that, at its core, is conducted in furtherance of their business interests.  In fact, former executives of NYSE and NASDAQ argued to the SEC that the United States should separate all regulation and enforcement from for-profit trading venues because "[t]here is a significant conflict-of-interest for a for-profit enterprise to serve as its own regulator."[37]

---

[36]   The Exchanges also state that the challenged conduct with respect to enhanced data feeds, co-location services, and complex order types was somehow "approved" by the SEC.  Exch. Mem. at 36-37.  This argument is without merit and belies Plaintiffs' allegations, which must be accepted as true for purposes of this motion, that:  (1) the SEC does not regulate the pricing of alternative data feeds (¶¶52, 123, 293); (2) co-location services are not a core regulatory function of an exchange (¶¶110-111, 116); and (3) the creation and functionality of various complex order types was not disclosed and virtually unknown to the SEC (¶¶99, 137, 143, 146, 160, 203, 210, 214, 225, 229).  Nevertheless, even if the challenged conduct was approved by the SEC, "'SEC approval . . . is not the *sine qua non* of SRO immunity; engaging in regulatory conduct is.'"  *See Facebook*, 986 F. Supp. 2d at 451 n.11 (quoting *Opulent Fund*, 2007 U.S. Dist. LEXIS 79260, at *6).

[37]   The International Stock Exchange Executives Emeriti Comments on Concept Release on Equity Market Structure, File No. S7-02-10 at 5 (Apr. 20, 2010), *available at* https://www.sec.gov/comments/s7-02-10/s70210-117.pdf.

By way of example, the Exchanges now argue to this Court that their "dissemination of market data is a core regulatory function that falls within their statutorily delegated responsibilities . . . ." Exch. Mem. at 26.  But NASDAQ previously represented to the SEC that "[a]ll significant member-regulation of the Nasdaq market occurs in a legally separate entity [the NASD]" and that all "[r]egulatory functions performed within Nasdaq include real-time market surveillance, application of listing standards to listed issuers, and providing legal advice . . . ."[38] NASDAQ also stated that the "separation of the legal/*regulatory function* at Nasdaq from the *principal Nasdaq business lines* of Transaction Services, *Market Data* and the Corporate Client Group was completed in 2003."[39]  Each of the Exchanges have made similar statements characterizing their provision of proprietary data feeds, co-location services, and complex order types as core business functions.  For example, Direct Edge commented to the SEC that "[i]n today's marketplace, technological proficiency and superiority are core parts of the exchanges', including Direct Edge's, business models.  Increasingly these efforts have focused largely on infrastructure and related 'access services' [such as co-location]."[40]  Similarly, NYSE did not think that proprietary data feeds were at all regulatory in nature because although "[t]he *business units* responsible for NYSE market data distribution made some efforts to ensure that their systems complied with [Reg NMS] . . . [t]he Compliance Department *played no role* in the decision-making process that led to the design and implementation of [the proprietary data feed] in 2008 . . . ."  *In the Matter of New*

---

[38]   The Nasdaq Stock Market, Inc., Comments on Concept Release Concerning Self-Regulation, Release No. S7-40-04 at 15-16 (Mar. 8, 2005), *available at* http://www.sec.gov/rules/concept/s74004/esknight030805.pdf.

[39]   *Id.*

[40]   Direct Edge Holdings, LLC, Comments on Concept Release on Equity Market Structure, Release No. File S7-02-10, at 19 (Apr. 28, 2010), *available at* http://www.sec.gov/comments/s7-02-10/s70210-159.pdf.

*York Stock Exch. LLC, & NYSE Euronext*, Release No. 67857, at 7-8 (Sept. 14, 2012); *see also infra*, §IV.B.1-3 (explaining why the Exchanges' provision of proprietary data feeds, co-location services, and complex order types are business functions). Indeed, several of the Exchanges joined together in explaining to the SEC that "each Exchange certainly considers market data to be a significant product of their core business." *See supra*, nn.25-26 and accompanying text.

Furthermore, in proposing a new SEC rule related to co-location services, NYSE and ARCA took the position that co-location fees do not "significantly affect the protection of investors or the public interest."[41] Here NYSE and the other Exchanges argue that Plaintiffs' allegations related to co-location services are merely "allegations that they have failed to implement the national market system consistent with their regulatory responsibilities." Exch. Mem. at 26. When it suits them, the Exchanges discount their role as regulators and instead describe their conduct as business related. In other instances, like in this case, the Exchanges diminish their role as businesses and instead classify virtually all of their actions as delegated core regulatory functions. They cannot have it both ways.

### E.    Immunity Should Not Apply Without the Parties Conducting Discovery

At a minimum, Plaintiffs should be entitled to discovery prior to the Court's immunity determination. Limited discovery is sometimes necessary before the district court can resolve a motion based on qualified immunity. *In re Facebook, Inc.*, 42 F. Supp. 3d 556, 2014 U.S. Dist. LEXIS 119595, at *7-*8 (S.D.N.Y. 2014) (citing *Crawford-El v. Britton*, 523 U.S. 574, 593 (1998)). For example, the following information – obtainable through discovery – could aid the Court in its immunity analysis:

---

[41]    Release No. 34-71931 at 6 (Apr. 11, 2014), *available at* http://www.sec.gov/rules/sro/nasdaq/2014/34-71931.pdf.

- how access to the manipulative products and services, including proprietary data feeds, co-location, and order types were developed;

- whether or not the products and services were developed in the Exchanges' business-related departments as opposed to regulatory and/or compliance;

- how these products and services were marketed and to whom;

- how the pricing of these services was determined and whether it was designed to cater to a limited group of investors;

- the Exchanges' intention with HFT firms in refunding those firms, as well as with regard to proprietary feeds, co-location, and order types; and

- FINRA's involvement, if any, with the Exchanges' access services.

Assuming the allegations of the SCAC are true for purposes of this Opposition, the Exchanges are not entitled to absolute immunity.  However, if the Court finds that there are related factual issues, Plaintiffs request the opportunity to conduct discovery consistent with the above.

## V.   PLAINTIFFS HAVE PROPERLY PLED A FRAUDULENT SCHEME UNDER §10(b) AND RULE 10b-5(a) AND (c)

Fraudulent scheme liability under subsections (a) and (c) provides a "distinct cause of action" for market manipulation that "does not require 'the making of an untrue statement of material fact or omission to state a material fact.'"  *Compudyne Corp. v. Shane*, 453 F. Supp. 2d 807, 821 (S.D.N.Y. 2006); *see also In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 335 (S.D.N.Y. 2004) ("[A] cause of action exists under subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant."); *Affiliated Ute Citizens v. United States*, 406 U.S 128, 152-53 (1972); *SEC v. Zandford*, 535 U.S. 813, 820 (2002) ("[N]either the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act."); *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209 (KBF), 2013 U.S. Dist. LEXIS 43774, at *24 (S.D.N.Y Mar.

27, 2013) ("Though much less frequently pled [when compared to a misrepresentation claim], plaintiffs may bring claims that a particular scheme, or course of conduct was itself fraudulent.").

The "gravamen of [a market] manipulation [claim] is [deceiving] investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999). This includes deception related to "***any***" "course of business," "device, scheme, or artifice." 17 C.F.R. §240.10b-5; *see also Affiliated Ute*, 406 U.S. at 151 (noting that the "proscriptions [in §10(b) and Rule 10b-5] are broad and, by repeated use of the word 'any,' are obviously meant to be inclusive").

In contrast to Rule 10b-5(b), which prohibits material misrepresentations and omissions, Rule 10b-5(a) and (c) prohibit "***all fraudulent schemes*** in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception." *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 11 (1971) (some emphasis in original). This includes the use of "any device, scheme, or artifice to defraud" or the participation "in any act, practice, or course of business" that would perpetrate fraud on investors. 17 C.F.R. §240.10b-5(a), (c); *Compudyne*, 453 F. Supp. 2d at 821.

### A.    Legal Standards

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must accept "the allegations in the complaint . . . as true, and all reasonable inferences must be drawn in the plaintiffs' favor." *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 410 (S.D.N.Y. 2013); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007).

"A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *In re*

- 46 -

*Stillwater Capital Partners Inc.*, 858 F. Supp. 2d 277, 284 (S.D.N.Y. 2012).  Furthermore, "[t]he task of the court in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998).

To state a claim for a violation of subsections (a) and (c), a plaintiff must plausibly allege: "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; and (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007).

Where "'the principal allegations of wrongdoing involve market manipulation rather than false statements, the level of specificity required by Rule 9(b) is somewhat relaxed.'"  *Compudyne*, 453 F. Supp. 2d at 821 (quoting *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 339 (S.D.N.Y. 1999)); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 385-90 (S.D.N.Y. 2003) (recognizing that "a market manipulation claim, while still requiring particularity, may be pled with less specificity than that required in claims alleging material misstatements or omissions").  Courts relax the Rule 9(b) standard for Rule 10b-5(a) and (c) claims because they "present circumstances in which the mechanism of the scheme is likely to be unknown to the plaintiffs."  *In re Blech Sec. Litig.*, 928 F. Supp. 1279, 1290-91 (S.D.N.Y. 1996); *accord ATSI*, 493 F.3d at 102.  In this regard, allegations addressing the "'nature, purpose, and effect of the fraudulent conduct and the roles of the defendants'" are sufficient to meet the pleading requirements of Rule 9(b).  *Compudyne*, 453 F. Supp. 2d at 821; *IPO*, 241 F. Supp. at 386 n.162 (citing to numerous courts in the Southern District of New York that have embraced the "'nature, purpose, and effect' formulation for pleading market manipulation").

- 47 -

The Exchanges' motion contests the (1) "manipulative acts," (2) "reliance," (3) "damage," (4) "scienter," and (5) "in connection with the purchase or sale of securities" elements of Plaintiffs' §10(b) and Rule 10b-5 claims.  As explained below, all of these arguments fail.

## B.    The Exchanges Engaged in Manipulative Acts

This district has embraced the "nature, purpose, and effect" formulation for pleading fraudulent scheme liability.  Moreover, the Second Circuit has stated that "[the "nature, purpose, and effect test"] will be satisfied if the complaint sets forth, to the extent possible, 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'"  *ATSI*, 493 F.3d at 102.  The SCAC more than satisfies this standard.

### 1.    Direct and Enhanced Data Feeds

Plaintiffs have alleged that each of the Exchanges – separate and apart from any role they may have in maintaining and disseminating the consolidated SIP data feed – sold enhanced trading data directly to HFT firms.  ¶¶86-87 (NASDAQ's and BX's sale of proprietary data feeds); ¶¶89 n.36 & 89-92 (NYSE's sale of "real-time information relating to price, transaction and order data on all of the instruments traded on . . . *our exchanges*," which necessarily includes ARCA); ¶93 (BATS' sale of proprietary data feeds); ¶98 (Direct Edge's sale of enhanced data feeds); *see also* ¶¶118, 123 (alleging that the Exchanges sold HFT firms enhanced trading information through "direct data feeds").

These "premium" data feed services place HFT firms at a significant informational advantage when compared to non-HFT market participants because they provide those firms with early and (virtually) exclusive access to pricing and depth of order book trading data that is unavailable to non-subscribers.  ¶¶3-4, 9, 13, 15, 64-65, 86-88, 90-91, 95, 98, 107, 117-119, 123-124.  The

- 48 -

informational asymmetries are even more pronounced given the exceedingly high access fees that the Exchanges charge for these services.  ¶¶127-129 (alleging cost-prohibitive access fees to proprietary data feeds ranging from $10,000 to $500,000 a month for market participants other than those employing HFT trading strategies); *see also* ¶¶86-88, 90, 98.  Indeed, the Exchanges' "course of business" related to enhanced data feeds is designed to cater to the needs of HFT firms[42] because those firms' activities generate order flow (which, in turn, generates transaction fees).  In return, the HFT firms receive *de facto* exclusive access to enhanced data because the Exchanges price these services at a level that is not accessible to non-HFT market participants.[43]  In other words, the deceptive scheme or device, as alleged in the SCAC, is not the mere existence of direct and enhanced data feeds or even the Exchanges' desire to sell access to them.  Rather, it is the Exchanges' "scheme, or course of conduct" (*IBEW Local 90*, 2013 U.S. Dist. LEXIS 43774, at *24), of charging supra-competitive prices for those "premium" services because such high pricing renders those services out of reach for investors other than HFT firms.  This *quid pro quo* (*i.e.*, increased revenue and order flow in return for near-exclusive access to trading data) between the Exchanges and HFT firms results in market manipulation because that same data, when combined with the

---

[42]   The Exchanges appear to concede that their target customer base for enhanced data feeds are HFT firms.  Exch. Mem. at 10 ("the SEC has expressly recognized that the [Exchanges'] proprietary feeds cater to 'traders who are very latency . . . sensitive and . . . who desire to use [the data] to power certain trading algorithms'").

[43]   *See* Release No. 34-59039, 2008 WL 5070293, at *8 (Dec. 2, 2008) (noting that some commentators "believed that an exchange has a monopoly position as the exclusive processor of its proprietary data that 'creates a serious potential for abusive pricing practices,' and urged the Commission to consider the lack of competition and the inability to obtain market data from other sources"); Release No. 34-62194, 2010 WL 2180557, at *3 (May 28, 2010) (referencing commentary that excessively high fees for access to proprietary data discriminates against smaller broker-dealers).

increased speed of co-location services and availability of special order types, is then used to manipulate the price of stocks traded on the public exchanges.  ¶¶109, 299.

### 2.  Co-Location Services

As with enhanced data feeds, the SCAC alleges that as part of the Exchanges manipulative scheme they sell faster exclusive access to trading data by providing co-location services at prices that were prohibitive for even large traders, but not HFT firms.  *See generally* ¶¶107-117 (alleging that NASDAQ, NYSE, BATS, and Direct Edge sell co-location services that are cost-prohibitive for non-HFT investors).  These services are marketed and sold to HFT firms who then use it to gain early access to trading data.  *Id.*  The data is then used to alter the price that investors pay for stocks traded on the Exchanges.  ¶¶110-112.  Thus, the same *quid pro quo* regarding enhanced data feeds (*i.e.*, increased revenue and order flow in return for near-exclusive access to trading data), also applies to co-location services and represents a "course of business" or scheme that results in market manipulation.  ¶¶108-109.

### 3.  Complex Order Types

Plaintiffs have also alleged that each of the Exchanges created complex order types that manipulated the markets for their own financial interests, and that of HFT firms, to the detriment of Plaintiffs and the Class.  ¶¶173-175 (ARCA); ¶¶163-168, 228-231 (NASDAQ); ¶¶158-162, 212-215 (Direct Edge); ¶¶169-172, 208-211 (BATS); ¶¶177-181, 216-218 (CHX).  Indeed, these complex trade commands, many of which were never disclosed to investors other than HFT firms, provide "guarantee[d] economic results."  ¶¶141-142; *see also* ¶14 (referencing HFT firm with **one** day of trading losses in five years).  To the extent that some of these commands were disclosed by the

Exchanges to investors other than HFT firms, the full functionality of these order types were not.[44] And certainly the impact on investors of the combination of proprietary data feeds, co-location, and the numerous order types was never disclosed by the Exchanges to the investing public.

As is the case with enhanced data feeds and co-location services, the SCAC properly alleges that the Exchanges engaged in manipulative and deceptive acts through the creation, provision, and lack of disclosure regarding the existence and functionality of complex order types, devices that were specifically designed by the Exchanges to entice HFT firms to generate order flow.[45]

Nonetheless, the Exchanges seek to narrow Plaintiffs' allegations concerning enhanced data feeds, co-location services, and complex order types by suggesting that the SCAC "do[es] not allege any conduct by the Exchanges that fits into either category of [manipulative or deceptive]." Exch. Mem. at 38. They do so, however, by erroneously suggesting that courts view the concept of manipulation as "narrow." *Id.* at 40 (citing 3 Thomas Lee Hazen, The Law of Securities Regulation §12.1[2][A], at 473 (6th ed. 2009)). This, of course, ignores longstanding Supreme Court precedent. *See Affiliated Ute*, 406 U.S. at 151 ("Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.'"); *see also Zandford*, 535 U.S. at 819. So while it may be that "manipulation" is a term of art, the concept of manipulation is in no way "narrow" or otherwise limited, as the

---

[44]   *See, e.g.*, SEC Charges Direct Edge Exchanges with Failing to Properly Describe Order Types (Jan. 12, 2015), *available at* http://www.sec.gov/news/pressrelease/2015-2.html.

[45]   The Exchanges' various references (Exch. Mem. at 15; 19; 31) to *Citadel Sec., LLC v. Chi. Bd. Options Exch., Inc.*, No. 13-cv-5833, slip op. at 2 (N.D. Ill. Aug. 4, 2014) suggest that the maker-taker model provided for by Reg NMS – and ***not*** one of the three manipulative schemes described in the SCAC – results in increased order flow to the Exchanges. Setting aside the fact that *Citadel* is wholly inapposite from the case at bar given its focus on internal SRO administrative review procedures, the Exchanges' view on this point presents a question of fact that cannot be resolved at this stage in the proceedings.

Exchanges contend, to "wash sales" or "matched orders."  Exch. Mem. at 41.  Indeed, the conduct specifically at issue in this case, namely rigged markets and unfair prices,[46] is in fact referenced in the same authority relied on by the Exchanges.  *See, e.g.*, *Santa Fe*, 430 U.S. at 476 ("[Manipulation] refers generally to practices, such as wash sales, matched orders, *or rigged prices*, that are intended to mislead investors by artificially affecting market activity.").  In any event, because the SCAC properly alleges the "nature, purpose and effect" of the Exchanges' market manipulation with respect to enhanced data feeds, co-location, and complex order types, Plaintiffs have properly pled that the Exchanges engaged in manipulative acts.

### C.    Plaintiffs Alleged a Primary Violation of §10(b) and Rule 10b-5

In addition to arguing that Plaintiffs cannot identify any manipulative acts, the Exchanges contend the SCAC alleges only *aiding and abetting* manipulation, as opposed to a primary violation of §10(b) and Rule 10b-5 (a) and (c).  Exch. Mem. at 41.  Such a narrow reading of the SCAC, however, ignores how courts in this district have previously addressed the issue of aiding and abetting primary actors in the context of a §10(b) manipulation claim.  In the end, "aiding and abetting" is simply a label designed to support a red-herring argument.  Indeed, where a violation of Rule 10b-5(a) and (c) is alleged:  "the major question . . . is whether the [alleged manipulators] *directly or indirectly used or employed* any device or contrivance with the capacity or tendency to deceive."  *Parmalat*, 376 F. Supp. 2d at 504.

Here, the SCAC is replete with allegations of the Exchanges' own "direct" or "indirect" manipulative acts, separate and distinct from the acts of HFT firms, including:

- "NASDAQ OMX Group was providing preferred market participants with trading advantages to the substantial detriment of all other investors."  ¶86.

---

[46]    *See* ¶¶8, 109, 118, 234, 238.

- "Direct Edge at times only disclosed its unfair order types to a select group of predatory HFT firms. Additionally, Direct Edge often only marketed its enhanced data feeds and co-location services to those who could afford them." ¶98.

- "Exchanges[] offer[] co-location services to attract HFT order flow." ¶117.

- "Exchanges sold and continue to sell alternative data feeds to market participants, for extremely high fees, that provide either or both of (a) faster transmission of data regarding bids and offers than provided by the SIPs (*i.e.*, so-called "direct feeds") and (b) a greater depth of data regarding bids and offers than provided by the SIPs (*i.e.*, so-called "enhanced feeds"). These alternative data feeds gives market participants who are able and willing to pay extremely high fees to the exchanges an enormous competitive advantage over other market participants." ¶123.

- "[B]y selling co-location and direct and enhanced information feed services, and in exchange for a premium, the Exchanges provide HFT firms with an enhanced glimpse into what the market is doing before others who do not have similar access." ¶131.

- "Exchanges create a two-tiered market where individual and institutional investors trade with an informational disadvantage to technology-enhanced insiders such as HFT firms." *Id.*

- "By failing to include important information about how their order types worked in their regulatory filings, or failing to make the filings altogether, the Exchanges . . . deprived the investing public of adequate notice of order types; they deprived the public of an opportunity to comment; and they deprived the SEC of information essential to performing its statutory regulatory function." ¶143.

- "Direct Edge implemented these marketing strategies with the specific knowledge of the adverse impact on the majority of investors whom Direct Edge deliberately kept in the dark as to the existence and full functionality of the Hide Not Slide order." ¶162.

- "NASDAQ knowingly implemented a two-tiered system in which HFT firms communicated with NASDAQ through a superior interface filled with advantageous order types while other market participants, including Plaintiffs and the Class, communicated through an inferior interface." ¶165.

- "ARCA . . . failed to market the PNP B and ALO orders to all market participants on a fair and equal basis." ¶175.

- "CHX's non-routable order provides queue-priority features that advantage these orders over traditional orders." ¶180.

- 53 -

- "Exchanges and dark pools often choose to use the slow consolidated data feeds (the SIP) to restrict access to prices, a practice which harms investors by denying them access to liquidity in fast moving markets . . . ." ¶188.

- "NASDAQ and BATS quickly imitated Direct Edge, offering flash orders in June 2009 before promptly stopping the practice three months later after the SEC and Congress launched investigations into the practice and one senator contended that 'flash orders are not being shown to all investors at the same time, creating a two-tier market.'" ¶233.

- "Direct Edge defiantly refused to stop 'flashing' orders until February 28, 2011, almost two years into the Class Period." ¶236.

And at the same time the Exchanges were engaged in this manipulative conduct, the Exchanges made numerous public statements about their operations being fair and orderly while concealing their manipulative schemes.  ¶¶85, 89, 93, 97, 100, 117.

Because of the numerous allegations in the SCAC outlining the Exchanges' own fraudulent conduct, the authority relied on by the Exchanges (Exch. Mem. at 39-43) is easily distinguishable. For example, in *ATSI*, the court found that the plaintiff "offered no specific allegations that the defendants did anything to manipulate the market" and that the complaint only argues that "manipulation may be inferred." 493 F.3d at 103.  Furthermore, in *Fezzani v. Bear, Stearns & Co.*, 716 F.3d 18, 23 (2d Cir. 2013), the court's "difficulty with regard to [defendant's] liability under Section 10(b) arises from the lack of an allegation that [defendant] was involved in any communication with any of the [plaintiffs]."  Likewise, in *In re Charter Commc'ns, Inc.*, 443 F.3d 987, 992 (8th Cir. 2006), *aff'd*, 552 U.S. 148 (2008), the defendants "did not issue any misstatement relied upon by the investing public, nor were they under a duty to . . . disclose information."  Finally, in *Cent. Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 191 (1994), the respondents "concede[d] that Central Bank did not commit a manipulative or deceptive act within the meaning of §10(b)."  In stark contrast, the SCAC alleges many manipulative and deceptive acts committed directly or indirectly by the Exchanges themselves.

- 54 -

It is a fundamental goal of the federal securities laws "'to prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded,'" and therefore courts look to the charged activity's effect on capital market efficiency. *ATSI*, 493 F.3d at 100.  The Exchanges' efforts to shield their fraudulent conduct through technical and narrow interpretations of the law contradicts the purpose of §10(b).

### D.      Plaintiffs Have Adequately Alleged Reliance

In *Affiliated Ute*, the U.S. Supreme Court held that in cases

> involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.  Th[e] obligation to disclose and th[e] withholding of a material fact establish the requisite element of [reliance].

406 U.S. at 153-54.  Despite their protestations to the contrary (*see* Exch. Mem. at 46), the *Affiliated Ute* presumption is equally applicable to market manipulation actions.  *See In re UBS Auction Rate Sec. Litig.*, No. 08 Civ. 2967 (LMM), 2010 U.S. Dist. LEXIS 59024, at *82 (S.D.N.Y. June 10, 2010) (finding "unpersuasive" argument that *Affiliated Ute* does not apply to market manipulation claims).      Indeed, "[w]here a defendant has engaged in conduct that amounts to 'market manipulation' under Rule 10b-5(a) or (c), that misconduct creates an independent duty to disclose. . . . ***This is so because participants in the securities markets are entitled to presume that all of the actors are behaving legally***."  *IPO*, 241 F. Supp. 2d at 381-82.

Faced with this, the Exchanges argue that their disclosure of co-location services, proprietary feeds, and various order types undermines Plaintiffs' reliance theory.  *See* Exch. Mem. at 46.  They miss the point.  Plaintiffs have alleged that the Exchanges omitted, among other things:

- That their co-location offerings, as well as proprietary feeds, allowed certain investors, such as the HFT firms, to front run large and small investors alike.  By

- 55 -

frontrunning these investors, the HFT firms increased the price to investors to purchase securities and decreased the price investors received when selling securities. This is manipulative and deceptive conduct that impacted the price of securities purchased and sold causing damages to investors. ¶¶118-119.

- That they designed and implemented hundreds of new complex "order types" in the knowledge that HFT firms would use them to detect investors' trading patterns, jump ahead of them in the exchange's order book queue, and trade in front of them to the investors' detriment. ¶¶4, 136-236.

As such, the Exchanges cannot seriously contend that their purported "disclosures" came close to covering these omissions or that these omissions were immaterial to investors.[47]

Consequently, "hav[ing] sufficiently pled an omission of a material fact by one with a duty to disclose," Plaintiffs have "made out a prima facie case of entitlement to the *Affiliated Ute* presumption of reliance." *UBS Auction*, 2010 U.S. Dist. LEXIS 59024, at *86.[48]

### E.    Plaintiffs Have Adequately Alleged Scienter

To allege scienter under §10(b), a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). Under the analysis required by the Supreme Court, a court must consider plausible opposing inferences in determining whether the pleaded facts give rise to a "strong inference of scienter."

---

[47]    Questions concerning the materiality of the Exchanges' omissions are inappropriate for resolution on a motion to dismiss. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 181 (S.D.N.Y. 2010) ("The materiality requirement poses a very low burden . . . . Thus, the trier of fact usually decides the issue of materiality.").

[48]    The Exchanges' argument that they owed no duty to disclose and owed no fiduciary duties to Plaintiffs should be rejected. *See* Exch. Mem. at 47. Certainly the Exchanges owed a duty not to knowingly create a market favoring the manipulation of trades by HFT firms and to the detriment of public investors. This is aside from the Exchanges' various assertions that they were providing a fair and orderly trading exchange. In any event, having chosen to speak on their provision of services to all investors (*see, e.g.*, ¶¶79, 85, 89, 93, 97, 100), the Exchanges were obligated to speak truthfully. *See Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008) ("Once defendants choose to speak about their company, they undertake a duty 'to speak truthfully and to make such additional disclosures as . . . necessary to avoid rendering the statements misleading.'") (alteration in original).

*Tellabs*, 551 U.S. at 323.  An inference of scienter is strong "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.*  Under *Tellabs*, however, a complaint should not be dismissed at the pleadings stage if equally strong inferences exist for and against scienter.  *Id.*  Stated otherwise, when evaluating scienter at the pleading stage, a tie goes to the plaintiff.  *In re ITT Educ. Servs.*, 34 F. Supp. 3d 298, 309 (S.D.N.Y. 2014).   When viewed holistically, the SCAC sufficiently alleges facts giving rise to a strong inference of scienter.

Here, Plaintiffs have readily pleaded with the requisite particularity that the Exchanges knew or recklessly disregarded the fact that their conduct would manipulate the markets in favor of HFT firms and deceive non-HFT investors including Plaintiffs.  *See id.* at 305 ("To state a violation of §10(b)(5) and Rule 10b-5, a plaintiff must plead . . . scienter (at least as high as recklessness) . . . .") (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)).[49]   The Exchanges' contention to the contrary, namely that "there is no plausible argument that the Exchanges engaged in deceptive or manipulative conduct" (Exch. Mem. at 49), is belied by any fair reading of the SCAC.  Among other things, Plaintiffs have alleged that the Exchanges:

- Created and provided HFT firms with the ability to receive enhanced trading information at faster speeds than the SIP through the Exchanges' low-latency direct data feeds, allowing HFT firms to gain access to public information sooner than the investing public or permit HFT firms to front-run the non-HFT investing public by gaining access to what is in the queue versus what is displayed.  ¶¶118-119.  These

---

[49]   The Exchanges contend that Plaintiffs "'must plead with particular[ity] facts giving rise to a strong inference that the defendants intended to deceive investors by artificially affecting the market price of securities.'"  Exch. Mem. at 48 (citing *ATSI*, 493 F.3d at 102).  As Plaintiffs point out, the standard for pleading scienter is not nearly so difficult.  Regardless, under either standard, Plaintiffs have adequately pled facts giving rise to a strong inference of scienter.

activities allowed the Exchanges to collect millions in fees each month.  ¶9.  More importantly, the Exchanges provided advantages such as proprietary data feeds and co-location services to HFT firms because these firms were the Exchanges' biggest and most important customers.  ¶10.

- Touted their ability to offer faster-speed co-location and other connectivity services to those willing to pay a premium.  ¶¶110, 114, 116.  The Exchanges were motivated to conduct their manipulative scheme because of the significant financial rewards available to them, including, as of 2010, collecting an annual $1.8 billion in co-location fees.  ¶110; *see also* ¶90 (NYSE's Information Service and Technology Solutions segment's revenues increased by approximately $50 million each year and NYSE set a target of $1 billion in revenues by 2015).

- Designed and implemented new complex order types with the knowledge that HFT firms would use them to detect investors' trading patterns, jump ahead of them in the Exchange's order book queue, and trade in front of them to the investors' detriment.  ¶¶4, 136-236.  It has been estimated that jumping to the front of the queue can cost investors 1.7 cents a share – millions upon millions – in today's markets.  ¶149.  The order types favored HFT firms over the general investing public because HFT firms generate enormous volume and revenues for the Exchanges.  ¶148.

As such, it cannot seriously be disputed that the Exchanges knew or recklessly disregarded the fact that their behavior would manipulate stock prices and deceive non-HFT investors including Plaintiffs – their scienter is therefore readily established.  *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) ("[T]he inference [of scienter] may arise where the complaint sufficiently alleges that the defendants:  (1) benefitted in a concrete and personal way from the purported fraud . . . ; (2) engaged in deliberately illegal behavior . . . ; (3) knew facts or had access to information suggesting that their public statements were not accurate . . . ; or (4) failed to check information they had a duty to monitor.").[50]  Indeed, because the Exchanges themselves created these products and services, for the purpose of profiting from them, it is axiomatic that the Exchanges understood and fully

---

[50]  Faced with these well-pleaded allegations, the Exchanges argue that Plaintiffs' scienter allegations are diminished because the Exchanges disclosed the existence of proprietary data feeds, co-location services and complex order types.  *See* Exch. Mem. at 49.  This argument is of no moment because the Exchanges reassured the market that they conducted their operations in compliance with applicable regulations.  *See, e.g.*, ¶¶79, 85, 89, 93, 97, 100.  Having chosen to speak on these topics, they were obligated to speak truthfully.  *See Hall*, 580 F. Supp. 2d at 226.

appreciated, or at least were reckless in disregarding, the functionality of these same products and services, particularly as it relates to the HFT firms that were specifically targeted by the Exchanges.

### F.    Plaintiffs Have Adequately Alleged Damages

In a typical securities fraud case, "'[l]oss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007). To successfully plead loss causation in a false statement case, a plaintiff must simply allege a "'short and plain statement.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). This Rule 8 pleading standard is "not meant to impose a great burden upon a plaintiff." *Id.* at 347.

The Exchanges contend that because Plaintiffs have not identified any drop in price of specific securities and have not identified the price they paid for particular securities on any exchange at a particular time, Plaintiffs have failed to properly allege loss causation. *See* Exch. Mem. at 48. Not so. When a plaintiff has alleged unique facts that differentiate its case from the "typical" securities fraud action, it is excused from such specific pleading requirements. *In re NYSE Specialists Sec. Litig.*, 405 F. Supp. 2d 281 (S.D.N.Y. 2005), is instructive:

> Defendants also argue that the Supreme Court's recent decision in *Dura* that plaintiff's allegation that he paid "an artificially inflated purchase price" inadequate to plead loss causation warrants dismissal. *Dura*, 125 S. Ct. at 1631. While *Dura* may have relied on the premise that in the typical case "the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value," the facts present here do not constitute the typical case. *Id.* (emphasis in original). Here, the ownership of a share does not possess an "equivalent value," *id.*, but rather a value which plaintiffs allege was manipulated by the specialist. ***Plaintiffs allege that it was the specialists' manipulative conduct at the time of the transaction that caused their losses.*** As such, the "equivalent value," *id.*, of the shares for the purchaser and the seller would have been the price had the specialist performed his function properly. ***Therefore, the Supreme Court's decision in Dura is inapposite, and Plaintiffs have adequately pled loss causation under the unique facts of this case***.

*Id.* at 315-16.

Here, Plaintiffs have alleged that through their manipulative scheme the Exchanges created a marketplace where investors purchased and sold securities at prices that were not as favorable as those to which they were entitled. Given the nature of the manipulation conduct alleged, Plaintiffs could not know – without discovery – at what prices their trades would have filled but for the manipulation by Defendants and HFT firms. Taking these well-pled allegations as true, Plaintiffs have satisfied the "short and plain statement" requirement under Fed. R. Civ. P. 8 to plead loss causation. Nothing more is required.

### G.   Plaintiffs Have Standing to Assert a Claim Under §10(b) and Rule 10b-5

The Exchanges argue that Plaintiffs' claims fail as a matter of law because they lack standing under §10(b) and Rule 10b-5. Exch. Mem. at 38. Under §10(b), a plaintiff must be a purchaser or seller of securities in connection with the fraud. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730-31 (1975). The Supreme Court has rejected other narrow interpretations of §10(b), finding that "[s]ince there was a 'sale' of a security and since fraud was used 'in connection with' it, there is redress under §10(b)." *Superintendent of Ins.*, 404 U.S. at 12 (1971). Neither the SEC nor the Supreme Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the act. *Zandford*, 535 U.S. at 814. In fact, in its role enforcing §10(b), the SEC has consistently adopted a broad reading of the phrase "'in connection with the purchase or sale of any security.'" *Id.* at 819. The Exchanges' narrow interpretation would thwart Congress' intent to hold liable those that engage in this type of fraudulent conduct. *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963) (recognizing that Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed not technically and restrictively, but flexibly to effectuate its remedial purposes).

- 60 -

In 2006, the Supreme Court explained that when it has sought to give meaning to the phrase "'in connection with the purchase or sale of securities'" in the context of §10(b) and Rule 10b-5, the Supreme Court consistently "espoused a broad interpretation." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 84-85 (2006).  The Court rejected a "narrow construction" of the phrase, and held that "[u]nder our precedents, it is enough that the fraud alleged 'coincide' with a securities transaction–whether by the plaintiff or by someone else." *Id.* at 85.  Thus, "[t]he requisite showing . . . is 'deception "in connection with the purchase or sale of any security," not deception of an identifiable purchaser or seller.'" *Id.*  This broader interpretation of the statutory language also comports with the longstanding views of the SEC.  *Id.*

Courts in this district take a similar view when confronted with the "in connection with" phrase from Rule 10b-5.  For example, in *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618, 629 (S.D.N.Y. 2004), the plaintiffs alleged that defendants' acts caused them to believe that the price of the stocks was the result of an orderly market, when, in fact, it was a result of the defendants' fraudulent manipulation.  The Court rejected the argument that the plaintiffs lacked standing under §10(b) and, citing the Supreme Court's decision in *Zandford*, held that since the fraud alleged by the plaintiffs coincided with the sale of securities, it falls within §10(b)'s flexible ambit.  *Id.* at 638.

Furthermore, because "the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation."  *In re Blech Sec. Litig.*, 961 F. Supp. 569, 580 (S.D.N.Y. 1997).  Accordingly, Plaintiffs' allegations that they purchased securities in connection with the fraud during the Class Period (¶¶21-25) satisfies the standing requirement.

## VI.   PLAINTIFFS HAVE A PRIVATE RIGHT TO ACTION UNDER §6(b) OF THE EXCHANGE ACT

Under §6 of the Exchange Act, "national securities exchange[s]" are obligated to operate in the public interest and for the protection of investors, ensuring that they are operated in a fair and equitable manner.  *See* 15 U.S.C. §78f(a), (b). Section 6 places a legal duty on exchanges to adopt rules that protect investors from deceptive and manipulative conduct and to enforce the rules adopted thereunder.  Section 6(b)(5), for example, requires that rules of exchanges are

> designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest.

15 U.S.C. §78f(b)(5).  The Exchanges argue there is no implied right of action under §6, but in doing so misinterpret the prevailing law in this Circuit.  The Second Circuit in *Baird v. Franklin*, 141 F.2d 238, 244-45 (2d Cir. 1944), held that "§6(b) must be construed as granting to injured investors individual causes of action to enforce the statutory duties imposed upon the exchanges."

In a footnote, the Exchanges argue that the 1975 amendments to the Exchange Act and the Supreme Court's more restrictive approach to implied rights of action caused the Second Circuit to "express strong doubts" about the continued viability of a private cause of action under §6. Exch. Mem. at 37 n.20.  When the Second Circuit revisited the issue after the amendments were implemented, however, it explicitly refused to overturn the private right of action acknowledged in *Baird*, and instead found that such action against an exchange "may be bought . . . if it is premised upon allegations of ***fraud or bad faith***."  *Brawer v. Options Clearing Corp.*, 807 F.2d 297, 299, 302 (2d Cir. 1986) (discussing cases applying bad faith exception); *see also Manning v. Smith Barney, Harris Upham & Co.*, 828 F. Supp. 256, 257 (S.D.N.Y. 1993) (noting exception provided in

*Brawer*).  Moreover, the Court in *Rich v. New York Stock Exch., Inc.*, 509 F. Supp. 87, 87-89

(S.D.N.Y. 1981), held that Supreme Court decisions did not eliminate the private cause of action

established in *Baird* and reasoned that the Congressional silence in the 1975 amendments indicated

approval of the then-existing private cause of action under §6.[51]  Thus, this Circuit has contemplated

and provided that in limited circumstances – when the violation is premised on allegations of fraud –

a private right of action does exist for violations of §6.  *See Brawer*, 807 F.2d at 299.

The Exchanges' cited authority does not mandate a different result.  In *Feins v. AMEX*,

81 F.3d 1215, 1223-24 (2d Cir. 1996), the court declined to explore the continued vitality of a

private right of action under §6 because the plaintiff's claim was based on the "general obligations"

language of §19(g) of the Exchange Act.  Likewise, in *Desiderio v. NASD*, 191 F.3d 198, 208 (2d

Cir. 1999), without even mentioning §6, the court simply applied the reasoning in *Brawer* that no

private right of action under the Exchange Act existed to redress denials of membership in an

---

[51]   The *Rich* Court explained that at the time of the amendments:

> Congress was unquestionably aware of the *Baird v. Franklin* heredity and of the
> strong jurisprudence throughout the securities laws, capped by the Supreme Court's
> *Borak* decision, acknowledging the existence of implied causes of action.  As Judge
> Friendly noted in *Leist*, if one undertakes at all to interpret Congressional silence, the
> fairer reading must surely be that this silence, in the course of substantial other
> changes, must be viewed as at least an approving expectation that this well-
> entrenched jurisprudence would continue.

509 F. Supp. at 89; *see also Arneil v. Ramsey*, 550 F.2d 774, 783 (2d Cir. 1977) ("Of course, the
right of the public investor to recover from an exchange under Section 6 continues unabated . . . .");
*Hughes v. Dempsey-Tegeler & Co.*, 534 F.2d 156, 166 & n.5 (9th Cir. 1976) ("[W]e find no reason
to conclude that the factors enunciated in [the Supreme Court] decisions [regarding implied right of
actions] mandate a reversal of the longstanding rule that a private right of action is available under
Section 6."); *Aldrich v. New York Stock Exch., Inc.*, 446 F. Supp. 348, 354 (S.D.N.Y. 1977)
(acknowledging potential liability of New York Stock Exchange to investors for violation of duties
under §6).

exchange to its finding that no bad faith exception was available for the plaintiff's private state law claims. But that is all irrelevant here.

Under *Baird*, *Brawer*, and their progeny, a private right of action under §6(b) does exist when the allegations are based in fraud or bad faith. Such is the case here. As the Exchanges are registered national securities exchanges under §6, they are duty-bound to operate their exchanges in the public interest, for the protection of all investors and with the assurance that their rules are designed to "prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade." 15 U.S.C. §78f(b)(5); *see also Facebook*, 986 F. Supp. 2d at 439. The Exchanges violated their obligations under §6 by engaging in the fraudulent and deceptive scheme detailed in the Complaint – namely, manipulating the market for securities on their venues in favor of HFT firms and to the detriment of Plaintiffs and the Class in order to garner increased revenues from greater HFT order flow. *See, e.g.*, ¶¶3-4, 9.

Accordingly, Plaintiffs have adequately stated a proper claim under §6 arising out of the Exchanges' fraudulent conduct.

## VII.  PLAINTIFFS' COMPLAINT STATES A MARKET MANIPULATION CLAIM AGAINST BARCLAYS UNDER §10(b) OF THE EXCHANGE ACT

### A.  Barclays' Rule 12(f) Motion to Strike Should Be Denied

Barclays moves to strike portions of the SCAC that rely upon allegations from the NYAG's complaint in *People ex. Rel. Schneiderman v. Barclays Capital, Inc., et al.*, No. 451391/2014, Dkt. No. 1 (N.Y. Sup. Ct. June 25, 2014) ("NYAG Complaint") (Barclays Mem. at 11-12; *see also id.*, App. A). Barclays' motion should be denied.

"'To prevail on a [Rule 12(f)] motion to strike, a party must demonstrate that: "(1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing

on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant.'"" *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012); *see also In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012) (recognizing the Second Circuit's "strong presumption against striking portions of the pleadings").  Barclays has not argued that any of these three factors exist.

Contrary to Barclays' contentions, courts in this District permit plaintiffs to rely on allegations from unadjudicated complaints – especially when, as in this case, the unadjudicated complaint was filed by a governmental entity with pre-suit subpoena and other investigative powers.  *See Landesbank Baden-Württemberg v. RBS Holdings USA, Inc.*, 14 F. Supp. 3d 488, 497 (S.D.N.Y. 2014) (allegations relying on forensic study from a Federal Housing Finance Agency complaint not stricken); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 622 (S.D.N.Y. 2014) (granting plaintiffs leave to amend complaint to add factual allegations from separate proceeding); *Bear Stearns*, 851 F. Supp. 2d at 768 n.24 (allegations relying a study from an Ambac complaint were not stricken); *Lee*, 720 F. Supp. 2d at 340 (allegations relying on SEC and Community Futures Trading Commission complaints were not stricken); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 395 (S.D.N.Y. 2005) (allegations relied on from SEC complaint were not stricken).[52]

No Second Circuit court has adopted "the broad rule that a complaint may never reference allegations from a separate proceeding that has not been decided on the merits." *OSG*, 12 F. Supp. 3d at 620.  Rather, Plaintiffs may use of the fruits of governmental investigations, conducted by means of resources and subpoena powers unavailable to private litigants pre-suit.  As one court in this District noted, "[t]here is no absolute rule barring a private plaintiff from relying on

---

[52]   Further, the NYAG Complaint has been sustained in pertinent part and awaits further adjudication.  *See People ex. Rel. Schneiderman v. Barclays Capital, Inc., et al.*, No. 451391/2014, Dkt. No. 75 (N.Y. Sup. Ct. Feb. 13, 2015).

government pleadings in order to meet the Rule 9(b) and PSLRA thresholds." *Lee*, 720 F. Supp. 2d at 340; *see also Beacon Hill*, 376 F. Supp. 2d at 395 (reliance on SEC complaint was "adequate for Rule 9(b) and PSLRA purposes"). Rather, "there is nothing improper about utilizing information contained in an SEC complaint as evidence to support private claims under the PSLRA." *Lee*, 720 F. Supp. 2d at 341.

Several of the cases Barclays cites are inapposite, as they failed to reach the motion to strike at issue or rested on circumstances absent here.[53] The remainder of the cases err in expanding the holding of the Second Circuit's decision in *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976), beyond the facts present in that case (and absent here) that warranted the result reached. In *Lipsky*, the court stated that "in deciding whether to strike a Rule 12(f) motion on the ground that the matter is impertinent and immaterial, it is settled that the motion will be denied, unless it can be shown that no evidence in support of the allegation would be admissible." *Id.* at 893. The Second Circuit ruled in *Lipsky* that allegations from a consent judgment between the SEC and a private corporation were to be stricken because a consent judgment is equivalent to a plea of *nolo contendere*, which is inadmissible in subsequent litigation pursuant to Fed. R. Evid. 410 against the consenting party. *Id.* at 893-94.[54] Thus, as noted in *OSG*, "*Lipsky* did not hold that a complaint may never reference allegations from a separate proceeding under any circumstances. Instead, its holding

---

[53]   Two of the cases cited by Barclays did not provide rulings on a motion to strike as the motions were deemed moot. *See In re Lehman Bros. Sec. & Erisa Litig.*, No. 09 MD 2017 (LAK), 2013 U.S. Dist. LEXIS 107559 (S.D.N.Y. July 31, 2013) (Barclays Mem. at 11); *Dexia SA/NV v. Deutsche Bank AG*, No. 11 Civ. 5672 (JSR), 2013 U.S. Dist. LEXIS 3482 (S.D.N.Y. Jan. 4, 2013) (Barclays Mem. at 11). In *Grimes v. Fremont Gen. Corp.*, 933 F. Supp. 2d 584, 607 (S.D.N.Y. 2013) (Barclays Mem. at 12), the Court held that the allegations of the complaints referred to were themselves insufficient to state a claim by the plaintiff.

[54]   *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588 (S.D.N.Y. 2011) (Barclays Mem. at 11), similarly involved a complaint's citation of material from a consent decree barred by Fed. R. Evid. 410.

was limited to complaints that ultimately resulted in a consent decree or nolo contendere plea protected by FRE 410." 12 F. Supp. 3d at 621.  The remaining cases cited by Barclays on this point miss that distinction and incorrectly attempt to apply *Lipsky* outside the consent decree context.[55]

Thus, courts have held that Rule 11 does not bar Plaintiffs from relying on information from other people or complaints.  *See Dubois v. U.S. Dep't of Agric.*, 270 F.3d 77, 82 (1st Cir. 2001) ("Courts have further noted that '[a] signer's obligation personally to comply with the requirements of Rule 11 clearly does not preclude the signer from any reliance on information from other persons.'") (quoting *Garr v. U.S. Healthcare*, 22 F.3d 1274, 1278 (3d Cir. 1994)); *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 224 (S.D.N.Y. 2008) ("The Court must accept Plaintiffs' allegations in the Complaint as true, regardless of whether the allegations are taken from a complaint in another case."); *Morris v. Wachovia Sec., Inc.*, No. 3:02cv797, 2007 U.S. Dist. LEXIS 52675, at *27 (E.D. Va. July 20, 2007) ("Indeed, under Rule 11, an attorney may rely on other attorneys for factual assertions, if that reliance is reasonable.").[56]

---

[55]  *Dexia*, 2013 U.S. Dist. LEXIS 3482 (S.D.N.Y. Jan. 4, 2013) (Barclays Mem. at 11); *Low v. Robb*, No. 11-CV-2321 (JPO), 2012 U.S. Dist. LEXIS 6836 (S.D.N.Y. Jan. 20, 2012); *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382 (S.D.N.Y. 2009) (summary order of no precedential effect, *see* 2d Cir. R. 32.1.1)  (Barclays Mem. at 11), *aff'd on other grounds*, 387 F. App'x 72 (2d Cir. 2010); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 218 F.R.D. 76 (S.D.N.Y. 2003) (Barclays Mem. at 11).

[56]  Barclays' accusation that Plaintiffs' reliance on allegations from the NYAG Complaint demonstrates Plaintiffs "made little or no independent investigation, as required by Rule 11(b)" (Barclays Mem. at 12) is patently wrong.  Plaintiffs fulfilled their "reasonable inquiry" obligation required by Rule 11 in their pre-filing investigation (*MacDraw, Inc. v. CIT Grp. Equip. Fin.*, 73 F.3d 1253, 1257 (2d Cir. 1996)) by investigating publicly available documents and discussing with industry experts and consultants when drafting their allegations against Barclays to substantiate and corroborate the NYAG Complaint allegations to the extent possible and to support their allegations, generally.  Plaintiffs did not, of course, have the pre-suit subpoena power and other investigative powers available to the Attorney General.  *Cf. In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 U.S. Dist. LEXIS 141449, at *54-*55 (S.D.N.Y Sept. 28, 2012) (Barclays Mem. at 12) (concerning **uncorroborated** allegations), *aff'd*, 752 F.3d 173 (2d Cir. 2014).

- 67 -

Plaintiffs' reliance on the NYAG Complaint was reasonable because governmental complaints, like newspaper articles, are credible sources of information that satisfy the "reasonable inquiry" requirement under Rule 11.  Here, the NYAG filed its Complaint under the powers conferred by the Martin Act, General Business Law §352 *et seq*.  Courts have remarked upon the benefit of relying on allegations from NYAG investigations.  *See In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 406 n.7 (S.D.N.Y. 2010) ("Given the strength of the new allegations [taken from the New York Attorney General's complaint] in the SCAC, the Court need not reach the question of whether large fees would be probative of motive to commit fraud.").  As one court in this District has explained, "there is nothing improper about utilizing information from the SEC as evidence to support private claims;" indeed, "'*it would have been irresponsible for plaintiff to have ignored the SEC's highly relevant allegations and findings*.'"  *De la Fuente*, 259 F. Supp. 2d at 260.  The Court further stated that the "striking similarity" between an SEC complaint and the plaintiff's complaint did not show that the plaintiff lacked evidentiary support:

> Rather, *the SEC allegations provided plaintiff with evidentiary support*.  The PSLRA does not require that a plaintiff re-invent the wheel before filing a complaint; and one could argue that a complaint predicated on the results of an SEC investigation has far more "evidentiary support" than one based on rumor and innuendo gleaned from "Heard on the Street."

*Id.*

Based on the foregoing, Barclays' Rule 12(f) motion to strike should be denied in its entirety.

### B.    Plaintiffs Have Adequately Alleged Reliance on Barclays' Fraudulent Scheme

Barclays argues that Plaintiffs have not pled reliance on the many specific misrepresentations alleged in the Complaint (Barclays Mem. at 13-17), a contention which misconstrues the nature of Plaintiffs' claims against Barclays.  Plaintiffs' primary assertion is that Barclays is liable for

engaging in a scheme to manipulate the market in its own dark pool, in violation of Rule 10b-5(a) and (c).  The misrepresentations alleged in the SCAC are part of the scheme.

The existence of a scheme claim distinguishes this case from almost every case cited by Barclays:

> Most claims for violations of Section 10(b) of the 1934 Act are based upon alleged material misstatements or omissions upon which plaintiffs relied in connection with securities transactions. That, in effect, is the classic case. However, the reach of Section 10(b) is not so limited. Though much less frequently pled in this manner, plaintiffs may bring claims that a particular scheme, or course of conduct was itself fraudulent.  *See* 15 U.S.C. §78j(b); 17 C.F.R. 240.10b-5(a)-(c).  This effectively allows plaintiffs to allege a fraudulent scheme without being tethered to whether specific statements were themselves material misstatements or omissions; such statements may simply be part of the fabric of the fraudulent scheme alleged.

*IBEW Local 90*, 2013 U.S. Dist. LEXIS 43774, at \*24-\*25.

### 1.        Barclays Schemed to Manipulate the Market

To state a claim that a defendant has engaged in a fraudulent or deceptive scheme in violation of Rule 10b-5(a) and (c), a plaintiff must allege that a defendant:  (1) committed a deceptive or manipulative act; (2) with the requisite scienter; (3) that the act affected the market for securities or was otherwise in connection with their purchase or sale; and that (4) defendant's actions caused the plaintiff's injuries.  *See Parmalat*, 376 F. Supp. 2d at 492; *Global Crossing*, 322 F. Supp. 2d at 329; *IBEW Local 90*, 2013 U.S. Dist. LEXIS 43774, at \*32-\*33; *IPO*, 241 F. Supp. 2d at 385.

Because a "scheme" liability claim is not a claim of misrepresentation, the pleading is subject only to Rule 9(b) and not the further heightened pleading requirements of the PSLRA:

> Unlike actionable misstatements or omissions, claims that liability is premised on a fraudulent or deceptive scheme do not require compliance with the PSLRA's pleading requirements.  *See, e.g.*, *In re Parmalat*, 376 F. Supp. 2d at 492; *see also Shields*, 25 F.3d at 1128. Such claims do sound in fraud, however, and plaintiffs must meet the strict pleading requirements of Rule 9(b).  *Id.*  To meet the Rule 9(b) requirements for a claim of market manipulation, a plaintiff must allege specific facts regarding what manipulative acts were performed, which defendant(s) performed them, when they were performed, and what the effect of the alleged scheme was on

the securities.  *See Global Crossing*, 322 F. Supp. 2d at 329; *In re Blech Sec. Litig.*, 961 F. Supp. 569, 580 (S.D.N.Y. 1997).

*IBEW Local 90*, 2013 U.S. Dist. LEXIS 43774, at \*33.

Where "'the principal allegations of wrongdoing involve market manipulation rather than false statements, the level of specificity required by Rule 9(b) is somewhat relaxed.'"  *Compudyne*, 453 F. Supp. 2d at 821 (quoting *Dietrich*, 76 F. Supp. 2d at 339).  Although the manipulative scheme may include the making of misrepresentations, a claim of market manipulation "does not require 'the making of an untrue statement of material fact or omission to state a material fact.'"  *Id.* at 821; *see also Global Crossing*, 322 F. Supp. 2d at 335 ("[A] cause of action exists under subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant.").

Plaintiffs have alleged in great detail that Barclays, in operating its dark pool, "committed deceptive or manipulative act[s]" that "affected the market for securities or [were] otherwise in connection with their purchase or sale . . . ."  *See IBEW Local 90*, 2013 U.S. Dist. LEXIS 43774, at \*32.  Thus, the SCAC alleges in detail that investors in Barclays LX relied on Barclays' compliance with the applicable regulatory framework, which requires fairness and integrity in operating a platform where orders are submitted and securities are bought and sold.  ¶¶263-268.  Barclays' violation of those fundamental requirements to treat investors fairly and not expose them to unfair predation for Barclays' own financial benefit (¶¶275-279) constitute the predicate allegations of a "deceptive or manipulative act."

Plaintiffs also allege that not only did Barclays do nothing to dispel investors' understanding, but Barclays actively encouraged that belief – and deflected discovery of the true state of its dark pool – with its public statements.  Barclays marketed Barclays LX as a fair and efficient place to trade securities that was free from the predatory trading employed by HFT firms.  ¶268.  Barclays

- 70 -

touted its "Liquidity Profiling" service as a tool to monitor the toxicity of entities' trading behavior in the dark pool.  ¶¶269-270.  Barclays announced that investors could use the Liquidity Profiling feature to avoid interacting with entities that were potentially engaging in HFT, and in its marketing materials, Barclays made efforts to demonstrate the low rates of aggressive trading in its dark pool, as well as its commitment to transparency.  ¶¶270-274.  No reasonable investigation would have contradicted Plaintiffs and the Class' justified belief that Barclays operated its dark pool as a fair and level market.  ¶269; *see, e.g.*, *Global Crossing*, 322 F. Supp. 2d at 336 (recognizing that a Rule 10b-5(a), (c) scheme can include misstatements and omissions committed in furtherance of the scheme, but a scheme claim is distinct from a claim on those misstatements and omissions).

Barclays courted HFT firms to participate in its dark pool in order to enjoy the benefits of the enormous trading volume on Barclays LX.  ¶275.  Rather than monitoring activity to identify aggressive trading tactics, Barclays never prohibited a firm from participating in its dark pool and was well aware of the high levels of toxic trading that were actually occurring in its dark pool. ¶¶276-277.  In furtherance of this manipulative scheme, Barclays would override certain Liquidity Profiling ratings in order to assign "safer" scores to aggressive HFT traders, including to Barclays' own internal HFT trading desks.  ¶277.  And, similar to actions taken by the Exchanges, Barclays provided HFT firms with certain benefits and information, such as allowing latency arbitrage, cross connecting, and financial incentives, thereby allowing the HFT firms to effectively engage in predatory trading.  ¶278.  This caused Plaintiffs and the Class to lose money on trades whose terms were substantially less favorable to them (*i.e.*, they bought at higher prices than they would have and sold at lower prices than they would have) than they would have been on a fair and unmanipulated market.  ¶279.

### 2.        Plaintiffs Have Adequately Alleged Reliance

A plaintiff alleging a fraudulent scheme need not allege (or ultimately establish) that it relied on any particular misrepresentation made in furtherance of the scheme.  *See IBEW Local 90*, 2013 U.S. Dist. LEXIS 43774, at \*32-\*33.  Rather, the fraud on the market presumption applies to market manipulation cases (such as this one) and is satisfied where Plaintiffs affirmatively plead facts establishing reliance on the integrity of the market.  *See Scone Invs., LP v. Am. Third Mkt. Corp.*, No. 97 Civ. 3802 (SAS), 1998 U.S. Dist. LEXIS 5903, at \*28 (S.D.N.Y. Apr. 28, 1998).

Here, Plaintiffs have alleged such reliance, based on the regulatory scheme applicable under Reg ATS to which Barclays LX was subject.[57]  ¶263.  Barclays never disclosed that its dark pook was not a fair and level market for the placing of orders and the purchase and sale of securities, such that Plaintiffs could not have learned the truth even if they were privy to Barclays' statements.  ¶¶269-274.  At the same time, Barclays actively rigged its dark pool contrary to the interests of Plaintiffs.  ¶¶275-279.  Even if Plaintiffs did not rely directly on any particular misrepresentation made in furtherance of the scheme, Plaintiffs relied on the integrity and efficiency of Barclays's LX market, free of manipulative conduct.[58]  "The fraud-on-the-market theory is particularly relevant where a §10(b) and Rule 10b-5 case alleges market manipulation."  *In re Enron Corp. Sec.,*

---

[57]   The footnote that Barclays cites in *UBS Auction*, 2010 U.S. Dist. LEXIS 59024, at \*88-\*89  n.19 ( Barclays Mem. 15), is inapposite, as Plaintiffs do not rely on any "presumption" of the "integrity of the market."  Rather as in *Scone*, Plaintiffs make detailed allegations of the basis of their reliance on the integrity and fairness of Barclays LX.

[58]   Barclays claims that Plaintiffs' clarification in the SCAC that their claims are based on a scheme to manipulate rather than misrepresentations upon which they directly relied, is an improper attempt to "recast" Plaintiffs' claims in response to a motion to dismiss (Barclays Mem. at 15-17).  In fact, this Court's Order dated November 4, 2014 (Dkt. No. 246) specifically provided for Plaintiffs amending their pleading in response to Defendants' motions to dismiss.  Plaintiffs are also entitled to an *Affiliated Ute* presumption of reliance, where Barclays did nothing to dispel the known public perception (which it falsely promoted) that its dark pool was fair and even for investors not rigged in favor of HFT firms.  *See supra*, §V.D.

*Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 574 (S.D. Tex. 2002) (citing *Scone*, 1998 U.S. Dist. LEXIS 5903, at \*16); *see also In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) (finding that "several courts have held that the [FOTM] presumption can also apply to claims of market manipulation" reasoning that "[t]he false premise, regardless of whether it is conveyed by a written misstatement or by manipulative misconduct, is then reflected in the price of the security"); *UBS Auction*, 2010 U.S. Dist. LEXIS 59024, at \*85 ("[P]articipants in the securities market are entitled to presume that all of the actors are behaving legally.") (quoting *IPO*, 241 F. Supp. 2d at 381).

Additionally, the SCAC alleges several misstatements uttered by Barclays to bolster the existing impression that its dark pool was a fair and efficient trading venue. To the extent direct reliance on these misrepresentations must be established, the "fraud on the market" presumption of reliance applies. Here, the SCAC alleges that Barclays' fraudulent and manipulative conduct distorted orders and the prices at which securities traded on Barclays LX.[59]

### C.     Barclays Did Not Disclose Its Fraudulent Scheme and Misrepresented Its Conduct to Conceal the Scheme

Barclays does not argue that the statements cited in the SCAC disclosed its scheme. Instead, Barclays argues that to the extent it made material misrepresentations, Plaintiffs did not plead direct reliance on such statements. This is a misreading of the SCAC's allegations which are premised on its fraudulent scheme as well as fraudulent misrepresentations. The misrepresentations demonstrate that there was no disclosure of Barclays' scheme. Otherwise, Barclays simply argues that Plaintiffs

---

[59]   *Last Atlantis Capital LLC v. Chi. Bd. Options Exch., Inc.*, 455 F. Supp. 2d 788, 800 (N.D. Ill. 2006), did not hold, as Barclays claims (Barclays Mem. at 14), that all claims based on the manner of operation of a securities exchange fall outside the purview of the "fraud on the market" presumption. Rather, it held that the presumption was inapplicable in that case because, unlike here, plaintiffs' claims did not arise from the prices they paid for securities.

- 73 -

have failed to allege the falsity of some of those statements – which Plaintiffs are not required to do as part of their market manipulation claim under Rule 10b-5(a) and (c).[60]

### 1.      Barclays HFTs from Barclays LX

Barclays failed to prevent even a single HFT firm from trading in Barclays LX, failed to update its profiles of traders to correctly identify overly aggressive or predatory HFTs, and provided "overrides" to permit trading by entities identified as "toxic" including ones with which Barclays has commercial relationships to the detriment of investors.  ¶¶270, 277.  In response, Barclays claims that Plaintiffs never alleged that they attempted (unsuccessfully) to avail themselves of services such as "Liquidity Profiling."  Barclays Mem. at 18.  The point, however, is not whether Plaintiffs specifically asked Barclays to exclude predatory traders, but rather whether Barclays took steps in furtherance of its unlawful scheme to conceal the fact that it was not protecting ordinary investors like Plaintiffs and the Class.

While Barclays asserts that Plaintiffs do not allege that they were "clients" of Barclays (*id.*), at least one plaintiff does allege that it traded on Barclay's dark pool.  ¶21.  Beyond that, Barclays simply argues that Plaintiffs do not allege that they or their investment managers received the statements they allege were false (Barclays Mem. at 19).  Again, however, this is not necessary to plead a market manipulation claim.[61]

---

[60]    In *People ex. Rel. Schneiderman v. Barclays Capital, Inc., et al.*, No. 451391/2014, Dkt. No. 75 (N.Y. Sup. Ct. Feb. 13, 2015), the NYAG did not allege a "scheme to defraud" claim under Rule 10b-5, but rather a straight misrepresentation claim under New York's Martin Act.  Accordingly, the court's remarks about the requirements for pleading misrepresentations are inapposite here.

[61]    Plaintiffs do allege, in furtherance of its scheme to hide the true nature of the way it operated its dark pool, that Barclays knowingly understated calculations of the amount of "aggressive" trading in Barclays LX.  ¶276.  In response, Barclays sets forth a factual argument concerning the meaning and possible interpretation of Barclays' statements (Barclays Mem. at 20) – a question for the jury, not the Court on a motion to dismiss.

Barclays does not deny that it gave HFT firms inducements to trade in its dark pool, and that it knew such trading operated to the disadvantage of ordinary investors like Plaintiffs and the Class. *See* Barclays Mem. at 20 n.16.  Barclays claims this was not fraudulent because Plaintiffs do not allege that Barclays ever made any representations to the contrary.  *Id.*  But to allege a scheme to defraud, Plaintiffs need allege only that Barclays induced HFT firms to trade in its dark pool on favorable terms to the detriment of ordinary investors, while knowing of – and in fact actively fostering – the ordinary investors' belief that Barclays was operating its dark pool as a fair, efficient, and level market free of the HFT firms' predations.

> **2.     Barclays Failed to Disclose, and Otherwise Concealed, the Truth About Its Manipulative and Unfair Operation of Its Dark Pool**

Barclays argues that Plaintiffs cannot claim that Barclays acted wrongly in failing to disclose the truth about its rigging of its dark pool because Barclays owed Plaintiffs no "duty to disclose." Barclays Mem. at 21-22.  However, ***participation in a scheme to defraud establishes a "duty to disclose***" their misconduct to their intended victims.  *UBS Auction*, 2010 U.S. Dist. LEXIS 59024, at *85; *see* Barclays Mem. at 15.  "'This is so because participants in the securities markets are entitled to presume that all of the actors are behaving legally'" – doubly so when the scheme is perpetrated by the operator of the securities market itself.  *See UBS Auction*, 2010 U.S. Dist. LEXIS 59024, at *85 (quoting *IPO*, 241 F. Supp. 2d at 381).  Barclays breached this duty to disclose.

> **D.     Plaintiffs Have Adequately Pled Barclays' Scienter**

Barclays argues that Plaintiffs have failed to allege scienter, claiming that the SCAC merely alleges Barclays acted with a motivation to increase its profits, which is not by itself an adequate basis for a strong inference of scienter.  Barclays Mem. at 22-23.  That argument misrepresents Plaintiffs' allegations.  Plaintiffs do not allege merely that Barclays was motivated by profit but was

engaged in a manipulative course of conduct and knowingly put the interests of one group of customers over those of the Class. This conduct was contrary to the natural and justified expectations of the public – expectations that Barclays itself fostered – and that the unwitting customers would be injured by such treatment. *See* ¶¶257-279. Allegations that Barclays knowingly engaged in wrongful conduct render allegations of motive unnecessary, since "[s]cienter can be alleged in *two* ways: by pleading ***facts that evidence conscious misbehavior or recklessness*** or by pleading facts that evidence defendant's motive and opportunity to commit fraud." *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 99 (S.D.N.Y. 2006) (citing *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)). Allegations that Barclays engaged in conscious (or at the very least reckless) misbehavior obviate allegations of Barclays' motivation. That Barclays engaged in such conscious misbehavior in order to increase its profits does not negate scienter: most frauds are committed to make money. The SCAC's allegations that Barclays engaged in conscious misbehavior (as shown, for example, by the differences between Barclays' alleged public statements regarding the operation of its dark pool and the true facts known to Barclays at the time it issued those statements (¶¶269-289)) raise a strong inference of scienter irrespective of motive.

Moreover, there is no question here of whether the SCAC adequately alleges Barclays' "corporate scienter." The manner in which the dark pool is alleged to have been operated is central to Barclays' business plan, directed by specified high-level management. ¶¶261-262. There simply is no plausible competing inference that can be taken from the SCAC's allegations that Barclays' management might have merely been acting "mistakenly," or lacked knowledge of a fraud perpetrated by rogue lower-level employees. *Cf. Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 707 (7th Cir. 2008) (no corporate scienter would be alleged where misrepresentation could have been the result of a mistake by a junior employee not caught by senior management). To the

- 76 -

contrary, Barclays' management is specifically alleged to have known of and directed the fraudulent scheme alleged in the SCAC.

### E.   Plaintiffs Have Adequately Alleged Loss Causation

Barclays also misconstrues Plaintiffs' loss causation allegations.  Far from alleging that Plaintiffs would not have engaged in losing transactions but for Barclays' misrepresentations, Plaintiffs allege that Barclays engaged in a fraudulent course of conduct that manipulated Barclays LX and caused Plaintiffs – who were relying on the efficiency, integrity, and fairness of the market – to lose money.  *See, e.g.*, ¶279; *IBEW Local 90*, 2013 U.S. Dist. LEXIS 43774, at *37 (to plead loss causation, "plaintiffs must assert that they relied upon a scheme . . . in connection with a securities transaction and that such reliance caused at least part of their losses") (citing *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 179 (2d Cir. 2001)).

Barclays similarly misses the point when it argues that the proximate causes of Plaintiffs' losses were the actions of the HFT firms not Barclays.  Since "scheme" liability is imposed on all actors in the scheme, it makes no difference for purposes of loss causation, that causal responsibility is shared among actors.

Barclays further argues that (i) it cannot be liable for aiding and abetting the market manipulation of the HFT firms, and (ii) Plaintiffs' "conclusory assertions" do not establish Barclays' primary liability in connection with the conduct of the HFT firms.  Barclays Mem. at 24-25 & n.19. These arguments ignore Plaintiffs' detailed allegations concerning Barclays' ***direct participation*** in a fraudulent scheme to manipulate its own market.  Barclays ***created*** and ***operated*** its dark pool. While holding that a private litigant cannot assert aiding and abetting liability under Rule 10b-5, the Supreme Court nonetheless acknowledged that:

> Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a

- 77 -

> purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming all of the requirements for primary liability under Rule 10b-5 are met. In any complex securities fraud, moreover, there are likely to be multiple violators; in this case, for example, respondents named four defendants as primary violators.

*Cent. Bank*, 511 U.S. at 191.  Further, this Court has explained that:

> Alleging a fraudulent scheme has significant legal relevance to whether claims withstand initial scrutiny as to individual defendants who may not be alleged to have "made" actionable misstatements, but may nonetheless be alleged to be "actors" in a scheme. In this regard, whether a claim has been properly pled as to an individual may be based either on plausible facts that he "made" a misstatement *or that he participated in a fraudulent scheme*.

*IBEW Local 90*, 2013 U.S. Dist. LEXIS 43774, at *25-*26 (citing *Parmalat*, 376 F. Supp. 2d at 491).

Rather than alleging that Barclays assisted – or aided and abetted – the HFT firms' manipulation, the SCAC alleges that (i) Barclays has primary liability under §10(b) based on its active participation in the scheme that ruined investors' reasonable expectation that Barclays' dark pool was a safe, efficient, and fair place to trade free from predatory practices (¶269), when in fact, (ii) Barclays actively courted HFT firms to trade in its dark pool and disclosed detailed, sensitive information to the HFT firms in order to increase their activities in the dark pool, which benefited Barclays to the detriment of Plaintiffs and the Class.  ¶278.

This District has endorsed the view that "'§10(b) and Rule 10b-5 . . . impose primary liability on any person who *substantially participates in a manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device* . . . intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market.'"  *Parmalat*, 376 F. Supp. 2d at 502 (quoting *In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161, 173 (D. Mass. 2003)); *see also IBEW Local 90*, 2013 U.S. Dist. LEXIS 43774, at *33 ("One can be held liable in connection with such a scheme even if he did not himself make a

material misstatement in connection with it."). Barclays' participation is, at a minimum, "part of the fabric of the fraudulent scheme" perpetuated to deceive Plaintiffs and other investors, which ultimately manipulated the prices paid by the investors that traded on Barclays LX. *IBEW Local 90*, 2013 U.S. Dist. LEXIS 43774, at \*25. Thus, Plaintiffs' allegations establish that Barclays was a primary participant in the scheme to manipulate the trading in its dark pool and deceive investors.

Barclays' further suggestion that it can avoid liability because other securities markets were engaging in similar fraudulent misconduct (Barclays Mem. at 25), such that Plaintiffs would have been similarly defrauded no matter *where* they traded, is similarly misplaced. The fact that other trading venues were involved in similar fraudulent schemes is of no consequence and certainly does not absolve Barclays of liability for its own misconduct. *Cf. Miller v. Asensio & Co.*, 364 F.3d 223, 231-32 (4th Cir. 2004) (collecting cases) (loss causation does not require plaintiff to prove that defendant's conduct was the sole cause of his damage, but only a substantial contributing cause). Regardless of what happened in other trading venues, in Barlcays LX Plaintiffs' losses were harmed by Barclays' fraudulent scheme.

## VIII.   CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request Defendants' motions to dismiss be denied.

DATED: March 24, 2015                    Respectfully submitted,

                                         ROBBINS GELLER RUDMAN & DOWD LLP
                                         ANDREW J. BROWN
                                         DAVID W. MITCHELL
                                         BRIAN O. O'MARA
                                         LONNIE A. BROWNE


                                         s/ ANDREW J. BROWN
                                         ─────────────────────────────
                                         ANDREW J. BROWN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: 619/231-1058
(619/231-7423 (fax)

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN
VINCENT M. SERRA
58 South Service Road, Suite 200
Melville, NY  11747
Telephone: 631/367-7100
631/367-1173 (fax)

ROBBINS GELLER RUDMAN & DOWD LLP
PATRICK J. COUGHLIN
RANDI BANDMAN
30 Vesey Street, Suite 200
New York, NY  10007
Telephone: 212/ 693-1058

MOTLEY RICE LLC
JOSEPH F. RICE
WILLIAM H. NARWOLD
JOSHUA L. LITTLEJOHN
DAVID P. ABEL
CHRISTOPHER F. MORIARTY
MEREDITH MILLER
28 Bridgeside Boulevard
Mount Pleasant, SC  29464
Telephone: 843/216-9000
843/216-9450 (fax)

MOTLEY RICE LLC
DONALD A. MIGLIORI
ALEX R. STRAUS
600 Third Avenue, Suite 2101
New York, NY  10016
Telephone: 212/577-0040
212/577-0054

- 80 -

LABATON SUCHAROW LLP
JOEL H. BERNSTEIN
IRA A. SCHOCHET
BARRY MICHAEL OKUN
140 Broadway
New York, NY  10005
Telephone: 212/907-0700
212/818-0477 (fax)

Co-Lead Counsel for Plaintiffs in *City of
Providence, Rhode Island, et al. v. BATS Global
Markets, Inc., et al.*, No. 1:14-cv-02811-JMF

- 81 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 24, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 24, 2015.

s/ ANDREW J. BROWN
ANDREW J. BROWN

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:       andrewb@rgrdlaw.com

## Mailing Information for a Case 1:14-md-02589-JMF

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Patricia I. Avery**
  pavery@wolfpopper.com

- **Randi Dawn Bandman**
  randib@rgrdlaw.com

- **Alexander E. Barnett**
  abarnett@cpmlegal.com,lconcepcion@cpmlegal.com

- **Joel H. Bernstein**
  jbernstein@labaton.com,ElectronicCaseFiling@labaton.com,lmehringer@labaton.com,smundo@labaton.com,sauer@labaton.com

- **George Anthony Borden**
  gborden@wc.com

- **Francis A Bottini , Jr**
  fbottini@bottinilaw.com

- **Andrew J. Brown**
  andrewb@rgrdlaw.com,nhorstman@rgrdlaw.com,ldeem@rgrdlaw.com

- **Albert Y Chang**
  achang@bottinilaw.com

- **Albert Yong Chang**
  achang@cfsblaw.com,sammirati@bottinilaw.com,ykolesnikov@bottinilaw.com

- **Patrick Joseph Coughlin**
  patc@rgrdlaw.com

- **Douglas Randall Cox**
  dcox@gibsondunn.com,aarias@gibsondunn.com,smartin@gibsondunn.com

- **Steven M.. Farina**
  sfarina@wc.com

- **John Joseph Hughes , III**
  hughesj@sullcrom.com,s&cmanagingclerk@sullcrom.com,john.j.hughes@gmail.com

- **Michael Robert Huston**
  mhuston@gibsondunn.com

- **Fred Taylor Isquith**
  fisquith@lshllp.com

- **Seth L. Levine**
  slevine@levinelee.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,lpvega@pomlaw.com

- **Joshua C. Littlejohn**
  jlittlejohn@motleyrice.com

- **Joseph C. Lombard**
  jlombard@mmlawus.com

- **Felicia Yvonne Mann**
  fmann@labaton.com

- **Francis Paul McConville**
  fmcconville@pomlaw.com

- **Brent James McIntosh**
  McIntoshB@sullcrom.com,s&cmanagingclerk@sullcrom.com

- **David W. Mitchell**
  davidm@rgrdlaw.com,slandry@rgrdlaw.com,michelew@rgrdlaw.com,SJodlowski@rgrdlaw.com

- **Mark Cotton Molumphy**
  mmolumphy@cpmlegal.com,mkeilo@cpmlegal.com,rbarghi@cpmlegal.com,bschnarr@cpmlegal.com,obacigalupi@cpmlegal.com,jacosta@cpmlegal.com

- **James Alwin Murphy**
  jmurphy@mmlawus.com

- **William H. Narwold**
  bnarwold@motleyrice.com,vlepine@motleyrice.com,ajanelle@motleyrice.com

- **Nanci E. Nishimura**
  nnishimura@cpmlegal.com,palmasi@cpmlegal.com,jbloch@cpmlegal.com,iatkinsonyoung@cpmlegal.com

- **Kevin Patrick O'Brien**
  kobrien@cpmlegal.com

- **Barry M. Okun**
  bokun@labaton.com,electroniccasefiling@labaton.com

- **Jessica L. Pahl**
  JLPahl@wc.com

- **Christos Papapetrou**
  cpapapetrou@levinelee.com

- **Adam S Paris**
  parisa@sullcrom.com

- **Lesley Frank Portnoy**
  LPortnoy@glancylaw.com

- **Fei-Lu Qian**
  fqian@wolfpopper.com

- **Andrew Hunter Reynard**
  reynarda@sullcrom.com,s&cmanagingclerk@sullcrom.com

- **Joseph F. Rice**
  jrice@motleyrice.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Joshua Wolf Ruthizer**
  jruthizer@wolfpopper.com,cdunleavy@wolfpopper.com

- **Joshua H Saltzman**
  jsaltzman@wolfpopper.com

- **Ira A. Schochet**
  ischochet@labaton.com,electroniccasefiling@labaton.com

- **Matthew Alexander Schwartz**
  schwartzmatthew@sullcrom.com,s&cmanagingclerk@sullcrom.com

- **Jeffrey T. Scott**
  scottj@sullcrom.com,s&cmanagingclerk@sullcrom.com

- **Theodore R. Snyder**
  Theodore.Snyder@mmlawus.com

- **Victor E. Stewart**
  victornj@ix.netcom.com

- **Elizabeth Tran**
  etran@cpmlegal.com

- **Chet Barry Waldman**
  cwaldman@wolfpopper.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Joseph          Winters Cotchett
Cotchett Pitre and McCarthy
San Francisco Airport Office Center
840 Malcolm Road  Suite 200
Burlingame, CA 94010


Brian           O. O'Mara
Robbins Geller Rudman & Dowd LLP (SANDIEGO)
655 West  Broadway
Suite  1900
San Diego, CA 92101
```

Case 1:14-md-02589-JMF   Document 26   Filed 03/24/15   Page 99 of 99