**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:<br><br>BARCLAYS LIQUIDITY CROSS AND HIGH FREQUENCY TRADING LITIGATION<br><br>*This Document Relates to City of Providence, Rhode Island, et al. v. BATS Global Markets, Inc., et al.*, 1:14-cv-02811-JMF (S.D.N.Y.) (consolidated) | 14-MD-2589 (JMF) |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' RENEWED MOTION TO DISMISS**
**THE SECOND CONSOLIDATED AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

I.    PRELIMINARY STATEMENT ............................................................................. 1

II.   STATEMENT OF FACTS ..................................................................................... 2

    A.    Defendants Cater To HFT Firms For Their Own Profit ............................ 3

    B.    The Second Circuit's Decision ................................................................. 4

III.  ARGUMENT .......................................................................................................... 4

    A.    Plaintiffs Have Standing To Assert Their Exchange Act Claims ............. 4

    B.    The Complaint Adequately Alleges Scienter ........................................... 6

        1.    Defendants Had The "Motive and Opportunity" To Commit The Alleged Scheme ................................................................... 7

        2.    The Complaint Adequately Alleges Scienter Due To Defendants' "Conscious Misbehavior Or Recklessness" ................. 9

    C.    The Complaint Adequately Alleges Reliance ......................................... 11

        1.    The *Affiliated Ute* Presumption Of Reliance Applies ............... 12

        2.    The Complaint Adequately Alleges Reliance On The Integrity Of The Public Securities Markets .............................. 13

    D.    Plaintiffs Adequately Allege Loss Causation ........................................ 14

    E.    Plaintiffs Have Adequately Alleged Article III Standing ...................... 17

    F.    Defendants' Preclusion Argument Fails ................................................. 18

        1.    Defendants' Preclusion Argument Is A Rehash Of Arguments Previously Rejected By The Second Circuit ............... 18

        2.    To The Extent Preclusion Was Not Raised In Defendants' Earlier Motion, The Defense Is Barred .................... 19

        3.    The *Credit Suisse* Preclusion Factors Are Specific To Antitrust Law And Do Not Apply To This Case ....................... 20

        4.    Even If Defendants' Preclusion Defense Is Properly Raised In The Present Motion, Questions Of Fact Remain That Cannot Be Resolved At The Pleading Stage ............................. 22

IV.  CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

*Affiliated Ute Citizens of the State of Utah v. United States*,
  406 U.S. 128 (1972)..................................................................................... 12

*Alzheimer's Ass'n of America, Inc., d/b/a Alzheimer's Foundation v. Alzheimer's Disease
  & Related Disorders Ass'n, Inc.*,
  Civ. No. 10-cv-2214, 2018 WL 2084168 (S.D.N.Y. 2018)...................................... 20

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ...................................................................... passim

*Axcan Scandipharm Inc. v. Ethex Corp.*,
  585 F. Supp. 2d 1067 (D. Minn. 2007)............................................................. 21

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988).................................................................................... 13

*Blue Chip Stamps v. Manor Drug Stores*,
  421 U.S. 723 (1975)...................................................................................... 4

*Church & Dwight Co. Inc. v. SPD Swiss Precision Diagnostics, GmbH*,
  No. 14 CIV. 00585 AJN, 2014 WL 2526965 (S.D.N.Y. June 3, 2014) ................................. 22

*City of Providence, Rhode Island v. Bats Global Markets, Inc.*,
  878 F.3d 36 (2d Cir. 2017) ...................................................................... passim

*Cohen v. UBS Financial Services, Inc.*,
  No. 12 CIV. 2147 BSJ JLC, 2012 WL 6041634 (S.D.N.Y. Dec. 4, 2012) ........................... 21

*Connecticut Office of Protection & Advocacy for Persons With Disabilities v. Hartford
  Board of Education*,
  464 F.3d 229 (2d Cir. 2006). ......................................................................... 23

*Credit Suisse Securities (USA) LLC v. Billing*,
  551 U.S. 264 (2007)........................................................................ 20, 21, 23, 25

*Desiderio v. NASD*,
  191 F.3d 198 (2d Cir. 1999) ......................................................................... 21

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  847 F. Supp. 2d 624 (S.D.N.Y. 2012) .................................................................. 9

*Dura Pharmaceuticals Inc. v. Broudo*,
  544 U.S. 336 (2005).................................................................................... 15

*Electronic Trading Group,, LLC v. Banc of America Securities LLC*,
  588 F.3d 128 (2d Cir. 2009) ......................................................................... 21

*Fezzani v. Bear Stearns & Co.*,
  777 F.3d 566 (2d Cir. 2015) ...................................................................... 13, 14

*Fezzani v. Bear, Stearns & Co.*,
  384 F. Supp. 2d 618 (S.D.N.Y. 2004) .......................................................... 6, 7, 16

*Freudenberg v. E*Trade Financial Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ........................................................ 23

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
    No. 16 CIV. 5263 (AKH), 2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) ............... 18

*Gelboim v. Bank of America Corp.*,
    823 F.3d 759 (2d Cir. 2016) ...................................................................... 17

*Greene v. City of Norwalk*,
    Civ. No. 3:14-cv-01016 (VLB), 2016 WL 829864 (D. Conn. 2016) .................... 19

*Gutierrez-Brizuela v. Lynch*,
    834 F.3d 1142 (10th Cir. 2017) ................................................................. 23

*Harry v. Total Gas & Power North Am.erica, Inc.*,
    889 F.3d 104 (2d Cir. 2018) ...................................................................... 17

*In re Barclays Liquidity Cross & High Frequency Trading Litigation*,
    126 F. Supp. 3d 342 (S.D.N.Y. 2015) .................................................. 13, 14

*In re Blech Securities Litigation*,
    961 F. Supp. 569 (S.D.N.Y. 1997) ....................................................... 6, 13

*In re Citigroup Inc. Securities Litigation*,
    753 F. Supp. 2d 206 (S.D.N.Y. 2010) ........................................................ 15

*In re Initial Public Offering Securities Litigation*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003) ............................................ 10, 12, 16

*In re Initial Public Offering Securities Litigation*,
    297 F. Supp. 2d 668 (S.D.N.Y. 2003) ........................................................ 15

*In re Interest Rate Swaps Antitrust Litigation*,
    261 F. Supp. 3d 430 (S.D.N.Y. 2017) ........................................................ 21

*In re Longtop Financial Technologies Ltd. Securities Litigation*,
    32 F. Supp. 3d 464 (S.D.N.Y. 2014) ........................................................... 7

*In re NYSE Specialists Securities Litigation*,
    405 F. Supp. 2d 281 (S.D.N.Y. 2005) .................................................. 16, 17

*In re NYSE Specialists Securities Litigation*,
    503 F.3d 89 (2d Cir. 2007) ...................................................................... 16

*In re Series 7 Broker Qualification Exam Scoring Litigation*,
    548 F.3d 110 (D.C. Cir. 2008) ................................................................. 21

*Lanier v. BATS Exchange, Inc.*,
    838 F.3d 139 (2d Cir. 2016) ..................................................................... 21

*Litwin v. Blackstone Group, L.P.*,
    634 F.3d 706 (2d Cir. 2011) ..................................................................... 23

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006)..................................................................................... 5

iii

*Novak v. Kasaks,*
   216 F.3d 300 (2d Cir. 2000) ............................................................................. 7

*Ross v. Bank of America, N.A. (USA),*
   524 F.3d 217 (2d Cir. 2008) ........................................................................... 17

*Rothstein v. UBS AG,*
   708 F.3d 82 (2d Cir. 2013) ............................................................................. 18

*Santa Fe Industries v. Green,*
   430 U.S. 462 (1977)....................................................................................... 2, 4

*Securities & Exchange Commission v. Capital Gains Research Bureau, Inc.,*
   375 U.S. 180 (1963)........................................................................................... 5

*Securities & Exchange Commission v. Kern,*
   425 F.3d 143 (2d Cir. 2005) ............................................................................. 7

*Securities & Exchange Commission v. Lek Securities Corp.,*
   276 F. Supp. 3d 49 (S.D.N.Y. 2017) ............................................................... 9

*Securities & Exchange Commission v. U.S. Environmental, Inc.,*
   155 F.3d 107 (2d Cir. 1998) ............................................................................. 9

*Securities & Exchange Commission v. Zandford,*
   535 U.S. 813 (2002)........................................................................................... 5

*Sharette v. Credit Suisse International,*
   127 F. Supp.3d 60 (S.D.N.Y 2015) ....................................................... 6, 8, 15

*Stratte-McClure v. Morgan Stanley,*
   776 F.3d 94 (2d Cir. 2015) ............................................................................... 7

*Superintendent of Insurance v. Bankers Life & Casualty Co.,*
   404 U.S. 6 (1971).............................................................................................. 5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007)..................................................................................... 6, 22

*UBS Auction Rate Securities Litigation,*
   08-cv-2967, 2010 WL 2541166 (S.D.N.Y. June 10, 2010) ....................... 12, 14

## STATUTES

15 U.S.C. §78aa(a) ................................................................................................. 4

15 U.S.C. §78u-4(b)(4) ........................................................................................ 17

## OTHER AUTHORITIES

5C Federal Practice & Procedure Civil §1385 (3d ed.) ...................................... 19

## RULES

Fed. R. Civ. Proc. 12(g)(2) ............................................................................ 19, 20

Lead Plaintiffs City of Providence, Rhode Island, Plumbers and Pipefitters National Pension Fund, Employees' Retirement System of the Government of the Virgin Islands, and State-Boston Retirement System (collectively, "Plaintiffs") respectfully submit this Memorandum of Law in Opposition to Defendants' Renewed Motion to Dismiss the Second Consolidated Amended Complaint (ECF No. 252) (the "Complaint").[1]

## I.    PRELIMINARY STATEMENT

The Complaint alleges that Defendants provided HFT firms with a complex web of products and services, including proprietary data feeds, co-location services, and complex order types, that the HFT firms used in combination to systematically manipulate the public securities markets and take advantage of non-HFT market participants. These products and services, used in concert, allowed HFT firms to divert billions of dollars in trading proceeds from Plaintiffs and the Class. ¶¶13-16.[2]

On December 19, 2017, the Second Circuit reversed this Court's dismissal of Plaintiffs' Section 10(b) and Rule 10b-5 claim against Defendants. In doing so the appellate court concluded that "we have subject matter jurisdiction over this case, the defendant exchanges are not entitled to absolute immunity, and the district court erred in dismissing the complaint under Federal Rule of Civil Procedure 12(b)(6)." *City of Providence, R.I. v. Bats Glob. Mkts., Inc*., 878 F.3d 36, 40 (2d Cir. 2017).

---

[1]    Defendants are BATS Global Markets, Inc., Chicago Stock Exchange, Inc., Direct Edge ECN, LLC, The NASDAQ Stock Market LLC, NASDAQ OMX BX, Inc., New York Stock Exchange, LLC and NYSE Arca, Inc. (collectively, "Defendants").

[2] Herein, "¶__" or "¶¶__" refers to paragraphs of the Complaint, unless otherwise noted. All terms not otherwise defined herein have the same meaning as they have in the Complaint. Unless otherwise noted herein, all emphasis is added.

Importantly, after discussing in detail the allegations of the Complaint that explain how HFT firms used Defendants' products and services in combination, it held that the Complaint "sufficiently pled that the exchanges created a fraudulent scheme that benefited HFT firms and the exchanges, sold the products and services at rates that only the HFT firms could afford, and failed to fully disclose to the investing public how those products and services could be used on their trading platforms." *Id.* at 34. It therefore held that the Complaint "sufficiently alleges conduct that 'can be fairly viewed as manipulative or deceptive within the meaning of the Exchange Act.'" *Id.* at 49 (quoting *Santa Fe Indus. v. Green*, 430 U.S. 462, 474 (1977). In addition, it held Defendants had committed "primary" violations of Section 10(b) and Rule 10b-5. *Id.* at 51-52. In other words, Defendants were not merely aiders and abettors of the HFT firms.

Now before this Court is Defendants' renewed motion for dismissal ("Renewed Motion"). As set forth below, each of Defendants' arguments should be rejected and their Renewed Motion should be denied. The Complaint's detailed allegations demonstrating Defendants' primary liability for market manipulation are overwhelming. The factual bases for these allegations are now common knowledge, and Defendants cannot and do not deny the underlying facts of their market manipulation scheme, or their profiteering from it.

## II.   STATEMENT OF FACTS

This action arises from Defendants' multi-year stock market manipulation scheme.[3] Defendants are the nation's largest stock exchanges, upon which the vast majority of equity trades occur. Contrary to Plaintiffs' reasonable expectations, Defendants created products and services for HFT firms that allowed those firms to obtain and react to market data more quickly, using

---

[3] Plaintiffs incorporate herein the Statement of Facts provided in their Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss, ECF No. 83, including those facts recited in the Second Circuit's opinion.

unexplained and in some cases unknown order types. Using these products and services, HFT firms did what Defendants knew they would do – create the appearance of liquidity with "spam" orders, front-run legitimate orders, queue-jump to take advantage of a profitable trade and/or to steal "market" rebates and cancel out of toxic trades before they occurred, all to the benefit of Defendants and to the detriment of Plaintiffs and the Class.

### A.    Defendants Cater To HFT Firms For Their Own Profit

The Exchanges have changed dramatically in recent years, shifting from non-profit, member-owned entities to for-profit, publicly traded corporations. ¶¶3, 26-33. In connection with this change, Defendants have entered into a Faustian bargain with HFT firms, which provide Defendants with the increased trading volume, or "order flow," that they require to generate higher profits. *See, e.g.*, ¶87 (NASDAQ admitting that "a significant percentage of our revenues is tied directly to the volume of securities traded and cleared on our markets").

This is a relatively new development in the securities market, as HFT firms have grown exponentially since their introduction in 1999. As HFT firms have grown in size, the financial incentives provided by their order flow proved too great for Defendants to resist. In sum, Defendants attracted HFT firms by providing them with special products and services that, in combination, allowed them to position their trades to the detriment of Plaintiffs and the Class. ¶68. In return, Defendants benefitted greatly, collecting large sums in fees from HFT firms for these products and services. ¶¶13, 64-65; *see also* ¶110 (estimating the Defendants' annual revenue from co-location fees at $1.8 billion); ¶90 (noting that NYSE's Information Services and Technology Solutions segment's annual revenues increased by roughly $50 million each year during the Class Period and setting a target of $1 billion in revenues by 2015). In fact, Defendants "now receive most of their revenue from transactions and the sale of market data and related services based on those transactions." ¶64.

### B.     The Second Circuit's Decision

On appeal, the Second Circuit made several key findings. ***First***, it affirmed this Court's finding of subject-matter jurisdiction over Plaintiffs' claims under Section 10(b) and Rule 10b-5. *City of Providence*, 878 F.3d at 45 (citing 15 U.S.C. §78aa(a)). ***Second***, it found that Defendants were not absolutely immune from Plaintiffs' market manipulation claims, because Defendants had engaged in conduct "that is distinct from its oversight role," and had therefore been acting "as a *regulated* entity – not a *regulator*." *Id.* at 48 (emphasis in original). ***Third***, it reversed "dismissal of this action under Rule 12(b)(6) for failure to state a claim," because "[t]he complaint sufficiently alleges conduct that 'can be fairly viewed as manipulative or deceptive within the meaning of the Exchange Act.'" *Id.* at 49 (quoting *Santa Fe*, 430 U.S. at 474). After describing in detail Plaintiffs' allegations of manipulative behavior, the Second Circuit concluded that "plaintiffs have sufficiently pled that the exchanges misled investors by artificially affecting market activity." *Id.* at 51. The Second Circuit specifically noted that Defendants committed "primary" violations of Section 10(b) and Rule 10b-5, and were not merely aiders and abettors of HFT firms. *Id.* at 51-52.

## III.    ARGUMENT

### A.     Plaintiffs Have Standing To Assert Their Exchange Act Claims

Defendants argue that Plaintiffs' claims fail as a matter of law because they lack statutory standing under §10(b) of the Exchange Act and Rule 10b-5. Exch. Mem. at 7-8.[4]  That argument fails.

Under §10(b), a plaintiff must be a purchaser or seller of securities in connection with the fraud. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730-31 (1975). The Supreme

---

[4] Herein, references to "Exch. Mem. __" are to the Memorandum of Law in Support of the Exchanges' Renewed Motion to Dismiss the Second Consolidated Amended Complaint (ECF No. 83).

Court has rejected other narrower interpretations of §10(b), finding that "[s]ince there was a 'sale' of a security and since fraud was used 'in connection with' it, there is redress under §10(b)." *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971). Neither the SEC nor the Supreme Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Exchange Act. *SEC v. Zandford*, 535 U.S. 813, 814 (2002). In fact, in its role enforcing §10(b), the SEC has consistently adopted a broad reading of the phrase "'in connection with the purchase or sale of any security.'" *Id.* at 819. Defendants' narrow interpretation would thwart Congress's intent to hold liable those that engage in this type of fraudulent conduct. *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963) (recognizing that Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed not technically and restrictively, but flexibly to effectuate its remedial purposes).

When it has sought to give meaning to the phrase "'in connection with the purchase or sale of securities'" in the context of §10(b) and Rule 10b-5, the Supreme Court has consistently "espoused a broad interpretation." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 84-85 (2006). The Court rejected a "narrow construction" of the phrase, and held that "[u]nder our precedents, it is enough that the fraud alleged 'coincide' with a securities transaction–whether by the plaintiff or by someone else." *Id.* at 85. Thus, "[t]he requisite showing . . . is 'deception "in connection with the purchase or sale of any security," not deception of an identifiable purchaser or seller.'" *Id.* This broader interpretation of the statutory language also comports with the longstanding views of the SEC. *Id.*

Courts in this district take a similar view when confronted with the "in connection with" phrase from Rule 10b-5. For example, in *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618,

629 (S.D.N.Y. 2004), the plaintiffs alleged that the defendants' acts caused them to believe that the price of the stocks was the result of an orderly market, when, in fact, it was a result of the defendants' fraudulent manipulation. The *Fezzani* court rejected the argument that the plaintiffs lacked standing under §10(b) and, citing the Supreme Court's decision in *Zandford*, held that since the fraud alleged by the plaintiffs coincided with the sale of securities, it fell within §10(b)'s flexible ambit. *Id.* at 638.

Furthermore, because "the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation." *In re Blech Sec. Litig.*, 961 F. Supp. 569, 580 (S.D.N.Y. 1997); *see also Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 83 (S.D.N.Y 2015), ("[I]t is important to note that a manipulation claim need not be pleaded to the same degree of specificity as a misrepresentation claim when relevant information is likely to be solely within the defendant's knowledge."). Accordingly, Plaintiffs' allegations that they purchased securities in connection with the fraud during the Class Period (¶¶21-25) satisfy the statutory standing requirement.

### B.      The Complaint Adequately Alleges Scienter

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). To plead scienter, a complaint must allege a "strong inference of scienter" that is "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. In determining whether a complaint has alleged a strong inference of scienter, a court should not "scrutinize each allegation" separately. *Id.* at 326. Rather, it should "assess all the allegations holistically" and ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.*

6

Additionally, "at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007).  In the end, "the tie . . .goes to the plaintiff." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 464, 473 n.82 (S.D.N.Y. 2014)

As set forth below, the Complaint pleads the requisite strong inference of scienter in two ways: by alleging facts to show (1) "that the defendants had both the motive and opportunity to commit the fraud" and (2) "strong circumstantial evidence of conscious misbehavior or recklessness." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015).

### 1.    Defendants Had The "Motive and Opportunity" To Commit The Alleged Scheme

A complaint successfully pleads scienter under the "motive and opportunity" theory if it alleges facts showing that the defendant "benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks,* 216 F.3d 300, 307-08 (2d Cir. 2000).

Here, the Complaint specifically alleges that Defendants "demanded and received substantial kickback payments in exchange for providing HFT firms access to material trading data via preferred access to exchange floors, and enriched data feeds . . . and designed and implemented hundreds of new complex 'order types' . . . with the knowledge that those same HFT firms would use these order types to detect investors' trading patterns and trade in front of them to their detriment." ¶4; *see also*, ¶¶5-10; 107-17; 118-23; 136-41.  Such allegations are more than sufficient to plead "motive and opportunity." *See S.E.C. v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005) (holding that "motive/opportunity" was adequately pled in a market manipulation case where the defendant was aware of "the potential for their own individual profit" from the alleged scheme); *see also Fezzani*, 384 F. Supp. 2d at 644-45 (holding that "motive and opportunity" was adequately

pled against certain defendants in a market manipulation case where those defendants had agreed to "split the proceeds" from the alleged scheme).

For example, in *Sharette v. Credit Suisse International*, the court held that the complaint pleads "motive and opportunity" where it alleged that the defendants employed the alleged scheme to "strengthen [their] brand name in the lucrative hedge fund brokerage fee market." 127 F. Supp. 3d 95. The court rejected the defendants' argument that the complaint's scienter allegations were insufficient because they merely concerned the "desire to make money off of services offered to clients," reasoning:

> Plaintiffs have not alleged merely that the purported scheme allowed the Credit Suisse Defendants to make a profit from the transaction at issue, or to keep receiving fees. Rather, the CACAC alleges motives that encompass larger and longer-term financial ends. Fairly read, the CACAC strongly suggests that, through the fraud alleged therein, ***the Credit Suisse Defendants were able to improve their ability to access a specific and extremely profitable market, potentially worth billions of dollars***.

*Id.* at 96.

Similarly, here, the Second Circuit has already held that Plaintiffs "sufficiently plead that [Defendants] committed manipulative acts and participated in a fraudulent scheme in violation of the Exchange Act and Rule 10b-5" as "primary violators," stating:

> [Plaintiffs] have sufficiently pled that the exchanges created a fraudulent scheme that benefited HFT firms and the exchanges, sold the products and services at rates that only the HFT firms could afford, and failed to fully disclose to the investing public how those products and services could be used on their trading platforms. They allege that, in doing so, ***the exchanges used the HFT firms to generate hundreds of millions of dollars in fees and established a system that, unbeknownst to the plaintiffs, catered to the HFT firms at the expense of individual and institutional traders***.

*City of Providence*, 878 F.3d at 52.[5]

---

5   Defendants argue that the Complaint fails to plead "the falsity of an alleged misstatement." Exch. Mem. at 14. This argument misses the point. The Complaint alleges *market manipulation* claims under Rules 10b-5 (a) and (c), not claims based on any alleged misstatements. Nevertheless,

In other words, the Complaint adequately pleads scienter based on its allegations concerning Defendants' motive and the opportunity to commit the alleged scheme.

### 2. The Complaint Adequately Alleges Scienter Due To Defendants' "Conscious Misbehavior Or Recklessness"

Scienter is also adequately pled where, as here, a complaint's allegations "*collectively* supply sufficient circumstantial evidence from which the Court could reasonably infer Defendants' recklessness." *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 643-44 (S.D.N.Y. 2012) (emphasis in original) (holding in a market manipulation case that, even in the absence of a "smoking gun," scienter was adequately alleged).

In market manipulation cases, scienter is adequately pled where a complaint alleges a strong inference that a defendant knowingly or recklessly participated in manipulative conduct, "even if [he] did not share [another participant's] specific overall purpose to manipulate the market." *SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 108, 112 (2d Cir. 1998) (holding that scienter was adequately pled) ("[A]s long as Romano, with scienter, effected the manipulative buy and sell orders, Romano's personal motivation for manipulating the market is irrelevant in determining whether he violated §10(b). Even if Romano were motivated by a desire to obtain compensation rather than by a desire to change USE's market price, as D'Onofrio was, Romano is liable under §10(b) if, with scienter, he effected the manipulative trades."); *see also SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 60 (S.D.N.Y. 2017) (holding that scienter was adequately pled in a market manipulation case where the defendant acted with "knowledge of [an HFT firm's] manipulative activity and substantial assistance").

---

as the Second Circuit recognized, Plaintiffs have alleged and it is relevant that Defendants "misrepresented and omitted critical information about products and services they were providing and had purposefully created a 'two-tiered market' in which plaintiffs were 'at an informational disadvantage.'" *City of Providence*, 878 F.3d at 51.

Here, based on the Complaint's allegations, the Court could reasonably infer that Defendants knew, or were at least reckless in not knowing, that they "catered to the HFT firms at the expense of individual and institutional traders." *City of Providence*, 878 F.3d at 52. Defendants cannot argue that the scheme was anything but intentional. *See In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 385 (S.D.N.Y. 2003) (holding in a market manipulation case that the defendants could not argue the alleged misconduct was not intentional because it was based on improper "Tie-in Agreements" that "do not happen accidently, negligently, or even recklessly").

As the Complaint alleges, Defendants knew that catering to HFT firms with complex (and oftentimes selectively or incompletely disclosed) order types would result in increased trading volume and increased transaction fees. *See, e.g.*, ¶139 ("'We're always competing for market share, so we try to create products that will attract more volume.'"); *id.* ("'[Defendants] are losing out to dark pools, so when HFTs ask for a new order type, they get a new order type.'"); ¶149 ("[I]nferior queue positioning can cost investors 1.7 cents per share, resulting "in tens of millions of dollars (conservatively) of extra trading costs for investors (and profits for HFTs).").

The Complaint's allegations concerning Defendants' active concealment of the alleged scheme further strengthen the inference of scienter. *See id.* at 361 ("The rule – of logic as much as of law – is that whenever a defendant engages in clearly manipulative practices, and then conceals those practices by making misstatements, the concealment is presumptively done with the intent to defraud."). Here, the Complaint alleges that Defendants knew the "guaranteed economics" provided to HFT firms by such order types would come at the expense of Plaintiffs and the Class, ¶¶138-41, 149, yet Defendants actively concealed the functionality (and sometimes even the existence) of their complex order types and how these order types were used in conjunction with co-location services and proprietary date feeds to disadvantage the investing public. *See* ¶¶137-38,

140-50, 145-46 (alleging active concealment of complex order types, and the way those products "are used by HFT firms *in combination with* co-location services and/or enhanced data feeds" to commit the alleged market manipulation scheme); *see also* ¶¶116-17 (alleging active concealment of co-location services, their nature, and the manner in which they are used by HFT firms "to achieve virtually risk-free arbitrage opportunities").

Thus, the Complaint adequately pleads a strong inference of scienter based on its allegations that, collectively, supply ample circumstantial evidence of Defendants' conscious misbehavior or recklessness.[6]

### C.    The Complaint Adequately Alleges Reliance

Plaintiffs expected fair treatment from Defendants, not market manipulation; they did not expect informational asymmetries and complex order types to expose them to predatory tactics by HFT firms. ¶¶7-8, 16, 78-83, 85 (NASDAQ's statements reassuring investors); ¶89 (NYSE); ¶93 (BATS); ¶97 (Direct Edge); ¶100 (CHX). Plaintiffs' justifiable reliance was misplaced.

The Complaint adequately alleges reliance because: (i) the *Affiliated Ute* presumption of reliance applies here; and (ii) the Complaint adequately pleads reliance on the integrity of the public securities markets.

---

[6]    Moreover, Plaintiffs' inference of scienter is at least as compelling as any competing inference. Defendants argue that they could not have acted with scienter because they "publicly disclosed the existence" of the "products and services" at issue. Exch. Mem. at 13. This argument ignores Plaintiffs' well-pled facts.  Defendants failed to disclose the existence of certain of their products and services, or at least fully disclose the existence and functionality of their products and services. Defendants "failed to fully disclose to the investing public *how* those products and services could be used on their trading platforms." *City of Providence*, 878 F.3d at 52 (emphasis added); *see also id.* at *50 ("[Plaintiffs] assert that the exchanges did not publicly disclose the full range or cumulative effect that such services would have on the market, the trading public, or the prices of securities.").

### 1. The *Affiliated Ute* Presumption Of Reliance Applies

In *Affiliated Ute v. United States*, the U.S. Supreme Court held that in cases

> involving primarily a failure to disclose, positive proof of reliance is not a
> prerequisite to recovery. All that is necessary is that the facts withheld be material
> in the sense that a reasonable investor might have considered them important in the
> making of this decision. Th[e] obligation to disclose and th[e] withholding of a
> material fact establish the requisite element of [reliance].

406 U.S. 128, 153-54 (1972) (internal citations omitted).

Courts have held that the *Affiliated Ute* presumption is also applicable in market manipulation cases, reasoning that any failure to fully disclose market manipulation is "intrinsically misleading" and "(presuming the illegality is also material) is always violative" of Rule 10b-5. *In re IPO*, 241 F. Supp. 2d at 382; *see also UBS Auction Rate Sec. Litig*, 08-cv-2967, 2010 WL 2541166, at \*26-27 (S.D.N.Y. June 10, 2010) (applying the *Affiliated Ute* presumption in a market manipulation case).

Defendants argue that the *Affiliated Ute* presumption does not apply here because they "owed no fiduciary duties to investors." *See* Exch. Mem. at 9.  However, that argument fails because, "[w]here a defendant has engaged in conduct that amounts to 'market manipulation' under Rule 10b-5 (a) or (c), that misconduct creates an independent duty to disclose." *In re IPO*, 241 F. Supp. 2d at 381-82 (reasoning that "[t]his is so because participants in the securities markets are entitled to presume that all of the actors are behaving legally"); *see also ATSI*, 493 F.3d at 101 ("market manipulation is forbidden regardless of whether there is a fiduciary relationship between the transaction participants.").

Here, the Second Circuit has already determined that the Complaint adequately alleges that Defendants "failed to fully disclose to the investing public how [Defendants'] products and services could be used [to commit market manipulation] on their trading platforms." *City of Providence*, 878 F.3d at 52.

Thus, the *Affiliated Ute* presumption of reliance applies here.[7]

### 2. The Complaint Adequately Alleges Reliance On The Integrity Of The Public Securities Markets

The Supreme Court has reasoned that "it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity," and that the Exchange Act was enacted "to facilitate an investor's reliance on the integrity of [the public securities] markets." *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988). After all, "[w]ho would knowingly roll the dice in a crooked crap game?" *Id.* at 247.

Accordingly, the Second Circuit has held that, in a market manipulation case, a plaintiff may plead reliance by alleging that his injury was "caused by reliance on an assumption of an efficient market free of manipulation." *ATSI*, 493 F.3d at 101 (2d Cir. 2007); *see also In re Blech Sec. Litig.*, 961 F. Supp. 569, 582 (S.D.N.Y. 1997) (holding in a market manipulation case that the plaintiff had adequately alleged "reliance on the integrity of the market").

Defendants cite *Fezzani v. Bear Stearns & Co.*, 777 F.3d 566, 572 (2d Cir. 2015), for the proposition that the Second Circuit has "rejected" the theory of reliance on the integrity of the public securities markets. Exch. Mem. at 10. If relevant here at all, *Fezzani* supports Plaintiffs' theory of reliance. The *Fezzani* panel reasoned that, "in a manipulation claim, a showing of reliance

---

[7]   This Court previously declined to apply the *Affiliated Ute* presumption against Barclays for two primary reasons: (i) Plaintiffs "fail[ed] to adequately plead that Barclays committed any manipulative acts" and (ii) Plaintiffs' claims against Barclays were "based primarily, if not entirely, on Barclays' alleged misrepresentations, with any omissions playing only a minor role." *See In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 126 F. Supp. 3d 342, 364-65 (S.D.N.Y. 2015). With regard to the Exchanges, however, the Second Circuit has already held that Plaintiffs adequately alleged market manipulation, and Plaintiffs' claims against Defendants are not based on misrepresentations. *See City of Providence*, 878 F.3d at 52. Defendants' invocation of the "law of the case" doctrine (Exch. Mem. at 10-11) thus should be rejected. Indeed, the Second Circuit remanded this case specifically because this Court did ***not*** reach the issue of reliance. *City of Providence*, 878 F.3d at 52 (directing this Court to address several issues, including reliance, that had not been decided "in the first instance").

may be based on market activity intended to mislead investors by sending a false pricing signal to the market, upon which victims of the manipulation rely." *Fezzani*, 777 F.3d at 571-72, citing *ATSI*, 493 F.3d at 100.  Here, the Complaint alleges that Defendants created precisely the type of "false pricing signal" that the *Fezzani* panel reasoned would be sufficient to show reliance. Specifically, the Complaint alleges that Defendants "knowingly created a false appearance of market liquidity that, unbeknownst to plaintiffs, resulted in their bids and orders not being filled at the best available prices." *City of Providence*, 878 F.3d at 49; *see also, e.g.*, ¶251 (alleging how HFTs used Defendants' products and services to make "non-bona fide orders to send false signals regarding the actual demand for such securities"); ¶15 (alleging how techniques such as "spoofing" distorted the pricing of orders).[8]

Thus, the Complaint adequately alleges reliance on the integrity of the public securities markets. *See* ¶16 (citing *Basic* and alleging that Defendants' misconduct deprived Plaintiffs of the very "market integrity" the Supreme Court acknowledges all "'buyer[s] [and] seller[s] . . . rely on'"); *see also* ¶301 (alleging that "Plaintiffs and members of the Class that traded during the Class Period relied on the integrity of the market in the securities listed and traded on the public exchanges").

### D.    Plaintiffs Adequately Allege Loss Causation

A valid securities-fraud claim requires that defendants' "misrepresentation[s] (or other fraudulent conduct) proximately caused the plaintiff[s'] economic loss." *Dura Pharm., Inc. v.*

---

[8]    This should assuage the concern previously expressed by the Court that the theory of reliance on the integrity of the public markets would "all but eliminate the reliance requirement" in market manipulation cases. *High Frequency Trading*, 126 F. Supp. 3d at 366 (S.D.N.Y. 2015). Plaintiffs also note that the authority previously cited by the Court held that the *Affiliated Ute* presumption applied in a market manipulation case. *See id.* (citing *In re UBS*, 2010 WL 2541166, at *26-27); *see also supra* Section III.C.1.

14

*Broudo*, 544 U.S. 336, 346 (2005). Notably, while Plaintiffs eventually must sort out the "tangle of factors" affecting proof of loss causation, *id.* at 343, at the pleading stage plaintiffs need only provide defendants "with notice of what the relevant economic loss might be or of what the causal connection might be between" their loss and the alleged misconduct. *Id.* at 347. The Supreme Court observed that this is not a difficult exercise: plaintiffs must allege "some indication of the loss and the causal connection that the plaintiff has in mind." *Id.*; *see also Sharette*, 127 F. Supp. 3d at 102-03 ("Loss causation need not be pled with particularity. A short and plain statement in accordance with Rule 8 of the Federal Rules of Civil Procedure is sufficient.") (citing *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 234 (S.D.N.Y. 2010).

In a market manipulation case, where the details of the "mechanism" of the manipulation are not fully disclosed to the public, "it should be sufficient to *allege*" that Plaintiffs suffered "a loss that stems from defendant's manipulative conduct, even if the plaintiff is not precisely sure how the manipulative conduct caused the loss" because "[t]he particulars may then be obtained in discovery" and issues of proof can be resolved at summary judgment and trial. *In re Initial Public Offering Sec. Litig.*, 297 F. Supp. 2d 668, 674 n.31 (S.D.N.Y. 2003) (emphasis in original)).

That loss and causal connection is more than sufficiently pled here. Plaintiffs allege that, through their manipulative scheme, Defendants created a rigged marketplace where innocent investors purchased and/or sold securities at prices that were not as favorable as those they would have paid in the absence of the fraud. *See, e.g.*, ¶108 ("[B]y such conduct [that is, their manipulative scheme], [Defendants] have diverted billions of dollars annually away from non-HFT market participants such as Plaintiffs and the Class and into the hands of the [Defendants] and their preferred HFT customers."); ¶251 (investors were deceived into buying/selling stocks from/to HFT firms at artificially high/low prices); ¶¶237-38 (investors were damaged via

15

"electronic front running, latency arbitrage, spoofing, and layering"); ¶299 (investors "purchased

and/or sold shares at artificially distorted and manipulated prices" during the Class Period).

Defendants try to restyle their prior argument "that something more is needed," but this is

not the law. Manipulative scheme cases are simply different from run-of-the-mill securities fraud

cases; Plaintiffs do not need to allege the specifics of what price they paid for what security on

what exchange and at what time. *See ATSI*, 493 F.3d at 102 (market manipulation complaint must

plead "'what effect the scheme had on the market for the securities at issue'"); *see also In re NYSE

Specialists Sec. Litig.*, 405 F. Supp. 2d 281, 315-16 (S.D.N.Y. 2005) (distinguishing the "typical"

case, and accepting plaintiffs' allegation that it was the "specialists' manipulative conduct at the

time of the transaction that caused their losses") (footnote omitted), *aff'd in part and vacated in

part*, 503 F.3d 89 (2d Cir. 2007); *In re IPO*, 241 F. Supp. 2d at 374 n.137 ("So long as Plaintiffs

allege a coherent scheme to defraud that accounts directly for their losses, loss causation has been

adequately pled.").

This is especially true here given the nature of the manipulative scheme – a systematic

attempt on the part of public stock exchanges to stack the deck in favor of their preferred trading

clients, to the substantial detriment of Plaintiffs and the investing public. Plaintiffs specify – in

sworn certifications – that they conducted millions (and in some cases, billions) of dollars in trades

on the affected exchanges at relevant times. At this stage, this "is sufficient to allege that Plaintiffs

participated in transactions in which they paid disadvantageous prices as a result of the

[Defendants'] manipulative conduct." *See NYSE Specialists*, 405 F. Supp. 2d at 315.[9]

---

[9]    Defendants miss the point when they highlight language from cases concerning *specific*
securities. *See* Exch. Mem. at 12 n.6. Unlike in the cases cited by Defendants, here, Plaintiffs allege
a **stock exchange-level** manipulative scheme (i.e., one that could conceivably be applicable to all
of the securities traded on Defendants' respective exchanges, not a scheme concerning any one or
two securities specifically). *Cf. Fezzani*, 384 F. Supp. 2d at 642-43 (concerning "fraudulent acts

### E.     Plaintiffs Have Adequately Alleged Article III Standing

Defendants also attempt to bootstrap a new issue, "Article III standing," to the issue of loss causation by claiming that because Plaintiffs did not allege loss causation with sufficient specificity they, in turn, have not alleged an injury traceable to a Defendants' challenged action. Exch. Mem. at 6.  While this issue was not raised in Defendants' earlier motion and therefore should not be raised now (*see infra* Section III.F.2), Plaintiffs submit that the Complaint easily alleges an injury sufficient to satisfy Article III's standing requirements. As the Second Circuit repeatedly has explained, it is a low threshold to plead injury-in-fact, and one will only be unsuccessful if the "allegation of injury is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 110 (2d Cir. 2018) (internal citations omitted); *see also Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) ("Injury in fact is a low threshold"). Even if the alleged manipulation is not "plausible," if it is "within the realm of possibility . . . that is enough" for standing purposes. *Harry*, 889 F.3d at 111.

Here, Plaintiffs specifically allege that the Defendants' manipulative conduct resulted in artificially distorted prices for the stocks on their trading venues and Plaintiffs and the Class ultimately bore the effect of this scheme (in the form of artificially high/low prices for the stocks they bought/sold). ¶¶2; 7-8; 16; 21-25; 237-51; 296-302. This is sufficient. *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770 (2d Cir. 2016) ("[T]he harm component of constitutional standing

---

specifically with regard to Jockey Club and PaperClip securities"); *ATSI*, 493 F. 3d at 93 (concerning plaintiff ATSI's securities specifically); *NYSE Specialists*, 405 F. Supp. 2d at 315 (focusing on "the 42 stocks identified in the Settlement Orders []"). Defendants' argument that Plaintiffs must plead loss causation on a defendant-by-defendant basis fares no better. *See* Exch. Mem. at 12 (citing 15 U.S.C. §78u-4(b)(4)). There is simply no requirement that Plaintiffs plead loss causation with this level of specificity in a market manipulation case like the one here. Defendants citation to the PSLRA does not change the analysis.

is . . . easily satisfied by [plaintiffs'] pleading that they were harmed by receiving lower returns on

LIBOR-denominated instruments as a result of defendants' manipulation of LIBOR."); *see also*

*Rothstein v. UBS AG*, 708 F.3d 82, 91-92 (2d Cir. 2013) (plaintiff has only a "relatively modest"

burden to show traceably injury, and "harms that flow indirectly from the action in question" will

confer standing on a plaintiff).[10]  Thus, the Complaint sufficiently alleges Article III standing.

### F.    Defendants' Preclusion Argument Fails

#### 1.   Defendants' Preclusion Argument Is A Rehash Of Arguments Previously Rejected By The Second Circuit

As an initial matter, Defendants recast an argument advanced in their original motion to

dismiss, ECF No. 245, under a different framework – but the heart of the argument is effectively

the same argument made in their earlier motion. Once again, Defendants assert in their renewed

motion to dismiss that private lawsuits challenging the conduct at issue here would conflict with

Congress's intent that the SEC make the rules regarding the national markets. Exch. Mem. 15. The

Second Circuit, however, already addressed this contention, agreeing "that [Plaintiffs'] claims are

not a challenge to the SEC's general authority or an attack on the structure of the national securities

market. Instead, they are properly characterized as allegations of securities fraud against the

exchanges that belong to that ordinary set of suits in equity . . ." *City of Providence*, 878 F.3d at

45 (internal citations omitted). In other words, Plaintiffs' allegations ***do not conflict with*** the

---

[10] Defendants suggest that Plaintiffs might have "even benefited from the alleged manipulation," Exch. Mem. at 6. But Plaintiffs have adequately alleged that they were ***harmed*** by the manipulative scheme. *See* ¶¶2; 7-8; 16; 21-25; 237-51; 296-302. What's more, the mere ***possibility*** of a benefit alleged by Defendants is not sufficient to negate Article III standing. *See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 CIV. 5263 (AKH), 2017 WL 3600425, at *9 (S.D.N.Y. Aug. 18, 2017) (standing adequately alleged even where "defendants' alleged manipulation, at different times, may have both hurt and helped plaintiffs' trading positions, depending on the day or trade"). At best, Defendants have identified a factual dispute that cannot be decided at this stage in the proceedings.

"SEC's general authority" or the "structure of the national securities market;" rather, this is precisely the kind of private lawsuit that Section 10 of the Exchange Act grants to private plaintiffs to pursue as an "essential supplement" to SEC regulation. *Id.* at 45.

Defendants also appear to exhume their recently-deceased immunity defense, by arguing that the "comprehensive structure set up by Congress . . . illustrates Congress's desire to protect SROs from liability," and that "[d]isseminating market data is a critical regulatory function within the Exchanges' Exchange Act responsibilities." Exch. Mem. at 23-25. But "the plaintiffs' claims do not involve any exchange conduct that we could properly characterize as regulatory," and therefore the conduct at issue "does not implicate the SROs' need for immunity." *City of Providence*, 878 F.3d at 47. Thus, the authority Defendants cite for the proposition that courts have "implied immunity" to "federal agencies entrusted with regulation in the public interest" is irrelevant. Exch. Mem. at 23.

### 2. To The Extent Preclusion Was Not Raised In Defendants' Earlier Motion, The Defense Is Barred

Defendants' preclusion defense also is barred at this stage in the proceedings. As Federal Rule of Civil Procedure 12(g)(2) makes clear, absent exceptions not present here, "a party that makes a motion under [Rule 12] must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." *Id.* In other words, a party is foreclosed under Rule 12(g)(2) from making successive, pre-answer 12(b) motions that include new defenses. *Greene v. City of Norwalk*, Civ. No. 3:14-cv-01016 (VLB), 2016 WL 829864 at *3 (D. Conn. 2016), *citing* 5C Fed. Prac. & Proc. Civ. §1385 (3d ed.) ("The Federal

Rules of Civil Procedure 'contemplate a single pre-answer motion in which the defendant asserts all the Rule 12 defenses and objections that are then available to him or her.'").[11]

### 3. The *Credit Suisse* Preclusion Factors Are Specific To Antitrust Law And Do Not Apply To This Case

Should this Court decide to consider it, Defendants' preclusion argument is based on the faulty premise that the four-factor framework set forth in *Credit Suisse Securities (USA) LLC v. Billing*, 551 U.S. 264 (2007), sometimes referred to as the "*Billing* test," applies to these facts. It does not.

In *Credit Suisse*, investor plaintiffs sued certain underwriting firms, alleging that they violated antitrust laws by entering into illegal contracts with purchasers of securities distributed in IPOs. *Credit Suisse*, 551 U.S. at 264. The Supreme Court identified four factors as considerations that bear upon whether "the securities laws are 'clearly incompatible' with the application of the *antitrust laws*." *Id.* at 285. In deciding that the plaintiffs' antitrust claims were precluded by securities laws, the Supreme Court recognized that "investors harmed by underwriters' unlawful practices may bring lawsuits and obtain damages under the securities law" – an option not available to Plaintiffs should this Court accept Defendants' preclusion arguments. *Id.* at 283. The Supreme Court's decision also was based on other factors not relevant here, including the threat that antitrust lawsuits could alter underwriter conduct and the risk that future plaintiffs could use antitrust lawsuits to circumvent the more stringent procedural requirements required in securities lawsuits. *Id.* at 283-84.

---

[11] *See also Alzheimer's Ass'n of Am., Inc., d/b/a Alzheimer's Found. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, Civ. No. 10-cv-2214, 2018 WL 2084168 at *3 (S.D.N.Y. 2018) ("Rule 12(g)(2) requires a party to consolidate all of its available Rule 12 defenses into a single motion."); Advisory Committee's 1966 Notes to Fed. Rule Civ. Proc. 12 (noting that the rule was designed to prevent piecemeal litigation); Fed. R. Civ. P. 12(g)(2) (defense must have been unavailable at the time the earlier motion was filed).

Notably, Defendants' recitation of the *Credit Suisse* factors, Exch. Mem. at 16, omits a critical piece – the full text of the third prong calls for an analysis of whether "a resulting risk that the securities **and antitrust laws, if both applicable**, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct." *Id.* at 264. Naturally, courts applying the *Credit Suisse* factors have done so in the context of antitrust laws and immunity. *See, e.g.*, *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 495 (S.D.N.Y. 2017) ("[T]he *Billing* test . . . is reserved for cases '[w]here regulatory statutes are *silent with respect to antitrust*.'") (emphasis in original); *Elec. Trading Grp., LLC v. Banc of Am. Sec. LLC*, 588 F.3d 128, 133 (2d Cir. 2009) ("The Court articulated four considerations that bear upon whether 'the securities laws are "clearly incompatible" with the application of the antitrust laws' in a particular context."); *see also Cohen v. UBS Fin. Servs., Inc.*, No. 12 CIV. 2147 BSJ JLC, 2012 WL 6041634, at *3 (S.D.N.Y. Dec. 4, 2012) ("*Billing* dealt with the specific impact of the federal securities regulations on antitrust laws, and its holding cannot be broadly construed as advocated for by Plaintiffs."); *Axcan Scandipharm Inc. v. Ethex Corp.*, 585 F. Supp. 2d 1067, 1077 (D. Minn. 2007) (denying application of *Credit Suisse* to claims involving the Lanham Act and the FDA).

Defendants offer no authority indicating that the *Credit Suisse* antitrust preclusion analysis applies in this context. Indeed, they fail to cite a single case in which a plaintiff's Exchange Act claim was precluded by the Act's own regulatory structure. *See* Exch. Mem. at 15.[12] That is not surprising, because it is fundamental to the structure of the Exchange Act that private plaintiffs be

---

[12] Defendants argue that it is "routine" for courts to "dismiss private challenges to actions within the SEC's regulatory authority at the motion-to-dismiss stage." Exch. Mem. at 16. However, the cases Defendants cite for this proposition are all *state law* pre-emption cases, not preclusion cases. *See id.* (citing *Lanier v. BATS Exch., Inc.*, 838 F.3d 139, 156 (2d Cir. 2016) (state law breach of contract claims pre-empted by federal law); *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 116 (D.C. Cir. 2008) (same); *Desiderio v. NASD*, 191 F.3d 198, 201, 208 (2d Cir. 1999) (mandatory arbitration provision in employment dispute)).

permitted – even encouraged – to pursue private rights of action as "private attorneys general." *See* "The Sec At 60" Remarks By Chairman Arthur Levitt United States Securities And Exchange Commission National Legal Center For The Public Interest General Counsel Briefing Washington, D.C., 1995 WL 320419, at *4 (quoting former SEC Chairman Arthur Levitt as stating that "private rights of action are not only fundamental to the success of our securities markets, they are an essential complement to the SEC's own enforcement program."); *see also Tellabs*, 551 U.S. at 313 (reasoning that "meritorious private actions to enforce federal antifraud securities laws are an essential supplement to . . . civil enforcement actions").

### 4.   Even If Defendants' Preclusion Defense Is Properly Raised In The Present Motion, Questions Of Fact Remain That Cannot Be Resolved At The Pleading Stage

The preclusion doctrine "is not subject to a 'bright-line' rule of decision" and courts are "wary of applying this approach too broadly." *Church & Dwight Co. Inc. v. SPD Swiss Precision Diagnostics, GmbH*, No. 14 CIV. 00585 AJN, 2014 WL 2526965, at *7-8 (S.D.N.Y. June 3, 2014) (discussing Lantham Act claims and FDCA preclusion). To the extent that the preclusion defense presented here is a unique argument properly raised in this motion (Plaintiffs contend it is not), it is still not ripe for decision as there are questions of fact that remain. The Second Circuit recognized that it "cannot make [a] determination [on a preclusion argument] ***based on the pleadings***." *City of Providence*, 878 F.3d at 50 n.5. Similarly, in the *amicus* brief that the SEC submitted to the Second Circuit, the Agency stated, "Whether and to what extent principles of preclusion would protect the defendants from liability has not been briefed by the parties, and ***is unclear on the limited record*** at this stage in the proceedings." SEC Br. at 35, ECF No. 141.[13]

---

[13]   Defendants misleadingly argue that the "SEC's views support preclusion here." Exch. Mem. at 25. However, the SEC explicitly stated, "While the Commission believes that the SRO activities in this case should be subject to a preclusion analysis, ***it takes no position*** on the outcome of such an analysis here." SEC Br. at 34. Even assuming *arguendo* that the SEC took a position on the

As discussed above, the *Credit Suisse* factors are not applicable. But even if this Court were to view *Credit Suisse* as instructive, its holding is still inapposite. The first factor is "the existence of regulatory authority under the securities law to supervise the activities in question." *Credit Suisse*, 551 U.S. at 275. Although Plaintiffs understand and appreciate the general authority the SEC possesses over the Exchanges, their claims fall outside that. The Second Circuit is in accord. *City of Providence*, 878 F.3d at 47 ("[P]laintiffs' claims do not involve any exchange conduct that we could properly characterize as regulatory.").

The second *Credit Suisse* factor cannot be adjudicated at this stage because it requires "***evidence*** that the responsible regulatory entities exercise that authority." *Credit Suisse*, 551 U.S. at 295; *see also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 179 (S.D.N.Y. 2010) ("[a] plaintiff is not required to plead evidence"). The Second Circuit confirmed the existence of a fact question:

> But here ***there is a contested question of fact*** as to the extent and accuracy of the disclosure [of complex order types]. We must, at this stage, accept as true the factual allegations in the complaint and draw all reasonable inferences in favor of plaintiffs, including that the exchanges failed to disclose or omitted material facts to the investing public concerning these products and services. *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 711 n.5 (2d Cir. 2011).

*City of Providence*, 878 F.3d at 50. There is also a question of fact as to whether the Defendants have disclosed, and the SEC exercised the authority to regulate, the full functionality of the

---

merits of the preclusion issue, the Agency's opinion would not be entitled to *Chevron* deference because such deference is not appropriate "[w]here . . . an agency advances a statutory interpretation in an amicus brief that has not been articulated before in a rule or regulation . . . ." *Conn. Office of Prot. & Advocacy for Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 239-40 (2d Cir. 2006) . And even if the Court is inclined to apply *Chevron* deference to the SEC's position, it should be mindful that *Chevron* deference does not require "abdication of the judicial duty," because "Congress vested the courts with the power to 'interpret . . . statutory provisions' and overturn agency action inconsistent with those interpretations." *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1151 (10th Cir. 2017) (Gorsuch, J.) (quoting the Administrative Procedure Act).

proprietary data feeds, co-location services, and complex order types. *See id.* at 50 (plaintiffs "assert that the exchanges did not publicly disclose the full range or cumulative effect that such services would have on the market, the trading public, or the prices of securities."). Further, there is a question of fact as to whether the services and products at issue in this case, when used in concert, have been found to be "'fair,' 'reasonable,' 'equitable,' 'just,' and in 'the public interest'" by the SEC. *See* Exch. Mem. at 22. These questions of fact preclude dismissal at this stage in the proceedings.

The third *Credit Suisse* factor – "a resulting risk that the securities and antitrust laws, if both applicable, would produce conflicting guidance, requirements, duties, privileges, or standards of conduct" – does not apply because (1) there are no antitrust claims and (2) there is no "actual conflict" between the SEC's regulations and Plaintiffs' claims. *See* Exch. Mem. at 19. Once again, "the exchanges mischaracterize the plaintiffs' allegations." *City of Providence*, 878 F.3d at 45. The Second Circuit found that there was no conflict between the SEC regulations and Plaintiffs' claims because "[t]he plaintiffs do not challenge the SEC's authority or decision to generally approve these products or services as inconsistent with the Exchange Act or Regulation NMS." *Id.* at 45. Plaintiffs instead claim that the Exchanges engaged in fraudulent, manipulative conduct, including "fail[ing] to disclose the full capabilities of these products and services to the investing public." *Id.*

Defendants argue that a rule permitting recovery under "Plaintiffs' securities-fraud theory would allow litigants to define by lawsuit ***the regulatory duties*** of a self-regulatory organization, a result which cannot co-exist with the Congressional scheme of delegated authority under the Exchange Act.'" Exch. Mem. at 23. But the Second Circuit already rejected this point, finding that "plaintiffs' claims do not involve any exchange conduct that we could properly characterize as

*regulatory*." *City of Providence*, 878 F.3d at 47. At the very least, there is a question of fact as to whether an actual conflict exists.

The fourth *Credit Suisse* factor is "the possible conflict affected practices that lie squarely within an area of financial market activity that the securities law[s] seek [] to regulate." *Credit Suisse*, 551 U.S. at 276.  It is impossible to apply this factor here since it questions whether *antitrust* conduct falls "within the heartland" of federal securities regulation so as to preclude antitrust claims – an issue not present here. Moreover, this factor, even as mischaracterized by Defendants (Exch. Mem. at 24), still does not favor preclusion. Defendants argue that "[d]isseminating market data is a critical regulatory function within the Exchanges' Exchange Act responsibilities." *Id*. Yet, the Second Circuit acknowledged this very point, stating "[w]e agree . . . that disseminating market data is a critical function . . . *but* the provision of co-location services and proprietary data fees *does not* relate to the exchanges' regulatory function." *City of Providence*, 878 F.3d at 47.

Hence, *Credit Suisse* is inapplicable here, and Plaintiffs are *not* precluded from bringing their Exchange Act claims.

## IV.    CONCLUSION

Based on the foregoing, Plaintiffs submit that the Court should reject Defendants' arguments and deny their Renewed Motion.

June 15, 2018

Respectfully submitted,


BY:    */s/  William H. Narwold*
MOTLEY RICE LLC
William H. Narwold
Michael J. Pendell
20 Church St., 17th Floor
Hartford, CT 06103
Telephone: 860/882-1681

860/882-1682 (fax)
bnarwold@motleyrice.com
mpendell@motleyrice.com

MOTLEY RICE LLC
Joseph F. Rice
Joshua C. Littlejohn
Meredith B. Weatherby
Annie E. Kouba
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: 843/216-9000
843/216-9450 (fax)
jrice@motleyrice.com
jlittlejohn@motleyrice.com
mweatherby@motleyrice.com
akouba@motleyrice.com


BY:   _/s/  Patrick J. Coughlin_ (by permission)
ROBBINS GELLER RUDMAN & DOWD LLP
Patrick J. Coughlin
Randi Bandman
30 Vesey Street, Suite 200
New York, NY 10007
Telephone: 212/693-1058
patc@rgrdlaw.com
randib@rgrdlaw.com

ROBBINS GELLER RUDMAN& DOWD LLP
David W. Mitchell
Brian O. O'Mara
Lonnie A. Browne
600 West Broadway
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
davidm@rgrdalw.com
bomara@rgrdlaw.com
lbrowne@rgrdlaw.com

ROBBINS GELLER RUDMAN& DOWD LLP
Samuel H. Rudman
Vincent M. Serra
58 South Service Road, Suite 200
Melville, NY 11747

Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
vserra@rgrdlaw.com


BY:   */s/ Thomas A. Dubbs* (by permission)
LABATON SUCHAROW LLP
Thomas A. Dubbs
Louis Gottlieb
Thomas G. Hoffman, Jr.
James Ostaszewski
140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)
tdubbs@labaton.com
lgottlieb@labaton.com
thoffman@labaton.com
jostaszewski@labaton.com


*Attorneys for Lead Plaintiffs City of Providence, Rhode Island, Plumbers and Pipefitters National Pension Fund, Employees' Retirement System of the Government of the Virgin Islands, and State-Boston Retirement System*

27