UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                     :

IN RE                           :
                     :

BARCLAYS LIQUIDITY CROSS AND HIGH    :         14-MD-2589 (JMF)
FREQUENCY TRADING LITIGATION        :
                     :       OPINION AND ORDER

*This Document Relates to All Remaining Open Actions*  :
(14-CV-2811, 14-CV-3133, and 14-CV-3608)    :
                     :
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      In this multidistrict litigation, familiarity with which is presumed, investors allege that

seven stock exchanges (the "Exchanges") are violating the federal securities laws by providing

services to high-frequency trading ("HFT") firms in a way that amounts to actionable "market

manipulation."  In particular, the investors argue that by providing (or selling) HFT firms

services that allow those firms to execute allegedly harmful trading strategies more successfully

(thus harming the investors), the Exchanges have engaged in conduct that adds up to an unlawful

manipulative scheme under Securities and Exchange Commission ("SEC") Rule 10b-5 and are

therefore liable under Section 10(b) of the Securities Exchange Act of 1934.  In 2015, this Court

dismissed each of the consolidated cases in its entirety.  (Of particular relevance here, the Court

found that the Exchanges' alleged conduct did not rise to the level of unlawfully "manipulative"

acts and that the Exchanges were protected from these lawsuits by a quasi-governmental

immunity.)  After some (but not all) of the plaintiffs appealed the dismissal of some (but not all)

of their claims, the Court of Appeals ruled in favor of those plaintiffs and remanded to this Court

for further consideration.  The remaining defendants — the Exchanges — now move to dismiss

what remains of the cases, renewing several of their original arguments.  Given the Court of

Appeals' ruling, and the standards applicable at this stage of the litigation, the Court concludes

that Plaintiffs allege sufficient facts to survive the Exchanges' renewed motion to dismiss.

Accordingly, the Court denies Defendants' motion.

## BACKGROUND

The following facts are drawn from the allegations in the Second Consolidated Amended

Complaint ("SAC" or the "Complaint") — which the Court must accept as true for purposes of

this Rule 12(b)(6) motion — and the "other sources courts ordinarily examine when ruling on

Rule 12(b)(6) motions to dismiss," including documents attached to the Complaint, statements or

documents incorporated into the Complaint by reference, and matters of which judicial notice

may be taken. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

In four actions originally filed in this District, various investors (collectively, "Plaintiffs")

brought claims under Sections 6(b) and 10(b) of the Securities Exchange Act of 1934 (the

"Exchange Act"), 15 U.S.C. § 78a *et seq.*, against (as relevant here) seven stock exchanges —

BATS Global Markets, Inc., Chicago Stock Exchange, Inc., Direct Edge ECN, LLC, New York

Stock Exchange, LLC, NYSE Arca, Inc., Nasdaq OMX BX, Inc., and the Nasdaq Stock Market

LLC (collectively, the "Exchanges") — and two Barclays entities, Barclays PLC and Barclays

Capital, Inc. (collectively, "Barclays").[1]  In a fifth action filed in the Central District of

California and later consolidated here by the Judicial Panel on Multidistrict Litigation ("JPML"),

Plaintiff Great Pacific Securities ("Great Pacific") brought California-law claims against

Barclays.[2]

The Court has already summarized the facts relevant to these lawsuits and, thus, will not

repeat them at great length here.  *See In re Barclays Liquidity Cross & High Frequency Trading

Litig.* ("*In re Barclays LX*"), 126 F. Supp. 3d 342, 348-53 (S.D.N.Y. 2015).  Of particular

---

[1]      Case Nos. 14-CV-2811, 14-CV-3133, 14-CV-3608, and 14-CV-4321.

[2]      Case No. 15-CV-168.

relevance to the claims that remain are three services that the Exchanges sell to HFT firms: proprietary data feeds, "co-location" services, and "complex order types."

The proprietary data feeds at issue here are certain "enhanced" or "direct" data feeds that the Exchanges offer as a subscription service to certain customers. *See* Docket No. 252 in 14-CV-2811 ("SAC"), ¶¶ 118-31. In general, they provide better or faster (or better *and* faster) data to customers who are willing to pay extra for it. All investors seeking to trade on the Exchanges have access (as they must) to a "consolidated" data feed that includes (1) the price at which the latest sale of each stock traded on the Exchanges occurred, the size of that sale, and the exchange on which it took place; (2) the current highest bid and lowest offer for each stock traded on the Exchanges, along with the number of shares available at those prices; and (3) the highest bid and lowest offer currently available across all the Exchanges and the exchange or exchanges on which those prices are available. *See In re Barclays LX*, 126 F. Supp. 3d at 349. Customers who pay for enhanced and direct data feeds receive more information, more quickly: Some such data feeds, for example, offer access to a greater "depth[] of order book information," meaning that instead of the single best bid and offer for a given stock on a given exchange, an exchange may provide information about *every* bid and offer for a given stock through an enhanced data feed. SAC ¶ 126. Further, because the Exchanges transmit these enhanced data feeds directly to subscribers, those subscribers typically receive the data (including the "core" data included in the consolidated feed) *before* the consolidated feed — which must first assemble information out of the raw data received from each contributing exchange — reaches other investors. SAC ¶¶ 118, 124.

Next, "co-location" services involve the Exchanges' practice of selling HFT firms the right to place their servers in close physical proximity to the Exchanges' own servers. By shortening the physical distance that trading signals have to travel, HFT firms are able to send

trading signals to the Exchanges at faster speeds.  SAC ¶¶ 108-09.

Finally, the Exchanges offer customers certain complex "order types," which are "preprogrammed commands" that instruct an exchange how to handle a customer's buy and sell orders.  More familiar, and standard, order types might instruct an exchange simply to execute a trade at the current market price (a "market order"), or to buy at or below — or sell at or above — a particular price (a "limit order").  Complex order types, by contrast, can involve more involved and customized steps.  For example, a "hide-and-light" order, once placed, remains hidden from all observers on a given exchange — until, that is, the stock that is the subject of the order reaches a particular price, at which point the "hide-and-light" order "lights," appearing at the front of the order queue just in time to execute a trade at that price before other limit orders that may have lost their place in line as the price moved away from them.  SAC ¶¶ 136, 152-56; *In re Barclays LX*, 126 F. Supp. 3d at 351-52.

The gravamen of Plaintiffs' Section 10(b) claim is that the Exchanges developed these products and services, sold them to HFT firms — whose technology enabled them to employ the services in allegedly manipulative schemes at investors' expense — and failed to fully disclose these facts to those investors, including Plaintiffs.  Plaintiffs allege that, as a result, they were induced to trade based on artificial price signals, only to see their trades execute at worse prices than advertised, and that the Exchanges' role in that overall scheme makes them liable to Plaintiffs under Section 10(b) and Rule 10b-5.  *In re Barclays LX*, 126 F. Supp. 3d at 353-54.[3]

In 2015, this Court dismissed Plaintiffs' claims in their entirety.  *See In re Barclays LX*,

---

[3]    Another feature of the Exchanges' fee structure — the so-called "maker-taker" model by which the Exchanges charge a small fee to the party who "takes" liquidity in a given trade and pays a small rebate to the party who "makes" liquidity — is the subject of some discussion in the SAC.  *See, e.g.*, SAC ¶¶ 49-51.  Plaintiffs, however, expressly abandoned any claim for relief based on that feature.  *See In re Barclays LX*, 126 F. Supp. 3d at 351 n.1.

126 F. Supp. 3d at 355-75.  The Court dismissed all claims against the Exchanges on the alternative and overlapping grounds that (1) the Exchanges were absolutely immune from liability for the conduct alleged, *id.* at 355-60; (2) Plaintiffs had failed to plead a manipulative act under Section 10(b) or any "primary" (as opposed to secondary, or "aiding-and-abetting") violations of the statute, *id.* at 361-62; and (3) Section 6(b) does not provide a right of action to private plaintiffs, *id.* at 362-63.  The Court dismissed all of Plaintiffs' claims against Barclays on the grounds that (as with the Exchanges) Plaintiffs had failed to plead any manipulative acts or "primary" violations by Barclays, *id.* at 364, and, alternatively, that Plaintiffs had not adequately alleged any reasonable reliance on Barclay's alleged misrepresentations, *id.* at 365-66.  Finally, the Court dismissed Great Pacific's state-law claims against the Exchanges *and* Barclays for failure to state a plausible claim for relief.  *Id.* at 367-75.

Plaintiffs appealed the dismissal of their Section 10(b) claims — but not the dismissal of their Section 6(b) claims — against the Exchanges.  *See City of Providence, R.I. v. BATS Global Mkts, Inc.*, 878 F.3d 36, 43 n.3 (2d Cir. 2017), *cert. denied*, 139 S. Ct. 341 (2018).  Nor did Plaintiffs appeal the dismissal of any of their claims against Barclays.  *Id.* at 40 n.2.  (Great Pacific, which had brought claims only against Barclays, did not appeal at all — at least not in this Circuit.  *See* Docket No. 56.)[4]  The Court of Appeals vacated the Court's judgment dismissing Plaintiffs' claims against the Exchanges, holding that the Exchanges were *not* absolutely immune from liability for the conduct alleged, *City of Providence*, 878 F.3d at 45-48;

---

[4]     The Court granted Great Pacific leave to amend its Complaint, 126 F. Supp. 3d at 375-76, but because the Court's disposition left Great Pacific's action as the only one remaining in the MDL, the Court recommended — and the JPML ordered — that Great Pacific's action be remanded to the Central District of California.  *See* Docket No. 54; Docket No. 45 in No. 15-CV-168; *see Great Pac. Secs. v. Barclays PLC*, No. 14-CV-1210 (DSF) (C.D. Cal. Oct. 13, 2015).  That Court eventually dismissed Great Pacific's Amended Complaint, *see Great Pac. Secs. v. Barclays PLC*, No. 14-CV-1210 (DSF) (SHX), 2016 WL 11502178 (C.D. Cal. Oct. 19, 2016), *aff'd sub nom. Great Pac. Secs. v. Barclays Capital, Inc.*, 743 Fed. App'x 780 (9th Cir. 2018).

that Plaintiffs had adequately pled manipulative acts under Section 10(b), *id.* at 49-51; and that

those allegations amounted to a "primary violation" of the statute, *id.* at 51-52.  The Court of

Appeals did not, however, address any of the Exchanges' remaining arguments for dismissal, *id.*

at 52, which this Court had not addressed in its earlier decision,  *see In re Barclays LX*, 126 F.

Supp. 3d at 361 n.6.  Instead, the Circuit remanded the case for further proceedings, leaving it to

this Court to consider those arguments in the first instance.  *City of Providence*, 878 F.3d at 52.

Notably, given Plaintiffs' choice not to appeal the dismissal of their Section 6(b) claims against

the Exchanges, and both Plaintiffs' and Great Pacific's choice not to appeal the dismissal of their

claims against Barclays, the case returns to this Court in slimmer form.  In particular, two of the

member cases (14-CV-4321 and 15-CV-168) remain dismissed and closed, while neither Great

Pacific nor Barclays remain as parties to any of the consolidated cases.[5]  All that remains of the

three surviving member cases (14-CV-2811, 14-CV-3133, and 14-CV-3608) and the Complaint

are Plaintiffs' Section 10(b) claims against the Exchanges — which the Exchanges now move,

once again, to dismiss.  Docket No. 82.

## LEGAL STANDARDS

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all facts

set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See*,

*e.g.*, *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018); *see*

*also Tellabs*, 551 U.S. at 322.  A claim will survive a Rule 12(b)(6) motion, however, only if the

plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face."  *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the

---

[5]      Första AP-fonden, a Swedish national pension fund, was a plaintiff in the initial
proceeding before this Court, but was later dismissed from the appeal on its own motion, *see*
Docket No. 70, No. 15-3057 (2d Cir. Jan. 8, 2016), and is no longer a party here, *see* Docket No.
88 ("2018 Conference Tr."), at 4.

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555. If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570. In addition, "[b]ecause a claim for market manipulation is a claim for fraud," certain elements of such a claim "must be pled with particularity under Rule 9(b)" of the Federal Rules of Civil Procedure, although because such claims "can involve facts solely within the defendant's knowledge . . . , at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101-02 (2d Cir. 2007).

## DISCUSSION

To the extent relevant here, Section 10(b) of the Exchange Act makes it unlawful "for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). The SEC has promulgated Rule 10b-5, which makes it "unlawful for any person, directly or indirectly," "in connection with the purchase or sale of any security," to (1) "employ any device, scheme, or artifice to defraud," (2) "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading," or (3) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5; *see City of Providence*, 878 F.3d at 48. A

person who violates Rule 10b-5 is subject to civil liability under Section 10(b).  *Halliburton Co.*

*v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).  To state a valid private Section 10(b)

claim under a Rule 10b-5 market-manipulation theory of liability, a plaintiff must adequately

allege "(1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an

efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of

securities; (6) furthered by the defendant's use of the mails or any facility of a national securities

exchange."  *Fezzani v. Bear, Stearns & Co.*, 716 F.3d 18, 22 (2d Cir. 2013) (internal quotation

marks omitted).

     The Exchanges argue that Plaintiffs fail to establish several of the foregoing elements.  In

addition, they contend that the Court lacks jurisdiction because Plaintiffs' allegations do not

establish that they have Article III standing to bring their claims.  The Court will discuss each

argument in turn, beginning — as it must — with Article III standing.  *See, e.g.*, *Lance v.*

*Coffman*, 549 U.S. 437, 439 (2007) (per curiam).

## A.    Article III Standing

     The Exchanges argue that Plaintiffs lack Article III standing to bring this suit.  *See*

Docket No. 82 ("Exchanges' Mem."), at 6-7.  Although Plaintiffs protest that standing "should

not be raised now" because the Exchanges did not raise it in their earlier motion to dismiss, *see*

Docket No. 86 ("Pls.' Mem."), at 17, Article III standing is jurisdictional and therefore "not

subject to waiver."  *Lewis v. Casey*, 518 U.S. 343, 349 n.1 (1996).  Not even the Exchanges'

concession that Plaintiffs allege an adequate injury in fact, *see* Docket No. 46 ("2015 Oral Arg.

Tr."), at 19-20, can relieve the Court of its independent obligation to "determine that [it has]

jurisdiction before proceeding to the merits," *Lance*, 549 U.S. at 439; *see also Alliance for Envt'l*

*Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87 (2d Cir. 2006).

At the pleading stage, a plaintiff must satisfy the "irreducible constitutional minimum" of Article III standing by "clearly alleg[ing] facts demonstrating" that the plaintiff has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (internal quotation marks omitted).[6]  Here, Plaintiffs easily satisfy the second and third elements.  If Plaintiffs' allegations are true, then their injury is plainly "fairly traceable" to the Exchanges' conduct and a favorable decision would provide some relief, whether in the form of damages or an injunction.  The closer question, which is the basis for the Exchanges' motion, is whether Plaintiffs adequately allege an injury in fact.

At this stage of the litigation, "general factual allegations of injury resulting from the defendant's conduct may suffice."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *see John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (describing Article III's injury-in-fact requirement as a "low threshold," meant to "ensure that the plaintiff has a personal stake in the outcome of the controversy" (internal quotation marks omitted)).  And Plaintiffs' allegations are indeed "general": They do not allege that they transacted in any particular security at any particular price, "or how that price was supposedly affected by the alleged manipulation."  Exchanges' Mem. 6.  Instead, they combine several general allegations to establish that they paid too much (or received too little) in some number of stock trades: first, that the Exchanges engaged in conduct that distorted stock prices; second, that the distortions were so pervasive and routine that anyone who traded in stocks listed on those exchanges almost

---

[6]     In reviewing the Exchanges' motion to dismiss for lack of Article III standing pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, the Court applies the same standard as to a motion under Rule 12(b)(6) and relies on the same materials, except that it may also rely on "non-conclusory, non-hearsay statements outside the pleadings" that would only be admissible in the Rule 12(b)(6) context if they were incorporated within or integral to the complaint.  *M.E.S., Inc. v. Snell*, 712 F.3d 666, 671 (2d Cir. 2013).

certainly would have done so at a distorted price; and third, that Plaintiffs were such routine traders on the Exchanges that they necessarily suffered whatever losses were common to the Exchanges' customers during that period.  Plaintiffs thus seek to establish Article III standing based on "a likelihood of past injury," *John*, 858 F.3d at 738, inferred both from their theory of how the Exchanges' conduct harmed non-HFT customers and the fact that they were among those non-HFT customers for the relevant period of time.

The Exchanges point out, not unreasonably, that because Plaintiffs' theory relies on an inference of harm from unspecified trading at unspecified prices, Plaintiffs might have occasionally *benefited* from the Exchanges' alleged manipulation by buying lower or selling higher than they otherwise would have.  *See* Exchanges' Mem. 6-7.  And at a deeper level, Plaintiffs do not (yet) establish that any "inflated" or "depressed" prices at which they may have traded to their apparent detriment were actually "worse," from Plaintiffs' perspective, compared to what those prices would have been absent the Exchanges' conduct.  But "the mere fact 'that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing.'"  *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 53 (S.D.N.Y. 2016) (quoting *Ross v. Bank of Am. N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008)).  And, although Plaintiffs may face an uphill battle in proving any harm at all, in confirming its Article III jurisdiction at the pleading stage, the Court's task is to evaluate the allegations of injury in fact in Plaintiffs' complaint, not to predict the viability of their ultimate claim for damages.  *See In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 549-50 (S.D.N.Y. 2016).  Thus, neither the possibility that Plaintiffs may have occasionally found themselves on the right side of any allegedly "manipulated" prices, nor the potential difficulties they may face in proving and quantifying actual harm even where they wound up on

the wrong side, would defeat Plaintiffs' Article III standing if they otherwise allege a sufficient injury in fact.

Second Circuit precedent compels the Court to conclude that Plaintiffs do allege a sufficient injury in fact.  In *John*, the Second Circuit confronted a situation not unlike this one: The plaintiff had incorporated into his complaint a New York City Department of Consumer Affairs press release stating that "89 percent of Whole Foods' pre-packaged products tested by the [Department] were mislabeled" and that "the mislabeling was systematic and routine."  858 F.3d. at 736 (internal quotation marks omitted).  In addition, the plaintiff alleged that "he made monthly purchases of Whole Foods pre-packaged cheese and cupcakes." *Id.*  The district court dismissed the complaint, holding that the plaintiff had "failed adequately to allege that he *personally* overpaid for any specific purchase," and thus had failed to allege a sufficient injury in fact.  *Id.* at 737; *see In re Whole Foods Mkt. Grp., Inc. Overcharging Litig.*, 167 F. Supp. 3d 524, 535-37 (S.D.N.Y. 2016).  The Second Circuit disagreed, reiterating that "general factual allegations of injury may suffice" to establish injury in fact because, at the motion-to-dismiss stage, courts must "presume that general allegations embrace those specific facts that are necessary to support the claim."  *John*, 858 F.3d at 737 (alterations omitted) (citing *Lujan*, 504 U.S. at 561).  Thus, to satisfy Article III, a plaintiff "need only generally allege facts that, accepted as true, make his alleged injury plausible." *Id.*  The *John* court thus held that it is possible for a plaintiff to satisfy the injury-in-fact requirement "with plausible allegations of a likelihood of past injury" — in that case, "by pleading both the frequency of [the plaintiff's] purchases and the systematic overcharging of pre-packaged foods at the Whole Foods stores he patronized." *Id.* at 738.

Although it is a close question, Plaintiffs here satisfy the standard established in *John*. They plausibly allege both (1) that they were sufficiently frequent purchasers on the Exchanges

and (2) that they were systematically victimized by distorted prices. *See* SAC ¶¶ 21-25, 237-51. Under the *John* standard, those suffice as "plausible allegations of a likelihood of past injury" and thus satisfy Article III. *John*, 858 F.3d at 738. Indeed, it is not only "plausible," but actually fairly certain that if the scheme Plaintiffs allege had the effects they suggest, then they traded at artificially "manipulated" prices at some point during the period covered by the SAC. True enough, Plaintiffs here "may ultimately be unable to show [that they were] injured under the more demanding standards applicable at summary judgment or trial," and therefore "face[] what may be significant evidentiary obstacles on the merits." *Id.* at 737. But requiring that Plaintiffs allege a specific trade at a specific price manipulated to their detriment "ultimately amounts to a demand for specifics that are not required, and that Plaintiffs could not be reasonably expected to know, at the pleading stage." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 595 (S.D.N.Y. 2015). Instead, "[t]aking [their] allegations as true and drawing all reasonable inferences in [their] favor," Plaintiffs' allegations that they were frequent purchasers in an environment of systematic overcharging make it "plausible" that they "overpaid for at least one" stock. *John*, 858 F.3d at 737. Thus, they demonstrate an adequate injury in fact for purposes of Article III standing.[7]

---

[7]    The Exchanges argue that Plaintiffs assert only a "generalized grievance" because virtually all non-HFT participants in the U.S. stock markets would have suffered the same injuries as Plaintiffs. Docket No. 87 ("Exchanges' Reply"), at 1-2 & n.1. But this argument misses the point of the prohibition on "generalized grievances": a grievance is "generalized," and thus does not suffice as an injury for standing purposes, if it is "undifferentiated and common to all members of the public." *Lujan*, 504 U.S. at 575 (internal quotation marks omitted). By contrast, where a plaintiff has suffered a particularized (as opposed to "undifferentiated") injury, standing is not defeated merely because the class of persons who might have suffered the same injury is substantial. *Spokeo*, 136 S. Ct. at 1548 n.7.

**B.      The Merits**

With that, the Court turns to the Exchanges' arguments with respect to the merits of Plaintiffs' claims.  In doing so, however, the Court is not writing on a blank slate: In its decision on appeal, the Second Circuit held that Plaintiffs have "sufficiently pled that the [E]xchanges created a fraudulent scheme that benefited HFT firms and the [E]xchanges, sold the products and services at rates that only the HFT firms could afford, and failed to fully disclose to the investing public how those products and services could be used on their trading platforms." *City of Providence*, 878 F.3d at 52.  That holding is obviously binding on this Court and, thus, conclusively resolves whether Plaintiffs adequately allege the first element of a Section 10(b) market-manipulation claim: that the Exchanges engaged in "manipulative acts." *See ATSI Commc'ns*, 493 F.3d at 101.[8]  The Court of Appeals left the remaining issues for renewed consideration on remand, and the Exchanges now advance six categories of such arguments, which track the elements of a Section 10(b) claim: (1) statutory "standing" (which, despite its name, is properly understood as an argument going to the merits of a claim, rather than a jurisdictional "standing" inquiry); (2) reliance; (3) loss causation; (4) scienter; (5) particularity; and (6) preemption or preclusion.  The Court will address each one in turn.

---

[8]      Along similar lines, the Exchanges contend that the law-of-the-case doctrine calls for dismissal of Plaintiffs' claims because this Court dismissed Plaintiffs' claims against Barclays for failure to plead adequate reliance and Plaintiffs did not appeal that ruling. *See* Exchanges Mem. 9-10; *In re Barclays LX*, 126 F. Supp. 3d at 365-66.  The Court is unpersuaded.  As discussed below, there are material differences between Plaintiffs' former claims against Barclays and their claims against the Exchanges.  In any event, if the Court's ruling as to Barclays applies with equal force to the Exchanges, there is no need to rely on the law-of-the-case doctrine; if the ruling does not, then there is good reason not to rely on the law-of-the-case doctrine, which, after all, "does not rigidly bind a court to its former decisions, but is only addressed to its good sense." *Colvin v. Keen*, 900 F.3d 63, 68 (2d Cir. 2018) (internal quotation marks omitted).

### 1.      Statutory "Standing"

First, the Exchanges argue that Plaintiffs lack statutory "standing" to assert their Section 10(b) claims.  Exchanges' Mem. 7-8.  Courts now recognize that "what has been called 'statutory standing' in fact is not a standing issue" in the Article-III-jurisdiction sense, "but simply a question of whether the particular plaintiff has a cause of action under the statute," *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127-28 (2014)), and for the sake of clarity, the Second Circuit has dispensed with the term "statutory standing" altogether, *see, e.g.*, *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 111 (2d Cir. 2018).[9]  Instead, certain statutes require courts to engage in a familiar *merits* inquiry — at bottom, an exercise in statutory interpretation — to determine "who can sue" under the statute.  *Klein*, 906 F.3d at 221. Put differently, some causes of action are designed to redress the injuries of only certain plaintiffs, requiring courts to determine, as an element of the cause of action, whether the plaintiff before the court falls within that category of plaintiffs.

In an early effort to define the scope of its cause of action for private plaintiffs, the Second Circuit explained that Section 10(b) is "directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities rather than at fraudulent mismanagement of corporate affairs, and that [Rule 10b-5] extended protection only to the defrauded purchaser or seller." *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461, 464 (2d Cir. 1952).  The Supreme Court eventually adopted precisely that rule, holding that "one

---

[9]      To be sure, the bulk of Second Circuit authority directly on point — *i.e.*, that which concerns Section 10(b) and Rule 10b-5 — speaks in terms of "statutory standing."  But this is a function of the relative age of those cases (pre-2014), and the Court has no doubt that if they "had been written after the 2014 *Lexmark* decision, [they] would surely not have used 'standing' in describing the object of [their] analysis."  *Klein on behalf of Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 222 (2d Cir. 2018).

asserting a claim for damages" under Section 10(b) "must be either a purchaser or seller of securities." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749 (1975).

Subsequent case law in the Second Circuit has led to some uncertainty about the precise limits of Section 10(b)'s cause of action.  For example, despite the Second Circuit's apparent holding that "[s]tockholders do not have standing to sue under Section 10(b) and Rule 10b-5 when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase," *Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*, 369 F.3d 27, 34 (2d Cir. 2004), the Court has since clarified that it is *not* the case that "an action under Rule 10b-5 for false statements about a security purchased by the plaintiff lies only against the issuer of the security, or that only statements about a security issuer are actionable," *In re NYSE Specialists Secs. Litig.*, 503 F.3d 89, 102 (2d Cir. 2007).  Despite those ripples in the case law, however, the Court concludes that the scope of the Section 10(b) private action has not substantially changed since the Second Circuit first described it: Section 10(b) and Rule 10b-5 "extend[] protection only to the defrauded purchaser or seller" of securities.  *Birnbaum*, 193 F.2d at 464.  In order to establish that they are among those that the cause of action is designed to protect, that is, Plaintiffs must "allege that . . . [they fall] within either class."  *Id.*; *accord Blue Chip Stamps*, 421 U.S. at 749.  Because they do so, *see* SAC ¶¶ 21-25, Plaintiffs are among those who may assert a cause of action under Section 10(b).

### 2.     Reliance

Next, the Exchanges argue that Plaintiffs fail to adequately allege that they relied on the Exchanges' manipulative conduct.  Exchanges' Mem. 8-11.  "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action. It ensures that, for liability to arise, the requisite causal connection between a defendant's

misrepresentation and a plaintiff's injury exists as a predicate for liability." *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008) (internal quotation marks omitted).  Accordingly, to survive a motion to dismiss their market-manipulation claim, Plaintiffs must successfully allege that their losses were "caused by reliance on an assumption of an efficient market free of manipulation." *ATSI Commc'ns*, 493 F.3d at 101.  They can do so either by plausibly alleging actual, reasonable reliance on that assumption or, if applicable, through a rebuttable presumption of such reliance.  *See Waggoner v. Barclays PLC*, 875 F.3d 79, 93-94 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702 (2018).  Plaintiffs argue that they plausibly allege actual reliance and that they are also entitled to rely on two such presumptions: the "*Affiliated Ute*" presumption that a plaintiff injured by a defendant's failure to disclose material facts reasonably relied on the absence of those facts, *see id.* at 93 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S 128 (1972)), and a novel "integrity-of-the-market" presumption which would entitle *all* Plaintiffs in market-manipulation cases to a presumption that they relied on a market free from manipulation, *see* Pls.' Mem. 13-14.

The Court agrees that Plaintiffs are entitled to rely on the *Affiliated Ute* presumption and, thus, does not reach Plaintiffs' alternative arguments.  It is true, as Defendants stress, *see* Exchanges' Mem. 9, that the Ninth Circuit has held that *Affiliated Ute* does not apply to market-manipulation cases.  *See Desai v. Deutsche Bank Secs. Ltd.*, 573 F.3d 931, 940-41 (9th Cir. 2009) (per curiam).  Substantially for the reasons set forth by Judge McKenna in *In re UBS Auction Rate Secs. Litig.*, No. 08-CV-2967 (LMM), 2010 WL 2541166 (S.D.N.Y. June 10, 2010), however, the Court declines to follow *Desai*.  *See also In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 495-96 (S.D.N.Y. 2009) (reaching the same conclusion); *cf. Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) (departing from *Desai* by eschewing a rigid distinction between "manipulation" claims, on the one hand, and "misrepresentation" and

"nondisclosure" claims, on the other).  As the Second Circuit has opined, "[w]hat is important"
in this context "is to understand the rationale for a presumption of causation in fact in cases like
*Affiliated Ute*, in which no positive statements exist: reliance as a practical matter is impossible
to prove."  *Wilson v. Comtech Telecommc'ns Corp.*, 648 F.2d 88, 93 (2d Cir. 1981).  To
determine whether the presumption applies, therefore, a court must engage in a "context-
specific" inquiry, "bearing in mind that the *Affiliated Ute* presumption . . .  exists in the first
place to aid plaintiffs when reliance on a negative would be practically impossible to prove" and
"analyz[ing] the complaint to determine whether the offenses it alleges can be characterized
primarily as omissions or misrepresentations."  *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir.
2000) (internal quotation marks omitted), *abrogated on other grounds by California Pub.
Employees' Ret. Sys. v. ANZ Secs., Inc.*, 137 S. Ct. 2042 (2017); *see In re UBS Auction Rate
Secs. Litig.*, 2010 WL 2541166, at *26 (following *Joseph*).

Sensitive as that analysis may be in other cases, *see Joseph*, 223 F.3d at 1162, it is
straightforward here, as the Second Circuit has already held that Plaintiffs' claim is premised on
the Exchanges' "fail[ure] to fully disclose" how HFT firms could use certain products and
services on the Exchanges' trading platforms.  *City of Providence*, 878 F.3d at 52.[10]  That is, the
Court of Appeals has resolved the question whether this case "involv[es] primarily omissions" in
the affirmative.  It therefore falls within the category of cases to which the *Affiliated Ute*
presumption may apply at this stage of the litigation.  *See Waggoner*, 875 F.3d at 93 & n.24.

---

[10]    More specifically, Plaintiffs point to two specific omissions: first, that the Exchanges' co-
location services and proprietary feeds allowed HFT firms to "front-run" Plaintiffs' trades,
Docket No. 26 ("Pls.' Omnibus Mem."), at 55-56; *see City of Providence*, 878 F.3d at 41-43, and
second, that the Exchanges' complex order types allowed HFT firms to "detect investors' trading
patterns, jump ahead of them in the exchange's order book queue, and trade in front of them to
[Plaintiffs'] detriment," Pls.' Omnibus Mem. 56; *see City of Providence*, 878 F.3d at 43.

That excuses Plaintiffs from offering direct proof (or, at the pleading stage, allegations) of reliance "if there is an omission of a material fact by one with a duty to disclose." *Stoneridge Investment Partners, LLC*, 552 U.S. at 159. The Second Circuit has not yet decided whether "the act of market manipulation itself triggers a duty to disclose," *Levitt v. J.P. Morgan Secs., Inc.*, 710 F.3d 454, 467 n.9 (2d Cir. 2013), and, as the Exchanges point out, *see* Exchanges' Mem. 9, it is doubtful that exchanges owe any freestanding fiduciary duties to investors who trade on their platforms, *see, e.g.*, *Arneil v. Ramsey*, 414 F. Supp. 334, 343 (S.D.N.Y. 1976); *Piemonte v. Chi. Bd. Options Exch., Inc.*, 405 F. Supp. 711, 718 n.4 (S.D.N.Y. 1975). But that is neither here nor there because "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014); *accord Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002) (noting that "the lack of an independent duty is not, under such circumstances, a defense to Rule 10b-5 liability" because, "upon choosing to speak," one acquires a "duty to be both accurate and complete"). And here, the Exchanges concede that they did speak to the market about the services at issue. *See, e.g.*, Exchanges' Mem. 13 ("[T]he Exchanges publicly disclosed the existence of these products and services."); *id.* at 21 (citing the Exchanges' publicly available rules). And finally, as the Court of Appeals effectively held already, the Exchanges' alleged omissions were material. *See City of Providence*, 878 F.3d at 50 (accepting as true, at the pleading stage, that "the [E]xchanges failed to disclose or omitted material facts to the investing public concerning these products and services").

At this stage, therefore, the Court must and does conclude that Plaintiffs are entitled to a presumption that they reasonably relied on the Exchanges' alleged manipulative acts. Of course, the *Affiliated Ute* "presumption . . . is just that and can be rebutted by appropriate evidence." *Amgen, Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 462 (2013) (internal

quotation marks and alterations omitted).  In other words, the Court's conclusion here is not the same thing as a conclusive finding that Plaintiffs *actually* relied on the conduct at issue; instead, it is a recognition that requiring more direct proof of such reliance at the pleading stage would be unrealistic.  As this case proceeds, the Exchanges will have an opportunity to rebut the presumption by "prov[ing] by a preponderance of the evidence that [Plaintiffs] did not rely on the omission[s] at issue" in making their investment decisions.  *Waggoner*, 875 F.3d at 102 (internal quotation marks and alterations omitted).  They may — or may not — be able to do so, but that is a question for another day.

3.      **Loss Causation**

Plaintiffs also adequately allege "loss causation."  "Loss causation" describes the "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). The Second Circuit has "described loss causation in terms of the tort-law concept of proximate cause, *i.e.*, that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission," and clarified that "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172-73 (2d Cir. 2005) (internal quotation marks omitted).  At the pleading stage, a plaintiff's allegations must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

Applying that standard here, the Court concludes that Plaintiffs plausibly allege that the Exchanges' alleged misconduct was *a* proximate cause of the economic loss they suffered by trading in the manipulated securities markets hosted on the Exchanges' platforms.  The Court

finds, without much hesitation, that the zone of foreseeable risk created by the Exchanges'

allegedly manipulative scheme included the risk that investors trading on the Exchanges'

platforms would be victimized by the very products and services that the scheme allegedly

concealed.  Given the role of the HFT firms in the chain of events leading to Plaintiffs' alleged

losses, the Exchanges' conduct may not be (and surely, in the final analysis, would not be) the

*only* proximate cause of Plaintiffs' injuries.  But "it is fundamental that there may be more than

one proximate cause of an injury," *Moore v. M.P. Howlett, Inc.*, 704 F.2d 39, 43 (2d Cir. 1983);

*see also New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 622 & n.54 (S.D.N.Y.

2019), and it would be unsurprising if the complex manipulative scheme alleged here included

several proximate causes of injury.  Most importantly, by alleging that the Exchanges' omissions

at least concealed certain risks (for example, HFT firms' ability to use the concealed complex

order types to jump trading queues) that led to Plaintiffs' losses, *Lentell*, 396 F.3d at 175,

Plaintiffs plausibly establish that the Exchanges' conduct was among them, and provide the

Exchanges with enough of an "indication of the loss and the causal connection that [Plaintiffs

have] in mind" to survive this motion to dismiss.  *Dura Pharmaceuticals*, 544 U.S. at 347.

### 4.    Particularity

"Because a claim for market manipulation is a claim for fraud, it must be pled with

particularity under Rule 9(b)" of the Federal Rules of Civil Procedure, but because such a claim

"can involve facts solely within the defendant's knowledge . . . , at the early stages of litigation,

the plaintiff need not plead manipulation to the same degree of specificity as a plain

misrepresentation claim."  *ATSI Commc'ns*, 493 F.3d at 101-02.  Plaintiffs' omissions-focused

manipulation claim fits comfortably in the class of claims that "involve facts solely within the

defendant's knowledge," and thus qualifies for the relaxed particularity requirement

contemplated by *ATSI Communications*.  Under that standard, "a manipulation complaint must

plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *Id.* at 102. Plaintiffs' Complaint — which includes allegations that the Exchanges developed certain specialized services that they knew would be useful to HFT firms, *e.g.* SAC ¶ 140; that they marketed those services to HFT firms at prices other investors could not afford, *e.g.* SAC ¶ 98, 107; that they selectively disclosed the existence and nature of those services in order to conceal their true nature from Plaintiffs, *e.g.* SAC ¶ 138, 140; and that they did all this to induce Plaintiffs to trade on their platforms, thereby financially benefiting the Exchanges, *e.g.* SAC ¶ 145 — does just that.

     **5.**     **Scienter**

     Similarly, Plaintiffs easily satisfy the scienter requirement for a Section 10(b) claim. Establishing scienter in this context "requires a showing of intent to deceive, manipulate, or defraud" or "reckless conduct." *ATSI Commc'ns*, 493 F.3d at 99 n.3 (internal quotation marks omitted). Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a private Section 10(b) plaintiff must allege enough to raise a "strong inference" of a defendant's scienter. 15 U.S.C. § 78u-4(b)(2). The PSLRA's heightened pleading standards apply here, too: "[T]he complaint must plead with particular[ity] facts giving rise to a strong inference that the defendant intended to deceive investors by artificially affecting the market price of securities." *ATSI Commc'ns*, 493 F.3d at 102. To satisfy that requirement, "an inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23. And the Court "must take into account plausible opposing inferences," *id.* at 323, asking whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as

any opposing inference one could draw from the facts alleged," *id.* at 324.  Importantly, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences," *id.* (internal quotation marks omitted), only "strong in light of other explanations," *id.*

Applying those standards here, the Court finds that Plaintiffs' allegations, taken collectively, raise a "cogent and compelling" inference that the Exchanges acted with scienter. Plaintiffs allege, for example, that the Exchanges developed complex order types "for and at the behest of their preferred HFT customers," knowing that those order types would permit the HFT firms to exploit the advantages conferred by other services — like co-location and enhanced data feeds — to manipulate prices and exploit Plaintiffs.  SAC ¶ 140.  Plaintiffs allege that the Exchanges came to understand the exploitative potential of this mix of services, and "began aligning their interests with those of the HFT firms, including enabling predatory HFT strategies."  SAC ¶ 145; *see also, e.g.*, SAC ¶ 162 (one exchange acted "with the specific knowledge of the adverse impact on the majority of investors whom Direct Edge deliberately kept in the dark as to the existence and full functionality" of one complex order type).  Taken together, these allegations constitute "strong circumstantial evidence of conscious misbehavior or recklessness," *ATSI Commc'ns*, 493 F.3d at 99, thereby raising the necessary "cogent and compelling" inference that the Exchanges acted with the necessary scienter, *Tellabs*, 551 U.S. at 324.

To be sure, one plausible alternative inference is that the Exchanges acted in service of a non-fraudulent motive — namely, the profit motive.  And indeed, such "allegations of a generalized motive that could be imputed to any for-profit endeavor" would fall short of establishing the "motive and opportunity" that can serve as an alternative basis for an inference of scienter.  *See Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 217 (S.D.N.Y.

2009); *In re Merrill Lynch Auction Rate Secs. Litig.*, 851 F. Supp. 2d 512, 528 (S.D.N.Y. 2012).

Having raised the inference via a showing of "strong circumstantial evidence of conscious

misbehavior or recklessness," however, the competing inference of a mere profit motive is not

enough to *defeat* the inference of scienter.  Profit, after all, is (presumably) the goal of *any*

financial fraud.  A reasonable person would, therefore, have to deem the inference of scienter

here "at least as compelling" as a hypothetical mere profit motive — or else the ever-present

profit motive would outcompete every inference of scienter premised on such "strong

circumstantial evidence," rendering the scienter requirement a virtually automatic bar to Section

10(b) liability.  Thus, whether or not Plaintiffs are ultimately able to prove that the Exchanges

acted with the necessary scienter to sustain liability under Section 10(b), Plaintiffs' allegations at

this stage raise an inference of scienter that is "cogent and at least as compelling as any opposing

inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.

      **6.**     **Preclusion**

      Finally, the Exchanges argue that Plaintiffs' Section 10(b) claim should be dismissed

now because it "conflicts with and is precluded by the Exchange Act's comprehensive regulatory

structure."  Exchanges' Mem. 15.[11]  In its opinion, the Court of Appeals reserved decision on the

question, noting that it "[could not] make this determination based on the pleadings" or on the

briefing before it.  *City of Providence*, 878 F.3d at 50 n.5.  Along similar lines, the SEC filed an

*amicus curiae* brief in the Court of Appeals, in which it maintained that "the SRO activities in

this case should be subject to a preclusion analysis," but declined to take a position on the

---

[11]     The Exchanges' argument is related to, but distinct from, their earlier argument that
Congress precluded subject-matter jurisdiction over Plaintiffs' claims by creating a
"comprehensive regulatory scheme" lodging primary jurisdiction over this subject matter in the
SEC — an argument the Court of Appeals rejected.  *See City of Providence*, 878 F.3d at 44-45.
They now focus on a "merits" question: namely, whether in light of Congressional enactments
and SEC regulations, principles of preemption and preclusion bar Plaintiffs' claims.

outcome of that analysis at this stage of the case, citing the current motion-to-dismiss posture and the parties' apparent disagreement "about whether each of the challenged practices was approved by the Commission."  Br. of the Secs. & Exch. Comm'n as Amicus Curiae 34, *City of Providence*, 878 F.3d 36 (No. 15-3057) (2d Cir. Nov. 28, 2016), ECF No. 141.

Assuming without deciding that such a preclusion analysis applies, the Court agrees that its resolution on this record would be premature.  It may well be that, on a more developed record (and perhaps with the benefit of the SEC's further views, refined in light of that record), the Court will conclude that allowing Plaintiffs' claims to proceed in this context "would defeat Congress's intent that the SEC, with its expertise in the operation of the securities markets, make the rules regulating those markets."  *Lanier v. BATS Exch., Inc.*, 838 F.3d 139, 155 (2d Cir. 2016).  But the Court declines to dismiss Plaintiffs' claim now on the basis of an argument that — in the Exchanges' description — would require the Court to evaluate the "risk that allowing the claims to proceed would produce conflicting guidance, requirements, duties, privileges, or standards of conduct."  Exchanges' Mem. 16 (internal quotation marks omitted).  Such a fact-sensitive inquiry is better left to a later stage of the litigation.

## CONCLUSION

A motion to dismiss tests "only the legal feasibility of a complaint.  The test of a claim's substantive merits is reserved for the summary judgment procedure" or, if necessary, trial.  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558 (2d Cir. 2016) (citation and internal quotation marks omitted).  Given the Court of Appeals' earlier opinion in this case, and the law governing private Section 10(b) claims, the Court concludes that Plaintiffs' allegations (taken as true, for now) have "nudged [themselves] across the line from conceivable to plausible" and, thus, are sufficient at this stage of the litigation.  *Twombly,* 550 U.S. at 570.  Accordingly, and for the reasons discussed above, the Exchanges' motion to dismiss is DENIED.  By separate order to be entered

today, the Court will schedule an initial pretrial conference at which the parties will finalize a

case management plan to govern further proceedings.

      The Clerk of Court is directed to terminate Docket No. 82.


      SO ORDERED.

Dated: May 28, 2019
      New York, New York

                                          JESSE M. FURMAN
                                  United States District Judge